Samuel Richard Rubin
Federal Public Defender
Oliver W. Loewy, IL #6197093
Teresa A. Hampton, ID #4364
Capital Habeas Unit
702 W. Idaho, Suite 900
Boise, Idaho 83702
Telephone: (208) 331-5530
Facsimile:  (208) 331-5559
ECF:  Oliver_Loewy@fd.org
        Teresa_Hampton@fd.org

Philip H. Gordon, ID #1996
Gordon Law Offices
623 Hays Street
Boise, Idaho 83702
ECF: pgordon@gordonlawoffices.com

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS E. CREECH, JAMES H. HAIRSTON,** <br> **RICHARD A. LEAVITT, GENE F. STUART,** ) <br> ) <br>                              Plaintiffs, ) <br> ) <br> v.                                           ) <br> ) <br> **BRENT REINKE,** in his official capacity as ) <br> Director, ) <br> Idaho Department Of Correction, ) <br> ) <br> **KEVIN KEMPF**, in his official capacity as ) <br> Chief, Operations Division, ) <br> Idaho Department of Correction, ) <br> ) <br> **JEFF ZMUDA,** in his official capacity as ) <br> Deputy Chief, Bureau of Prisons, ) <br> Idaho Department of Correction, ) <br> ) | **CASE NO.** <br><br> **COMPLAINT** |

**JOSH TEWALT,** in his official capacity as                )
Deputy Chief, Bureau of Prisons,                             )
Idaho Department of Correction, and                          )
                                                             )
**RANDY BLADES**, in his official capacity as                )
Warden, Idaho Maximum Security Institution,                  )
Idaho Department of Corrections.                             )
                                                             )
                            Defendants.                      )
_____                     )

### NATURE OF ACTION

1.  Plaintiffs stand sentenced to death by the State of Idaho.  This action challenges the newly adopted protocol which Defendants intend to employ in executing Plaintiffs. Plaintiffs seek injunctive and declaratory relief pursuant to 42 U.S.C. §1983, and 28 U.S.C. §2201 for violations and threatened violations of their rights to be free from cruel and unusual punishment and to due process under the Eighth and Fourteenth Amendments to the United States Constitution.

2.  This Court, Judge Winmill, presided or is currently presiding over each plaintiff's petition for habeas corpus relief.

3.  Judge Winmill entered a final judgment in Plaintiff Thomas Creech's habeas corpus action in 2010.  *Creech v. Hardison*, No. 1:99-cv-00224-BLW, Dkt. No. 280 (D. Idaho 3/31/2010) (judgment).  Plaintiff Creech's case is pending before the Ninth Circuit Court of Appeals, having been argued and submitted in that court on March 8, 2012.  *Creech v. Hardison*, No. 10-99015, Dkt. 59 (9th Cir. 3/8/12) (notation).

4.  Judge Winmill entered a final judgment in Plaintiff James Hairston's habeas corpus action in 2011.  *Hairston v. Blades*, No. 1:00-cv-00303-BLW, Dkt. No. 193 (D. Idaho

3/30/2011) (judgment).  Mr. Hairston's case is pending before the Ninth Circuit Court

of Appeals, with the opening brief due on May 18, 2012.  *Hairston v. Blades*, No. 11-

99012 at Dkt. 12 (9th Cir. 3/22/12) (order).

5. Judge Winmill entered a final judgment granting sentencing relief in Plaintiff Richard

Leavitt's habeas corpus action in 2007.  *Leavitt v. Arave*, No. 1:93-cv-0024-BLW,

Dkt. No. 297 (D. Idaho 9/28/2007) (judgment).  On appeal, the Ninth Circuit Court of

Appeals reversed.  *Leavitt v. Arave*, 646 F.3d 605 (9th Cir. 2011).  Mr. Leavitt's

petition for writ of certiorari is now pending before the United States Supreme Court.

*Leavitt v. Arave*, No. 11-8844 (U.S. 3/20/2012) (order extending time to file response

to petition for writ of certiorari).

6. Judge Winmill is now presiding over Plaintiff Stuart's habeas corpus action.  *Stuart v.*

*Fisher*, No. 1:02-cv-0020-BLW, Dkt. No. 78 (D. Idaho 6/15/2011) (amended petition

for writ of habeas corpus).

## JURISIDICTION AND VENUE

7. The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343

(civil rights violations), 2201 (declaratory relief), and 2202 (injunctive relief).

8. The Court has personal jurisdiction over each Defendant in this matter.  The planning

and carrying out of the proposed executions of Messrs. Creech, Hairston, Leavitt, and

Stuart ("Plaintiffs"), the events giving rise to this Complaint, have already occurred or

will occur in this District in or near Boise, Idaho.

9. Venue is proper under 28 U.S.C. §1391(b).  Each Plaintiff is located at Idaho

Maximum Security Institution on Pleasant Valley Road near Boise, Idaho, located in

this District.  Should the State schedule any Plaintiff for execution, the execution will be scheduled to occur at the Idaho Maximum Security Institution.

## PARTIES

10.    Each Plaintiff is a United States citizen residing at the Idaho Maximum Security Institution in Boise, Idaho.

11.    Each Plaintiff is under the control and supervision of the Idaho Department of Correction ("IDOC").

12.     Defendant Reinke is being sued in his official capacity as Director of the IDOC.

13.    On information and belief, Reinke is a citizen of the United States and a resident of the State of Idaho.

14.    Defendant Kevin Kempf is being sued in his official capacity as Chief of the Operations Division of the IDOC Bureau of Prisons.

15.    On information and belief, Chief Kempf is a citizen of the United States and a resident of the State of Idaho.

16.    Defendant Jeff Zmuda is being sued in his official capacity as a Deputy Chief of the IDOC Bureau of Prisons.

17.    On information and belief, Deputy Chief Zmuda is a citizen of the United States and a resident of the State of Idaho.

18.    Defendant Josh Tewalt is being sued in his official capacity as a Deputy Chief of the IDOC Bureau of Prisons.

19.    On information and belief, Deputy Chief Tewalt is a citizen of the United States and a resident of the State of Idaho.

20.     Defendant Randy Blades is being sued in his official capacity as Warden of IMSI.

21.     On information and belief Defendant Blades is a citizen of the United States and a

        resident of Idaho.

### FACTS COMMON TO ALL CLAIMS

**A.  The Lethal Injection Process**

22.     As Director, Defendant Reinke is responsible for the daily supervision of operations

        of the IDOC.

23.     Idaho Code §19-2716 provides that the "substance or substances" to be used in an

        execution must be "approved by the [IDOC] director[.]"

24.     Idaho Code §19-2716 provides that the IDOC director must "determine the

        procedures to be used in any execution."

25.     Defendant Reinke has a duty to ensure that executions are carried out in compliance

        with the Eighth and Fourteenth Amendments to the United States Constitution, Idaho

        law, and departmental procedure.

26.     IDOC policy obligates Chief of Operations Kempf to ensure that executions are

        carried out in compliance with the Eighth and Fourteenth Amendments to the United

        States Constitution, Idaho law, and department procedure.

27.     IDOC policy obligates Deputy Chiefs Zmuda and Tewalt to ensure that executions are

        carried out in compliance with the Eighth and Fourteenth Amendments to the United

        States Constitution, Idaho law, and department procedure.

28.     IDOC policy obligates Warden Blades to ensure that executions are carried out in

        compliance with the Eighth and Fourteenth Amendments to the United States

        Constitution, Idaho law, and department procedure.

29.     On October 14, 2011, the IDOC adopted "a completely revised execution procedure

        for the IDOC[.]" *Rhoades v. Reinke*, No. 1:11-cv-00445-REB, Dkt. No. 7-1 at p. 11

        (D. Idaho Oct. 14, 2011) (Memorandum In Support of Defendants' 12(b)(6) Motion

        to Dismiss).

30.     That protocol (the "2011 Protocol") was the subject of expedited litigation in the Fall

        of 2011, in which the plaintiff sought but was denied expedited discovery and a stay

        of execution.

31.     On January 6, 2012, the IDOC significantly revised its execution procedures again.

        *See* Exhibit 1 ("2012 Protocol").

32.     The 2011 Protocol provided for only three-drug executions.

33.     The 2011 Protocol provided that a Medical Team initiate and maintain the IVs

        through which the chemicals are administered, mix the chemicals, prepare the

        syringes, monitor the prisoner (including the level of consciousness) and supervise the

        administration of chemicals.

34.     The 2011 Protocol provided that an Injection Team administer the chemicals.

35.     The 2011 Protocol mandated credential, training and experience requirements for

        Medical Team members which were different than those it mandated for Injection

        Team members.

COMPLAINT - 6

36.     The 2012 Protocol provides for presumptive three-drug executions with two one-drug execution alternatives.

37.     Each of the four lethal injection methods calls for administering chemicals through an intravenous catheter ("IV").

38.     Which method "is used is dependent upon the availability of chemicals." Exhibit 1 at Appendix A at 1.

39.     Each of the four lethal injection methods provides for the use of heparin/saline to flush the IV lines.

40.     Each of the four lethal injection methods differ from the remaining three in the particular remaining chemicals administered.

41.     The first method calls for administering the following three chemicals in the following order: sodium pentothal ("thiopental"), an anesthetic; pancuronium bromide, a paralytic; and potassium chloride, a cardiac-arrest inducing chemical.

42.     The second method is the same as the first except that pentobarbital is substituted for thiopental as the first chemical.

43.     The third method calls for administering thiopental without pancuronium bromide or potassium chloride.

44.     The fourth method calls for administering pentobarbital without pancuronium bromide or potassium chloride.

45.     The 2012 Protocol does not provide for the creation of an Injection Team.

46.     The 2012 Protocol provides for the creation of a Medical Team responsible for mixing the chemicals, preparing and labeling the syringes, initiating and maintaining

the IVs through which the chemicals are administered, monitoring the prisoner (including the level of consciousness), and administering the chemicals.

47.   Thiopental and pentobarbital are both barbiturates intended to render the condemned inmate unconscious.

48.   Pancuronium bromide causes progressive paralysis and results in suffocation.

49.   Pancuronium bromide does not affect consciousness and does not prevent the sensation of pain.

50.   Pancuronium bromide precludes an accurate assessment of consciousness by visual and auditory observations.

51.   Pancuronium bromide is "a paralytic neuromuscular blocking agent that causes complete paralysis and accompanying suffocation." *Rhoades v. Reinke*, 2011 WL 5520446 at *3.  (D. Idaho 2011).

52.   A fully conscious or lightly unconscious individual who receives a therapeutic or greater dose of pancuronium bromide would experience suffocation and be unable to move or otherwise respond. *Id.*

53.   Potassium chloride is intended to induce cardiac arrest. *Id.*

54.   Potassium chloride does not affect consciousness and does not prevent the perception of pain.

55.   As it travels in the bloodstream from the site of the injection throughout the body, potassium chloride activates all of the nerve fibers inside the blood vessels.

COMPLAINT - 8

56.     Potassium chloride's activating all the nerve fibers inside the blood vessels causes an extraordinarily painful burning sensation, absent adequate anesthesia. Exhibit 2 at 8-9 (*Rhoades v. Reinke*, hearing transcript excerpts).

57.     The three drugs contemplated by Idaho (assuming the use of thiopental), are the same as used in Kentucky and discussed by the Supreme Court in *Baze v. Kentucky*, 553 U.S. 35, 36-37 (2008).

58.     In *Baze,* the Supreme Court held that a state's execution protocol violates the Eighth Amendment if it creates a substantial risk of severe pain, as compared to the risk created by known and available alternatives. *Id*. at 61.

59.     The Supreme Court noted that "proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs." *Id*. at 44.

60.     Unless the condemned inmate has first reached a sufficiently deep unconscious state from a "proper dose" of the anesthetic, "there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride." *Id*. at 53.

## SUMMARY OF CLAIMS

61.     The 2012 Protocol creates a demonstrated "risk of severe pain" that "is substantial when compared to the known and available alternatives." *Baze*, 553 U.S. at 61.

62.     The 2012 Protocol provides that it may be amended at any time by and in the sole discretion of one of two IDOC officials, without any notice to any prisoner or his counsel, including Plaintiffs and their counsel. The 2012 Protocol also provides that

the IDOC Director or the IMSI Warden is to determine in the midst of an execution how to respond to unforeseen but foreseeable developments, without any constraint on their discretion. Executing any Plaintiff without notice of the procedures to be used denies each Plaintiff his right to a reasonable opportunity to review and to be heard, in violation of the right to due process.

63. The 2012 Protocol violates the Eighth and Fourteenth Amendments because it does not include any of the *Baze* safeguards relating to daily experience establishing IVs, meaningful redundancy and a thorough consciousness check.

64. The 2012 Protocol violates the Eighth Amendment as interpreted in *Baze* by allowing for a "cut down" to establish a central IV line. Allowing for a "cut down" creates a substantial "risk of severe pain ... when compared to the known and available alternative" of allowing venous access using ultrasound but not employing a cut down. *Baze,* 553 U.S. at 61.

65. The IDOC's use of adulterated or illegally obtained drugs creates a substantial risk of pain, in violation of the Eighth Amendment.

66. The continued use of a three-drug protocol -- known to fail and induce severe pain, notwithstanding the alleged safeguards relied upon by the Supreme Court in upholding a three-drug protocol in *Baze* -- is unconstitutional and violates the Eighth Amendment in light of the known alternative, a one-drug protocol that does not present any risk of severe pain.

67. Finally, Plaintiffs seek declaratory judgments pursuant to 28 U.S.C. §2201, clarifying that the Controlled Substances Act ("CSA") (21 U.S.C. §801 *et seq.*) and the Food,

Drug and Cosmetic Act ("FDCA") (21 U.S.C. §301 *et seq.*) apply to his lethal injection in Idaho; that Defendants are now violating or, if they act in compliance with IDOC policy, will violate these statutes.

68.   All statements of fact in this Complaint are based upon sworn testimony, declarations or affidavits, or upon well-founded information or belief.

69.   All statements of fact and allegations made anywhere in this Complaint are incorporated by reference into each legal claim as if fully rewritten therein.

## CLAIMS

### A.   Claims Pursuant To 42 U.S.C. § 1983

70.   As articulated in each of the following specific 42 U.S.C. § 1983 claims, Defendants are acting under color of Idaho law and with deliberate indifference to the wanton and unnecessary infliction of prolonged, intense pain their conduct will cause any Plaintiff during his execution. *Baze*, 553 U.S. at 54.

### CLAIM 1:   Executing Any Plaintiff Pursuant to a Protocol Which He Has Not Been Afforded a Reasonable Opportunity To Review and Be Heard On Would Violate His Right to Due Process.

71.   The 2012 Protocol provides that:

> **Note:**  This SOP is subject to revision at the discretion of the chief of the Operations Division or the director of the IDOC.  Either person may revise, suspend, or rescind any procedural steps, at any time, at his sole discretion.

Exhibit 1 at 1(bold in original).

72.   This provision allows additions to and deletions from the execution protocol in advance of any Plaintiff's execution without notice to any Plaintiff.

COMPLAINT - 11

73.    This provision allows additions to and deletions from the execution protocol actually

       implemented during any Plaintiff's execution without notice to that Plaintiff.

74.    The 2012 Protocol contains several procedures which cannot be implemented without

       employing unidentified necessary steps, including these procedures:

- If "any potential problems . . . occur" with the IVs, the IDOC director shall stop the proceeding "and take all steps necessary in consultation with the Medical Team leader prior to proceeding further with the execution." Exhibit 1 at Appendix A at 7.

- The 2012 Protocol further provides that "[i]n the unlikely event that the offender is conscious, . . . the IMSI warden will determine how to proceed[.] . . . If deemed appropriate, the IMSI warden may instruct the Injection Team to administer an additional 5 grams of sodium pentothal/or pentobartibal followed by the heparin/saline flush from Backup Set 2." *Id.* at 8.

- The 2012 Protocol fails to limit the amount of time or the number of attempts allowed in trying to establish the IV lines.

75.    The IDOC does not seek advance public comment on any changes to its execution

       protocol.

76.    The provisions quoted and summarized in the foregoing paragraphs of this Claim A

       allow the addition and/or deletion of procedural steps from the 2012 Protocol which

       create a substantial risk that a Plaintiff will suffer severe pain during his execution,

       without prior notice to any Plaintiff.

77.    The 2012 Protocol applies only to IDOC "staff members involved in the

       administration of capital punishment and to offenders who are under a death warrant

       and the execution of which has not been stayed." Exhibit 1 at 1.

78. The 2012 Protocol does not provide for its application to independent contractors hired to administer capital punishment. *Id.*

79. The 2012 Protocol contemplates the IDOC "entering into an agreement" specific to Medical Team membership with some or all Medical Team members. Exhibit 1 at 10.

80. In its most recent execution, the IDOC hired an independent contractor to serve as the Medical Team Leader.

81. The 2012 Protocol contemplates the creation of "SOPs, field memorandums, and post orders related to the execution process." Exhibit 1 at 2.

82. The 2012 Protocol does not provide criteria for selecting from the four sets of chemicals described in the 2012 Protocol for any particular execution.

83. The 2012 Protocol does not provide who is to determine which of the four sets of chemicals it describes will be used in any particular execution.

84. Executing any Plaintiff without first according him a fair opportunity to review the lethal injection protocol and register any legal objections to it in a court of law would violate his right to due process. U.S. Const. Amend. XIV. *Dickens v. Brewer*, 2009 WL 1904294 (D.Ariz. 2009) ("Fundamental fairness, if not due process, requires that the execution protocol that will regulate an [sic] prisoner's death be forwarded to him in prompt and timely fashion.") (quoting *Oken v. Sizer*, 321 F.Supp.2d 658, 664 (D.Md. 2004), *aff'd*, 631 F.3d 1139 (9th Cir. 2011).

**CLAIM 2:** **The 2012 Protocol's Required Procedures Are Materially Different From Those Approved in *Baze v. Kentucky* And They Do Not Include Sufficient Alternative Safeguards Against Plaintiffs Suffering Severe Pain During Their Executions, All In Violation of The Eighth And Fourteenth Amendment Guarantee Against Cruel and Unusual Punishment.**

85.   The 2012 Protocol requires procedures materially different from those approved by the Supreme Court in *Baze v. Kentucky*, 553 U.S. 35 (2008).

86.   *Baze* approved the Kentucky protocol because it required certain "safeguards" against the inmate suffering severe pain, including:

- that the personnel establishing and monitoring an IV possess, in addition to a healthcare credential, "at least one year of professional experience."  *Baze*, 553 U.S. at 55.

- that those personnel have "daily experience in establishing IV catheters."  *Id.*

- that those personnel together with the remaining personnel directly involved in an execution complete "at least ten practice sessions per year" which "encompass a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers." *Baze*, 553 U.S. at 55, 56.

- that meaningful redundancy through backup chemical preparation by adequately trained and experienced personnel or through establishing a backup IV line by adequately trained and experienced personnel. *Id*. at 56.

COMPLAINT - 14

- that a meaningful consciousness check be conducted after the anesthetic is administered. *Baze*, 553 U.S. at 45.

### No Credential and Experience Requirements For Those Personnel Establishing IV Lines And Those Injecting The Drugs

87. The 2012 Protocol provides that a Medical Team initiate and maintain the IVs through which the chemicals are administered, prepare the chemicals for injection, prepare the syringes, monitor the prisoner (including the level of consciousness), and administer the chemicals through IV.   Exhibit 1 at Appendix A.

88. The 2012 Protocol does not mandate that Medical Team members, as part of their regular daily professional practice, initiate and maintain IVs or engage in any of the other steps for which they are responsible under the 2012 Protocol.

89. In *Rhoades v.Reinke*, the plaintiffs alleged that the 2011 Protocol "d[id] not (or, in the case of replacements [i.e.-substitute team members], will not) have the requisite medical credentials and experience over time."  *Rhoades v. Reinke,* 2011 WL 5520446 at *9.

90. The magistrate judge rejected the plaintiff's argument based on findings that even though the 2011 Protocol did not require that members of the Medical Team have "'at least one year of professional experience[,]' as was the case in *Baze*[,] . . . Zmuda's affidavit addresses this concern."  *Id.* at *8.

91. The affiant on whom the magistrate court relied was Defendant Zmuda ("Zmuda") in the instant case.

92. In *Rhoades v. Reinke*, Zmuda affirmed that:

> [A]ll members of the Medical Team and Injection Team are certified in CPR, *have venous access currency*, *which means they have current professional practice in insertion of IVs on a regular basis.*
>
> ***
>
> SOP 135 [i.e.- the 2011 Protocol] does not state that the Medical Team members have at least one year of professional training and practical experience, however, all Medical Team members selected for the preparation of chemicals have at least one year of professional training and practical experience necessary to prepare the chemicals.

Exhibit 3 at paras. 18, 24 (redacted Zmuda affidavit) (emphasis added).

93.    The court in *Rhoades v. Reinke* denied plaintiff a stay of execution to develop his challenge based on the qualifications of the actual executioners as described by IDOC Bureau of Prisons Deputy Chief Zmuda.

94.    The 2012 Protocol does not require for Medical Team membership currency in initiating IVs.

95.    The 2012 Protocol does not require for Medical Team membership currency in maintaining IVs.

96.    The 2012 Protocol does not require for Medical Team membership any experience or training in preparing chemicals for injection.

97.    The 2012 Protocol does not require for Medical Team membership currency in preparing chemicals for injection.

98.    The 2012 Protocol does not require for Medical Team membership any experience or training in administering chemicals through an IV into a human being.

99.     The 2012 Protocol does not require for Medical Team membership currency in

preparing syringes for use in administering chemicals through an IV into a human

being.

100.    The 2012 Protocol does not require for Medical Team membership any experience or

training in monitoring varying levels of consciousness in human beings.

101.    The 2012 Protocol does not require for Medical Team membership currency in

monitoring varying levels of consciousness in human beings.

102.    The 2012 Protocol does not require for Medical Team membership any experience or

training in injecting fluids through IV lines.

103.    The 2012 Protocol does not require for Medical Team membership currency in

injecting fluids through IV lines.

104.    The 2012 Protocol sets out minimum Medical Team, including the Medical Team

Leader, membership credential requirements:

- Emergency medical technician ["EMT"];
- Licensed practical nurse (LPN) or registered nurse (RN);
- Military corpsman;
- Paramedic;
- Phlebotomist;
- Physician assistant;
- Physician; or
- Other medically trained personnel including those trained in the United States Military.

Exhibit 1 at 9.

105.    Idaho licensed LPNs need not be trained or have any experience in initiating IVs or

administering medication through IVs.

COMPLAINT - 17

106.   Idaho licensed LPNs need not be trained or experienced in assessing whether an
       individual is sufficiently conscious to feel extreme pain.

107.   The State of Idaho does not license, certify, or regulate the training or scope of
       practice of Phlebotomists.  *See* Exhibit 4 (Letter from Nicole Walton, Pbt,
       Phlebotomy Instructor, College of Western Idaho dated 8/25/11).

108.   Phlebotomists do not initiate, maintain, or administer any substance via IVs in the
       ordinary scope of practice in Idaho.  *Id.*

109.   Phlebotomists are not trained to initiate, maintain, or administer any substance via
       IVs.  *Id.*

110.   The State of Idaho licenses and regulates the training and scope of practice of
       Emergency Medical Technicians ("EMTs") and Paramedics.

111.   The Idaho legislature has invested the Idaho Emergency Medical Services Physician
       Commission ("EMS Physician Commission") with the authority and obligation to
       "adopt appropriate rules defining the allowable scope of practice and acts and duties
       which can be performed by persons licensed by the EMS bureau[.]"  I.C. § 56-
       1023(1).

112.   The EMS Physician Commission Standards Manual ("Standards Manual") fulfills this
       legislative mandate.  Exhibit 5 (EMS Physician Commission Standards Manual).

113.   The Standards Manual distinguishes between EMTs and Advanced EMTs
       ("AEMTs") for training and scope of practice purposes.  *Id.*  at 2, 16-18.

114.   The Standards Manual allows only AEMTs and Paramedics to initiate an IV and
       administer non-medicinal substances via IV infusion.  *Id.* at 22-23.

COMPLAINT - 18

115. The Standards Manual allows only Paramedics to administer medicinal substances via IV infusion or to administer any substance via IV push. *Id.* at 23.

116. There are different kinds of military corpsmen. Not all kinds have training and/or experience in initiating, maintaining or administering substances through an IV.

117. The 2012 Protocol does not define "[o]ther medically trained personnel," the catch-all credential category which can be used to qualify for Medical Team membership, as requiring any minimum training or experience.

118. The "[o]ther medically trained personnel" credential category could be interpreted to encompass Certified Medical Assistants.

119. IV medication administration is outside the scope of Certified Medical Assistant practice and certification. Exhibit 6 (Timothy P. Hodges, FAAFP, Medical Director-Medical Assistant Program/College of Western Idaho letter to Greg Worthen, Federal Defender Services of Idaho, dated 8/22/2011).

120. It would be inappropriate for a Medical Assistant to start or manage IV fluids, or administer intravenous medication. *Id.*

121. The 2012 Protocol provides that:

> At least three (3) days before the scheduled execution date, [the Administrative Team shall] obtain technical assistance for the purpose of reviewing the lethal substances, the amounts, the methods of delivery and injection, and the offender's physical and historical characteristics to evaluate compliance with this SOP. The individual(s) conducting the technical review will observe the Medical Team place IV catheters and establish an IV drip line in a live body. The individual(s) conducting the technical review will meet with the Administrative Team to review his findings. The director of the IDOC will make the final determination regarding compliance with this SOP.

COMPLAINT - 19

Exhibit 1 at 28.

122.   The 2012 Protocol does not mandate any training, experience or knowledge

requirement for the individual(s) who provide the technical assistance described in the

last paragraph.

123.   The 2012 Protocol does not require that team members, or anyone else who

participates in mandated training or rehearsals, perform with any minimal competency

at any assigned task.

## Inadequate On-Site Training

124.   The 2012 Protocol  provides for :

- "a minimum of 10 annual training session for the escort and medical
  teams";

- in the event a death warrant issues, the "Medical Team . . . will train
  weekly before the scheduled execution date";

- the "Medical Team . . . must participate in a minimum of four (4) training
  sessions prior to participating in an actual execution";

- prior to a scheduled execution, the Medical team "shall conduct a
  minimum of two (2) rehearsal sessions during the 48 hours before the
  scheduled execution"; and

- "[t]raining and rehearsal sessions for the Medical Team shall include the
  placing of IV catheters and establishing an IV drip in a minimum of two
  (2) live volunteers prior to each execution."

Exhibit 1 at 10.

125.    The mandated annual training sessions may be suspended "[i]f no execution is anticipated beyond the time required to assemble and adequately train the . . . medical team[.]" *Id.*

126.    The 2012 Protocol does not require that the Execution Teams participate in "10 practice sessions per year . . . encompass[ing] a complete walk-through of the execution procedures, including the siting of IV catheters into volunteers." *Baze*, 553 U.S. at 55.

127.    The full complement of training and rehearsal sessions, including the ten annual training sessions, is inadequate to render an individual current in initiating IVs.

128.    The full complement of training and rehearsal sessions, including the ten annual training sessions, is inadequate to render an individual current in maintaining IVs.

129.    The full complement of training and rehearsal sessions, including the ten annual training sessions, is inadequate to render an individual current in preparing chemicals for injection.

130.    The full complement of training and rehearsal sessions, including the ten annual training sessions, is inadequate to render an individual current in administering chemicals through an IV into a live human being.

131.    The full complement of training and rehearsal sessions, including the ten annual training sessions, is inadequate to render an individual current in assessing whether a prisoner's level of consciousness is sufficient to allow him to suffer extreme pain caused by the administration of pancuronium bromide and potassium chloride.

132.    Reconstitution is required for preparing either thiopental or pentobarbital.

133.    The procedure for reconstituting pentobarbital requires many more steps than is

        required for reconstituting thiopental.

134.    The increased number of steps necessary to reconstitute pentobarbital as compared to

        thiopental increases the risk of error in the reconstitution process.

135.    The 2012 Protocol does not address how to reconstitute thiopental or pentobarbital.

### Inadequate Redundant Measures

136.    The 2012 Protocol does not require adequate redundancy.  *See Baze*, 553 U.S. at 55.

137.    While the 2012 Protocol requires the setting of primary and backup lines and the

        preparation of two sets of chemicals, these redundant measures do not constitute

        safeguards against severe pain because they are performed by the same inadequately

        credentialed and trained personnel who performed the initial measures.

### Inadequate Consciousness Checks

138.    The 2012 Protocol provides that the Medical Team Leader "shall be responsible for

        monitoring the offender's level of consciousness."  Exhibit 1 at Appendix A at 6.

139.    If Method 1 or 2, *see* supra at paras. 29 – 37, is used then the Medical Team Leader

        must check whether the prisoner is unconscious after administration of the first drug

        but before the pancuronium is administered.  *Id*. at 8.

140.    In determining whether the prisoner is unconscious, the Medical Team Leader shall

        use "all necessary medically appropriate techniques such as giving verbal stimulus,

        soliciting an auditory response, touching the eyelashes, and/or conducting a sternal

        rub."  *Id.*

141.   Unless properly administered, none of the articulated methods of assessing consciousness allows an adequate determination of whether a prisoner is sufficiently conscious to experience extreme pain from the administration of pancuronium bromide and potassium chloride.

142.   The sternal rub is inadequately described to ensure that it will be properly applied to assess the prisoner's level of unconsciousness.

143.   Absent currency in using a sternal rub to assess unconsciousness to extreme pain, an individual will not know how to properly apply a sternal rub to make such an assessment.

144.   The 2012 protocol does not require that any person directly involved in an execution and charged with consciousness checking have previous training in consciousness checking.

145.   Phlebotomists, EMTs, paramedics, military corpsmen, LPNs, or other medically trained personnel which the 2012 Protocol permits to be on an execution team, are not required for credentialing purposes to have any training and/or experience in assessing unconsciousness against extreme pain following the administration of an anesthetic.

## Inadequate Alternative Safeguards

146.   The 2012 Protocol contains no procedures which adequately safeguard against plaintiff suffering severe pain during his execution.

### The 2012 Protocol's Lack of Adequate Safeguards Against Plaintiffs Suffering Severe Pain Violates His Right Against Cruel and Unusual Punishment

147. Absent proper training and practice in initiating and maintaining IVs, there is a substantial risk that an IV will not serve as a reliable mechanism for delivering chemicals into the bloodstream.  Exhibit 7 at paras. 5, 6, 20, *passim* (Affidavit of Mark Heath, M.D.).

148. There is a substantial risk that an insufficient amount of anesthetic will reach the prisoner.  *Id.* at para. 20.

149. Where a three-drug protocol is employed, if an insufficient amount of anesthetic reaches the offender, he will experience the pain and suffering caused by a paralytic chemical and a cardiac-arrest inducing chemical which do reach him.  *Baze*, 553 U.S. at 53.

150. During or after initiation of an IV, the needle can perforate the walls of the vein, delivering the chemicals into the surrounding tissue rather than the blood vessel. Exhibit 7 at para. 6 (Heath affidavit).

151. Regardless the particular mechanism, inadvertent delivery of fluid into the tissues is referred to as infiltration.  *Id.*

152. Assessing infiltration requires a trained and experienced individual to inspect the site, visually and tactilely "for swelling, discoloration, and temperature changes, as well as monitoring of the IV equipment."  *Id.* at para. 11.

153. "The signs of an infiltrated IV are often very subtle, and can easily be missed by an inexperienced practitioner."  *Id.* at para. 12.

154.    In addition to problems with infiltration, leakage of chemicals may occur at any point

of connection.  *Id.* at para. 8.

155.    Importantly, "[i]nfiltration and leakage are not necessarily 'all-or-nothing' events."

*Id.* at para. 10.  This can create a partial dose of the drugs administered to the prisoner

and results in severe pain.

156.    Infiltration and leakage are not "mutually exclusive causes of IV failure."  *Id.* at para.

10.

157.    Allowing individuals without proper training and experience to establish, monitor,

and inject chemicals through an IV creates a high, substantial risk that the offender

will experience severe pain.

**IDOC is Not Subjectively Blameless for Risk of Harm**

158.    IDOC officials have known since 2008 that they needed to establish execution

procedures in compliance with *Baze*.

159.    In October, 2011, IDOC officials issued an amended execution protocol (i.e.- the

2011 Protocol), an admittedly  "completely revised execution procedure for the

IDOC[.]"  *Rhoades v. Reinke*, No. 1:11-cv-00445-REB, Dkt. No. 7-1 at p. 11 (D.

Idaho Oct. 14, 2011).

160.    IDOC officials have known since last October of the claimed deficiencies in the 2011

Protocol.

161.    Many of the claims raised in this action are similar to or the same as claims raised in

*Rhoades v. Reinke*, No. 1:11-cv-00445-REB.  At an evidentiary hearing in that case,

IDOC Deputy Chief of Prisons Jeff Zmuda testified in an affidavit at an evidentiary

hearing to the particular ways in which the IDOC was implementing the 2011

Protocol.  Exhibits 2 and 3 (Zmuda hearing testimony and affidavit).  Those

particulars showed, it was claimed, that the IDOC's implementation of its execution

protocol in that case did not violate *Baze*.

162.   The 2012 Protocol fails to incorporate many of the particular ways in which,

according to Zmuda's testimony, the IDOC was implementing the 2011 Protocol.

163.   The IDOC has failed to bring its written execution protocol into compliance with

*Baze*.

164.   IDOC officials are not subjectively blameless for the substantial risk of serious harm

because of the failure to include the *Baze* safeguards in the 2012 Protocol.  *Baze*, 553

U.S. at 50; *Rhoades v. Reinke*, No. 1:11-cv-00445-REB, Dkt. No. 7-1 at 15.

### CLAIM 3:    Use of Adulterated or Illegally Obtained Drugs Creates a Substantial Risk of Harm.

165.   The Attorney General for the State of Idaho, Lawrence Wasden, was one of several

signatories to a January 25, 2011, letter to United States Attorney General Eric Holder

seeking his "assistance in either identifying an appropriate source for sodium

thiopental or making supplies held by the Federal Government available to the

States."  Exhibit 8 (letter to U.S. Attorney General Holder).

166.   As Idaho Attorney General Wasden explained:

> The protocol used by most of the jurisdictions employing lethal
> injection includes the drug sodium thiopental, an ultra-short-acting
> barbiturate.  Sodium thiopental is in very short supply worldwide
> and, for various reasons, essentially unavailable on the open market.
> For those jurisdictions that have the drug available, their supplies are
> very small—measured in a handful of doses.  The result is that many

jurisdictions shortly will be unable to perform executions in cases where appeals have been exhausted and Governors have signed death warrants.

*Id.* at 1.

167.    United States Attorney General Eric Holder responded that:

At the present time, the Federal Government does not have any reserves of sodium thiopental for lethal injections and is therefore facing the same dilemma as many States. . . . I appreciate and share your concerns about this matter, but I am optimistic that workable alternatives are available that will allow us to carry out our duties.

Exhibit 9 (U.S. Attorney General Holder letter).

168.    Upon information and belief, any thiopental which Defendants may use in executing any Plaintiff was illegally obtained.  *Cf.* Exhibit 10 (Sidley Austin LLP and Equal Justice Initiative letters to United States Attorney General Holder outlining illegal importation and DEA seizure of thiopental in several states) and Exhibit 11 (Public Records Response regarding IDOC's attempts to obtain pentobarbital and thiopental).

169.    In the *Rhoades v. Reinke* litigation, the court ordered the parties to conduct good faith discussions to resolve plaintiff's claims.  Pursuant to that order, counsel for the parties conducted a telephone call.

170.    In an effort to dispose of the claim that any thiopental which the IDOC would use in Mr. Rhoades's execution was adulterated or illegally obtained, creating a substantial risk of harm to the plaintiff, undersigned counsel inquired of the Assistant Attorney General whether she could provide assurances that any thiopental the IDOC would use in executing Mr. Rhoades was not unadulterated and/or illegally obtained.

171.   The Assistant Attorney General assured undersigned counsel that any drugs the IDOC

intended to use were legally obtained from a source within the United States.

172.   When pressed, the Assistant Attorney General did not address undersigned counsel's

expressed concern regarding any thiopental's point of origin, legal or illegal

importation, the standards of manufacture adhered to in its production, and its storage

and transport conditions.

173.   Upon information and belief, any thiopental which Defendants may use in executing

any Plaintiff was manufactured without adequate safeguards to ensure its identity and

quality as thiopental.

174.   On March 27, 2012, the United States District Court for the District of Columbia

found that "thiopental cannot lawfully be introduced or delivered for introduction into

interstate commerce or lawfully be imported into the United States[.]"  Exhibit 12 at

2.  (*Beaty*, *et al. v Food and Drug Administration*, No. 11-289-RJL at Dkt. 24 (D.

D.C. March 27, 2012)).

175.   That court ordered the Food and Drug Administration "immediately notify any and all

state correctional departments which it has reason to believe are still in possession of

any foreign manufactured thiopental that the use of such drug is prohibited by law and

that, that thiopental must be returned immediately to the FDA[.]"  *Id.*

176.   Upon information and belief, any thiopental which Defendants may use in executing

any Plaintiff has expired and deteriorated to an extent that it cannot be reliably used to

induce anesthesia, due to improper storage or age.

177.   Given these conditions, the use of thiopental under the 2012 Protocol violates *Baze*

and the Eighth Amendment.

> **CLAIM 4:   Use of Pentobarbital in a Three-Drug Protocol Violates the Eighth Amendment, Though its Use as a One-Drug Protocol Would Not.**

178.   Pentobarbital takes 15 to 60 minutes to take full effect, according to the FDA-

approved package insert for pentobarbital.  Exhibit 13 (FDA package insert).

179.   The FDA-approved package insert classifies pentobarbital as a short-acting

barbiturate rather than an ultra short-acting one, like thiopental.  *Id.*

180.   There is no scientific literature establishing what dose of pentobarbital will induce

anesthesia.  Exhibit 14 at para. 7 (David Lubarsky, M.D., declaration).

181.   Because pentobarbital is slower-acting than thiopental, any Plaintiff may be only

partially anesthetized.  He may be sufficiently anesthetized to appear unconscious to

the untrained or inexperienced observer but still able to experience the pain from the

second and third chemical injections.

182.   Offenders experiencing severe pain while being executed by a three-drug protocol

continues even after *Baze*.

183.   Such executions have occurred using a three-drug protocol with pentobarbital as the

anesthetic.

184.   In 16 reported executions utilizing pentobarbital in a three-drug protocol, at least one

botched execution has occurred.  Exhibit 15 at para. 6 (David B. Waisel, M.D.,

affidavit).

COMPLAINT - 29

185.    Using pentobarbital in a three-drug protocol presents a substantial risk of severe pain in light of the known alternative, using pentobarbital in a one-drug protocol.

**CLAIM 5:    Idaho Should Use A One-Drug Protocol of Thiopental or Pentobarbital.**

186.    There is scientific consensus that rapid IV delivery of a large dose of thiopental or pentobarbital will cause death in a short amount of time.

187.    A one-drug protocol using pentobarbital (or thiopental) is a known alternative that has been used in 14 executions since 2008 in Ohio and Washington.

188.    Of those 14 one-drug executions, 11 used thiopental and 3 used pentobarbital.

189.    A one-drug protocol completely eliminates the substantial risk of severe pain that arises in three-drug executions, like those contemplated in Idaho, which allow for the injection of pancuronium bromide and potassium chloride, chemicals that may potentially cause excruciating pain.

190.    The one-drug protocol does not employ either of the chemicals—pancuronium bromide and potassium chloride—which create severe pain absent proper administration of the anesthetic.

191.    There are no reports of one-drug protocol executions apparently creating severe pain for the offender.

192.    If an inadequate amount of anesthetic reaches the condemned inmate for any reason; whether from accidental or reckless acts, degraded or ineffective anesthetic, or incompetent or insufficient consciousness checks, the injection of the latter two chemicals in a three-drug protocol will produce severe, unconstitutional pain.

193.   The 2012 Protocol creates a demonstrated "risk of severe pain" that "is substantial when compared to the known and available alternatives." *Baze*, 553 U.S. at 61.

194.   The continued use of a three-drug protocol -- known to fail and induce severe pain, notwithstanding alleged safeguards that should preclude such executions and which were relied upon when the Supreme Court upheld a three-drug protocol in *Baze* -- is unconstitutional and violates the Eighth Amendment in light of the known alternative, a one-drug protocol that does not present substantial risk of severe pain.

   **CLAIM 6:   Executing Any Plaintiff in Accordance with the 2012 Protocol Would Infringe Mr. Leavitt's Fundamental Right Against Cruel and Unusual Punishment.**

195.   "[T]he Fourteenth Amendment 'forbids the government to infringe . . . 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

196.   The prohibition against the unnecessary infliction of cruelty is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment.

197.   There is no compelling state interest served by executing any Plaintiff using a protocol more likely, as compared to available alternatives, to result in his experiencing severe pain.

**B.  Request For Declaratory Judgment Under 28 U.S.C. § 2201**

    **CLAIM 7:**   **The Controlled Substances Act and The Food, Drug And Cosmetic Act.**

198.    The Controlled Substances Act ("CSA"), 21 U.S.C. §§801 *et. seq.*, creates five schedules of controlled substances.  *Id.* at §812.

199.    Because sodium thiopental contains a derivative or salt of barbituric acid, it is a Schedule III controlled substance.  21 C.F.R. §1308 (c)(3) (including in Schedule III "any substance which contains any quantity of a derivative of barbituric acid or any salt thereof").

200.    Pentobarbital is a Schedule II controlled substance.  21 C.F.R. §1308.12 (e)(3).

201.    21 U.S.C. §829 provides that, unless dispensed directly by a practitioner other than a pharmacist, Schedule II and III controlled substances may be dispensed only upon prescription by a practitioner licensed by law to administer such a substance.

202.    This provision means that either a doctor or other person licensed to administer pentobarbital or thiopental must administer the sodium thiopental to any Plaintiff, obtain the thiopental, or issue a prescription for the use of thiopental.  *Cf.* 21 U.S.C. §802 (2, 8, 10, 21) (defining 'administer,' 'deliver,' 'dispense,' and 'practitioner').

203.    Rules governing the issuing, filling and filing of prescriptions under the CSA are set out at 21 C.F.R. 1306.01, *et seq.*

204.    "A prescription for a controlled substance [such as pentobarbital or sodium thiopental] must be issued for a legitimate medical purpose by an individual

practitioner acting in the usual course of his professional practice."  21 C.F.R. 1306.04.

205.  The Federal Food, Drug & Cosmetic Act provides that only a licensed medical practitioner may obtain and use prescription substances.  21 U.S.C. §353 (b).

206.  Pancuronium bromide and potassium chloride are regulated substances requiring a prescription.  21 U.S.C. §353(b) (defining prescription drug); 21 U.S.C. §321(g)(1) (defining 'drug' as including any article included in the official United States Pharmocopoeia ("USP")); http://www.pharmacopeia.cn/v29240/ usp29nf24s0_alpha-18-1190.html (official USP listing pancuronium bromide) (last visited 9/19/2011); http://www.pharmacopeia.cn/v29240/usp29nf24s0_m67340.html (official USP listing potassium chloride) (last visited 9/19/2011).

207.  The 2012 protocol and Idaho Code § 19-2716 conflict with the CSA and FDCA because, upon information and belief, a physician is not dispensing or administering the drugs.

208.  In violation of the FDCA, no appropriately licensed medical practitioner has or will obtain and/or administer the sodium thiopental, pentobarbital, pancuronium bromide and/or potassium chloride which Defendants would use in executing any Plaintiff.

209.  The Supremacy Clause of the United States Constitution requires that the Defendants obey the CSA and FDCA.

210.  Courts entertain federal preemption claims seeking declaratory and injunctive relief even where the statutes at issue do not grant a private right of action.  *See Planned*

*Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324, 331-34 (5th Cir.

2005).  A statutory grant of a cause of action is unnecessary.  *Id.*

211.    Courts may entertain preemption claims even where the statute does not expressly

confer jurisdiction.  *Pharm. Research & Mfrs. of America v. Walsh*, 538 U.S. 644,

661-69 (2003) (indicating that a Supremacy Clause preemption claim exists by

considering a claim that alleged a conflict between a state statute and the Medicaid

Spending clause statute); *Lankford v. Sherman*, 451 F.3d 496, 509 (8th Cir. 2006)

(finding that the lack of a federally created "right" required for a §1983 claim was

inconsequential to analysis of a Supremacy Clause preemption challenge); *Qwest*

*Corp. v. City of Santa Fe*, 380 F.3d 1258, 1266 (10th Cir. 2004) ("A federal statutory

right or right of action is not required where a party seeks to enjoin the enforcement of

a regulation on the grounds that the local ordinance is preempted by federal law.").

212.    Plaintiffs seek equitable relief in the form of a declaratory judgment clarifying that the

safeguards contained in the CSA and FDCA apply to his execution by lethal injection.

213.    Plaintiffs seek a declaratory judgment that if Defendants act in compliance with the

2012 Protocol and Idaho Code § 19-2716, they will violate the CSA and FDCA

because the means the protocol prescribes for Defendants to obtain and administer the

lethal injection chemicals violate those statutes.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

1.  Injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing any Plaintiff until such time as Defendants can demonstrate that properly trained staff and medical personnel can implement Idaho's lethal injection procedures using safe and legal means as well as safe, tested and legal lethal injection drugs;

2.  Injunctive relief to enjoin Defendants, their officers, agents, servants, employees, and all persons acting in concert with them from executing any Plaintiff until such time as Defendants can demonstrate that measures are in place to allow for any Plaintiff's execution in a manner that complies with the Eighth Amendment to the United States Constitution, including but not limited to amending the 2012 Protocol to allow only a one-drug protocol;

3.  A declaratory judgment that IDOC's failure to follow its protocol regarding training violates Plaintiffs' rights under the Eighth Amendment to the United States Constitution;

4.  Enter a declaratory judgment that the CSA and FDCA apply to his lethal injection and that Defendants' executing a Plaintiff in accordance with the 2012 Protocol and Idaho Code § 19-2716 violates the CSA and FDCA;

5.  Appropriate and necessary discovery and an evidentiary hearing to permit Plaintiff to prove his constitutional claims;

6.  Costs of the suit; and

COMPLAINT - 35

7.    Any such other relief as the Court deems just and proper.

Dated this 6th day of April, 2012.

Respectfully submitted,

/s/

By: Oliver W. Loewy
Teresa A. Hampton
Philip H. Gordon
Attorneys for Plaintiff

COMPLAINT - 36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 6th day of April, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to the following persons:

Mark Kubinski
mkubinski@idoc.idaho.gov

_____/s/_____
Oliver W. Loewy

COMPLAINT - 37