# EXHIBIT LIST

| EXHIBIT # | EXHIBIT DESCRIPTION |
|---|---|
| 1 | Idaho Department of Correction Policy Number 135 dated January 6, 2012 |
| 2 | *Rhoades v. Reinke*, Excerpts of Heath and Zmuda testimony at the November 10, 2011 Evidentiary Hearing |
| 3 | *Rhoades v. Reinke*, Redacted Zmuda Affidavit |
| 4 | Letter from Nicole Walton, Pbt, Phlebotomy Instructor, College of Western Idaho dated August 25, 2011 |
| 5 | State of Idaho EMS Physician Commission Standards Manual (Edition 2011-1) |
| 6 | Timothy P. Hodges, FAAFP, Medical Director-Medical Assistant Program/College of Western Idaho letter to Greg Worthen, Federal Defender Services of Idaho, dated August 22, 2011 |
| 7 | Affidavit of Dr. Mark Heath dated October 28, 2011 |
| 8 | Idaho Attorney General Lawrence Wasden, et al. January 25, 2011 letter to Attorney General Eric Holder |
| 9 | United States Attorney General Eric Holder March 4, 2011 letter responding to January 25, 2011 letter from Idaho Attorney General Lawrence Wasden, et al. |
| 10 | Sidley Austin LLP & Federal Public Defender for the District of Arizona letter to United States Attorney General Eric H. Holder, Jr. (February 16, 2011) & Equal Justice Initiative letter to United States Attorney General Eric H. Holder. Jr. (April 22, 2011) |

| EXHIBIT # | EXHIBIT DESCRIPTION |
|---|---|
| 11 | Public Records Response regarding IDOC's attempts to obtain pentobarbital and thiopental |
| 12 | Order in *Beaty, et al. v. Food and Drug Administration*, D.C. Cir. Case No. 11-289-RJL at Dkt. No. 24 (D.Columbia, March 27, 2012) |
| 13 | Pentobarbital sodium FDA package insert |
| 14 | Sworn Declaration of David Lubarsky, M.D. (July 22, 2011) in re: *Arthur v. Thomas, et al.,* No. 11-CV-438-MEF-TFM, Amended Complaint Exhibit A |
| 15 | David Waisel, M.D.'s Expert Report re Arizona Protocol (July 16, 2011), *West v. Brewer*, No. 2:11-cv-01409-NVW, Complaint Exhibit D |

# EXHIBIT 1

# EXHIBIT 1

| Idaho Department of Correction | **Standard Operating Procedure**<br><br>**Operations Division**<br><br>**General Administration** | **Control Number:**<br>135.02.01.001 | **Version:**<br>3.6 | **Page Number:**<br>1 of 35 |
|---|---|---|---|---|
| | | | | **Adopted:**<br>5-18-1998 |
| | | | | **Reviewed:**<br>1-6-2012 |
| | | **Title:**<br>Execution Procedures | | **Next Review:**<br>1-6-2014 |

**This document was approved by Kevin Kempf, chief of the Operations Division, on 1/6/12 (signature on file).**

Open to the general public: ☒ Yes ☐ No

If no, is there a redacted version available: ☐ Yes ☐ No

**BOARD OF CORRECTION IDAPA RULE NUMBER 135**

Executions

**POLICY CONTROL NUMBER 135**

Executions

**DEFINITIONS**

Standardized Terms and Definitions List

None

**PURPOSE**

The purpose of this standard operating procedure (SOP) is to establish specific procedures for administration of capital punishment in accordance with the Idaho Code and the constitutions of the United States of America and the state of Idaho.

**SCOPE**

This SOP applies to all Idaho Department of Correction (IDOC) staff members involved in the administration of capital punishment and to offenders who are under death warrant and the execution of which has not been stayed.

**Note:** This SOP is subject to revision at the discretion of the chief of the Operations Division or the director of the IDOC. Either person may revise, suspend, or rescind any procedural steps, at any time, at his sole discretion.

**RESPONSIBILITY**

***Director of the IDOC***

The director of the IDOC shall be responsible for:

- Exercising overall control of the administrative policy, SOP, field memorandum, and of the execution process itself;

- Communicating with Idaho governor's office, Idaho Board of Correction, legislators, and Idaho Commission of Pardons and Parole;

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 2 of 35 |

- Determining execution method and ensuring that applicable chemicals are obtained; and

- Approving news media representatives for media center access.

### Chief of the Operations Division

The chief of the Operations Division shall be responsible for:

- Approving all SOPs, field memorandums, and post orders related to the execution process;

- Contacting/notifying members of the victim's family;

- Contacting/notifying the state of Idaho's witnesses;

- Briefing the victim's family, the condemned offender's family, and the state of Idaho's witnesses before the execution; and

- Disseminating briefings as needed to staff following the issuance of a death warrant.

### Deputy Chief of the Prisons Bureau

The deputy chief of the Prisons Bureau shall be responsible for:

- Appointing one or more staff member(s) within the bureau to assist the Idaho Maximum Security Institution (IMSI) warden;

- Coordinating the IDOC's south Boise complex activities as the Incident Command System (ICS) command center operations chief; and

- Activating the following teams and overseeing their activities:

    - Command;

    - Correctional Emergency Response Team (CERT);

    - Maintenance;

    - Critical Incident Stress Management (CISM);

    - Traffic Control Team;

    - Idaho State Correctional Institution (ISCI) media center; and

    - South Idaho Correctional Institution (SICI) grounds and perimeter security.

### Administrative Team

The Administrative Team consists of the deputy chiefs of the Prisons Bureau, the IMSI warden, and the backup to the IMSI warden for the purpose of serving as the execution director. The Administrative Team is responsible for:

- Providing, planning, directing, and implementing all pre-execution and post-execution activities;

- Coordinating all processes associated with specialty team (section 5) personnel selection, equipment, supply acquisition, training, rehearsal, and performance;

- Conducting preparatory steps in order to ensure that the execution process is conducted in accordance with this SOP;

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 3 of 35 |

- Reviewing and ensuring that the department faithfully adheres to the letter and intent of Idaho Code, sections 19-2705, 19-2713, 19-2714, 19-2715, 19-2716, 19-2718;

- Selecting staff to serve on the Escort Team and Medical Team;

- Identifying a licensed physician to be on sight during the execution procedure;

- Ensuring that all of the equipment such as electrical, plumbing, heating and cooling units (HVAC) in the execution chamber are tested periodically to ensure they are in working order; and

- Ensuring that an annual training schedule is established and identifying dates for periodic for periodic on-site rehearsal sessions by the Escort Team, Medical Team, and command staff.

### Idaho Maximum Security Institution (IMSI) Warden

The IMSI warden shall be responsible for:

- Serving the death warrant;

- Assigning to the condemned offender a warden's liaison;

- Creating and maintaining a log documenting the events leading up to the execution date;

- Issuing all the orders to facilitate an execution at IMSI;

- Approving the spiritual advisor for the offender if one is requested; and

- Creating a permanent record of the execution activities.

### Idaho Maximum Security Institution (IMSI) Deputy Warden of Security

The IMSI deputy warden of security shall be responsible for internal security at IMSI. In addition to the regular posts, the IMSI deputy warden of security shall be responsible for scheduling staff for additional security to begin 48 to 24 hours prior to the execution up to and including a 'level C response' in accordance with the ICS.

### Idaho State Correctional Institution (ISCI) Warden

The ISCI warden shall be responsible for establishing a field memorandum to identify authority and guidelines to coordinate media activity and providing logistical and communication support at the IDOC's south Boise complex.

**Note:** The chief of the Operations Division must approve the field memorandum.

### South Idaho Correctional Institution (SICI) Warden

The SICI warden shall be responsible for establishing a field memorandum to identify authority and guidelines to coordinate and implement external security measures, including guidelines for other law enforcement and support agencies operating on the IDOC's south Boise complex.

**Note:** The chief of the Operations Division must approve the field memorandum.

## Table of Contents

General Requirements ........................................................................................................6

1. Introduction ................................................................................................................6

2. Monitoring Appellate Activities ..............................................................................7

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 4 of 35 |

3.  Staff Conduct and Professionalism ..................................................................7

4.  Attempted Disruption of Execution Process .....................................................8

5.  Specialty Teams and their Training and Practice Requirements ......................8

    Escort Team Members – Criteria and Selection Requirements ..................8

    Medical Team Members – Criteria and Selection Requirements ...............9

    Training and Rehearsal Requirements......................................................10

6.  Licensed Physician on Site during Execution ................................................10

    Emergency Medical Personnel and Ambulance Service...........................11

7.  Death Warrants and Pregnant Females..........................................................11

8.  Stay of Execution ............................................................................................11

    Director of the IDOC..................................................................................11

    Chief of the Operations Division ...............................................................11

    Administrative Team..................................................................................11

    Deputy Chief of the Prisons Bureau .........................................................12

    IDOC Public Information Officer (PIO) ......................................................12

    IMSI Warden .............................................................................................12

9.  General Timelines ...........................................................................................12

10. Public Information and Media Access .............................................................12

    Media Center ............................................................................................13

    Media Witnesses to the Execution ...........................................................13

    Random Drawing.......................................................................................14

    Media Staging ...........................................................................................14

11. External Security .............................................................................................14

    Temporary Flight Restriction ....................................................................14

    IDOC's South Boise Complex Security Zones .........................................14

12. Those Present at Execution ............................................................................15

    State of Idaho Witness Area .....................................................................16

    Condemned Offender's Witness Area ......................................................16

    Execution Chamber ..................................................................................16

    Medical Team Room .................................................................................16

13. Upon Receipt of a Death Warrant ...................................................................16

14. Briefing and/or Communication: After the Death Warrant is Served ..............18

15. Conditions of Confinement .............................................................................18

    Property....................................................................................................18

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 5 of 35 |

Commissary ................................................................................................19

Last Meal ...................................................................................................19

Hygiene Items .............................................................................................19

Access to the Offender................................................................................19

Visitation.....................................................................................................19

Spiritual Advisor .........................................................................................20

Healthcare ..................................................................................................21

16. Thirty (30) to 21 Days Prior to the Execution ...................................................21

Director of the IDOC ...................................................................................21

Chief of the Operations Division .................................................................21

Administrative Team....................................................................................22

Deputy Chief of the Prisons Bureau ...........................................................23

IDOC PIO ...................................................................................................24

IDOC Victim Services Coordinator .............................................................24

IMSI Warden ..............................................................................................25

IMSI Warden's Offender Liaison .................................................................26

IMSI Deputy Warden (Acting as Facility Head) ..........................................26

17. Twenty-one (21) to Seven (7) Days Prior to the Execution ...............................26

Chief of the Operations Division .................................................................26

Administrative Team....................................................................................26

Deputy Chief of the Prisons Bureau ...........................................................27

IDOC PIO ...................................................................................................27

IMSI Warden ..............................................................................................27

IMSI Warden's Offender Liaison .................................................................27

IMSI Deputy Warden (Acting as Facility Head) ..........................................28

18. Seven (7) to Two (2) Days Prior to the Execution ............................................28

Chief of the Operations Division .................................................................28

Administrative Team....................................................................................28

Deputy Chief of the Prisons Bureau ...........................................................28

IDOC PIO ...................................................................................................29

Medical Team Leader..................................................................................29

IMSI Warden ..............................................................................................29

IMSI Warden's Offender Liaison .................................................................29

IMSI Deputy Warden (Acting as Facility Head) ..........................................29

19. Two (2) Days Prior to the Execution ...................................................................30

    Chief of the Operations Division ...................................................................30

    Administrative Team ...................................................................30

    Deputy Chief of the Prisons Bureau ...................................................................30

20. Twenty-Four (24) to 12 Hours Prior To the Execution ...................................................................31

    Administrative Team ...................................................................31

    Deputy Chief of the Prisons Bureau ...................................................................31

    IDOC PIO ...................................................................31

    IDOC Health Authority ...................................................................31

    IMSI Warden ...................................................................32

    IMSI Deputy Warden (Acting as Facility Head) ...................................................................32

21. Twelve (12) Hours Prior To the Execution ...................................................................32

    Deputy Chief of the Prisons Bureau ...................................................................32

    Restricting Access to IDOC Property ...................................................................32

    Population Management ...................................................................33

    Condemned Offender Activities ...................................................................33

22. Final Preparations ...................................................................33

    Witness Briefing ...................................................................33

    Procedures to Carry out the Execution ...................................................................33

23. Pronouncement of Death ...................................................................33

24. Return of Service on the Death Warrant ...................................................................34

25. Following the Execution ...................................................................34

    Administrative Team ...................................................................34

    Deputy Chief of the Prisons Bureau ...................................................................34

    Execution Chamber and Condemned Isolation Cell Cleaning ...................................................................34

    Resuming Normal Operations ...................................................................34

    Debriefing ...................................................................34

References ...................................................................35

## GENERAL REQUIREMENTS

1. **Introduction**

    Execution of an offender under sentence of death is one of the most serious responsibilities of the agency and a high regard for the dignity of all involved must be maintained.

    An execution generates public debate and attention. IDOC staff must be aware of the pressures an execution places on themselves and offenders. Extra security precautions are necessary and staff must be prepared and able to meet the situations that might arise.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 7 of 35 |

All execution procedures, for both male and female offenders, will be conducted at IMSI.

No IDOC staff member or contractor, except as identified by Idaho Code or contract, will be forced to participate in an execution and can withdraw from the process at any time without prejudice.

The IDOC shall make every effort in the planning and preparation of an execution to ensure that the execution process:

- Faithfully adheres to the letter and intent of Idaho Code, sections 19-2705, 19-2713, 19-2714, 19-2715, 19-2716, and 19-2718;

- Is handled in a manner that minimizes its impact on the safety, security, and operational integrity of the prison in which it occurs;

- Reasonably addresses the right of the offender to not suffer cruelly during the execution;

- Accommodates the public's right to obtain certain information concerning the execution and strives to minimize the impact on the community and the state of Idaho;

- Reasonably addresses the privacy interests of victims and their families;

- Provides contingency planning to identify and address unforeseen problems;

- Maintains lines of communication for stays of execution, commutations, and other circumstances up to the time that the offender is executed;

- Provides opportunity for citizens to exercise their First Amendment rights to demonstrate for or against capital punishment in a lawful manner; and

- Ensures there is an appropriate response to unlawful civil disobedience, trespass and other violations of the law by any person attempting to impact the execution or the operation of the prison.

**2. Monitoring Appellate Activities**

The deputy chief of the Prisons Bureau, in conjunction with the deputy attorneys general (DAGs) who represent the IDOC, will monitor the appellate process of those offenders under the sentence of death. When it appears that an offender may be within one year or less of exhausting his appeals, the deputy chief of the Prisons Bureau will notify the director of the IDOC, chief of the Operations Division, and the IMSI warden of the possibility of the issuance of a death warrant within the next year.

The Administrative Team will begin the planning and preparation process when an offender is determined to be possibly within this one year timeframe.

**3. Staff Conduct and Professionalism**

All IDOC staff and contractors are responsible to maintain a high degree of professionalism regarding the execution process, to include all IDOC and contract facilities that are not involved in the execution process. Expectations demonstrating professionalism include, but are not limited to, the following:

- Restraint and courtesy when interacting with offenders, witnesses, demonstrators, attorneys, news media, state of Idaho and local law enforcement and any member of the public regarding the implementation of the death penalty;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 8 of 35 |

- All assigned duties are performed proficiently and professionally; and

- Conduct that appropriately reflects the gravity of the execution process.

The names of the individuals serving on the escort and medical teams (see section 5) and the name of the on-site licensed physician (see section 6) will be treated with the highest degree of confidentiality. Any staff member who is aware of the identities of the individual team members and/or the on-site physician must maintain strict confidentiality of those identities. Any staff member who discloses the identities of any individual team member or the on-site physician will receive disciplinary action up to and including dismissal. (See SOP 205.07.01.001, *Corrective and Disciplinary Action*).

**4.   Attempted Disruption of Execution Process**

The IDOC is required by Idaho Code to carry out the execution of an offender under sentence of death. The IDOC will take those actions necessary to fulfill this requirement and prevent the disruption of an execution or disruption to the safe and orderly operation of its correctional facilities to include, but not limited to the following:

- Filming, taping, broadcasting or otherwise electronically documenting the execution of an offender;

- Trespassing and otherwise entering upon IDOC property without authorization;

- Participating in unlawful demonstrations or unlawfully attempting to disrupt, prevent and otherwise interfere with an execution; and/or

- Unlawfully threatening, intimidating and otherwise attempting to influence authorized persons involved in the execution process.

These prohibitions apply to the offender population, contractors, IDOC staff, and members of the general public.

The IDOC will ensure that adequate law enforcement officers to include but not limited to the Boise Police Department, Ada County Sheriff's Department, and/or Idaho State Police are present to ensure the safe control of citizens on IDOC property, including officers stationed at the Execution Unit, if deemed necessary.

**5.   Specialty Teams and their Training and Practice Requirements**

The execution process requires three (3) specialty teams: an Escort Team, a Medical Team, and an Administrative Team. The names of the individuals on the Escort Team and Medical Team will be treated with the highest degree of confidentiality (see section 3). The anonymity of all individuals (except those Administrative Team members who must participate as required by Idaho Code) participating in or performing any ancillary functions in the execution and any information contained in the records that could identify those individuals must remain confidential and are not subject to disclosure. The identities of escort and medical team members will be limited to the director of the IDOC, the chief of the Operations Division, and the Administrative Team.

***Escort Team Members – Criteria and Selection Requirements***

To serve on the Escort Team is strictly voluntary (staff may withdraw at any time without prejudice). Escort Team members must meet the following criteria:

- Has displayed a high degree of professionalism;

- Has displayed an ability to maintain confidentiality;

| Case 1:12-cv-00173-EJL   Document 1-7   Filed 04/06/12   Page 12 of 230 |
| --- |

| Control Number:<br>135.02.01.001 | Version:<br>3.6 | Title:<br>Execution Procedures | Page Number:<br>9 of 35 |
| --- | --- | --- | --- |

- Has had no personnel disciplinary action in the past 12 months;

- Has at least one year of satisfactory employment with the IDOC;

- Has no blood relationship or legal relationship to the victim's family; and

- Has no blood relationship or legal relationship to the condemned offender or offender's family.

**The Administrative Team** shall identify qualified personnel to serve on the Escort Team, verify their qualifications, and complete criminal background checks before approving their participation on the team.

**The deputy chief of the Prisons Bureau** will designate an Escort Team leader and at least one alternate Escort Team leader.

**The Escort Team leader** shall (a) report to and take direction from a designated Administrative Team member, and (b) ensure that all team members thoroughly understand all provisions of this SOP and are well-trained in the escort procedures.

### Medical Team Members – Criteria and Selection Requirements

The Medical Team shall consist of volunteers whose training and experience include administering intravenous (IV) drips. The Medical Team shall be responsible for inserting IV catheters, ensuring the line is functioning properly throughout the procedure, mixing the chemicals, preparing the syringes, monitoring the offender (including the level of consciousness), and administering the chemicals as described in appendix A, *Execution Chemicals Preparation and Administration*.

The Medical Team can be comprised of any combination of the following disciplines:

- Emergency medical technician (EMT);

- Licensed practical nurse (LPN);

- Military corpsman;

- Paramedic;

- Phlebotomist;

- Physician assistant;

- Physician;

- Registered nurse (RN); or

- Other medically trained personnel including those trained in the United States military.

To serve on the Medical Team, individuals must meet the following criteria:

- Must have at least three (3) years of medical experience as an EMT, LPN, military corpsman, paramedic, phlebotomist, physician assistant, physician, RN, or other medically trained personnel including those trained in the United States military;

- Has no blood relationship or legal relationship to the victim's family; and

- Has no blood relationship or legal relationship to the condemned offender or offender's family.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 10 of 35 |

**The Administrative Team** shall identify qualified personnel to serve on the Medical Team; verify their professional qualifications (to include professional license[s] and certification[s]), training, and experience; complete criminal background checks; and conduct personal interviews before approving their participation on the team.

> **Note:** Licensing and/or certification, and criminal history reviews shall be conducted, prior to entering into an agreement. These reviews shall be conducted annually and upon the issuance of a death warrant.

**The Administrative Team** shall ensure that all Medical Team members thoroughly understand all provisions of this SOP and are well-trained in the execution procedures.

**The deputy chief of the Prisons Bureau** will designate a Medical Team leader and at least one alternate Medical Team leader.

**The Medical Team leader** shall (a) have direct oversight over the Medical Team, and (b) report to and take direction from a designated Administrative Team member

***Training and Rehearsal Requirements***

The Administrative Team shall (a) ensure an annual training schedule is established, and (b) identify dates for periodic on-site rehearsal sessions by the Escort Team, Medical Team, and command staff. All training and rehearsal sessions shall be documented and submitted to a designated Administrative Team member. The training schedule shall meet the following criteria:

- The schedule shall include a minimum of 10 annual training sessions for the escort and medical teams;

- After receiving a death warrant, the Escort Team, Medical Team, and command staff will train weekly before the scheduled execution date;

- The Escort Team, Medical Team, and command staff members must participate in a minimum of four (4) training sessions prior to participating in an actual execution;

- Prior to any scheduled execution, the Escort Team, Medical Team, and command staff shall conduct a minimum of two (2) rehearsal sessions during the 48 hours before the scheduled execution; and

- Training and rehearsal sessions for the Medical Team shall include the placing of IV catheters and establishing an IV drip in a minimum of two (2) live volunteers prior to each execution.

> **Note:** If no execution is anticipated beyond the time required to assemble and adequately train the escort and medical teams, the director of the IDOC may suspend annual training.

## 6. Licensed Physician on Site during Execution

A licensed physician will be on-site and staged in or near the Execution Unit. The Administrative Team will verify the physician's professional licensure and will complete a criminal background check.

> **Note:** The on-site physician will not be a member of any teams described herein this SOP and will not participate in the execution in any way.

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 11 of 35 |

> **Note:** The on-site physician's identity shall remain anonymous and shall be protected from disclosure in the same manner described for the medical and escort team members. (See section 3 and section 4.)

The on-site physician will have access to an on-site medical crash cart, including applicable medications, and defibrillator. The physician must be a medical doctor licensed by the Idaho Board of Medicine.

The on-site physician will provide the following services:

- First Aid: Provide emergency care if needed to any person in the immediate area; and

- Resuscitation: Will assist in any necessary resuscitation effort of the offender should a problem occur with the execution process.

***Emergency Medical Personnel and Ambulance Service***

Emergency medical technicians and ambulance service will be staged near the Execution Unit as determined by the Administrative Team to provide emergency medical assistance and transport to anyone requiring such care during the process.

### 7. Death Warrants and Pregnant Females

If there is reason to believe that a female under death warrant is pregnant, the facility warden will require the offender to be examined by three (3) physicians. If the offender is found to be pregnant, the facility warden will immediately notify the prosecuting attorney of the county with jurisdiction, the Idaho governor's office, and the sentencing judge. The facility warden will suspend the execution, until the offender is no longer pregnant and the sentencing court has appointed a day for execution.

### 8. Stay of Execution

Upon receipt of notification that the court has issued a stay of execution, the director of the IDOC shall advise the chief of the Operations Division, deputy chief of the Prisons Bureau, and IMSI warden.

If the stay of execution is received immediately prior to the execution, the IMSI warden will advise the witnesses that a stay of execution has been issued. If it is anticipated that the stay will be for an extended period of time, have the witnesses escorted back to their specified staging areas.

***Director of the IDOC***

- Notify the state of Idaho governor's office; and

- Notify the executive director of the Idaho Commission of Pardons and Parole.

***Chief of the Operations Division***

- Provide a briefing to the state of Idaho's witnesses and the condemned offender's witnesses; and

- Provide a briefing to IDOC staff.

***Administrative Team***

Ensure that all chemicals and medical supplies are handled in accordance with appendix A, *Execution Chemicals Preparation and Administration*.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 12 of 35 |

### Deputy Chief of the Prisons Bureau

- Advise facilities that a stay of execution has been issued;

- Begin systematically deescalating the operation and when applicable instruct execution activities related operations to stand down; and

- When appropriate, return all IDOC and contract facilities to normal operations.

### IDOC Public Information Officer (PIO)

Issue a press release to the media.

### IMSI Warden

- If the stay is issued after the offender has been moved to the execution chamber and IV catheters have been inserted, and the stay is anticipated to be for more than two (2) hours, direct the Medical Team to remove the catheters;

- Direct the Escort Team to remove the offender from the Execution Unit and return him to a designated cell; and

- If applicable, return offender's property.

## 9. General Timelines

The processes described in this SOP are based on a timeline; however, the timeline is subject to change as needed to accommodate unforeseen events.

The timeline begins with issuance of a death warrant and concludes following the execution or stay of execution. The sequence of events is based on the following timeline:

- Issuance of the death warrant;

- 30 days prior to the execution;

- 21 days prior to the execution;

- Seven (7) days prior to the execution;

- Two (2) days prior to the execution;

- 24 hours prior to the execution;

- 12 hours prior to the execution;

- Execution procedures; and

- Post-execution activities.

## 10. Public Information and Media Access

The IDOC PIO is responsible to prepare and release information to the media. The IDOC PIO will clear each press release with the deputy chief of the Prisons Bureau before it is released to the media.

The IDOC PIO will act as the IDOC's liaison with all media agencies requesting access to the IDOC's south Boise complex or information regarding the execution. The IDOC PIO will notify all news media of the following IDOC rules that must be adhered to:

- Tobacco is not allowed within any IDOC facility;

- Weapons of any kind are not allowed on IDOC property;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 13 of 35 |

- Cameras, video cameras, cellular telephones, and recording devices are not allowed inside IMSI or the execution chamber;

- Cameras, video cameras, and recording devices are allowed in the media center and at the area(s) designated for media on the IDOC's south Boise complex;

- Are subject to search (metal detector and random pat search);

- Must arrive at the facility at the designated time; and

- Must enter IDOC property as instructed.

### Media Center

A media center will be established and will be located on property at the IDOC's south Boise complex.

The term "news media representative" shall be defined as a person whose primary employment is gathering or reporting news for:

- A newspaper as defined in Idaho Code, section 60-106;

- A news magazine having a national circulation being sold by newsstands and by mail circulation to the general public;

- Radio and television news programs of stations holding Federal Communication Commission licenses; and

- The Associated Press.

Because advances in information technology have blurred the definition of the term 'news media', resulting in there being no commonly accepted definition of the term, and because IDOC has an obligation to assure the orderly operation of the media center by regulating access to center, news organizations which distribute content primarily via a website will be admitted on a case-by-case basis. The IDOC PIO will verify that each web-based organization is a bona fide news media. The director of the IDOC will be the final authority to approve admittance of news media representatives from web-based news agencies.

### Media Witnesses to the Execution

In addition to the media center where news media representatives will be provided information and briefings, the IDOC has allotted four (4) seats for news media representatives to witness the execution. News media organizations wishing to have reporters witness the execution must submit their representatives' names, birth dates and Social Security numbers at least 14 days prior to the scheduled execution for the purposes of undergoing a criminal background check and approval (see appendix B, *Media Notification and Agreement*). The four (4) media seats are comprised as follows:

- One media witness seat is allocated to the Associated Press. The Associated Press will select the reporter.

The following media witness seats are selected by random drawings:

- One media witness seat is allocated to media representing the region that serves the county of conviction. The director of the IDOC will determine which media agencies provide substantial coverage to the residents in the county of conviction for admittance into the pool for this seat;

- One seat is allocated for local print/internet; and

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 14 of 35 |

- One seat is allocated for local broadcast media.

> **Note:** Local media is defined as a print/internet or broadcast media whose primary mission is to cover and deliver local news to the residents of Idaho. Each media organization may submit no more than one person as a possible media witness.

### Random Drawing

Approximately one week before the scheduled execution, the IDOC PIO will conduct the random drawing for three (3) media seats. The drawing shall include selecting alternative representatives should the primary representative withdraw prior to the execution.

News media representatives requesting access to the media center must complete appendix B, *Media Notification and Agreement,* and agree to return directly to the media center following the execution and share their information with the other news media representatives. The IDOC PIO will facilitate that discussion and briefing.

### Media Staging

The deputy chief of the Prisons Bureau will determine the schedule and location for media vehicle staging and the schedule when news media representatives who are not participating in the witness pool must arrive.

News media representatives who have been selected to witness the execution must arrive at the media center at the time designated by the IDOC PIO, which is approximately three (3) hours before the scheduled execution.

News media representatives will sign in at the designated media center.

ISCI will provide two (2) escort officers and a transport van to transport the news media representatives selected to be present at the execution from the media center to IMSI. The news media witnesses will join the other state of Idaho witnesses to be escorted to the Execution Unit.

The transport officers will remain in a pre-assigned area at IMSI until the execution is declared completed by the IMSI warden. The escort officers will then transport the media representatives back to the media center to participate in the news conference.

## 11. External Security

### Temporary Flight Restriction

In consultation with local law enforcement and home land security, the deputy chief of the Prisons Bureau will assess any security threat or risk posed by air craft. If a security or safety risk involving aircraft is perceived, before the execution the deputy chief of the Prisons Bureau will request through appropriate channels that the Federal Aviation Administration (FAA) place a temporary flight restriction (TFR) surrounding the IDOC's south Boise complex consisting of the following (see section 16). An example of the TFR airspace would be as follows:

- **Radius:** Three (3) nautical miles
- **Altitude:** 500 feet from the surface

### IDOC's South Boise Complex Security Zones

The IDOC property south of Boise known as IMSI, ISCI, SICI, and South Boise Women's Correctional Center (SBWCC) will be broken down into four (4) security areas:

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 15 of 35 |

- **Inner perimeter zone:** the respective facilities fences
- **Controlled perimeter zone**: an extended perimeter around the four (4) facilities
- **Restricted zones:** areas designated for the media
- **Extended zones:** areas designated for observers/demonstrators.

At the designated time, the SICI warden will control access to the IDOC's south Boise complex to include IMSI, ISCI, SICI, and SBWCC.

SBWCC will provide security staff as needed to the SICI warden to help support security of the controlled perimeter zone.

The SICI warden is responsible for establishing posts at strategic access and checkpoints in the controlled perimeter zone surrounding the facilities.

## 12. Those Present at Execution

The director of the IDOC (or designee) shall have the discretion to determine the number of persons allowed in the Execution Unit during the execution procedure. In exercising this discretion, the director of the IDOC (or designee) shall consider the safe and orderly operation of IMSI, the interests of the victim's family, and whether multiple death warrants are being executed concurrently. Persons allowed in the Execution Unit are as follows.

**Note:** Individual placement of attendees in the Execution Unit is subject to change at the discretion of the IMSI warden.

- The Administrative Team;
- The Escort Team (up to four [4] members total);
- The Medical Team;
- The on-site physician (one total);
- The director of the IDOC (or designee);
- An Idaho Board of Correction representative (one total);
- The chief of the Operations Division (or designee);
- The IMSI warden (or designee) (one total);
- The Ada County coroner (one total);
- The prosecuting attorney from the county of conviction (one total);
- The sheriff from the county of conviction (one total);
- The sentencing judge (one total);
- The Idaho governor (or his representative) (one total);
- The Idaho attorney general (or his representative) (one total);
- Members of the victim's family (two [2] total);
- A spiritual advisor of the offender's choosing (one total);
- Friends (approved visitors) or members of the offender's family (two [2] total);
- The offender's attorney of record (one total); and

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 16 of 35 |

- Members of the news media (up to four [4] total, see section 10).

The Execution Unit includes witness areas, the execution chamber, the Medical Team room, and staging areas. The persons in each area are as follows:

### State of Idaho Witness Area

- An Escort Team member (one total);

- The chief of the Operations Division;

- Members of the victim's family (two [2] total);

- Members of the news media (up to four [4] total in accordance with section 10);

- The prosecuting attorney from the county of conviction (one total);

- The sheriff from the county of conviction (one total);

- The sentencing judge (one total);

- An Idaho Board of Correction representative (one total);

- The Idaho governor (or his representative) (one total); and

- The Idaho attorney general (or his representative) (one total).

### Condemned Offender's Witness Area

- An Escort Team member (one total);

- IDOC liaison for offender's family;

- Friends (approved visitors) or members of the offender's family (two [2] total);

- The offender's attorney of record (one total); and

- A spiritual advisor of the offender's choosing (one total);

### Execution Chamber

Other than the offender, the other individuals authorized to be in the execution chamber are:

- Escort Team members (up to two [2] total);

- Interpreter (if necessary);

- The director of the IDOC; and

- The IMSI warden (or designee).

**Note:** The Ada County coroner and the on-site physician (see section 6) will be located in a staging area <u>near</u> the execution chamber as determined by the IMSI warden.

### Medical Team Room

- Only the Medical Team; and

- Only the Administrative Team.

## 13. Upon Receipt of a Death Warrant

Upon the receipt of a death warrant by the director of the IDOC, the following steps will be implemented.

| Control Number:<br>135.02.01.001 | Version:<br>3.6 | Title:<br>Execution Procedures | Page Number:<br>17 of 35 |
|---|---|---|---|

**Note:** If the warrant is delivered to a facility warden instead of the director of the IDOC, the facility warden will implement step 4, and immediately notify the director, the chief of the Operations Division, and the deputy chief of the Prisons Bureau.

| Functional Roles and Responsibilities | Step | Tasks |
|---|---|---|
| **Director of the IDOC** | 1 | • Immediately notify the warden of the facility in which the offender is housed **and** the IMSI warden; and<br><br>• Immediately forward the death warrant to the warden of the facility in which the offender is housed. |
| Director of the IDOC | 2 | Notify the:<br>• Idaho Board of Correction;<br>• Executive director of the Idaho Commission of Pardons and Parole;<br>• Idaho governor's office; and<br>• IDOC PIO. |
| **Facility Warden** | 3 | Begin a log to provide a comprehensive chronological history of every aspect of the execution procedure. |
| Facility Warden | 4 | Serve the death warrant on the offender. |
| Facility Warden | 5 | Immediately segregate the offender from the general offender population (see section 15). |
| Facility Warden | 6 | Place the offender under constant observation by two (2) staff members for 24 hours a day, seven (7) days a week.<br><br>**Note:** An observation logbook will be immediately established to record staff's observation of the offender's activities and behavior until the offender is executed or a stay of execution is received. Entries will be chronological. Each day will be recorded beginning at midnight as M/DD/YYYY. During the final four (4) hours before the execution, staff shall record each entry noting the time in hours and minutes, and make entries a minimum of once every 30 minutes. |
| Facility Warden | 7 | Notify the facility health authority **and** clinician that the offender has been placed in solitary confinement under a death warrant. |
| Facility Warden | 8 | • Notify the sentencing court that the death warrant has been served;<br><br>• Retain the original death warrant;<br><br>• Place a copy of the death warrant in the offender's central file;<br><br>• Provide the offender with a copy of the death warrant; and<br><br>• Forward a copy of the death warrant to the lead DAG who represents the IDOC. |

| Control Number:<br>135.02.01.001 | Version:<br>3.6 | Title:<br>Execution Procedures | Page Number:<br>18 of 35 |
|---|---|---|---|

| Functional Roles and Responsibilities | Step | Tasks |
|---|---|---|
| Facility Warden | 9 | Within 24 hours after the death warrant is served, appoint a staff member (normally an IMSI deputy warden) to relieve the warden of all duties except those duties related to the execution procedure until there is a stay of execution **or** the execution process has been completed. |
| Facility Warden | 10 | Appoint a staff member to serve as liaison between the condemned offender, the offender's family, and the IMSI warden (if the offender does not speak English ensure an interpreter is obtained and available to communicate with offender); |

**14. Briefing and/or Communication: After the Death Warrant is Served**

The facility warden shall ensure that at a minimum, a weekly briefing will occur for all involved staff commencing after the death warrant is served until the facility has returned to normal operations. The CISM team members will be available to speak with interested and affected staff, individuals, or groups who have been identified by the facility warden or other staff.

At a minimum, briefings and/or communication will be conducted as follows:

- Immediately after the death warrant is served;

- If any changes are made to the established execution timeline;

- As deemed necessary to keep staff well informed during the week prior to the execution; and

- The day after the execution.

**15. Conditions of Confinement**

Immediately following the service of a death warrant, the offender will be moved to a predetermined isolation cell in accordance with Idaho Code, section 19-2705. The isolation cell will be supplied a fresh mattress and pillow that has been thoroughly inspected, and clean bedding. An unclothed body search will be conducted and the offender will be given clean clothes and different shoes.

Identify any special accommodations that are required if the offender has a disability or other special need.

Until the execution has been stayed or completed, any movement of the offender will require that he be escorted in full restraints, by two (2) correctional staff.

The offender will be placed under 24-hour, constant observation by two (2) uniformed staff members until there is a stay of execution or the offender is transferred to the execution chamber.

The offender will be allowed daily outdoor exercise, showers, and telephone access.

The offender will be provided access to a television set.

***Property***

The offender's personal property will be handled as provided in this section.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 19 of 35 |

The offender's personal property shall be inventoried. The offender will be allowed to keep not more than six (6) cubic feet of legal papers and religious materials, a pencil and paper, books or periodicals, and commissary food items. All remaining property will be boxed, sealed and removed from the cell. It will be stored pending receipt of written instructions from the offender regarding disposition of property or otherwise disposed of as outlined in directive 312.02.01.001, *Death of an Inmate*.

### Commissary

The offender will be allowed to purchase food items from the commissary until the delivery date of commissary is within seven (7) days of the execution, the IMSI warden can extend this time frame at his discretion. Non-food purchases must be approved by the IMSI warden. The spending limit will be the same as established in SOP 320.02.01.001, *Property: State-issued and Offender Personal Property*. However, the IMSI warden can increase or decrease this amount with approval of the deputy chief of the Prisons Bureau. The offender may retain consumable commissary items as approved by the IMSI warden until completion of the last meal.

### Last Meal

For the last meal, the offender can select a meal from the established IDOC menu. The last meal will be provided to the offender at approximately 1900 hours the day prior to the scheduled execution.

### Hygiene Items

The offender shall receive limited hygiene supplies (bar soap, toothpaste and toothbrush) and a towel and washcloth. These items will be exchanged on a daily basis.

The offender will be issued a clean set of clothing and bedding daily.

The offender will be provided (issued by staff) a safety razor to shave. Staff will immediately remove the razor from the offender's possession after he has finished shaving.

### Access to the Offender

Access will be limited to the following:

* Law enforcement personnel investigating matters within the scope of their duties;

* The offender's attorney of record;

* Agents of the offender's attorney of record; and

* Attending physician/healthcare staff.

Access is defined as those activities that are necessary for official business. Law enforcement personnel, attorneys of record and their agents, and attending physician/healthcare staff are considered as official business and such access will be a contact visit.

### Visitation

Visitation will be limited to the following:

* Spiritual adviser of the offender's choosing;

* Approved visitors;

* Members of the offender's immediate family, specifically the offender's:

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 20 of 35 |

♦ Mother or father, including step parents;

♦ Brothers or sisters of whole or half (½) blood, by adoption or stepbrothers or stepsisters;

♦ Lawful spouse verified by marriage license or other operation of law;

♦ Natural children, adopted children, or stepchildren;

♦ Grandparents of blood relation; and

♦ Grandchildren of blood relation.

All visitations must be in accordance with SOP 604.02.01.001, *Visiting*, and the guidelines established herein this SOP.

The offender's attorney of record and his agents will be provided contact visits. Such contact visits will be under staff visual observation, but so that the staff members cannot hear the conversation.

**Note:** For the purposes of this section, 'agents of the attorney of record' means employees of the attorneys of record including investigators, paralegals, legal interns and mitigation specialists but does not include retained experts or other independent contractors of the attorneys of record.

Immediate family and approved visitors must be approved in accordance with SOP 604.02.01.001, *Visiting*. Normally, minor children will not be allowed to visit and any exception must be approved by the deputy chief of the Prisons Bureau.

Approved visitors and immediate family may be allowed non-contact visits until seven (7) days before the execution date. Any exception to this rule must be approved by the deputy chief of the Prisons Bureau. Between serving the death warrant until seven (7) days before the execution, all visits with immediate family, approved visitors, and spiritual advisor will be non-contact.

In the seven (7) days immediately before the execution, if there is no stay of execution, visits with approved visitors who are not immediate family will cease. This time frame can be extended by the IMSI warden in collaboration with the deputy chief of the Prisons Bureau.

In the seven (7) days immediately before the execution, approved immediate family and spiritual advisor may be granted contact visits with the offender. (The offender's attorney of record will continue to have contact visiting during the seven [7] days immediately before the execution.)

The IMSI warden shall establish the frequency and duration in which visits occur and shall have the authority to suspend or deny visits when public safety or the safe, secure and orderly operation of the prison could be compromised.

**Note:** If there is a stay of execution, the IMSI warden will determine housing in accordance with SOP 319.02.01.001, *Restrictive Housing*, and visiting in accordance with SOP 604.02.01.001, *Visiting*.

### *Spiritual Advisor*

The offender can request a spiritual advisor of his choosing. The spiritual advisor must be approved by the facility warden before visitation can occur. The spiritual advisor cannot be an IDOC staff member or the staff member of a contract facility. The spiritual

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 21 of 35 |

advisor will normally be an approved religious volunteer or member of the clergy. The spiritual advisor may be a contract provider for volunteer and religious activities in accordance with the requirement of that contract.

### Healthcare

The IMSI warden shall request that the facility health authority review the condemned offender's healthcare record and identify any prescribed medication(s) or health care issues.

Facility healthcare services staff shall dispense all medications in unit doses and when available, in liquid form. No medication including over-the-counter medications shall be provided or maintained by the offender as keep-on-person.

The facility health authority shall provide the offender an opportunity to complete an Idaho Physician Orders for Scope of Treatment form.

Facility healthcare services staff will take necessary steps to maintain the offender's health prior to the execution and shall respond appropriately to health care issues and emergencies including suicide attempts and will take reasonable steps to revive the offender in medical distress at all times prior to the execution, unless the offender has a "do not resuscitate" request on file.

Facility healthcare services staff will monitor the offender daily for significant changes in the offender's medical or mental health and if the offender's health changes, facility healthcare services staff must report the offender's condition immediately to the IMSI warden.

> **Note:** All access, visits, etc. will be documented in the constant observation log.

### 16. Thirty (30) to 21 Days Prior to the Execution

After serving the death warrant until 21 days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the deputy chief of the Prisons Bureau.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

### Director of the IDOC

- Continue communication with the Idaho Board of Correction;

- Continue communication with the Idaho governor (or his representative);

- Communicate as needed with the executive director of the Idaho Commission of Pardons and Parole; and

- Meet with the chief of the Operations Division, the deputy chief of the Prisons Bureau, and other members of the IDOC Leadership Team as needed.

### Chief of the Operations Division

- Continue to provide briefings to IDOC staff;

- Send appendix C, *State Witness Notification and Agreement,* to the following and establish a deadline for the return of all forms:

  - The Ada County Coroner;

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 22 of 35 |

- ♦ The prosecuting attorney from the county of conviction;

- ♦ The sheriff from the county of conviction;

- ♦ The sentencing judge;

- ♦ The Idaho governor;

- ♦ The Idaho attorney general;

- ♦ The Idaho Board of Correction; and

- Monitor planning related to the scheduled execution.

***Administrative Team***

- Finalize arrangements with the Ada County coroner's office for the disposition of the body, security for the Ada County medical examiner's vehicle, and the custodial transfer of the body;

- Evaluate the candidates to serve on the escort and medical teams (see section 5), approve or deny each candidate, review the current specialty team rosters, and make replacements if needed;

- Ensure the assigned Medical Team members physically evaluate the offender to predetermine appropriate venous access locations;

- Ensure that all of the equipment such as electrical, audio, plumbing, HVAC units in the execution chamber are tested periodically to ensure they are in working order;

- Contact licensed physician to ensure he is available to perform duties as identified herein;

- Assign a staff member to test and perform maintenance as needed to all utilities (HVAC units, plumbing, electrical etc.) in the Execution Unit and establish a schedule for testing and reporting unit status during the time leading up to the execution date;

- Ensure the Medical Team room and execution chamber are equipped with one synchronized clock each. The synchronized clocks will be the official time keeping devices for the execution procedures.

- Ensure that execution chemicals and other medical supplies have been purchased and/or that sources have been established. When chemicals are received, immediately start a chain of custody document, secure the chemicals, and monitor to ensure compliance with manufacturer specifications. Access to the chemicals must be limited the members of the Administrative Team;

- If chemicals are on site, check the expiration dates on each item to ensure they will not expire before the execution date. If any item will expire before the execution date, immediately dispose of it appropriately;

- Consult with Medical Team members regarding the equipment for the procedure and ensure all equipment necessary to properly conduct the procedure is on site, immediately available for use and functioning properly;

- Ensure that all backup medical equipment, including a backup electrocardiograph (EKG) machine and instruments, crash cart, and defibrillator are on site, immediately available for use and functioning properly;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 23 of 35 |

- Check applicable sterilization dates on medical supplies to ensure they are useable on the execution date;

- Ensure that the Escort Team, Medical Team, and command staff are conducting training (see section 5) in preparation for the execution; and

- Ensure that communication devices with inter-operability capability and restricted frequencies are available and will be on site before the execution date.

***Deputy Chief of the Prisons Bureau***

- Notify facility heads at all IDOC correctional facilities of the pending execution and provide instruction to the facility heads regarding staff briefings and expectations;

- Request that all IDOC facility heads develop incident action plans (IAP) for their respective facilities for facility management during the period leading up to and following the execution. The IAPs must be submitted to the deputy chief of the Prisons Bureau at least 21 days before the scheduled execution date;

- Contact the IDOC contract monitor and Correctional Alternative Placement Program (CAPP) and Idaho Correctional Center (ICC) facility heads to discuss their respective IAPs for facility management during the period leading up to and following the execution. The CAPP and ICC facilities must submit their IAPs to the IDOC 21 days before the execution date;

- Identify and assign team leaders and members, and activate the teams;

- Establish the four (4) security areas of the IDOC's south Boise complex and provide that information to facility heads and other staff as needed see section 11;

- Confirm with the IMSI warden that the training schedule has been activated ensuring that staff members participating in the execution have received adequate training, written instruction and practice, and that all training has been documented;

- Discuss preparations at IMSI with the IMSI warden;

- Confirm with all IDOC south Boise complex facility wardens that the training schedule has been activated ensuring that staff members participating in the execution have received adequate training, written instruction and practice, and that all training has been documented;

- Contact the CISM team;

- Notify the IDOC victim services coordinator of the court's issuance of a death warrant;

- If warranted, request through the appropriate authority that the Federal Aviation Administration (FAA) place a 24 hour temporary flight restriction (TFR) surrounding the IDOC's south Boise complex consisting of the following:

    - **Radius:** Three (3) nautical miles

    - **Altitude:** 500 feet from the surface

- Ensure state of Idaho and local law enforcement is periodically briefed and adequately prepared for the execution;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 24 of 35 |

- Establish the agenda, schedule meetings, and lead the discussion with state of Idaho and local law enforcement and applicable IDOC staff regarding community safety, traffic control, and crowd control;

- Ensure that personnel from law enforcement agencies who have not participated in training sessions or who have not previously been involved in the execution process are briefed and their responsibilities explained;

- Invite state of Idaho and local law enforcement liaisons to participate in periodic briefings about the execution and its impact on the community including access restrictions, crowd control, additional security precautions that may be warranted, and other pertinent information. Collaborate with each agency to determine each agency's role and each jurisdiction's responsibilities;

- Schedule tabletop and simulation exercises with state of Idaho and local law enforcement identifying areas and activities for improvement and incorporate the findings into future simulations; and

- If it is determined that any IDOC staff member, contractor, volunteer, or other offender under IDOC jurisdiction is a family member, has a legal or other significant relationship with the condemned offender, the condemned offenders' family, the victim, or the victim's family, contact the applicable manager to discuss potential issues and ensure that appropriate management and/or support plans are developed.

### IDOC PIO

- Issue a news release announcing the date and time of the execution;

- Send appendix B, *Media Notification and Agreement,* to media liaisons and establish a deadline for the return of all forms; and

- Facilitate up to one telephone interview with the offender per day with Idaho media from the day the death warrant is issued until the day before the execution (excluding weekends and state of Idaho and federal holidays). The offender and his attorney of record may select the order in which the interviews occur. The offender may refuse any or all media requests for interviews.

### IDOC Victim Services Coordinator

Determine if the IDOC has recorded victims who have requested notification. If such victims exist, obtain contact information for each victim (minor children will not be allowed to witness an execution). The victim service coordinator will provide the contact information to the chief of the Operations Division. If possible, the chief of the Operations Division will first make contact with the victim's family by telephone.

- Send each victim who has identified themselves to the IDOC appendix D, *Victim's Family Witness Notification and Agreement* using certified mail with a return receipt;

- The requests to be present at the execution must be received at least 14 days before the execution; and

- Notify the IDOC victim services coordinator in the county in which the crime originated.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 25 of 35 |

*IMSI Warden*

- Begin an execution log to be kept in the IMSI warden's office. This log will provide a comprehensive and chronological history. The IMSI warden will document every aspect of the execution proceeding, including tasks and/or actions assigned to, or completed by an Administrative Team member, until the offender has been executed or has received a stay of execution order. When the process has been completed either by execution or stay, the log will be placed in the offender's central file;

- Ensure that the facility health authority provides the offender an opportunity to complete an Idaho Physician Order for Scope of Treatment form;

- Ensure that the facility healthcare service is providing medications in unit doses and when available, in liquid form; that no medication, including over-the-counter medication, is being provided to the offender as keep-on-person; and that any medication the offender has requested be discontinued is no longer being provided;

- Discuss with the offender the options available for the disposition of his body after it has been released by the Ada County coroner. Advise the offender that he cannot donate his body for organ donation;

- Inform the offender that he can request a spiritual advisor and ask if the offender would like to request a spiritual advisor now;

- Inform the offender that a total of two (2) adult family members or friends (approved visitors), his attorney of record, and a spiritual advisor may be present at the execution. The offender can decline any of these individuals who want to witness the execution. No minors (see section 16) or other offenders can witness the execution;

- Outline how conditions of confinement will be modified over the next 30 days and briefly describe the relevant aspects of the execution process;

- Offer the offender the opportunity to contact his attorney of record by phone and to speak with a facility volunteer and religion coordinator (VRC) or spiritual advisor;

- Advise the offender he may request a last meal. The meal can be his choice from the IDOC standard food service menu;

- Provide the offender with a copy of appendix E, *Summary of Procedures*. (Attach the signed original to the IMSI warden's execution log.);

- Ensure that the offender's file is reviewed thoroughly to determine if there are any IDOC staff members, contractors, or volunteers who are family members, have a legal relationship, or any other significant relationship with the condemned offender, the victim, or victim's family; or if there are any offenders under IDOC jurisdiction who are family members, have a legal relationship, or any other significant relationship with the condemned offender, the victim, or victim's family. If any such persons are identified, relay that information to the deputy chief of the Prisons Bureau;

- Notify the commissary provider of the restrictions placed on the offender's commissary purchases;

- Contact the condemned offender's family by telephone to inform them of the scheduled execution date, the name and contact information of the warden's liaison, and any other related issues;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 26 of 35 |

- Within two (2) business days of receiving a death warrant, send appendix F, *Offender's Friend/Family Witness Notification and Agreement,* to the offender's family by certified mail citing the date of execution and informing them of their liaison person. The notification will inform them that if they choose to receive the remains that they are responsible for making arrangements for the offender's burial, or the state of Idaho will have the remains cremated;

- Inform the offender and the offender's family that disposition of remains information must be received seven (7) days before the execution date and that if the offender does not provide information for disposal of his remains, his remains will be disposed of in accordance with directive 312.02.01.001, *Death of an Inmate.* (Give the offender a copy of directive 312.02.01.001.);

- Request that the IDOC health authority develop a medical emergency response plan that provides adequate emergency response in the Execution Unit; and

- Ensure that healthcare services staff obtain the offender's current weight and enter that information into the IMSI warden's execution log.

***IMSI Warden's Offender Liaison***

Meet with the condemned offender at least once each working day and forward all of the offender's questions and concerns directly to the IMSI warden.

***IMSI Deputy Warden (Acting as Facility Head)***

- Establish a management plan including staffing, meals, and contingency plans to ensure the safe and orderly operation of the facility during the time leading up to the execution;

- Brief the deputy chief of the Prisons Bureau on the management plan; and

- Monitor IMSI activities and brief the deputy chief of the Prisons Bureau if any concerns or problems arise.

## 17. Twenty-one (21) to Seven (7) Days Prior to the Execution

Twenty-one (21) to seven (7) days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the deputy chief of the Prisons Bureau.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Chief of the Operations Division***

- Continue to provide briefings to IDOC staff;

- Compile a list of state of Idaho and media witnesses including pool reporters, and submit the list and all completed state witness notification and agreements (appendix C) and media notification and agreements (appendix B) to the deputy chief of the Prisons Bureau; and

- Monitor planning related to the scheduled execution.

***Administrative Team***

- Ensure that the Escort Team, Medical Team, and command staff are conducting training (see section 5) in preparation of the execution;

| Control Number: | Version: | Title: | | Page Number: |
|---|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | | 27 of 35 |

- Contact the Ada County coroner's office and determine the protocol regarding the transfer of the offender's body to the coroner's possession following the execution and forward that information to the IMSI warden; and

- Take steps to resolve outstanding equipment and inventory issues.

### Deputy Chief of the Prisons Bureau

- Brief director of the IDOC and chief of the Operations Division;

- Continue to conduct tabletop and live exercises with the previously identified teams;

- Review IDOC, CAPP, and ICC facility IAPs, and continue discussion and preparation with facility heads;

- Contact the CISM team leader and ensure the team is making appropriate preparations; and

- Convene a meeting with state of Idaho and local law enforcement agencies to discuss any changes or modifications to crowd control, traffic control, and community safety.

### IDOC PIO

- Address media-specific inquiries;

- Forward all completed media notification and agreements (appendix B) to the deputy chief of the Prisons Bureau (or designee) for a criminal background check;

- Arrange telephone interviews with the offender up to one day prior to the execution; and

- Notify members of the media regarding the status of their witness applications.

### IMSI Warden

- Visit with the condemned offender as needed;

- Retrieve the completed *Offender's Friend/Family Witness Notification and Agreement* (appendix F) and answer any questions the offender may have;

- Ensure the offender has provided directions for the handling of his remains. (If the offender provides no information or the information is insufficient or incorrect, the deceased shall be disposed of in accordance with directive 312.02.01.001, *Death of an Inmate*.);

- Ensure that the offender has had the opportunity to complete an Idaho Physician Orders for Scope of Treatment form;

- Ensure the offender has provided directions for the disposition of his property and offender trust fund; and

- Meet with the facility health authority and IDOC health authority to review plans for coverage and emergency response before and following the scheduled execution.

### IMSI Warden's Offender Liaison

- Continue daily contact with the offender;

- Stay in contact with the condemned offender's family; and

- Update the IMSI warden on any issues, requests, or questions.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 28 of 35 |

### *IMSI Deputy Warden (Acting as Facility Head)*

- Ensure that the necessary action steps have been taken regarding the IMSI management plan including staffing, meals, and contingency plans to ensure the safe and orderly operation of the facility during the time leading up to the execution;

- Brief the deputy chief of the Prisons Bureau on the status of the management plan; and

- Continue to monitor IMSI activities and brief the deputy chief of the Prisons Bureau if any concerns or problems arise.

### 18. Seven (7) to Two (2) Days Prior to the Execution

Seven (7) to two (2) days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the deputy chief of the Prisons Bureau.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

### *Chief of the Operations Division*

- Continue to provide briefings to IDOC staff;

- Gather the names of those planning to be present in the Execution Unit; and

- Monitor planning related to the scheduled execution.

### *Administrative Team*

- Ensure that the Escort Team, Medical Team, and command staff have completed adequate training sessions (see section 5);

- Confirm preventive maintenance of the execution chamber is current;

- Test equipment, lighting, audio, HVAC units, etc. in the execution chamber;

- Ensure that audio/video equipment is ready and operational if needed;

- Confirm that the inventory of equipment, necessary supplies, and backup materials are on-site;

- Recheck the medical supplies and chemicals to ensure that each item is ready, expiration dates have not been exceeded, items are properly packaged, and if applicable sterilized; and

- At least three (3) days before the scheduled execution date, obtain technical assistance for the purpose of reviewing the lethal substances, the amounts, the methods of delivery and injection, and the offender's physical and historical characteristics to evaluate compliance with this SOP. The individual(s) conducting the technical review will observe the Medical Team place IV catheters and establish an IV drip line in a live body. The individual(s) conducting the technical review will meet with the Administrative Team to review his findings. The director of the IDOC will make the final determination regarding compliance with this SOP.

### *Deputy Chief of the Prisons Bureau*

- Brief director of the IDOC and chief of the Operations Division;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 29 of 35 |

- Stand up the ICS center;

- Continue tabletop and live exercises;

- Confirm staffing levels and necessary vehicles for regular operations and the execution are appropriate and ready;

- Ensure local law enforcement agencies are fully briefed;

- Gather all information regarding media, potential media witnesses, and those who will be present at the execution; and

- In conjunction with the IDOC Leadership Team, ISCI, and IMSI wardens, finalize the media plan, potential media witnesses, and those who will be present at the execution.

### IDOC PIO

- Conduct the random drawing, approximately seven (7) days prior to the execution, for three (3) media seats, to include alternate representatives should the primary representative withdraw prior to the execution;

- Complete a list of the media representatives that want to be on or near the IDOC's south Boise complex and/or be in the media center, but not present at the execution;

- Forward the lists of media agencies, media staff members, and potential media witnesses to the director of the IDOC, chief of the Operations Division, deputy chief of the Prisons Bureau, and IMSI warden; and

- Conduct a preliminary briefing with potential media witnesses and media representatives serving as pool reporters.

### Medical Team Leader

- Ensure serviceability of all medical equipment including EKG machines (to include instruments) and/or defibrillator, and the availability of graph paper; and

- Ensure heart monitor lead lines are sufficient in length.

### IMSI Warden

- Meet with the condemned offender as needed; and

- Address any unresolved questions or issues.

### IMSI Warden's Offender Liaison

- Continue daily contact with the offender;

- Have the offender complete a withdrawal slip for any remaining funds in his trust account and designate to whom the funds should be sent;

- Stay in contact with the condemned's family; and

- Update the IMSI warden on any issues, requests, or questions.

### IMSI Deputy Warden (Acting as Facility Head)

- Review staffing to ensure there is adequate coverage near the execution date;

- Review use of force inventories, less than lethal weapons and munitions to ensure that adequate supplies are in place if needed for emergency response;

- Brief shift commanders, unit sergeants, and case managers;

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 30 of 35 |

- Ensure that proper tool and key control procedures are being followed;

- Ensure that transportation vehicles that are not assigned to the execution process are available if needed for IMSI operational needs;

- Meet with maintenance staff to review any problems or concerns with infrastructure;

- Meet with the facility health authority to ensure that an adequate emergency response plan is in place for the time frame near the execution; and

- Brief the IMSI warden and the deputy chief of the Prisons Bureau regarding the emergency plan preparedness and any issues or concerns.

**19. Two (2) Days Prior to the Execution**

Two (2) days prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the deputy chief of the Prisons Bureau.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Chief of the Operations Division***

- Continue to provide briefings to IDOC staff; and

- Monitor planning related to the scheduled execution.

***Administrative Team***

- Conduct at least two (2) rehearsal sessions with the Escort Team, Medical Team, and command staff (see section 5);

- Confirm that escort and medical teams, a licensed physician (see section 6), emergency medical personnel, and the Ada County coroner are scheduled and will be on-site at the established time;

- Restrict access to the execution chamber to those with expressly assigned duties;

- Ready the execution chamber for the offender; and

- Verify execution inventory and equipment checks are completed and open issues resolved.

***Deputy Chief of the Prisons Bureau***

- Schedule and conduct IDOC south Boise complex simulation exercises, as necessary and modify practices if warranted;

- Ensure that contracted services have planned their activities to coincide with the incident action plans for modified operational status related to the scheduled execution;

- Contact IDOC, CAPP, and ICC facility heads to monitor their preparation and status;

- and

- Confirm adequate staffing, equipment, and materials are in place for regular operations and the execution.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 31 of 35 |

**20. Twenty-Four (24) to 12 Hours Prior To the Execution**

Twenty-four (24) to 12 hours prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the deputy chief of the Prisons Bureau.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Administrative Team***

- Ensure the final preparation of Execution Unit is complete. Each room receives a final evaluation specific to its functions including security, climate control, lighting, sound and sanitation;

- Ensure that video monitoring and intercom systems are functioning properly;

- Ensure the Medical Team room and execution chamber clocks are accurately set and working;

- Ensure that appropriate restraints are ready;

- Ensure that communication devices are ready;

- Ensure that the Medical Team leader checks the EKG machine instruments to confirm they are functioning properly;

- Ensure that the crash cart and defibrillator are in place and functioning properly; and

- Check medical supply and chemical inventory.

***Deputy Chief of the Prisons Bureau***

- Activate the following teams:

  - ♦ Command
  - ♦ CERT
  - ♦ Maintenance
  - ♦ CISM
  - ♦ Traffic Control Team

- Ensure CISM is activated state-wide;

- Modify operation of the IDOC's south Boise complex;

- Contact IDOC, CAPP, and ICC facility heads to ensure they are prepared to activate their IAPs for modified operation; and

- Establish the ICS command center.

***IDOC PIO***

Establish the media center.

***IDOC Health Authority***

Conduct a review of the offender's healthcare.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 32 of 35 |

***IMSI Warden***

- Ensure that all the offender's remaining property, except one religious item, is removed and inventoried, and that the offender has completed a disposition sheet for his property;

- Ensure that witness areas are in order;

- Ensure that transportation vehicles are ready; and

- Ensure that food service is prepared to serve offender his last meal request.

***IMSI Deputy Warden (Acting as Facility Head)***

- Activate the IMSI management plan;

> **Note:** the plan can be activated earlier if activities, behaviors, or other issues indicate it prudent to do so.

- Ensure that detailed staff briefings are provided; and

- Ensure that CISM is on-site at IMSI.

## 21. Twelve (12) Hours Prior To the Execution

Twelve (12) hours prior to the execution, the following activities will occur. If any of the activities identified in this section cannot be achieved within this timeframe, the responsible party will notify the director of the IDOC, chief of the Operations Division, and the Administrative Team.

Unless a specific timeline is identified, the tasks outlined in this section are not required to be completed in a specific order.

***Deputy Chief of the Prisons Bureau***

Contact IDOC, CAPP, and ICC facility heads to ensure they have activated their incident action plans for modified operation.

***Restricting Access to IDOC Property***

During the final twelve hours prior to the execution, access to the IDOC's south Boise complex is limited. Restrictions shall remain in effect until normal operations resume after the execution or a stay of execution is issued.

Access is limited to the following:

- On-duty personnel;

- On-duty contract personnel;

- Volunteers deemed necessary by the facility wardens;

- Approved delivery vehicles;

- Approved media;

- Approved execution witnesses;

- Law enforcement personnel on business-related matters; and

- Others as approved by the ICS operations chief.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 33 of 35 |

### Population Management

- The IDOC's south Boise complex and CAPP and ICC facilities shall go on secure status as defined and ordered by the ICS operations chief at conclusion of a formal count and not less than nine (9) hours prior to the scheduled execution; and

- After the conclusion of the execution or stay of execution, all IDOC and contract prison facilities shall return to regular operations at the direction of the ICS operations chief.

### Condemned Offender Activities

- Ensure the offender receives the last meal by approximately 1900 hours prior to the scheduled execution. (All eating utensils and remaining food and beverage shall be removed upon completion of the meal.);

- Phone calls are concluded by 2100 hours. (Telephone calls shall be terminated at 2100 hours the day prior to the execution, excluding calls with the offender's attorney of record and others approved by the IMSI warden.);

- Visitation shall be terminated at 2100 hours the night prior to the execution, excluding visits from the offender's attorney of record and others as approved by the IMSI warden;

- No later than 2300 hours the night before the execution, the facility healthcare services staff will offer the offender a mild sedative;

- No later than five (5) hours prior to the execution, the offender shall be offered a light snack. (All eating utensils and remaining food, to include any remaining consumable commissary, shall be removed upon completion of the meal.); and

- No later than four (4) hours prior to the execution, the facility healthcare services staff will offer the offender another mild sedative.

## 22. Final Preparations

During the final preparations, the IMSI warden will be unavailable to address issues not directly related to the execution process. All other inquiries shall be directed to a member of the Administrative Team.

### Witness Briefing

Prior to entering the execution witness area, the chief of the Operations Division will provide briefings of the execution process to those who will be present at the execution. The victim's family and offender's family will receive separate briefings.

### Procedures to Carry out the Execution

The procedures for carrying out the execution are found in appendix A, *Execution Chemicals Preparation and Administration*.

> **Note:** Total anonymity of personnel in the Medical Team room must be maintained. At no time will the personnel be addressed by name or asked anything that would require an oral response.

## 23. Pronouncement of Death

Idaho Code, section 19-2716, requires that the death of a condemned offender be pronounced by the Ada County coroner (or deputy coroner).

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 34 of 35 |

The Ada County coroner (or deputy coroner) will be staged in or near the Execution Unit during the execution process. When the execution process has been completed, the coroner will enter the execution chamber, examine the offender, and pronounce the offender's death to the IMSI warden. The IMSI warden will announce that the sentence of death has been carried out as ordered by the court and the execution has been completed.

## 24. Return of Service on the Death Warrant

After the execution, the IMSI warden must complete a return of service of the death warrant, showing the date, time, mode, and manner in which it was executed. The original death warrant will be returned to the sentencing court. A copy of the death warrant with the return of service information will be filed in the offender's central file. A copy of the original death warrant shall be forwarded to the DAG office.

## 25. Following the Execution

### Administrative Team

- Ensure that the assigned members of the Medical Team will return all unused materials to the safe in the execution chamber;

- Gather all documents, logs, recordings, sequence of chemical forms (see appendixes A1 thru A4), EKG machine tape, list of identifiers, etc. and deliver them to the DAG who represents the IDOC for storage;

- Upon completion or long-term stay, inventory the items, complete the chain of custody, and secure the items in the administration safe;

- Retrieve all secured materials; and

- Destroy all used materials in accordance with safe disposal practices and document the disposition of each drug on the inventory sheet.

### Deputy Chief of the Prisons Bureau

Contact all facility heads and determine each facilities' status and any issues that were experienced related to the execution process.

### Execution Chamber and Condemned Isolation Cell Cleaning

Under the supervision of a person designated by the designated Administrative Team member, the execution chamber and condemned isolation cell shall be cleaned and secured. Facility staff trained in infectious diseases preventive practices will utilize appropriate precautions in cleaning the execution chamber.

### Resuming Normal Operations

ICS command center shall determine when the prisons resume normal operations after receiving assessments from all facility wardens.

IDOC staff shall be deactivated at the direction of ICS command center.

### Debriefing

Within 48 hours, the deputy chief of the Prisons Bureau and IMSI warden will debrief the director of the IDOC and chief of the Operations Division and other Leadership Team staff as the director deems appropriate regarding the process and if applicable make recommendations to revise the standard operation procedure or other related processes or documents.

| Control Number: | Version: | Title: | Page Number: |
|---|---|---|---|
| 135.02.01.001 | 3.6 | Execution Procedures | 35 of 35 |

**REFERENCES**

Appendix A, *Execution Chemicals Preparation and Administration*

Appendix A1, *Sequence of Chemical Form- Method 1*

Appendix A2, *Sequence of Chemical Form- Method 2*

Appendix A3, *Sequence of Chemical Form- Method 3*

Appendix A4, *Sequence of Chemical Form- Method 4*

Appendix B, *Media Notification and Agreement*

- Appendix B (Fill-in version)

Appendix C, *State Witness Notification and Agreement*

- Appendix C (Fill-in version)

Appendix D, *Victim's Family Witness Notification and Agreement*

- Appendix D (Fill-in version)

Appendix E, *Summary of Procedures*

- Appendix E (Fill-in version)

Appendix F, *Offender's Friend/Family Witness Notification and Agreement*

- Appendix F (Fill-in version)

Directive 312.02.01.001, *Death of an Inmate*

Idaho Code, Title 19, Chapter 27, Section 19-2705, *Death Sentence or Death Warrant and Confinement There under – Access to Condemned Person*

Idaho Code, Title 19, Chapter 27, Section 19-2713, *Proceedings When Female Supposed to be Pregnant*

Idaho Code, Title 19, Chapter 27, Section 19-2714, *Findings in Case of Pregnancy*

Idaho Code, Title 19, Chapter 27, Section 19-2715, *Ministerial Actions Relating to Stays of Execution, Resetting Execution Dates, and Order of Execution of Judgment of Death*

Idaho Code, Title 19, Chapter 27, Section 19-2716, *Infliction of Death Penalty*

Idaho Code, Title 19, Chapter 27, Section 19-2718, *Return of Death Warrant*

Idaho Code, Title 60, Chapter 1, Section 60-106, *Qualifications of Newspapers Printing Legal Notices*

Standard Operating Procedure 205.07.01.001, *Corrective and Disciplinary Action*

Standard Operating Procedure 319.02.01.001, *Restrictive Housing*

Standard Operating Procedure 320.02.01.001, *Property: State-issued and Offender Personal Property*

Standard Operating Procedure 604.02.01.001, *Visiting*

– End of Document –

**IDAHO DEPARTMENT OF CORRECTION**
**Execution Chemicals Preparation and Administration**

## A. Modifications to Protocols and Procedures

There shall be no deviation from the procedures, protocols, and chemicals in this procedure without prior consent from the director of the IDOC. A member of the Administrative Team shall monitor and ensure compliance with protocols and procedures related to the preparation and administration of chemicals.

## B. Preparation of Chemicals

At the appropriate time, the IMSI warden shall transfer custody of the chemicals to the Medical Team leader so the Medical Team can complete chemical and syringe preparation.

The Medical Team leader will supervise the syringe preparation, assigning a Medical Team member to prepare each chemical and the corresponding syringe. The assigned Medical Team members shall prepare their designated chemical and syringes for two (2) complete sets of chemicals to be used in the implementation of the death sentence. A third set of syringes shall be available and ready for use as backup.

The assigned Medical Team member shall be responsible for preparing and labeling the assigned sterile syringes in a distinctive manner identifying the specific chemical contained in each syringe by (a) assigned number, (b) chemical name, (c) chemical amount and (d) the designated color, as set forth in the chemical chart below. This information shall be preprinted on a label, with two (2) labels affixed to each syringe to ensure a label remains visible.

There shall be sufficient lighting and physical space in the Medical Team room and the execution chamber to enable team members to function properly and to observe the offender. The offender will be positioned to enable the Medical Team leader to view the offender, the offender's arms (or other designated intravenous [IV] location) and face with the aid of a color camera and a color monitor.

After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the applicable chemical chart, the Medical Team leader shall place three (3) complete sets of the prepared and labeled syringes in the color-coded and labeled syringe trays in the order in which the chemicals are to be administered. The syringes will be placed in the color-coded and labeled syringe trays in a manner to ensure there is no crowding, with each syringe resting in its corresponding place in the shadow box which is labeled with the name of the chemical, color, chemical amount and the designated syringe number.

The syringes shall be placed in such a manner to ensure the syringe labels are clearly visible. Prior to placing the syringes in the color-coded and labeled syringe trays, the flow shall be checked by the Medical team leader running heparin/saline solution through the line to confirm there is no obstruction.

After all syringes are prepared and placed in color-coded and labeled syringe trays in proper order, the Medical Team leader shall confirm that all syringes are properly labeled and placed in the color-coded and labeled syringe trays in the order in which the chemicals are to be administered as designated by the applicable chemical chart. Each chemical shall be administered in the predetermined order in which the syringes are placed in the tray.

## C. Approved Chemicals

The IDOC has four (4) options for lethal injection methods. Which option is used is dependent upon the availability of chemicals.

The director of the IDOC has approved the following lethal injection chemicals and methods as described in Chemical Chart 1, Chemical Chart 2, Chemical Chart 3, and Chemical Chart 4:

**Method 1**

| CHEMICAL CHART 1 | |
|---|---|
| Primary SET A | |
| Syringe No. | Label |
| 1A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 2A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 3A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 4A (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 5A (flush) | 60mL Heparin/Saline, BLACK |
| 6A (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 7A (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 8A (flush) | 60mL Heparin/Saline, BLACK |
| 9A (complete 9-10) | 120mEq Potassium Chloride, RED |
| 10A (complete 9-10) | 120mEq Potassium Chloride, RED |
| 11A (flush) | 60mL Heparin/Saline, BLACK |

| CHEMICAL CHART 1 | | CHEMICAL CHART 1 | |
|---|---|---|---|
| Backup Set B | | Backup Set C | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 1C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 2B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 2C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 3B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 3C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 4B (complete 1-4) | 1.25 g Sodium Pentothal, GREEN | 4C (complete 1-4) | 1.25 g Sodium Pentothal, GREEN |
| 5B (flush) | 60mL Heparin/Saline, BLACK | 5C (flush) | 60mL Heparin/Saline, BLACK |
| 6B (complete 6-7) | 60mg Pancuronium Bromide, BLUE | 6C (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 7B (complete 6-7) | 60mg Pancuronium Bromide, BLUE | 7C (complete 6-7) | 60mg Pancuronium Bromide, BLUE |
| 8B (flush) | 60mL Heparin/Saline, BLACK | 8C (flush) | 60mL Heparin/Saline, BLACK |
| 9B (complete 9-10) | 120mEq Potassium Chloride, RED | 9C (complete 9-10) | 120mEq Potassium Chloride, RED |
| 10B (complete 9-10 | 120mEq Potassium Chloride, RED | 10C (complete 9-10) | 120mEq Potassium Chloride, RED |
| 11B (flush) | 60mL Heparin/Saline, BLACK | 11C (flush) | 60mL Heparin/Saline, BLACK |

### Syringe Preparation (Method 1)

Syringes 1A, 2A, 3A, 4A, 1B, 2B, 3B, 4B, 1C, 2C, 3C and 4C each contain 1.25 gm/50ml. of sodium pentothal / 1 in 50 ml. of sterile water in four (4) 60 ml. syringes for a total dose of 5 grams of sodium pentothal in each set. Each syringe containing sodium pentothal shall have a GREEN label which contains the name of chemical, chemical amount, and the designated syringe number.

Syringes 5A, 8A, 11A, 5B, 8B, 11B, 5C, 8C and 11C each contain 60 ml. of a heparin/saline solution, at a concentration of 10 units of heparin per milliliter, and shall have a BLACK label which contains the name of the chemical, chemical amount, and the designated syringe number.

Syringes 6A, 7A, 6B, 7B, 6C and 7C each contain 60 mg of pancuronium bromide for a total of 120 mg of pancuronium bromide in each set. Each syringe containing pancuronium bromide shall have a BLUE label which contains the name of the chemical, chemical amount, and the designated syringe number.

Syringes 9A, 10A, 9B, 10B, 9C and 10C each contain 120 milliequivalents of potassium chloride for a total of 240 milliequivalents of potassium chloride in each set. Each syringe containing potassium chloride shall have a RED label which contains the name of the chemical, chemical amount, and the designated syringe number.

After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the applicable chemical chart, the Medical Team leader shall ensure the IV setup is completed.

*Method 2*

| CHEMICAL CHART 2 | |
|---|---|
| **Primary SET A** | |
| Syringe No. | Label |
| 1A (compete 1-2) | 2.5 g Pentobarbital GREEN |
| 2A (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3A (flush) | 60mL Heparin/Saline, **BLACK** |
| 4A (complete 4-5) | 60mg Pancuronium Bromide, BLUE |
| 5A (complete 4-5) | 60mg Pancuronium Bromide, BLUE |
| 6A (flush) | 60mL Heparin/Saline, **BLACK** |
| 7A (complete 7-8) | 120mEq Potassium Chloride, RED |
| 8A (complete 7-8) | 120mEq Potassium Chloride, RED |
| 9A (flush) | 60mL Heparin/Saline, **BLACK** |

| CHEMICAL CHART 2 | | CHEMICAL CHART 2 | |
|---|---|---|---|
| **Backup Set B** | | **Backup Set C** | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-2) | 2.5 g Pentobarbital GREEN | 1C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 2B (complete 1-2) | 2.5 g Pentobarbital GREEN | 2C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3B (flush) | 60mL Heparin/Saline, **BLACK** | 3C (flush) | 60mL Heparin/Saline, **BLACK** |
| 4B (complete 4-5) | 60mg Pancuronium Bromide, BLUE | 4C (complete 4-5) | 60mg Pancuronium Bromide, BLUE |
| 5B (complete 4-5) | 60mg Pancuronium Bromide, BLUE | 5C (complete 4-5) | 60mg Pancuronium Bromide, BLUE |
| 6B (flush) | 60mL Heparin/Saline, **BLACK** | 6C (flush) | 60mL Heparin/Saline, **BLACK** |
| 7B (complete 7-8) | 120mEq Potassium Chloride, RED | 7C (complete 7-8) | 120mEq Potassium Chloride, RED |
| 8B (complete 7-8) | 120mEq Potassium Chloride, RED | 8C (complete 7-8) | 120mEq Potassium Chloride, RED |
| 9B (flush) | 60mL Heparin/Saline, **BLACK** | 9C (flush) | 60mL Heparin/Saline, **BLACK** |

### Syringe Preparation (Method 2)

Syringes 1A, 2A, 1B, 2B, 1C, and 2C each contain 2.5 gm of pentobarbital for a total of 5 grams in each set. Each syringe containing pentobarbital shall have a GREEN label which contains the name of chemical, chemical amount and the designated syringe number.

Syringes 3A, 6A, 9A, 3B, 6B, 9B, 3C, 6C and 9C each contain 60 ml. of a heparin/saline solution, at a concentration of 10 units of heparin per milliliter, and shall have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

Syringes 4A, 5A, 4B, 5B, 4C and 5C each contain 60 mg of pancuronium bromide for a total of 120 mg of pancuronium bromide in each set. Each syringe containing pancuronium bromide shall have a BLUE label which contains the name of the chemical, chemical amount and the designated syringe number.

Syringes 7A, 8A, 7B, 8B, 7C and 8C each contain 120 milliequivalents of potassium chloride for a total of 240 milliequivalents of potassium chloride in each set. Each syringe containing potassium chloride shall have a RED label which contains the name of the chemical, chemical amount and the designated syringe number.

After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the applicable chemical chart, the Medical Team leader shall ensure the IV setup is completed.

*Method 3*

| CHEMICAL CHART 3 | |
|---|---|
| **Primary Set A** | |
| Syringe No. | Label |
| 1A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 2A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 3A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 4A (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 5A (flush) | 60mL Heparin/Saline, **BLACK** |

| CHEMICAL CHART 3 | | CHEMICAL CHART 3 | |
|---|---|---|---|
| **Backup Set B** | | **Backup Set C** | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 1C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 2B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 2C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 3B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 3C (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** |
| 4B (complete 1-4) | 1.25 g Sodium Pentothal, **GREEN** | 4C (complete 1-4) | 1.25 g Setup Sodium Pentothal, **GREEN** |
| 5B (flush) | 60mL Heparin/Saline, **BLACK** | 5C (flush) | 60mL Heparin/Saline, **BLACK** |

### Syringe Preparation (Method 3)

Syringes 1A, 2A, 3A, 4A, 1B, 2B, 3B, 4B, 1C, 2C, 3C, and 4C each contain 1.25 gm/50ml. of sodium pentothal / 1 in 50 ml. of sterile water in four (4) 60 ml. syringes for a total dose of 5 grams of sodium pentothal in each set. Each syringe containing sodium pentothal shall have a **GREEN** label which contains the name of chemical, chemical amount, and the designated syringe number.

Syringes 5A, 5B, and 5C each contain 60 ml. of a heparin/saline solution, at a concentration of 10 units of heparin per milliliter, and shall have a **BLACK** label which contains the name of the chemical, chemical amount, and the designated syringe number.

After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the applicable chemical chart, the Medical Team leader shall ensure the IV setup is completed.

**Method 4**

| CHEMICAL CHART 4 | |
|---|---|
| Primary Set A | |
| Syringe No. | Label |
| 1A (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 2A (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3A (flush) | 60mL Heparin/Saline, **BLACK** |

| CHEMICAL CHART 4 | | CHEMICAL CHART 4 | |
|---|---|---|---|
| Backup Set B | | Backup Set C | |
| Syringe No. | Label | Syringe No. | Label |
| 1B (complete 1-2) | 2.5 g Pentobarbital GREEN | 1C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 2B (complete 1-2) | 2.5 g Pentobarbital GREEN | 2C (complete 1-2) | 2.5 g Pentobarbital GREEN |
| 3B (flush) | 60mL Heparin/Saline, **BLACK** | 3C (flush) | 60mL Heparin/Saline, **BLACK** |

### Syringe Preparation (Method 4)

Syringes 1A, 2A 1B, 2B, 1C, and 2C each contain 2.5 gm of pentobarbital for a total of 5 grams in each set. Each syringe containing pentobarbital shall have a **GREEN** label which contains the name of chemical, chemical amount and the designated syringe number.

Syringes 3A, 3B, and 3C each contain 60 ml. of a heparin/saline solution, at a concentration of 10 units of heparin per milliliter, and shall have a **BLACK** label which contains the name of the chemical, chemical amount and the designated syringe number.

After the Medical Team prepares all syringes with the proper chemicals and labels as provided in the applicable chemical chart, the Medical Team leader shall ensure the IV setup is completed.

> **Note:** The chemical amounts as set forth in chemical charts 1, 2, 3, and 4 are designated for the execution of persons weighing 500 pounds or less. The chemical amounts will be reviewed and may be revised as necessary for an offender exceeding this body weight.
>
> **Note:** The quantities of chemicals prepared and administered may not be changed in any manner without prior approval of the director of the IDOC.
>
> **Note:** The full dose contained in each syringe shall be administered to the offender and subsequently documented by the designated recorder. The quantities of the chemicals prepared and administered may not be changed in any manner without prior approval of the director of the IDOC after consultation with the Medical Team leader. If all electrical activity of the heart ceases prior to administering all of the chemicals, the Medical Team members shall continue to follow this protocol and administer all remaining chemicals in the order and amounts set forth in the applicable chemical chart.

### IV Setup Procedure

After all syringes are prepared and placed in proper order, the Medical Team leader shall confirm that all syringes are properly labeled and placed in the order in which the chemicals are to be administered as designated by the chemical chart. Each chemical shall be administered in the predetermined order in which the syringes are placed in the color-coded and labeled syringe trays.

> **Note:** All of the prepared chemicals shall be used or properly disposed of no later than 24 hours after the time designated for the execution to occur.
>
> **Note:** Should a stay delay the execution beyond 24 hours of the scheduled execution, another primary set of syringes shall be prepared when the execution is rescheduled in accordance with the process set forth in this procedure.

## D. Chemical Delivery Procedures

The Medical Team recorder is responsible for completing the applicable sequence of chemical form (see appendixes A1 thru A4). The recorder shall document on the form the amount of each chemical administered and confirm that it was administered in the order set forth in the chemical chart. Any deviation from the written procedure shall be noted and explained on the form.

## E. Preparation, Movement, and Monitoring of Offender

Prior to moving the offender from the isolation cell to the execution table, the director of the IDOC will confer with the Idaho attorney general (or designee) and the Idaho governor (or designee) to confirm there is no legal impediment to proceeding with the lawful execution and there are no motions pending before a court which may stay further proceedings.

The offender will be offered a mild sedative based on the offender's need. The sedative shall be provided to the offender no later than four (4) hours prior to the execution, unless it is determined medically necessary.

At the designated time, the Escort Team will escort the offender to the execution room secured on the table by the prescribed means with the offender's arms positioned at an angle away from the offender's side.

After the offender has been secured to the execution table, the Escort Team leader will personally check the restraints which secure the offender to the table to ensure they are not so restrictive as to impede the offender's circulation, yet sufficient to prevent the offender from manipulating the catheters and IV lines.

Once the offender is secured, the Medical Team leader will attach the leads from the electrocardiograph (EKG) machine to the offender's chest and confirm that the EKG machine is functioning properly and that the proper graph paper is used. A backup EKG machine shall be on site and readily available if necessary.

A Medical Team member shall be assigned to monitor the EKG machine, and mark the EKG graph paper at the commencement and completion of the administration of each chemical. The assigned identifier of the Medical Team member monitoring the EKG machine shall be noted at each juncture.

Throughout the procedure, the Medical Team members shall continually monitor the offender's level of consciousness and EKG machine readings, maintaining constant observation of the offender using one or more of the following methods: direct observation, audio equipment, camera, and television monitor as well as any other medically approved method(s) deemed necessary by the Medical Team leader. The Medical Team leader shall be responsible for monitoring the offender's level of consciousness.

The assigned Medical Team members will insert the catheters and attach the IV lines.

The witnesses will be brought in to the applicable witness areas.

Once all witnesses are secured in the witness rooms, the IMSI warden shall read aloud a summary of the death warrant.

A microphone will be positioned to enable the Medical Team leader to hear any utterances or noises made by the offender throughout the procedure. The Medical Team leader will confirm the microphone is functioning properly, and that the offender can be heard in the Medical Team room.

The IMSI warden shall ensure there is a person present in the execution chamber throughout the execution who is able to communicate with the offender in the offender's primary language. This person will be positioned to clearly see, hear and speak to the offender throughout the execution. If the IMSI warden can communicate with the offender in the offender's primary language, he may serve in that capacity.

The IMSI warden will ask the offender if he wishes to make a last statement and provide an opportunity to do so.

The IMSI warden will offer the offender an eye covering.

### F. Intravenous Lines

The assigned Medical Team members shall determine the best sites on the offender to insert a primary IV catheter and a backup IV catheter in two (2) separate locations in the peripheral veins utilizing appropriate medical procedures. The insertion sites in order of preference shall be: arms, hands, ankles and feet, as determined medically appropriate by the Medical Team leader. Both primary and backup IV lines will be placed unless in the opinion of the Medical Team leader it is not possible to reliably place two (2) peripheral lines. In the event that it is not possible to reliably place two (2) peripheral lines, the Medical Team leader will direct Medical Team members to place an IV catheter in a central line for the purpose of administering the chemicals.

At the discretion of the Medical Team leader, a localized anesthetic may be used to numb the venous access site.

To ensure proper insertion in the vein, the assigned Medical Team members should watch for the flashback of blood at the catheter hub in compliance with medical procedures.

The assigned Medical Team members shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the offender's hands. A flow of heparin/saline shall be started in each line and administered at a slow rate to keep the line open.

The primary IV catheter will be used to administer the chemicals and the backup catheter will be reserved in the event of the failure of the first line. Any failure of a venous access line shall be immediately reported to the IMSI warden.

The IV catheter in use shall not be covered and shall remain visible throughout the procedure.

The IMSI warden shall physically remain in the execution chamber with the offender throughout the administration of the chemicals in a position sufficient to clearly observe the offender and the primary and backup IV sites for any potential problems and shall immediately notify the Medical Team leader and director of the IDOC should any issue occur. Upon receipt of such notification, the director of the IDOC will stop the proceedings and take all steps necessary in consultation with the Medical Team leader prior to proceeding further with the execution.

Should it be determined that the use of the backup IV catheter is necessary, a complete set of backup chemicals will be administered in the backup IV as set forth in the applicable chemical chart.

Should it become necessary to use an alternate means of establishing an IV line because, in the opinion of the Medical Team leader, it is not possible to reliably place a peripheral line in the offender, a Medical Team member may utilize a central line catheter if, in the opinion of the Medical Team leader, such a line may be reasonably placed. The Medical Team member responsible for placing a central line

catheter shall have at least one year of regular and current professional experience conducting that procedure. The Medical Team member will place the central line catheter utilizing appropriate medical procedures. The Medical Team member shall ensure the catheter is properly secured with the use of tape or adhesive material, properly connected to the IV line and out of reach of the offender's hands. This line shall be utilized for the administering of all chemicals.

Upon successful insertion of the catheter into a central line, a Medical Team member will inject a solution of heparin/saline into the catheter to ensure patency of the catheter.

## G. Administration of Chemicals Methods 1 and 2

At the time the execution is to commence and prior to administering the chemicals, the director of the IDOC will reconfirm with the Idaho attorney general (or designee) and the Idaho governor (or designee) that there is no legal impediment to proceeding with the execution. Upon receipt of oral confirmation that there is no legal impediment, the director of the IDOC will instruct the IMSI warden to commence the process to carry out the sentence of death. The IMSI warden will then order the administration of the chemicals to begin. If there is a legal impediment to the execution, the director of the IDOC shall instruct the IMSI warden to **stop the process**, and to notify the offender and witnesses that the execution has been stayed or delayed. The IMSI warden (or designee) shall also notify the IDOC PIO and other pertinent staff.

Upon receiving the order to commence the execution process from the director of the IDOC, the IMSI warden will instruct the Medical Team leader to begin administrating the chemicals. The Medical Team leader will instruct the assigned Medical Team member to begin dispensing the first chemical.

Upon direction from the Medical Team leader, the assigned Medical Team member will visually and verbally confirm the chemical name on the syringe and then administer the full dose of sodium pentothal/or pentobarbital immediately followed by the heparin/saline flush. The heparin/saline is administered as a secondary precaution to further ensure the line is functioning properly and flushed between each chemical.

After the sodium pentothal/or pentobarbital and heparin/saline have been administered and before the Medical Team members begin administering the pancuronium bromide, the Medical Team leader shall confirm the offender is unconscious by direct examination of the offender. The Medical Team leader, dressed in a manner to preserve his anonymity, will enter into the room where the IMSI warden and offender are located to physically confirm the offender is unconscious by using all necessary medically appropriate techniques such as giving verbal stimulus, soliciting an auditory response, touching the eyelashes, and/or conducting a sternal rub. The Medical Team leader will also confirm that the IV line remains affixed and functioning properly.

No further chemicals shall be administered until the Medical Team leader has confirmed the offender is unconscious. After three (3) minutes have elapsed since the administration of the sodium pentothal/or pentobarbital, the Medical Team leader will assess and confirm that the offender is unconscious. The Medical Team leader will verbally advise the IMSI warden of the offender's status.

In the unlikely event that the offender is conscious, the Medical Team shall assess the situation to determine why the offender is conscious. The Medical Team leader shall communicate this information to the IMSI warden, along with all Medical Team input. The IMSI warden will determine how to proceed or, if necessary, to start the procedure over at a later time or stand down. The IMSI warden may direct the curtains to the witness viewing room be closed, and, if necessary, for witnesses to be removed from the execution unit.

If deemed appropriate, the IMSI warden may instruct the Medical Team to administer an additional 5 grams of sodium pentothal/or pentobarbital followed by the heparin/saline flush from backup set B.

Upon administering the sodium pentothal/or pentobarbital and heparin/saline from backup set B, the Medical Team leader will again physically confirm the offender is unconscious using proper medical

procedures and verbally advise the IMSI warden of the same. Throughout the entire procedure, the Medical Team members and the IMSI warden shall continually monitor the offender using all available means to ensure that the offender remains unconscious and that there are no complications.

Only after receiving oral confirmation from the Medical Team leader that the offender is unconscious and three (3) minutes have elapsed since commencing the administration of the sodium pentothal/or pentobarbital and heparin/saline from backup set B, will the IMSI warden instruct the Medical Team leader to proceed with administering the next chemicals.

When instructed, the Medical Team leader will instruct the assigned Medical Team members to begin administering the full doses of the remaining chemicals (pancuronium bromide and potassium chloride), each followed by a heparin/saline flush as set forth in the applicable chemical chart.

If after administering the potassium chloride and subsequent heparin/saline flush, the electrical activity of the offender's heart has not ceased, the additional potassium chloride and heparin/saline flush contained in backup set B shall be administered.

The full dose contained in each syringe shall be administered to the offender and subsequently documented by the designated recorder. The quantities of the chemicals prepared and administered may not be changed in any manner without prior approval of the director of the IDOC after consultation with the Medical Team leader.

If all electrical activity of the heart ceases prior to administering all the chemicals, the Medical Team members shall continue to follow this protocol and administer all remaining chemicals in the order and amounts set forth in the applicable chemical chart.

When all electrical activity of the heart has ceased as shown by the EKG machine, the Medical Team leader will advise the Ada County coroner and the IMSI warden that the procedure has been completed. The Medical Team leader will ensure that the EKG machine runs a print-out strip for two (2) minutes after the last chemical injection.

The Ada County coroner will enter the execution chamber, examine the offender, and pronounce the offender's death to the IMSI warden. The IMSI warden will then announce that the sentence of death as been carried out as ordered by the court.

The witnesses will be escorted from the Execution Unit back to the respective staging and/or exit locations.

> **Note:** Backup set C will be used if (1) electrical activity of the heart has not ceased after administration of sets A and B, or (2) either primary set A or backup set B are damaged or otherwise deemed unusable.

### H. Administration of Chemicals Methods 3 and 4

At the time the execution is to commence and prior to administering the chemicals, the director of the IDOC will reconfirm with the Idaho attorney general (or designee) and the Idaho governor (or designee) that there is no legal impediment to proceeding with the execution. Upon receipt of oral confirmation that there is no legal impediment, the director of the IDOC will instruct the IMSI warden to commence the process to carry out the sentence of death. The IMSI warden will then order the administration of the chemicals to begin. If there is a legal impediment to the execution, the director of the IDOC shall instruct the IMSI warden to **stop the process**, and to notify the offender and witnesses that the execution has been stayed or delayed. The IMSI warden (or designee) shall also notify the IDOC PIO and other pertinent staff.

Upon receipt of the director of the IDOC's order and under observation of the Medical Team leader, the IMSI warden will advise the Medical Team leader to begin the administration of chemicals. The Medical Team leader will instruct the assigned Medical Team member to begin dispensing the first chemical.

Upon direction from the Medical Team leader, the assigned Medical Team member will visually and verbally confirm the chemical name on the syringe and then administer the full dose of sodium pentothal/or pentobarbital immediately followed by the heparin/saline flush.

If after administering the sodium pentothal/or pentobarbital, subsequent heparin/saline flush, and 10 minutes have elapsed, and the electrical activity of the offender's heart has not ceased, the additional sodium pentothal/or pentobarbital and heparin/saline flush contained in backup set B shall be administered.

The full dose contained in each syringe shall be administered to the offender and subsequently documented by the designated recorder. The quantities of the chemicals prepared and administered may not be changed in any manner without prior approval of the director of the IDOC after consultation with the Medical Team leader.

If all electrical activity of the heart ceases prior to administering all the chemicals, the Medical Team members shall continue to follow this protocol and administer all remaining chemicals in the order and amounts set forth in the applicable chemical chart.

When all electrical activity of the heart has ceased as shown by the EKG machine, the Medical Team leader will advise the Ada County coroner that the procedure has been completed. The Medical Team leader will ensure that the EKG machine runs a print-out strip for two (2) minutes after the last chemical injection.

The Ada County coroner will enter the execution chamber, examine the offender, and pronounce the offender's death to the IMSI warden. The IMSI warden will then announce that the sentence of death as been carried out as ordered by the court.

The witnesses will be escorted from the Execution Unit back to the respective staging and/or exit locations.

> **Note:** Backup set C will be used if (1) electrical activity of the heart has not ceased after administration of sets A and B, or (2) either primary set A or backup set B are damaged or otherwise deemed unusable.

## I. Documentation of Chemicals and Stay

In the event that a pending stay results in more than a two (2) hour delay, the catheter will be removed, if applicable, and the offender shall be returned to the isolation cell until further notice.

The Medical Team recorder shall account for all chemicals that were not administered and document, in the applicable sequence of chemical form (see appendixes A1 thru A4), the chemical name, syringe identification code, amount, date, and the time. Time will be marked based on the approved Medical Team room clock. The Medical Team leader and the Medical Team recorder each will sign the applicable sequence of chemical form (see appendixes A1 thru A4). And will give the unused chemicals to a member of the Administrative Team.

All logs, the applicable sequence of chemical forms (see appendixes A1 thru A4), the list of identifiers, and the EKG machine tape shall be submitted to the deputy attorney general who represents the IDOC for storage.

Upon completion of the execution or when a stay exceeding 24 hours is granted the Administrative Team shall be responsible for the appropriate disposal of all medical waste and supplies to include unused, drawn chemicals in accordance with state of Idaho and federal law.

## J. Contingency Procedure

A portable cardiac monitor/defibrillator will be readily available on site in the event that the offender goes into cardiac arrest at any time prior to dispensing the chemicals; trained medical staff shall make every

effort to revive the offender should this occur, unless the offender has signed a do not resuscitate (DNR).

Trained medical personnel and emergency transportation, neither of which is involved in the execution process, shall be available in proximity to respond to the offender should any medical emergency arise at any time before the order to proceed with the execution is issued by the director of the IDOC.

If at any point any Medical Team members determine that any part of the execution process is not going according to procedure, they shall advise the Medical Team leader who shall immediately notify the IMSI warden. The IMSI warden, in consultation with the director of the IDOC may consult with persons deemed appropriate and will determine to go forward with the procedure, start the procedure over at a later time within the 24-hour day, or stand down.

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 1**

Offender: _____     Number: _____

Court Case #: _____

Warrant of Death Issued By: _____

| Chemical Chart 1: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1A | 1.25 g Sodium Pentothal, GREEN | | |
| 2A | 1.25 g Sodium Pentothal, GREEN | | |
| 3A | 1.25 g Sodium Pentothal, GREEN | | |
| 4A | 1.25 g Sodium Pentothal, GREEN | | |
| 5A | 60mL Heparin/Saline, BLACK | | |
| 6A | 60mg Pancuronium Bromide, BLUE | | |
| 7A | 60mg Pancuronium Bromide, BLUE | | |
| 8A | 60mL Heparin/Saline, BLACK | | |
| 9A | 120mEq Potassium Chloride, RED | | |
| 10A | 120mEq Potassium Chloride, RED | | |
| 11A | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 1: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1B | 1.25 g Sodium Pentothal, GREEN | | |
| 2B | 1.25 g Sodium Pentothal, GREEN | | |
| 3B | 1.25 g Sodium Pentothal, GREEN | | |
| 4B | 1.25 g Sodium Pentothal, GREEN | | |
| 5B | 60mL Heparin/Saline, BLACK | | |
| 6B | 60mg Pancuronium Bromide, BLUE | | |
| 7B | 60mg Pancuronium Bromide, BLUE | | |
| 8B | 60mL Heparin/Saline, BLACK | | |
| 9B | 120mEq Potassium Chloride, RED | | |
| 10B | 120mEq Potassium Chloride, RED | | |
| 11B | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 1: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1C | 1.25 g Sodium Pentothal, GREEN | | |
| 2C | 1.25 g Sodium Pentothal, GREEN | | |
| 3C | 1.25 g Sodium Pentothal, GREEN | | |
| 4C | 1.25 g Sodium Pentothal, GREEN | | |
| 5C | 60mL Heparin/Saline, BLACK | | |
| 6C | 60mg Pancuronium Bromide, BLUE | | |
| 7C | 60mg Pancuronium Bromide, BLUE | | |
| 8C | 60mL Heparin/Saline, BLACK | | |
| 9C | 120mEq Potassium Chloride, RED | | |
| 10C | 120mEq Potassium Chloride, RED | | |
| 11C | 60mL Heparin/Saline, BLACK | | |

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 2**

Offender: _____     Number: _____

Court Case #: _____

Warrant of Death Issued By: _____

| Chemical Chart 2: PRIMARY SET A | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Date and Time Administered** | **Comments** |
| **1A** | 2.5 g Pentobarbital GREEN | | |
| **2A** | 2.5 g Pentobarbital GREEN | | |
| **3A** | 60mL Heparin/Saline, BLACK | | |
| **4A** | 60mg Pancuronium Bromide, BLUE | | |
| **5A** | 60mg Pancuronium Bromide, BLUE | | |
| **6A** | 60mL Heparin/Saline, BLACK | | |
| **7A** | 120mEq Potassium Chloride, RED | | |
| **8A** | 120mEq Potassium Chloride, RED | | |
| **9A** | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 2: BACKUP SET B | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Date and Time Administered** | **Comments** |
| **1B** | 2.5 g Pentobarbital GREEN | | |
| **2B** | 2.5 g Pentobarbital GREEN | | |
| **3B** | 60mL Heparin/Saline, BLACK | | |
| **4B** | 60mg Pancuronium Bromide, BLUE | | |
| **5B** | 60mg Pancuronium Bromide, BLUE | | |
| **6B** | 60mL Heparin/Saline, BLACK | | |
| **7B** | 120mEq Potassium Chloride, RED | | |
| **8B** | 120mEq Potassium Chloride, RED | | |
| **9B** | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 2: BACKUP SET C | | | |
|---|---|---|---|
| **Syringe No.** | **Label** | **Date and Time Administered** | **Comments** |
| **1C** | 2.5 g Pentobarbital GREEN | | |
| **2C** | 2.5 g Pentobarbital GREEN | | |
| **3C** | 60mL Heparin/Saline, BLACK | | |
| **4C** | 60mg Pancuronium Bromide, BLUE | | |
| **5C** | 60mg Pancuronium Bromide, BLUE | | |
| **6C** | 60mL Heparin/Saline, BLACK | | |
| **7C** | 120mEq Potassium Chloride, RED | | |
| **8C** | 120mEq Potassium Chloride, RED | | |
| **9C** | 60mL Heparin/Saline, BLACK | | |

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 3**

Offender: _____     Number: _____

Court Case #: _____

Warrant of Death Issued By: _____

| Chemical Chart 3: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1A | 1.25 g Sodium Pentothal, GREEN | | |
| 2A | 1.25 g Sodium Pentothal, GREEN | | |
| 3A | 1.25 g Sodium Pentothal, GREEN | | |
| 4A | 1.25 g Sodium Pentothal, GREEN | | |
| 5A | 60mL Heparin/Saline, **BLACK** | | |

| Chemical Chart 3: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1B | 1.25 g Sodium Pentothal, GREEN | | |
| 2B | 1.25 g Sodium Pentothal, GREEN | | |
| 3B | 1.25 g Sodium Pentothal, GREEN | | |
| 4B | 1.25 g Sodium Pentothal, GREEN | | |
| 5B | 60mL Heparin/Saline, **BLACK** | | |

| Chemical Chart 3: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1C | 1.25 g Sodium Pentothal, GREEN | | |
| 2C | 1.25 g Sodium Pentothal, GREEN | | |
| 3C | 1.25 g Sodium Pentothal, GREEN | | |
| 4C | 1.25 g Sodium Pentothal, GREEN | | |
| 5C | 60mL Heparin/Saline, **BLACK** | | |

Appendix A3
135.02.01.001
(Appendix last updated 1/6/12)

**IDAHO DEPARTMENT OF CORRECTION**
**Sequence of Chemical Form- Method 4**

Offender: _____     Number: _____

Court Case #: _____

Warrant of Death Issued By: _____

| Chemical Chart 4: PRIMARY SET A | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1A | 2.5 g Pentobarbital GREEN | | |
| 2A | 2.5 g Pentobarbital GREEN | | |
| 3A | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 4: BACKUP SET B | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1B | 2.5 g Pentobarbital GREEN | | |
| 2B | 2.5 g Pentobarbital GREEN | | |
| 3B | 60mL Heparin/Saline, BLACK | | |

| Chemical Chart 4: BACKUP SET C | | | |
|---|---|---|---|
| Syringe No. | Label | Date and Time Administered | Comments |
| 1C | 2.5 g Pentobarbital GREEN | | |
| 2C | 2.5 g Pentobarbital GREEN | | |
| 3C | 60mL Heparin/Saline, BLACK | | |

Appendix A4
135.02.01.001
(Appendix last updated 1/6/12)

# EXHIBIT 2

# EXHIBIT 2

UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

SOUTHERN DIVISION


PAUL EZRA RHOADES,              )     Case No. CV11-445-REB
                               )
        Plaintiff,             )
                               )     Boise, Idaho
        vs.                    )     November 10, 2011
                               )     1:00 p.m.
BRENT REINKE, et al,           )
                               )
        Defendants.            )
                               )
. . . . . . . . . . . . . . . )

                        VOLUME I OF I
                       MOTIONS HEARING
           BEFORE THE HONORABLE RONALD E. BUSH
              UNITED STATES MAGISTRATE JUDGE

APPEARANCES:
For the Plaintiff:             MR. OLIVER W. LOEWY
                               MS. TERESA A. HAMPTON
                               MR. BRADY WARD-KING
                               MR. JONATHAN LIVINGSTON
                               Federal Defender Services of Idaho
                               702 West Idaho Street, Suite 900
                               Boise, Idaho  83702


For the Defendants:            MS. KRISTA LYNN HOWARD
                               MR. MARK KUBINSKI
                               MR. LAMONT ANDERSON
                               Office of Attorney General
                               Idaho Department of Corrections
                               1299 N. Orchard Street, Ste. 110
                               Boise, Idaho  83706


COURT RECORDER:                TRANSCRIPTION BY:

TRINIDAD DIAZ                  CANYON TRANSCRIPTION
U.S. District Court           P.O. Box 387
                               Caldwell, Idaho  83606
                               (208)454-1010


Proceedings recorded by electronic recording.  Transcript
produced by transcription service.

                    I N D E X

PLAINTIFF'S WITNESSES:                          PAGE   LINE

        HEATH, Mark Sherman John, M.D.
             (by video)
Direct Examination by Mr. Loewy                   4     2
Cross-Examination by Mr. Anderson                43    17
Redirect Examination by Mr. Loewy                55    18


        ZMUDA, Jeffrey
Direct Examination by Ms. Hampton                59    16
Cross-Examination by Ms. Howard                 115    14
Redirect Examination by Ms. Hampton             121     9


DEFENDANTS' WITNESS:

        ZMUDA, Jeffrey
Direct Examination by Ms. Howard                154    14
Cross-Examination by Ms. Hampton                155    16


PLAINTIFF'S ARGUMENT                            127     6
                                                165     4

DEFENDANTS' ARGUMENT                            147    20



                   E X H I B I T S

PLAINTIFF'S EXHIBITS:                           PAGE   LINE

PXE 1 - SOP 135 (Dkt. 7-4)
     Admitted                                    62    21

PXE 3 - SOP 135 2011 Draft
   Protocol (Dkt. 1-4, Ex. 1)
     Admitted                                    66     9

PXE 9 - IDOC Policy (Dkt. 7-3)
     Admitted                                    61     7

```
 1                    (Requested proceedings begin.)
 2          COURT:  Dr. Heath, I'm informed that this last page
 3   that for whatever reason didn't reach you the first time, it's
 4   on its way to you.  While we're waiting for that, we're going to
 5   have Ms. Case swear you in.
 6          DR. HEATH:  Okay.
 7          COURT:  She'll come to the podium so you can see her.
 8          CLERK:  Dr. Heath, if you could stand and raise your
 9   right hand, please.
10          DR. HEATH:  I have to adjust the camera I think.
11          CLERK:  Okay.  Thank you, sir.
12                    (MARK JOHN SHERMAN HEATH, M.D., is sworn.)
13          CLERK:  Thank you.  And for our record, sir, if you
14   could state your full name and spell your last.
15          WITNESS:  Mark, M-a-r-k, John, Sherman, Heath,
16   H-e-a-t-h.
17          CLERK:  Thank you.
18          WITNESS:  Thank you.
19          COURT:  Also for the record, let's just make sure we
20   don't have any issues about proceeding in this manner.  Ms.
21   Howard, is there any objection from the State to Dr. Heath
22   appearing by video conference?
23          MS. HOWARD:  No, Your Honor.
24          COURT:  All right.  Mr. Loewy, you may inquire.
25          MR. LOEWY:  Thank you, Your Honor.  I see that the fax
```

1    is now being delivered to Dr. Heath.

2                                DIRECT EXAMINATION

3    QUESTIONS BY MR. LOEWY:

4    Q.  Dr. Heath, I think what you just received was Exhibit A?

5    A.  Yes, that's correct.

6    Q.  And you'll see that there were some redactions on that as

7    well as a few additions and those additions should parallel the

8    changes that were made in the text of the affidavit.

9    A.  I see that.

10   Q.  Thank you.  The reason for the redactions, not to delete

11   them from the affidavit or for the Court's consideration but

12   rather for sealing purposes so we may as we proceed and I ask

13   questions need to refer in very general terms to some the

14   redacted matter and we will proceed as we go.  I don't think

15   that should prove any difficulty but I just want to ask you to

16   please be cautious in answering your questions not to refer or

17   try not to refer to any matter which has been redacted?

18            Let's start with your background, Dr. Heath.  Can you

19   just summarize, please, for the Court your education.

20   A.  Yes.  Currently, I'm an anesthesiologist practicing at

21   Columbia University in New York City.  I attended Harvard

22   College for undergraduate work.  I attended the University of

23   North Carolina in Chapel Hill for medical school.  I performed a

24   year of medical internship at George Washington University in

25   Washington, D.C. and then I did my residency and fellowship in

1   anesthesiology and cardiac anesthesiology at Columbia University

2   in New York City.

3   Q.  And how long have you been with Columbia University in a

4   teaching capacity?

5   A.  I began my residency there in 1988 and I began teaching

6   residents there in 1993.

7   Q.  What department are you associated with, please?

8   A.  Anesthesiology.

9   Q.  Thank you.  Are you Board-certified in any particular

10  medical specialty?

11  A.  Yes.  I'm Board-certified in the practice of anesthesiology

12  and also in carrying out intra-operative echocardiographic

13  examinations in patients who are having cardiac surgery.

14  Q.  Thank you.  I put the cart a little bit ahead of the horse a

15  moment ago when I mentioned your teaching duties at Columbia

16  because I'm not sure that we actually got to your having been

17  teaching at Columbia but we've got that out now.  In addition to

18  teaching as a professor at Columbia -- well, let's get that out

19  of the way.  What is your appointment at Columbia, please?

20  A.  I'm assistant professor of clinical anesthesiology.

21  Q.  And do you also practice anesthesiology?

22  A.  Yes.  I'm a full-time clinical practitioner of

23  anesthesiology.

24  Q.  And is it accurate to say that you've been a practicing

25  anesthesiologist since your residency?

1   A.   That's correct.

2   Q.   And that was in 1988 as I recall?

3   A.   The residency began in 1988, yes, and I became an attending

4   physician and a Board-certified physician in the early '90's.

5   Q.   Thank you.  Can you describe in summary fashion publications

6   which are relevant to the questions before the Court regarding

7   lethal injection?

8   A.   Yes.  I've had a variety of publications regarding the

9   lethal injection issue.  One of them was invited commentary in

10   the (inaudible) proceedings regarding the practice of lethal

11   injection and some of the ethical considerations that attach to

12   it when physicians become involved.  I've also published a

13   number of abstracts and presentations at meetings -- at

14   professional meetings regarding the subject.

15   Q.   Have you presented in any other capacity on lethal injection

16   such as grand rounds?

17   A.   Yes.  I delivered grand rounds at the National Institutes of

18   Health in Washington, D.C. at the main teaching hospital in

19   Washington, D.C. or actually in Bethesda regarding issues

20   related to lethal injection.

21   Q.   And can you tell me whether anyone else in your department,

22   to your knowledge, at Columbia University has presented grand

23   rounds at the National Institute of Health?

24   A.   I don't believe anybody has.

25   Q.   Thank you.  From your medical practice experience, your

1   teaching experience, your education, are you familiar with the

2   three drugs which are used in Idaho's protocol, SOP 135?

3   A.  Yes, I am.  Just to clarify, there are actually four drugs

4   because of the possibility of using one other barbiturate.

5   Q.  Yes, thank you.  Are you familiar with the establishment and

6   maintenance -- well, with the establishing of peripheral IV

7   intravenous catheter lines?

8   A.  Yes.  It's a central feature of every clinical procedure

9   that I'm involved in and I either perform it myself or supervise

10  a resident or nurse in establishing the IV access.

11  Q.  And are you familiar with establishing femoral vein IV's or

12  central lines?

13  A.  Yes, I am.  Yes, I am.

14  Q.  Thank you.  Are you familiar with regard to both -- with

15  maintaining those lines as open, productive, patent lines?

16  A.  Yes, I am.

17  Q.  And are you familiar with how those lines might fail?

18  A.  Yes, I am.

19  Q.  I take it being an anesthesiologist that it would be true

20  that you are familiar with how to assess an individual's depth

21  of unconsciousness.

22  A.  That's a central feature of the practice of anesthesiology,

23  yes.

24  Q.  Thank you.  Now, you've had an opportunity to review the

25  IDOC SOP 135; is that correct?

1   A.  That's correct.

2   Q.  And as you mentioned before, there are three drugs but four

3   involved because there's a question as to whether the anesthetic

4   would be one or the other.  Is that accurate?

5   A.  That's correct.

6   Q.  The last drug which is administered is potassium chloride?

7   Is that correct?

8   A.  That is correct.

9   Q.  If potassium chloride were introduced into the bloodstream

10  of an entirely unanesthetized individual, what would be the

11  effect?

12  A.  As soon as the potassium chloride reached -- again, we're

13  talking in the quantities involved in the lethal injection

14  procedure.  The potassium chloride, as soon as it reached the

15  interior of the vein in the arm or hand or groin, wherever the

16  IV were placed, would cause immediate activation of all the

17  sensory nerve fibers that it came into contact with and that

18  would cause excruciating pain.

19  Q.  Are there more painful stimulants than potassium chloride?

20  A.  It's difficult to know exactly how to rank extreme --

21  extremely agonizing chemicals or stimulations but I would say

22  this:  Potassium chloride depolarizes or activates all the nerve

23  fibers with which it comes into contact.  So what that means is

24  that every single nerve fiber that the potassium chloride

25  contacts is activated.  If that nerve fiber is normally

1    responsible for carrying information about burning, then there

2    will be a burning sensation and it will be a maximal burning

3    sensation.  If that nerve fiber is responsible for carrying

4    information about stretching or tearing or grinding or chemical

5    injury or shearing or crushing or pinching, all those sensory

6    modalities, those forms of sensation, will be activated to the

7    maximal possible amount.

8    Q.  I take it that there is no appropriate time in a hospital

9    setting to introduce potassium chloride into an individual's

10   bloodstream absent appropriate anesthetic.  Is that correct?

11   A.  That's not correct.  We sometimes administer or frequently

12   administer very diluted potassium chloride to patients whose

13   blood levels of potassium have fallen to a dangerously low

14   level.  So if a patient, for example, is on diuretics to lower

15   their blood pressure and that has reduced the amount of the

16   potassium in their blood, that creates a real threat of cardiac

17   arrhythmias and cardiac arrest.  And so we like to rapidly

18   replete potassium by diluting it into a large IV bag and then

19   administering it slowly intravenously.  If we administer it too

20   quickly, then it causes severe pain and the patients complain

21   bitterly.

22   Q.  If, however -- if you, however, administer it at the rate

23   that you just described, the slow rate, it does not cause pain?

24   A.  Well, at the slow rate that we give, it often does cause

25   quite significantly -- a significant amount of pain and the

1  nurses will call the physicians and ask for some kind of pain

2  medication and often if we can, we can slow the IV down or

3  dilute the potassium further.  But again, we're talking

4  concentrations much, much lower and amounts much, much lower

5  than are being used for the purposes of lethal injection.

6  Q.  So to contrast with the much more concentrated amounts, the

7  pain is severe in comparison to the pain that you've seen and

8  know of patients getting with the diluted amounts?

9  A.  That's right.  Obviously nobody would deliberately

10  administer concentrated potassium to a conscious person in a

11  hospital because it would kill them very rapidly.  But there are

12  a number of reports in the literature of patients being

13  accidentally administered concentrated potassium because of the

14  failure of either a doctor to write the order properly that the

15  potassium is diluted or a failure of a nurse to carry out that

16  dilution.  When the patient is administered that large amount of

17  concentrated potassium, the response is that they scream in

18  agony, writhe and then very rapidly drop dead as the potassium

19  reaches their heart.

20  Q.  In the three -- I'm going to call it for shorthand the

21  three-drug protocol, understanding of course that the protocol

22  allows for one of two drugs but it also calls for the

23  administration of only three so for purposes of this proceeding,

24  I'm going to refer to the IDOC lethal injection protocol as a

25  three-drug protocol.  Okay?

```
1           COURT:  Counsel, can we make certain that our record is

2    clear as to -- I know what you're talking about.  Counsel for

3    defendant knows what you're talking about but so the reference

4    to the record is clear, which SOP are you talking about located

5    where in the record?

6           MR. LOEWY:  Judge, when I am referring to the IDOC

7    protocol and I think what I will do is adopt as nomenclature SOP

8    135, I am referring to the SOP which was adopted by the

9    defendants on October 14 and which is attached to their motion

10   to dismiss in this proceeding.

11          COURT:  All right.  So I think that's at Docket 7,

12   Exhibit 4 if I'm remembering.

13          MR. LOEWY:  I believe that is correct.

14          MR. ANDERSON:  Your Honor, I don't disagree with Mr.

15   Loewy's characterization but that motion was withdrawn.  I

16   don't -- I don't know where that leaves us for purposes of the

17   record.

18          COURT:  I just want -- I just don't want any argument

19   later on about what the hard copy document is that we're talking

20   about.  Right now, if we got a stipulation that it's the SOP 135

21   that was found in the form attached to the motion to dismiss now

22   withdrawn as Exhibit 4, is that all right with the State -- it

23   should be the defendants.

24          MR. ANDERSON:  Yes.

25          COURT:  Mr. Loewy.
```

1          MR. LOEWY:  Very good.  Thank you, Your Honor.

2          COURT:  All right.  Very good.  Go forward.

3     BY MR. LOEWY:

4     Q.  So with regard to SOP 135, Dr. Heath, which you have

5     reviewed and you've so testified and rather than refer to it I

6     think, as I said a moment ago, as the IDOC three-drug protocol,

7     I will now adopt as nomenclature for purposes of this hearing

8     SOP 135.  That way, we will be clear on the record to what you

9     are referring and to what I am referring.  Okay?

10    A.  Okay.

11    Q.  Great.  Keeping SOP 135 in mind, which of the drugs which is

12    administered actually kills the offender?

13    A.  The third drug, the potassium chloride that we've just

14    discussed is the drug that kills the offender.

15    Q.  And you mentioned -- you testified a moment ago about the

16    agonizing pain which the unanesthetized individual feels when

17    potassium chloride of the kinds of concentration being

18    administered pursuant to SOP 135 is administered.  If that is

19    administered -- let me start that sentence again.  I'm not even

20    sure where we are.

21          You testified a moment ago that if potassium chloride

22    in the concentrations called for by SOP 135 is administered to

23    an unanesthetized individual, they will suffer agonizing pain.

24    My question is what effect does pancuronium bromide have on

25    that?

1   A.   Pancuronium is the second drug administered in the three-
2   drug sequence specified in SOP 135.  Pancuronium would have no
3   effect on the sensation of pain or agony that would be produced
4   by potassium or, if I could clarify, it would actually
5   exacerbate the level of agony that would be present because in
6   addition to feeling all of the sensations of potassium, the
7   individual would be unable to move any of their muscles
8   including the muscles that they use to draw breath and so they
9   would be suffocating.
10          So again, in addition to experiencing the excruciating
11   pain of the potassium, they would also experience the sensation
12   of suffocating and they would also experience the sensation of
13   being locked in or chemically entombed, unable to move in any
14   way.
15   Q.   In describing the effect of pancuronium just now, you spoke
16   about the person being unable to breathe.  That would -- what
17   would that do with regard to the person's ability to signal that
18   they have just received an extremely painful stimulant?
19   A.   Well, in addition to being unable to phonate or vocalize or
20   cry out, again, it's important to remember that pancuronium
21   paralyzes all of the muscles in our body that we can -- that we
22   are able to control so they would not be able to say anything,
23   they would not be able to make a face to indicate any pain, they
24   would not be able to grimace, they would not be able to tense
25   any of the muscles in their arms or other parts of their body.

1    They would be completely flaccid because that is the effect of

2    pancuronium.  It produces a flaccidity of the entire body.

3    Q.  If the first drug were administered as contemplated which is

4    to say if the first drug reached the bloodstream in the quantity

5    called for by SOP 135, would the offender be affected in a way

6    that would impact his feeling of the pain caused by the

7    potassium chloride?

8    A.  SOP 135 calls for the delivery of 5 grams of thiopental into

9    the circulation of the prisoner.  If 5 grams of thiopental lead

10   to the circulation and circulates to the brain, it will render

11   any human being completely insensate, deeply unconscious and

12   unable to experience anything at all.

13   Q.  Now, there was a second drug, pentobarbital, which we've

14   alluded to.  Is the difference -- is there any material

15   difference, in your opinion, between thiopental and

16   pentobarbital with regard to your last statement?

17   A.  Before answering that, I'd like to make a clarification.

18   Pentobarbital is not a drug routinely used by an

19   anesthesiologist.  I have used it occasionally in the distant

20   past but it's not a particularly useful drug for inducing or

21   maintaining anesthesia and my experience with it is

22   substantially less than with thiopental.

23        That being said, a dose of 5 grams of pentobarbital, if

24   it is successfully delivered into the circulation of a human

25   being and delivered to the brain of that human being will

1    necessarily result in a deeply unconscious state where the

2    person is completely insensate and unable to experience anything

3    whatsoever including any pain or suffering.

4    Q.  The premise for my question about the effect of thiopental

5    if administered in the full dose and properly administered was

6    that it was properly administered.  What if a smaller amount of

7    thiopental was to reach the offender?  Would that necessarily

8    render him insensate to the pain of potassium chloride?

9    A.  No, it would not.

10   Q.  Can you talk -- can you tell us, please, if an amount which

11   is a clinical amount of thiopental -- well, let me ask you this

12   before we go there.  Is there a clinical amount or was there

13   when thiopental was being used a clinical amount that would be

14   used by an anesthesiologist?

15   A.  Yes, there was.  Typically for the healthy adult male

16   patient of normal stature and proportions, it would be typical

17   to use approximately 250 to 300 milligrams of thiopental to

18   induce anesthesia.  I should clarify that that amount of

19   thiopental would be expected to provide unconsciousness for a

20   very, very brief period of time which is our purpose for

21   selecting it for the induction of anesthesia.

22   Q.  And can you tell us how long a period of time that might be?

23   A.  It would depend on the individual's sensitivity to the drug

24   but it could be as short as a few tens of seconds.  And in fact

25   that is the reason -- one of the main reasons why thiopental was

1    selected as the induction agent so that if problems were

2    encountered during the induction and we were unable to assume

3    control of the patient's physiology and airway and breathing

4    that the drug would wear off so rapidly that the patient would

5    be able to assume their own control of those essential functions

6    and that would result in the patient not dying from the

7    induction.

8    Q.  Would it then be possible to administer or try to administer

9    a large dose of thiopental but in fact actually administer only

10   a small dose through IV administration?

11   A.  I believe you're talking about an inadvertent error and,

12   yes, an inadvertent error is certainly very possible and are our

13   main principal concerns during the induction of anesthesia.

14   Q.  So if there were inadvertent error of that sort with regard

15   to the administration of thiopental, keeping in mind that we're

16   speaking of SOP 135 and then the next two drugs, pancuronium

17   bromide and then potassium chloride being administered and

18   keeping in mind that there is a consciousness check after the

19   administration of the thiopental, what is your -- what in fact

20   might the result be for the offender with regard to his

21   consciousness at the time that the potassium chloride were

22   administered?

23   A.  Well, here is the core of the problem with SOP 135.  If an

24   inadequate dose of thiopental is administered, you can easily

25   have a situation where the prisoner appears to be unconscious

1   and based on a consciousness check that's performed by the

2   execution personnel is deemed to be unconscious and may in fact

3   or in fact be unconscious but then a few tens of seconds later,

4   be fully awake, if that situation occurs, then the prisoner

5   which again was deemed unconscious is now awake, has now been

6   exposed to the paralyzing effects of pancuronium, is now

7   experiencing complete flaccidity, complete immobility and unable

8   to move any of their muscles, to all appearances of everybody

9   else, of all the witnesses and anybody in the room, they would

10  appear to be peacefully unconscious as they had been at the time

11  of the consciousness check but in fact they would be wide awake,

12  experiencing first the inability to draw breath from pancuronium

13  and then when the concentrated potassium was introduced, they

14  would then experience the agonizing effects of death by high

15  dose concentrated potassium.

16  Q.  If we can shift for a few moments to assessing

17  unconsciousness, what, Doctor, is the purpose of administering

18  an anesthetic?

19  A.  We're talking about general anesthetics here as opposed to a

20  regional anesthetic which would just anesthetize part of the

21  body.  We're talking about a general anesthetic where the

22  central nervous system is depressed to the point where surgery

23  can be performed on any part of the body and the purpose of that

24  is to take a procedure that would be excruciating and painful

25  and cruel and render it completely comfortable for a patient so

1    that they have no experience of it so that a necessary surgical

2    procedure can be undertaken.

3    Q.  Is unconsciousness an either/or proposition?

4    A.  It's a very interesting and important question.  It's a

5    little bit different from, for example, being pregnant where one

6    is either pregnant or not pregnant.  In terms of

7    unconsciousness, a person can be deeply unconscious and

8    unarousable so that no matter what stimuli are applied to them,

9    it is impossible to elicit any kind of response or evidence of

10   consciousness, a moan or an opening of the eyes or anything.

11         It is also possible to be in a lightly unconscious

12   state, a state where a very minor stimulus, for example, just

13   lightly touching the shoulder and shaking the person would

14   rapidly bring them to a point of full consciousness.  So within

15   that realm of unconsciousness, there are I think it's

16   appropriate to talk about different depths of unconsciousness

17   and those can be characterized by the intensity of stimulus that

18   is necessary to elicit a response.

19   Q.  And how does an anesthesiologist assess whether a patient in

20   the operating room is sufficiently unconscious to allow surgery?

21   A.  That's a very complicated task that's a mixture of science

22   and art and it takes many years to acquire the skill set to be

23   able to reliably do it.  We monitor a continuous stream of

24   numerous sources of live feed information that tell us about the

25   physiology of our patient, things like their heart rate, their

1    blood pressure, their skin moisture, their pupil size.  We

2    integrate those streams of information with information from

3    other monitors that we apply to our patients before we start the

4    general anesthetic and that again provides us with continuous

5    readouts that allow us to assemble an overall picture or sense

6    of what the anesthetic depth or the unconsciousness depth of our

7    patient is at any given time.

8    Q.  If you were in a situation outside of an operating room

9    where you had to assess consciousness and a depth of --

10   different depths of unconsciousness, are there ways to attempt

11   to do that?

12   A.  There are ways to attempt to do that but I have to clarify

13   that if a person has been given pancuronium, then it's

14   extraordinarily difficult or perhaps almost meaningless to try

15   to assess consciousness without the necessary equipment because,

16   again, all the tests that I would use outside of the operating

17   room would involve stimulating the patient and looking for some

18   kind of response from them.  If they are paralyzed by

19   pancuronium, they're completely flaccid and unable to move, they

20   would not be able to elicit a response whether they were wide

21   awake or deeply unconscious.  There would be no material

22   difference in what I could see except for some very subtle signs

23   to do with things like pupil size and skin moisture.

24   Q.  Can you characterize for the Court the depth of

25   unconsciousness which one must be at to not experience the pain

1   created by -- otherwise created by potassium chloride?

2   A.  Yes.  The surgical plane -- the plane of anesthesia that one

3   would need would be called a surgical plane.  It would be a

4   plane of anesthesia or a level of anesthesia, a depth of

5   unconsciousness where one could undertake surgery of essentially

6   any scope upon a person and they would not be sensible or

7   sensate to the pain of that surgery.  They would not experience

8   the ongoing surgery.  That's the necessary level of anesthetic

9   depth that is required for administering conscious -- a

10  concentrated potassium chloride.

11  Q.  And aside from monitoring various data on a patient that you

12  described before, the sort of data streams that you seek in the

13  operating room before you decide that the patient is

14  sufficiently unconscious to start surgery, are there ways which

15  one can try to establish the depth of unconsciousness through

16  stimulants rather than trying to get information from the

17  patient, give information to the patient and see what happens?

18  A.  The one thing that is sometimes done -- in fact I'll say

19  very often done is that prior to the -- after the patient is

20  anesthetized, after they have been fully prepped and they're

21  ready to start the surgery, the surgeon will say, "Is it okay if

22  I begin," and we'll apply what's called a test stimulus.  They

23  will do something to the patient that's -- would be painful to a

24  conscious patient and then that allows us to watch a response in

25  terms of heart rate or blood pressure or any of the myriad other

1    parameters that we're constantly monitoring to determine if the

2    patient really is in fact ready for surgery.

3    Q.  And is there a -- short of cutting into a patient -- and I

4    take it when we say "ready for surgery," certainly what I meant

5    and I guess I'll ask you this, Doctor, whether you meant the

6    same thing these last several minutes.  When I've said "ready

7    for surgery," I meant ready to take a scalpel and cut into the

8    person.  Is that consistent with what you meant?

9    A.  That's correct, yes, and to do things that are significantly

10   more stimulating than that.

11   Q.  Okay.  Aside from again looking at data coming back, blood

12   pressure data, heart rate data, is there other information which

13   you might receive from a patient if you were trying to, absent

14   that monitoring equipment, determine whether the patient were

15   sufficiently unconscious to undergo surgery or some other

16   extremely painful procedure?

17   A.  I'm sorry.  I need to clarify your question.  You said

18   absent all of the monitoring equipment that I normally use --

19   Q.  That's correct.

20   A.  -- which is a plethora of monitors and data streams.  You're

21   putting me in the nonexistent clinical situation where I'm in

22   the operating room but I don't have access to any of that

23   information but I would be trying to determine my patient's

24   anesthetic depth?

25   Q.  Correct.

1  A.  That would be an extraordinarily challenging situation,

2  particularly in my patients, almost all of whom are paralyzed

3  where they would not be able to move to tell me that they are

4  awake, if they are in fact awake or inadequately anesthetized.

5         There are things I could do.  I could look closely at

6  the patient's pupils.  Their pupils often dilate when a patient

7  is in extreme pain or agony.  I can look for lacrimation, the

8  formation of tears.  I can look for sweating.  These are inexact

9  measures that are deeply inferior to what is -- what is normally

10 a large suite of very sophisticated monitors that we've always

11 used to assess anesthetic depth.

12         MR. LOEWY:  Judge, if we could have a short discussion

13 at the bench, I think it might prove helpful.

14              (Side bar discussion had.)

15         COURT:  I wish they were always that easy.

16         MR. LOEWY:  I'm sorry.

17         COURT:  I wish they were always that easy.

18         MR. LOEWY:  Thank you, Your Honor.

19 BY MR. LOEWY:

20 Q.  Dr. Heath, give me just a moment, please.  Do you have in

21 front of you -- I think you do, Dr. Heath.  We just faxed it to

22 you recently -- the redacted affidavit of Jeff Zmuda?

23 A.  I do.

24 Q.  Can you please look at paragraph 21?

25 A.  Okay.

1   Q.  Thank you.  In light -- or rather keeping in mind that we

2   are speaking again of SOP 135 and the administration of

3   pancuronium and then potassium chloride after -- and the

4   administration of a barbiturate and I'm wondering whether you

5   can tell us, please, whether physically assessing the offender

6   for signs of consciousness through verbal stimulus would be an

7   adequate method of determining whether the offender is

8   sufficiently unconscious to not feel the, A, suffering of

9   suffocation and, B, the pain of potassium chloride.

10  A.  A verbal stimulus would be completely inadequate to make

11  that determination.

12  Q.  Same question with regard to soliciting an auditory

13  response.

14  A.  I'm not sure what exactly that means.  I think it means

15  asking the person to say something.  And again, the absence of a

16  response would not provide meaningful information as to whether

17  they were sufficiently anesthetized to be insensible to the

18  effects of pancuronium and potassium chloride.

19  Q.  Let's say that auditory response which I agree with you

20  seems not self-defining but let's suppose that auditory response

21  means yelling into the offender's ear.  With that understanding,

22  would that be sufficient?

23  A.  Just to clarify, that would -- that would not be an auditory

24  response.  That would be an auditory stimulus and then one would

25  be observing the response, if any, to that auditory stimulus.

1    Q.  Agreed.

2    A.  So I'm not quite sure how to answer the question but I think

3    in general terms, it's fair to say that a person's failure to

4    respond to an auditory stimulus such as yelling in their ear, to

5    use your example, is inadequate -- completely inadequate to

6    determine whether they are sufficiently anesthetized to endure

7    the effects of pancuronium and potassium chloride.

8    Q.  What about the next method, touching the offender's

9    eyelashes?  Same question.

10   A.  You can determine that for yourself by touching your own

11   eyelashes.  If you close your eye and just touch your own

12   eyelash, you'll see that it's not a particularly stimulating

13   event.  I believe it's the case that it's more stimulating if

14   somebody else touches your eyelashes when you're not expecting

15   it.  But if your eyes are open and you see it coming, then it's

16   not a particularly stimulating or painful thing to do to

17   somebody.  We would wipe the teary eyes of our child if they've

18   hurt themselves and no one would consider that to be an

19   agonizing thing to do to your child.

20   Q.  What about pinching the offender as a method of determining

21   a sufficient level of unconsciousness, Doctor?

22   A.  That depends on the intensity of the pinch.  I have a dog.

23   I like to grab him by the back of the neck and gently roll and

24   pinch the tissue between his shoulders.  He enjoys that as far

25   as I can tell.  It's also possible to pinch a person or an

1   animal obviously in a way that's excruciatingly painful.

2   Veterinarians, when they're assessing animals, if an animal is

3   sufficiently anesthetized to receive potassium chloride, tend to

4   use pliers and pinch very hard either on the toe pad or the tail

5   of the animal pinching extremely hard to determine if the animal

6   is responsive.  The description of a pinch is inadequate for me

7   to know what would actually be done and whether it would be

8   meaningful.

9   Q.  And finally, same question with regard to conducting a

10  sternal rub.

11  A.  Again, my pet dog loves to have his chest rubbed and I do it

12  in a way that doesn't hurt him.  It is possible to rub a person

13  or an animal's chest in a way that is, you know, pleasurable or

14  with a level of intensity that's very uncomfortable and it

15  really depends exactly on how it's done.  The description here

16  is inadequate for me to know how it would be done and therefore

17  inadequate to know whether it would bring to light a person who

18  is inadequately anesthetized to be exposed to concentrated

19  potassium and pancuronium.

20  Q.  If we can turn for a moment, please, to the affidavit at

21  page no. 4, paragraph 14, and we might also, if you would,

22  please, Doctor, take a look at Exhibit A which also provides

23  information about the medical team leader.  Is it your

24  understanding that the medical team leader will be conducting

25  the consciousness check in implementing SOP 135 should Mr.

1    Rhoades be executed?

2    A.  That is correct.  The SOP 135 is explicit that it would be

3    the medical team leader who would enter the room and conduct the

4    so-called consciousness check.

5    Q.  The medical team leader's experience as -- and credentials

6    as noted on page 4 and in Appendix A, can you tell us -- does it

7    allow you to assess whether that individual is competent at the

8    task of consciousness checking and specifically the necessary

9    consciousness or perhaps unconsciousness checking is the better

10   term here necessary in the context of a lethal injection

11   pursuant to SOP 135?

12   A.  No, I cannot.  The information presented to me is inadequate

13   to make that determination.

14   Q.  Can you tell us why?

15   A.  Yes, I can but I just want to be wary of inadvertently

16   straying beyond any boundaries regarding redaction or privacy or

17   confidentiality issues that pertain to this.  So if you sense

18   that I'm straying at all close to those areas, could you please

19   clarify the boundaries that I'm allowed to --

20          COURT:  It seems to me, Mr. Loewy, that you could

21   inquire as to what he thinks he would need to know.

22          MR. LOEWY:  Thank you, Your Honor.

23   BY MR. LOEWY:

24   Q.  Doctor, what do you think you would need to know in order to

25   determine whether an individual who is responsible for

1    determining whether or not an offender is sufficiently

2    unconscious to not experience the pain and suffering of the

3    pancuronium bromide and the potassium chloride?  What would you

4    need to know in order to assess whether that person is competent

5    at consciousness checking?

6    A.  The most important thing I would need to know is whether

7    that person is a currently actively practicing clinician who

8    provides active health care services hands-on to live patients.

9    Based on the information that's available to me in Mr. Zmuda's

10   affidavit, it is unclear to me whether person 1a or personnel 1a

11   possesses that requisite attribute.

12   Q.  Is consciousness checking a skill or a skill set which one

13   can get rusty at?

14   A.  Absolutely and it's important to bear in mind here we're

15   talking about consciousness checking from the administration of

16   a dose, either large or small, of an anesthetic drug.  We're not

17   talking about a consciousness check for a person who has been

18   hit by a baseball in their head or fallen off their bicycle or

19   perhaps suffered a cardiac arrest.  So absolutely, the

20   assessment of depth of unconsciousness or level of

21   unconsciousness, a level of anesthesia in a person who is

22   intoxicated by strongly sedative drugs is a complex task that

23   requires currency and active practice to maintain proficiency

24   in.

25   Q.  And if we can just hone in on that for a moment.  When you

1   say currency and active practice, do you mean someone who

2   regularly as part of their day job is doing consciousness

3   checks?

4   A.   That's exactly what I mean.   A person who part of their day

5   job, their routine clinical duties is either doing those checks

6   or in a position where at any time one of their patients would

7   warrant such a check being performed.

8   Q.   And such -- to remain current, such checks would need to be

9   performed on a regular basis.   Not merely that they might be

10  performed, they might be necessary but in fact that they are

11  performed on a regular basis.   Is that correct?

12  A.   Yes.   Proficiency does not come from the possibility of

13  performing a procedure.   It comes from having actually

14  repeatedly performed the procedure.

15  Q.   If we can take a look at the last sentence of paragraph 14

16  and also then at the right-hand column of Exhibit A, the top

17  line, the entry, can you tell us in your experience the

18  relationship between registered nurses who perform

19  administrative tasks, that is administrators, and those who are

20  clinicians?

21  A.   Well, you're using broad terms here but I think it's fair to

22  say a general breakout of medical professionals, the great

23  majority of whom maintain active clinical practices and have

24  hands on -- provide hands-on care to patients on a daily basis.

25  There are -- as in any industry, it's necessary for some

1   individuals who have efficiency within their profession to

2   assume administrative functions and what typically happens is

3   that a person who assumes administrative duties as they ascend

4   the administrative ladder becomes more and more remote from the

5   actual hands-on clinical provision of medical care.

6          So it's usually a binary thing.  A person is either a

7   medical administrator.  They deal with the many facets of the

8   profession that so warrant or they're a hands-on clinician who

9   provides daily hands-on care.

10  Q.  If we can shift for a few minutes to establishing

11  intravenous catheters and for purposes of this hearing, I'm just

12  going to use the abbreviation IV's for that, is establishing --

13  there's two types of IV's which are contemplated potentially by

14  SOP 135.  Is that correct?

15  A.  That's correct.

16  Q.  And what are those?

17  A.  The principal form of access -- of IV access contemplated is

18  what's called a peripheral access where a catheter is placed

19  into a vein.  It would probably be in the arm or hand or ankle

20  or foot according to SOP 135.  The other form of access is

21  what's called a central line.  It's a catheter that would be

22  placed in a much larger vein in the groin, the inner thigh of

23  the offender and that's a catheter that reaches up into the

24  upper abdomen and is a much larger catheter than a peripheral IV

25  catheter.

1    Q.  Would you describe for us, please, what it is you do --

2    well, let me, before I ask that question, back up and just

3    refresh that establishing and maintaining peripheral IV's is

4    something that you do on your day job.  Is that correct, Doctor?

5    A.  Yes, I do.  Yes, it is.

6    Q.  Thank you.  Could you describe for us, please, how you, in

7    summary fashion of course, establish a peripheral IV?

8    A.  It's a little bit like asking us how you're supposed to ride

9    a bicycle or how you're supposed to parallel park the car  but

10   I'll do my best.  I meet my patient before the surgery.  While

11   I'm talking with them, I'll be glancing at their arms to assess

12   the size and the scope of their venous access to see whether I

13   can put an IV in.  If it looks like they've had what we call

14   good or decent veins, then I would let my survey stop there.

15        If I don't see good venous access, I would probably

16   talk to the patient and ask them about their prior history of

17   venous access, try to find out if there are any favorite sites

18   where people have had more success or any techniques that are

19   helpful.

20        Once it gets to the point of actually placing the

21   intravenous catheter, I would put a catheter -- excuse me, a

22   tourniquet on the patient's upper arm assuming I've identified a

23   venous target in the arm or hand.  That would distend the vein.

24   I would then wipe the area with alcohol with an alcohol pad and

25   allow that to dry so that it did not cause a burning sensation.

1   I would then palpate the vein, feel the vein, try to fix it in a

2   position that did not roll and then use the IV catheter, the

3   needle of the catheter -- excuse me, I skipped a step.  I would

4   inject local anesthetic Lidocaine which numbs the skin and the

5   outside of the vein.  I would inject that over the site where I

6   was going to insert the catheter.

7            I would then insert the catheter looking for what's

8   called a flash or return of blood into the clear plastic cup of

9   that catheter.  Once I see a sustained return of blood into the

10  catheter, I would then ever so gently try to thread off the

11  catheter, the plastic catheter from the needle so that it was

12  gradually inserted into the vein.  I would then remove the

13  needle from the catheter, remove the tourniquet from the

14  patient's arm, apply pressure over the internal end of the IV

15  site and attach my IV tubing and assess for patency and

16  suitability, efficacy of that IV access site.

17  Q.  You've described all that sort of colloquially as trying to

18  describe how to ride a bicycle and you also described it using

19  another colloquial expression which frankly I can't remember

20  right now.  Do you, Doctor?

21  A.  I said parallel parking cars.

22  Q.  Thank you.

23  A.  I know how to do it but it's hard for me to describe in

24  words to a person who's never seen it done exactly what's

25  involved.

1   Q.  And is it true that there are some people who have seen it

2   done, have tried to do it, have had to do it but just are never

3   successful?

4   A.  Putting -- you're talking about intravenous catheters I

5   assume.  Not parallel parking.

6   Q.  Well, actually, I was kind of talking about both but the

7   subject matter here is intravenous catheters so let's stick to

8   that.

9   A.  Yeah.  So yes, it's -- it's a finicky task that requires

10  judgment and hand-eye coordination.  It's ineffable.  It's hard

11  to describe in words.  Some people are extremely good at it.

12  Some people are incompetent at it and never acquire competence.

13  It's a challenging thing -- endeavor that's not for anybody.  I

14  think anybody who's been in a clinical setting and needed an IV,

15  sometimes you get lucky and you have a good practitioner who

16  puts it in very elegantly and easily and other times, you're not

17  so lucky and it can be a painful struggle.

18  Q.  So if one were to qualify, were in a training program or

19  training someone on IV insertion, would it be important to you

20  to have some sort of failure rate in place, some sort of way of

21  assessing whether this is a person who should be inserting IV's?

22  A.  Yes, but I can't put a number on it.  I work with medical

23  students and residents elbow to elbow every day in the operating

24  room and I have to use my judgment as a teacher and as a

25  clinician whether it's proper for me to allow a given individual

1    to attempt IV access on my patient.

2    Q.  But you would insist, it sounds like, on you or someone who

3    knows how to do it well making that call?

4    A.  Oh, yes, and there are individuals that I -- that sometimes

5    come through the operating room who clearly in my and others'

6    opinion lack the requisite proficiency and skill set to

7    reasonably place intravenous catheters.

8    Q.  To go back for a moment to the analogy of riding a bicycle

9    or parallel parking, can you get rusty at inserting IV's?

10   A.  Yeah, I think my analogy is perhaps rather poor and breaks

11   down because one absolutely does get rusty at inserting IV's.

12   In terms of clinical practice, if I go away for vacation or what

13   have you, if I go away for a week, I can tell the difference and

14   as we joke among our colleagues, if I go away for -- if our

15   colleagues go away for a couple of weeks, then other people can

16   tell the difference.

17         So yes, it is a very precise refined hands-on technique

18   very much unlike riding a bicycle where people say, well, you

19   get back on a bicycle after five or ten years and you pick it up

20   right away.  It's the exact opposite of that.  You would not

21   want the person putting in your IV at the roadside or in the

22   emergency room having --

23         COURT:  Counsel, I'm understanding this.  Let's move

24   along.  All right?

25         MR. LOEWY:  Okay.  Thank you.

1    BY MR. LOEWY:

2    Q.  Generally speaking with regard to peripheral IV's and the

3    testimony you've given as to it being analogous to the riding of

4    the bicycle, the parallel parking, it being kind of an art and

5    the need for the training and the need for current experience in

6    order to do it competently today, does that also all hold true

7    for femoral vein central line IV establishment?

8    A.  Yes, and it holds true even more so than the peripheral

9    intravenous lines.

10   Q.  You're familiar, I take it, with the United States Supreme

11   Court Case Baze v. Rees?

12   A.  Yes, I am.

13   Q.  And since Baze, has additional relevant or has additional

14   evidence relevant to the question of whether an offender can

15   suffer or does suffer pain in a three-drug protocol, has

16   additional relevant evidence of that sort developed?

17   A.  Yes, it has.  When the justices -- the Supreme Court

18   Justices ruled regarding the case of Baze, there was very

19   important information that was unavailable to them that is

20   available now.  What has happened is that since the Baze

21   decision, a number of executions have been carried out -- lethal

22   injection executions have been carried out without the use of

23   pancuronium bromide and without the use of potassium chloride or

24   any similar or related drugs.  Those executions had not occurred

25   at the time that the Baze decision was issued and decided and

1    those executions, there are a total of 14 of them, are a matter

2    of legal and historical and scientific facts.  They're not my

3    opinion.  They're fact.

4    Q.  And I may have missed it, Doctor, but is it a fact that

5    those -- that there was no evidence that any of those executions

6    were painful for the offender?

7    A.  Obviously I was not present at any of those executions but I

8    read the media reports with great interest for those executions

9    and there was never any suggestion of any kind that there had

10   been any problem with the execution being carried out in that

11   fashion or that there had been any pain experienced on the part

12   of the offender.

13   Q.  Are you familiar, Doctor, with an affidavit written by a

14   prison official from Ohio referencing the one-drug protocol

15   executions in Ohio?

16   A.  I do not have a copy of it on me but I believe I'm familiar

17   with the document that you're referring to.

18   Q.  And are you familiar with that official's opinion or

19   statement with regard to those executions and whether they were

20   problematic at all?

21   A.  The assertion is that the executions conducted without

22   potassium chloride and without pancuronium bromide were in all

23   regards satisfactory from the point of view of the Department of

24   Corrections.

25   Q.  You of course have a broad knowledge with regard to lethal

1    injection.  You also brought experience with regard to lethal

2    injection.  You've worked on a variety of cases.  Is that

3    correct, Doctor?

4    A.  That's correct, yes.

5    Q.  And you've talked with probably more lawyers than you'd like

6    to talk with.  Is that correct, Doctor?

7    A.  I'm very impressed with attorneys so I enjoy talking with

8    them actually.

9    Q.  Thank you.

10           COURT:  That's always a good answer in a courtroom.  Go

11   ahead.

12   BY MR. LOEWY:

13   Q.  And are you familiar with any evidence of any warden from

14   or -- excuse me, prison official from Ohio wanting to return to

15   a three-drug protocol?

16           MR. ANDERSON:  Your Honor, I'm going to object.  That's

17   going to be based on hearsay.  We don't have those individuals

18   here and the issue is --

19           COURT:  The objection was hearsay.  Let's deal with

20   that first.  Mr. Loewy.

21           MR. LOEWY:  I'll withdraw the question, Judge.

22           COURT:  All right.  Next question, please.

23   BY MR. LOEWY:

24   Q.  I asked earlier about thiopental and what would happen with

25   an insufficient dose of thiopental.  I'd like to ask you about

1   the same question.  What would be the effect on the offender if

2   an insufficient dose of pentobarbital reached him then followed

3   by the pancuronium and the potassium chloride?

4        MR. ANDERSON:  Your Honor, I'm going to object.  This

5   has been asked and answered.  The doctor said it was basically

6   the same.

7        COURT:  Okay.  Okay.  Counsel, the objection is asked

8   and answered.

9        MR. LOEWY:  Your Honor, with respect, I don't actually

10  think that this particular question has been asked.  If counsel

11  is willing to stipulate that if an insufficient dose of

12  pentobarbital reaches the offender, he will suffer the sort of

13  pain and suffering that Dr. Heath has referenced with regard to

14  an insufficient dose of thiopental reaching the offender, then

15  I'll withdraw the question.  If not, I'd like to ask the

16  question of the witness.

17       MR. ANDERSON:  We'll absolutely stipulate, Your Honor.

18       COURT:  All right.

19       MR. LOEWY:  All right.  Very good.

20       COURT:  That's been stipulated.

21       MR. LOEWY:  If I may have one moment, please.  I'm

22  going to reput the question to -- at least I'm going to try to

23  reput the question, Your Honor, to Dr. Heath regarding the

24  opinions of prison officials in Ohio.  He's testifying as an

25  expert.  I've just been reminded that of course under Rule 702,

1  an expert may rely on hearsay.

2           COURT:  Well, all right.  Next objection.

3           MR. ANDERSON:  Your Honor, he can certainly rely upon

4  that information but he can't give the opinions of those

5  experts.  He can use it for his opinion but he can't use their

6  opinions and disclose those for the truth of their opinions.

7           COURT:  It was coming in in kind of a shaky form in the

8  question so I was trying to follow where you were going with it,

9  Mr. Loewy.  Ask the question again so I can get my arms around

10 just what it is you're inquiring about and then I can deal with

11 this objection.

12          MR. LOEWY:  I'm inquiring whether any --

13          COURT:  Ask the question.

14 BY MR. LOEWY:

15 Q.  Dr. Heath, are you aware of any prison official in Ohio who

16 has indicated a desire to return to the three-drug protocol that

17 they had before the one-drug barbiturate protocol?

18          MR. ANDERSON:  Objection.  Hearsay, Your Honor.

19          COURT:  I'm just going to allow you to make a proffer

20 here and link -- try to link this up because you're asking here

21 whether he has any awareness and then I assume that you need to

22 demonstrate that somehow it has some relevance to any opinion

23 that he's rendering.

24          MR. LOEWY:  Perhaps I can rephrase the question.

25          COURT:  Okay.

1   BY MR. LOEWY:

2   Q.  Dr. Heath, based on your conversations with -- well, let me

3   give -- let me ask you a couple other questions in advance,

4   please.  Dr. Heath, you've testified earlier that 13 of the 14

5   one-drug barbiturate protocol executions in the United States

6   since <u>Baze</u> have occurred in Ohio; is that correct?

7   A.  That's correct.

8   Q.  In your -- and have you -- are you aware of -- aside from

9   media reports, have you had any conversations with lawyers

10  regarding -- from Ohio regarding those executions?

11  A.  Yes, I have.

12  Q.  Have you had any conversations with prison officials

13  regarding any of those executions?

14  A.  No, I have not.

15  Q.  Have you read any depositions or statements by prison

16  officials regarding those executions?

17  A.  Yes, I have.

18  Q.  Do you have an opinion, Dr. Heath, as to whether the -- or

19  knowledge that any prison official in Ohio wishes to change

20  Ohio's current protocol to a three-drug protocol?

21          MR. ANDERSON:  Object, Your Honor.

22          COURT:  What's your objection?

23          MR. ANDERSON:  It's hearsay, Your Honor.

24          COURT:  Okay.  Counsel.

25          MR. LOEWY:  Let me try another question, Your Honor.

1   BY MR. LOEWY:

2   Q.  In evaluating the effectiveness of a one-drug protocol, did

3   you rely --

4            MR. LOEWY:  If you can give me a moment, please.

5   BY MR. LOEWY:

6   Q.  Did you rely on the warden's or other prison officials' from

7   Ohio statements in forming your opinion on the effectiveness of

8   the one-drug protocol in Ohio?

9   A.  Well, just to clarify, there's different meanings of the

10  word "effectiveness" as applied to a lethal injection procedure.

11  All of the procedures were effective in producing the rapid

12  death of the offender.  In terms of effectiveness of providing a

13  smooth procedure that was satisfactory from the point of view of

14  the Department of Corrections officials and other state

15  officials, all the evidence of that I saw was affirmative to

16  that and I saw no evidence that was contrary to that.  Nobody in

17  any reports that I saw voiced any dissatisfaction with that

18  procedure or desire to or interest in returning to the old

19  procedure.

20  Q.  Doctor, was there any pain -- evidence of pain whatsoever in

21  any of those executions to your knowledge?

22  A.  Again, I was not present at the executions.  I have to rely

23  on the reports by the prisoners' counsel who are present at

24  executions and also media witnesses.  There is no evidence of

25  any substantial or meaningful pain or discomfort.

1        MR. ANDERSON:  Your Honor, I'm going to object.  It's

2   based upon hearsay.  He was not present.

3        COURT:  I understand that.  Counsel.

4   BY MR. LOEWY:

5   Q.  Based on the statements made to you by --

6        COURT:  What's your response to the objection?

7        MR. LOEWY:  My response is that I'm asking for his

8   opinion as to whether there was any pain at these executions.

9   He can rely on hearsay to form his opinion.

10       COURT:  Well, all right, Counsel.  I'm going to allow

11  you to go ahead and continue this based upon what I gather to be

12  a representation that there is such an opinion and that you're

13  eventually going to elicit it and then the defendants can

14  cross-examine on that.  Go ahead.

15       MR. LOEWY:  Thank you, Your Honor.

16  BY MR. LOEWY:

17  Q.  Dr. Heath, based on the conversations you had with the

18  offenders' counsel regarding the offenders' executions and based

19  on reports that you have read regarding those executions, do you

20  have an opinion --

21       COURT:  I'm going to stop you there though, Mr. Loewy,

22  because I'm giving you a little leeway but I haven't heard

23  anything about the fact of such conversations.  I've heard

24  allusions to it but I don't recall any statement from Dr. Heath

25  that he'd had such conversations.

1          MR. LOEWY:  I'm sorry, Your Honor.  Let me go back.

2          COURT:  Go ahead.

3    BY MR. LOEWY:

4    Q.  Dr. Heath, have you had conversations with attorneys in Ohio

5    regarding their clients' executions under the one-drug

6    barbiturate protocol?

7    A.  Yes.  To clarify, I've had conversations with attorneys who

8    were present.  I've reviewed the prison execution logs from

9    executions carried out by just a single drug without the

10   pancuronium, potassium.  I've read media witness reports about

11   these executions.  Taken in sum and without any -- there's no

12   evidence to the contrary.  Amongst the sum of that information,

13   those executions were carried out in a humane fashion.

14   Q.  Thank you, Doctor.  I'd like to ask you I think one final

15   question.  If you are executing an individual pursuant to a

16   one-drug barbiturate protocol, is there any purpose to having a

17   consciousness check?

18   A.  No, there would be no purpose whatsoever.  In the absence of

19   pancuronium and potassium, there is no drug being administered

20   that can cause any level of significant pain or excruciating

21   suffering and therefore there would be no need to determine

22   ahead of time that if a person was in a state to tolerate such

23   pain and suffering or to be unconscious in preparation for such

24   pain and suffering.

25   Q.  Thank you, Dr. Heath.

1          COURT:  Mr. Anderson, are you cross-examining?

2          MR. ANDERSON:  Yes, Your Honor.  If I can have just a

3   moment, Your Honor.

4          COURT:  All right.

5          MR. ANDERSON:  Your Honor, could I have just a moment

6   to converse with my co-counsel?  Just a moment?

7          COURT:  Yes, that's fine.

8          MR. ANDERSON:  Thank you, Your Honor.

9          COURT:  Counsel, ordinarily, I'd take a recess but we

10  were late getting to Dr. Heath and it's, what, 5:45 in Brooklyn

11  and I'm sure the folks at the courthouse are ready for him to be

12  done.  We'll see how quickly we can move along and I'm not doing

13  it just to make your life difficult.

14         MR. ANDERSON:  No.  I understand that, Your Honor, and

15  I would like to move along.  Thank you very much.

16         COURT:  All right.  Go ahead.

17                          CROSS-EXAMINATION

18  QUESTIONS BY MR. ANDERSON:

19  Q.  Dr. Heath, could you tell me when you were first contacted

20  by the federal defenders regarding this case?

21  A.  I've had a number of contacts with the federal defender's

22  office in Idaho about lethal injection litigation over the past

23  several years.  I don't know whether they referred specifically

24  to this case or not.  I was first, to my certain knowledge,

25  contacted specifically about this case on approximately October

1  27 I would guess.

2  Q.  That would be of this year, Dr. Heath?

3  A.  Correct, yes.

4  Q.  But you'd indicated you'd been working with them regarding

5  Idaho's method of execution for a number of years?

6  A.  It depends on what you mean by working with them.  I've had

7  a number of telephone conversations with different individuals

8  in the Idaho federal defender's office.  I've reviewed some

9  documents and protocols.  It's been very sporadic over what I

10  would guess would be a period of approximately something like

11  six or seven years.

12  Q.  In fact, Dr. Heath, you reviewed Idaho's I believe it was

13  2006 protocol prior to 2007; is that correct?

14  A.  As I sit here now, I can't remember whether I've done that.

15  You have to understand that I've reviewed numerous iterations of

16  protocols for numerous states and I just can't answer that

17  question for you either way.  I would consider it likely due to

18  the nature of the on again, off again back and forth discussions

19  I've had with members of the Idaho federal defender's office.  I

20  would consider it quite plausible.  Let's put it that way.

21  Q.  Dr. Heath, are you familiar with a case of Turner vs. Epps

22  out of the Northern District of Mississippi?

23  A.  Not by name.

24  Q.  You don't recall providing an affidavit in that -- a

25  declaration in that particular case?

1    A.  I may well have.  I've provided affidavits in a large number

2    of cases regarding lethal injection and you have to give me more

3    specific information than just the names of the parties.

4    Q.  Okay.  How many death penalty cases have you been involved

5    in?

6    A.  I think rather than refer to death penalty cases, since many

7    of these lethal injection cases involve a number of plaintiffs

8    who are joined into the case, I would estimate -- and this is a

9    very, very approximate number of the 30-odd states that have

10   lethal injection as a method of execution, I've been involved in

11   litigation in the majority of those cases and probably an

12   average of one or two times in those cases but possibly more in

13   some cases and less in other states.

14   Q.  Have you --

15   A.  Several kinds of cases.

16   Q.  And I apologize.  I didn't mean to interrupt you.  That was

17   my mistake.  Have you reviewed every state's protocol?

18   A.  No, I have not.

19   Q.  Which states have you not reviewed?

20   A.  For one thing, because of the ongoing litigation, protocols

21   are dynamic entities now that are being constantly revised but I

22   do not believe I've reviewed -- I'm not certain about this.  I

23   do not believe I've reviewed the protocol of New Hampshire which

24   to my knowledge has not carried out an execution or lethal

25   injection procedure in a long time.  I'm not certain if I've

1    seen the protocol of New Mexico which is a similar situation.

2         Illinois because it's a moratorium that's been present

3    there for quite a number of years and it preexisted the advent

4    of lethal injection litigation, I've never been involved in

5    litigation there and I don't believe I've ever seen at least an

6    active version of their protocol.  But in the great majority of

7    states, I've reviewed the protocols and many iterations of

8    protocols.

9    Q.  And have you ever reviewed, of those protocols that you have

10   reviewed -- let me rephrase that.  Have you ever found of the

11   protocols that you have reviewed one that you believe passed

12   constitutional muster?

13   A.  I believe the protocol that's used in Ohio as it has been

14   used thus far has produced constitutional executions.  That

15   protocol has a peculiarity which is a method of obtaining IV --

16   obtaining -- of carrying out the execution in the event that

17   intravenous access cannot be obtained and I take exception to

18   that aspect of the Ohio protocol.

19        That involves using intramuscular -- repeated

20   intramuscular injections of drugs and that is not a suitable

21   method for providing euthanasia for humans or animals and so I

22   take exception to that part of the Ohio protocol but that part

23   of the Ohio protocol has never been implemented and the 13 times

24   that the current protocol has been implemented, I have no

25   problem with what they have done.

1   Q.  Has Ohio's protocol been recently revised?

2   A.  Not to my knowledge but I might not be aware of it so I

3   can't answer that question either way yes or no.

4   Q.  Do you know if it's been --

5   A.  Recently -- if I could just clarify -- sorry.  There was the

6   recent revision I believe in 2009 where pancuronium and

7   potassium were removed.  I'm aware there's been litigation about

8   the protocol and more to the point litigation about whether the

9   protocol is in fact being followed and I'm not aware if that's

10  resulted in any fine-tuning of their protocol.

11  Q.  And is it your understanding, Dr. Heath, that there are

12  three -- only three states that use the one-drug protocol?

13  A.  It's in flux right now.  There are states that are in

14  litigation or proposing using one-drug protocol.  Right now the

15  only states --

16  Q.  And Dr. Heath, if I could interrupt you, Dr. Heath, what I

17  want to know is right now -- I don't want to know about

18  litigation.  What I want to know is right now, are there more

19  than three states that use a one-drug protocol?

20  A.  Could you tell me what states you're referring to, please?

21  Q.  I want to know if you know of more than three states.

22  A.  I do not know of more -- I do not know of more than three

23  states that have currently used a one-drug protocol but I have

24  to say not currently but historically have used a one-drug

25  protocol because no one's actually using any protocol right now

1    as we speak.

2    Q.  And those states would be Ohio, correct?

3    A.  Correct.

4    Q.  South Dakota.

5    A.  I'd like to clarify that I believe South Dakota is in flux

6    right now but I believe, yes, that would be more accurate than

7    not.

8    Q.  And Washington.

9    A.  Correct.

10   Q.  And all of the other states that use lethal injection use a

11   three-drug protocol; is that correct?

12   A.  That's correct.

13   Q.  And despite the fact that South Dakota uses a one-drug

14   protocol -- well, let me back up.  What did you mean by saying

15   that South Dakota is in a state of flux?

16   A.  I hesitate a little bit because I'm not sure to the extent

17   to which I'm at liberty to discuss it.  I'm serving as an expert

18   witness in the case.  There have been recent depositions within

19   the last month regarding the conduct of lethal injection as

20   planned in South Dakota and I think the best way of describing

21   it is it's an unsettled matter.  It's an active case and I don't

22   know how an execution would actually in fact be carried out in

23   South Dakota if and when one is to be carried out.

24   Q.  So are you telling us that you don't know if South Dakota

25   currently has a protocol that uses a one or a three-drug method?

1   A.   South Dakota's protocol lists both -- again, the most recent

2   protocol I've seen lists both methods.   It also has flexibility

3   or versatility in terms of the barbiturate drug that would be

4   used.   It's in active litigation.   I do not know the state --

5   there have been updates to the protocol.   I'm reluctant to

6   comment about its current stature.   That's the best answer I can

7   give.   It's in flux.

8   Q.   And so to make sure that I understand exactly what you're

9   saying, as far as your level of definitiveness, there are only

10  two states that use a one-drug protocol?

11  A.   That's correct.   Ohio and Washington.

12  Q.   Now, all of the pain -- I think you used the words

13  "excruciating pain" associated with the use of the last two

14  drugs and I'm not going to try to pronounce them, those are

15  eliminated if the first drug is properly administered.   Correct?

16  A.   If the first drug is properly administered and reaches the

17  circulation and the brain in the intended dose, then those --

18  there will be no pain or suffering of any kind from the second

19  drug pancuronium or the third drug potassium.

20  Q.   Dr. Heath, do you assume that there's going to be error in

21  the administration of that first drug?

22  A.   No, I do not assume that error will occur.   I always assume

23  that error may occur.

24  Q.   May occur.

25  A.   Absolutely.

1    Q.   Okay.

2    A.   It's an essential feature of cautious practice to assume

3    that error may occur and to be constantly on guard to detect and

4    correct error.

5    Q.   Now, as I understand the problems with infiltration, that

6    can cause some problems with the administration of the first

7    drug, correct?

8    A.   Could you rephrase the question, please?

9    Q.   Infiltration --

10   A.   Repeat the question.

11   Q.   Infiltration can cause problems as far as pain if that

12   occurs as far as the administration of the first drug and I'm

13   talking infiltration occurring as a result of the -- and I'm

14   going to use a -- implementation of the IV.

15   A.   Fair enough.  There are two ways that pain could occur, two

16   principal ways, if the thiopental infiltrates which means that

17   it does not get injected into the vein.  It is injected instead

18   into the surrounding tissue, in the arm.  It accumulates in the

19   arm.

20        The first way the pain could occur is that thiopental

21   is an irritating chemical and in some patients when thiopental

22   is infiltrated, that in itself is painful.  The second way that

23   pain can occur is if thiopental infiltrates into the arm, it

24   will not reach the circulation or the brain and the patient --

25   or the prisoner rather in this context can then be exposed to

1   the effects of pancuronium and potassium.

2           And the second --

3   Q.  Now, you indicated -- I'm sorry.  Go ahead.

4   A.  -- way in which pain could occur is if thiopental

5   infiltrates.

6   Q.  Now, you indicated that you're familiar with the United

7   States Supreme Court decision in Baze, correct?

8   A.  Yes, I am.

9   Q.  And are you familiar with the fact that Justice Roberts'

10  plurality opinion is indicating that infiltration was something

11  that was very obvious?

12  A.  I'd have to review that myself but as a clinician, I

13  disagree that infiltration is something that is necessarily very

14  obvious.  It is sometimes obvious and it is sometimes occult.

15  Q.  And you've also discussed in your affidavit the problems

16  with leakage associated with faulty equipment, correct?

17  A.  Not so much with faulty equipment but with improperly

18  connected equipment or deployed equipment but yes, I suppose

19  also faulty equipment.  That would be rare.

20  Q.  Now, is the use of -- and if I misstate this, Doctor, please

21  correct me but is the use of a three-gang or a three-way

22  manifold unique to Idaho?

23  A.  Well, I've never heard the term "three-gang" used in any

24  protocol or medical setting regarding the injection of drugs.

25  But I think you used the words "three manifold"?

1   Q.   Three-way manifold.

2   A.   Three-way manifold.  Yeah.  I don't have an exact picture of

3   the way things are set up in Idaho because SOP 135 is unclear on

4   that but I will say that compared to other states, it is typical

5   to have -- it is in fact necessary to have sites in the IV

6   apparatus where drugs can be introduced so that they can be

7   delivered and flow into a patient or a prisoner.

8   Q.   So the reality is that there's always at least a possibility

9   that leakage will occur any time you have a connection or a

10   joint with an IV line, correct?

11   A.   That's correct.  And that for example is why I would always

12   be right next to my patient standing next to their arm with the

13   entire IV apparatus completely under my direct visual

14   surveillance any time I was inducing general anesthesia.

15   Q.   Now, Dr. Baze (sic), once again, you indicated you were

16   familiar with the Baze decision, correct?

17   A.   That's correct, yes.

18   Q.   Are you familiar with the dissents contained -- the dissent

19   contained with that opinion?

20   A.   Not at a level that I'm comfortable discussing now without

21   the opinion in front of me.

22   Q.   Well, I believe as far as consciousness checks that Chief

23   Justice Roberts referred to them as rough and ready tests for

24   checking consciousness.  Are you familiar with that?

25   A.   I don't remember that terminology being used and again,

without the document in front of me, I can't comment upon it.
Q. So if the dissent talked about the use of calling out of an inmate's name, brushing his eyelashes or presenting him with strong noxious odors, you're not familiar with that part of Baze.
A. I recall discussions of those -- discussions of that nature but again, I can't comment upon it without the document in front of me. I haven't reviewed it in a number of months.
Q. And the real problem isn't consciousness check but proper administration of the pentobarbital, correct?
A. To clarify, Baze did not discuss pentobarbital. It discussed thiopental or Sodium Pentothal.
Q. Correct.
A. But the problem I think is two-fold. If inadequate thiopental is administered, then the prisoner would be subjected to the agonizing effects of the other two drugs. If the consciousness check is inadequate, then the drugs will be administered without first ensuring that the prisoner is properly anesthetized.
COURT: Counsel, I'm on top of this issue.
MR. ANDERSON: Very good, Your Honor. I just have a couple questions.
COURT: Okay. I mean you're welcome to argue the law to me. I don't know that it's helping me right now what you're doing.

1          MR. ANDERSON:  I just have a couple more questions,

2    Your Honor.

3          COURT:  All right.

4    BY MR. ANDERSON:

5    Q.  Doctor, are you familiar with Washington's protocol -- one-

6    drug protocol?

7    A.  I've reviewed it but I don't have -- I'm not familiar with

8    it off the top of my head, no.

9    Q.  Does it pass constitutional muster?

10   A.  I can't comment on it without reviewing it in front of me.

11   Q.  If Idaho adopted a one-drug protocol --

12   A.  Sir, that's also a legal question and not really a medical

13   question within the purview of my expertise.

14   Q.  If Idaho adopted a one-drug protocol just using one of the

15   first two drugs, would you be satisfied that it meets

16   constitutional muster?

17   A.  I'd have to review the protocol but what is very clear is

18   that it would -- if Idaho were to remove the use of pancuronium

19   bromide and related drugs and to remove the use of potassium

20   chloride and other such drugs that can cause agony, then there

21   would be no potential for those drugs causing an agonizing

22   execution.

23         MR. ANDERSON:  One moment, Your Honor.

24         COURT:  That's fine.

25   BY MR. ANDERSON:

1    Q.  Doctor, you indicated that you have -- and these are my

2    words.  I'm going to paraphrase -- a daily practice as far as

3    the use of anesthetic?

4    A.  Correct.

5    Q.  Do you actually administer the anesthetic?

6    A.  It varies.  Sometimes I am the person who injects the drugs

7    myself.  Other times because my job is to teach residents and

8    fellows how to be accomplished and safe anesthesiologists, I

9    supervise them doing it.  It depends on the level of advancement

10   of the individual person who I'm training on that particular

11   day.

12   Q.  Thank you, Doctor.

13          MR. ANDERSON:  That's all I have, Your Honor.

14          COURT:  Mr. Loewy, do you have additional questions?

15          MR. LOEWY:  Just a few, Your Honor.

16          COURT:  Please proceed.

17          MR. LOEWY:  Thank you.

18                       RECROSS-EXAMINATION

19   QUESTIONS BY MR. LOEWY:

20   Q.  Dr. Heath, you were asked a question something along the

21   lines of do you assume error in the administration of the first

22   drug.  In the context of a three-drug protocol such as SOP 135,

23   evidence of error in the administration of the first drug would

24   be what sort of evidence?

25   A.  There's myriad forms of evidence that there's been an error.

1   The most important and pronounced one would be if the prisoner

2   did not achieve of a deep level of unconsciousness.  There have

3   been executions -- there was an execution in Ohio where the

4   thiopental was administered and the prisoner laid there and then

5   raised his head after a few minutes and said something to the

6   effect of the drugs are not working because he was aware that

7   they had accumulated in his arm and he was still fully

8   conscious.  And for the remaining 90 minutes that it took them

9   to execute him, he was conscious.

10  Q.  And to --

11  A.  That's one pronounced and robust way in which one would have

12  evidence that a large dose of barbiturate certainly had not

13  reached a person's brain if they were able to be conscious in

14  that way.

15  Q.  So consciousness, as I understand your testimony, Doctor, is

16  the primary evidence of maladministration of the anesthetic?  Is

17  that correct?

18  A.  It's one of them.  If a patient is -- the person is

19  paralyzed, then I don't have a direct way of getting to

20  consciousness.

21  Q.  And that's where I'm heading in a second, Doctor, but let's

22  just before the paralytic is administered, consciousness is the

23  evidence of error that the anesthetic has not been properly

24  administered.  Is that correct?

25  A.  It would be one evidence of error but also as has happened

1   in executions in other states, if a large pool of fluid were to

2   begin forming on the arm board or the floor or the gurney or

3   what have you while the injection was proceeding, that would

4   certainly raise important concern that the thiopental were not

5   administered because of a leak.

6        If similarly a swelling were noted in the prisoner's

7   arm or the prisoner gave evidence of discomfort in their arm,

8   that the thiopental was infiltrated --

9   Q.  Barring those possibilities -- barring those possibilities,

10  Doctor, consciousness would be another piece of evidence,

11  correct?

12  A.  Yes, that's correct.  It's one of the pieces of evidence

13  that would be used.

14  Q.  And pancuronium bromide is a paralytic which would preclude

15  that evidence from ever coming forth; is that correct?

16  A.  Once pancuronium bromide has been delivered into the

17  circulation of a person, then it's very, very difficult to

18  determine whether a person is conscious and I would say

19  essentially impossible without the sophisticated equipment that

20  is routinely and always employed in operating rooms to prevent

21  that event from occurring.  It would not be possible in the

22  context of a lethal injection procedure in a prison.

23  Q.  Thank you very much, Doctor.

24        COURT:  All right.

25        WITNESS:  You're welcome.

1          COURT:  Any additional cross-examination?

2          MR. ANDERSON:  No, Your Honor.  Thank you.

3          COURT:  All right.  Counsel, can we have agreement that

4     Dr. Heath can go on his way then or did plaintiff want to have

5     him remain available?  What's your pleasure?

6          MR. LOEWY:  Judge, we are in agreement that Dr. Heath

7     can go on his way.

8          COURT:  All right.  What about the defendants?

9          MR. ANDERSON:  No objection, Your Honor.

10          COURT:  All right.  Dr. Heath, we've finished your

11     testimony today.  Again, thank you for your patience as we were

12     getting started and would you please tell the folks at the

13     courthouse there that we appreciate very much their assistance

14     in helping us today, particularly when there are people who have

15     had to stay past their normal end of the working day.  All

16     right.  You may be excused, sir.  We'll turn off this call.

17          WITNESS:  Thank you, Your Honor.  I'll do that.

18          COURT:  All right.  Then in light of that, Counsel,

19     let's take a ten-minute recess so everybody can catch their

20     breath and then we'll pick up again.

21          CLERK:  All rise.  The Court --

22              (Recess taken.)

23          CLERK:  All rise.  The Court is again in session.

24          COURT:  Thank you.  Please be seated.  All right.  So

25     you want Mr. Zmuda up here I assume.

1              MS. HAMPTON:  Yes, please, Your Honor.

2              COURT:  All right.  Mr. Zmuda, you'll come into the

3    well of the courtroom, please.

4              CLERK:  Raise your right hand, please.

5                   (JEFFREY DONALD ZMUDA is sworn.)

6              CLERK:  Step around.  Please be seated.  For our

7    record, sir, if you could state your full name and spell your

8    last.

9              WITNESS:  Jeffrey Donald Zmuda, Z-m-u-d-a.

10             CLERK:  Thank you.

11             COURT:  Do we have your microphone over there, Mr.

12   Zmuda?  There we go.  All right.

13             WITNESS:  Is that better?

14             COURT:  That's better.  You may inquire.

15             MS. HAMPTON:  Thank you, Your Honor.

16                        DIRECT EXAMINATION

17   QUESTIONS BY MS. HAMPTON:

18   Q.  Mr. Zmuda, is there a title that you go by that I should use

19   today?

20   A.  I'm the deputy chief in the Bureau of Prisons for the Idaho

21   Department of Correction so deputy chief.

22   Q.  All right.  We'll agree on that one.  Deputy chief.  Sir,

23   have you had an opportunity to look at the redacted version of

24   your affidavit?

25   A.  I have.  I've glanced at it, yes.

1   Q.   And do you have a copy with you, Officer?

2   A.   I do.

3   Q.   To start with, how long have you been deputy chief?

4   A.   Different titles but in essence in the same position for

5   approximately eight years.

6   Q.   So prior to January of 2009, you were deputy chief of the

7   Bureau of Prisons?

8   A.   Prior to 2009.  It was a different title but in essence the

9   same position.  Same position, yes.

10  Q.   And since 2009, have you held that position continuously?

11  A.   Yes, yeah.

12  Q.   And your experience, does that either as the deputy chief or

13  in any other facet, does that encompass any medical training?

14  A.   It does not.

15  Q.   Do you hold any certificates or licenses in the medical

16  field?

17  A.   I had a CPR certificate years ago.  That's expired.

18  Q.   All right.  And, sir, you are familiar with the Department

19  of Corrections policy no. 135, correct?

20  A.   I am.

21  Q.   And if you could take a look at Plaintiff's Exhibit No. 9

22  which I believe Mr. Gordon will help provide.  Are you familiar

23  with that?

24  A.   I am.

25  Q.   Does that appear to be a complete copy of what was filed as

1    document no. 7-3 on behalf of the defendants in this case?

2    A.  Yes.  It looks like a copy of our policy.

3         MS. HAMPTON:  Your Honor, we'd move to admit Exhibit

4    No. 9.

5         MS. HOWARD:  No objection, Your Honor.

6         COURT:  Admitted.

7              (Plaintiff's Exhibit No. 9 admitted.)

8         COURT:  Just a moment.  Just a moment.  All right.

9    Thank you.  Go ahead.

10   BY MS. HAMPTON:

11   Q.  Now, the policy document is different than what we've been

12   referring to in this hearing as the SOP 135.  That's correct?

13   A.  Yes, the policy is different than the SOP.

14   Q.  And it's under the policy statements that we get some of the

15   broad general requirements for the SOP.

16   A.  That's correct.

17   Q.  For example, if you look at the policy, the director and the

18   chief of operations -- or operating division is responsible for

19   developing and implementing a standard operating procedure.

20   A.  That's correct.

21   Q.  And there's also some discussion about the execution team

22   establishing the execution team responsibilities there on page

23   1?

24   A.  Yes.

25   Q.  And then over on page 2, determining the execution method.

1   How about I'll call that the execution procedures.  Would you

2   agree with that?

3   A.  Yes.  Some of the broad procedures, yes.

4   Q.  And this document was developed October 13, 2011.

5   A.  Yeah, that's the date on it.

6   Q.  Now, one of the requirements was to establish the execution

7   procedures.  Would that be -- well, first, could you take a look

8   at what's been marked as Plaintiff's Exhibit No. 1?  Sir, do you

9   recognize that exhibit?

10  A.  I do.

11  Q.  And does that appear to be a copy of what was filed in

12  support of the defendant's motion to dismiss as document 7-4?

13  A.  Yes.

14  Q.  And is that the standard operating procedure for execution

15  procedures for the IDOC?

16  A.  It is.

17          MS. HAMPTON:  Your Honor, we'd move to admit Exhibit

18  No. 1.

19          MS. HOWARD:  No objection, Your Honor.

20          COURT:  Admitted.

21          (Plaintiff's Exhibit No. 1 admitted.)

22  BY MS. HAMPTON:

23  Q.  Now, Deputy Director, SOP 135 and that's the short term that

24  I'll use when I forget the exhibit number but SOP 135, that's a

25  completely revised protocol; is that correct?

1  A.  Yes.  Most of it is revised, yes.

2  Q.  And it includes a significant role for you in the execution

3  procedures; is that correct?

4  A.  That's correct.

5  Q.  Security coordination is one of those roles.

6  A.  Yes.

7  Q.  And then also appointing staff to assist the warden.  That's

8  on page 2 if you want to double-check me.

9  A.  Go ahead.  Yes.

10  Q.  And then also activating various teams.

11        COURT:  Ms. Hampton, do you mind if I just clarify?  I

12  assume when you say "for him," you mean for him in the position

13  that he occupies?

14        MS. HAMPTON:  That's correct, Your Honor.

15  BY MS. HAMPTON:

16  Q.  I'm talking deputy director.  The protocol refers to the

17  deputy director --

18  A.  Deputy chief position, yes, yes.

19  Q.  Thank you very much.

20  A.  That's correct.  Deputy chief.  Yes.

21  Q.  And if I misspeak again on your position, please do correct

22  me.  I apologize.  Now, you were involved in developing SOP 135.

23  A.  That's correct.

24  Q.  And you describe it as being intricately involved?

25  A.  Yes.

1   Q.  And how long was that involvement?  When did that start?

2   A.  Over the course of months.

3   Q.  And how far back would that be?

4   A.  Well, a couple -- a couple years back starting to look at

5   different procedures and practices.

6   Q.  All right.  And were you also tasked with the duty of

7   developing the SOP 135?

8   A.  Yes.

9   Q.  Now, this -- this exhibit, No. 1, was final on October 14,

10  2011; is that correct?

11  A.  That's correct.

12  Q.  And I assume that it took more than the one day between the

13  policy and the SOP.

14  A.  Yes, it did.

15  Q.  All right.  When -- prior to publishing this Exhibit No. 1,

16  there was another SOP that was under -- was in a draft state; is

17  that correct?

18  A.  That's correct.

19  Q.  And that was version 2 of the SOP?

20  A.  I'm not sure about version 2.  We had an approved version I

21  believe around 2006.  We had an approved SOP I think in 2006 and

22  then we were working on a draft off of that I believe.

23  Q.  Right.  If you would turn to Exhibit No. 3 if you wouldn't

24  mind, Deputy Chief.

25  A.  Okay.

1   Q.  Do you recognize that as a draft protocol developed by the

2   department?

3   A.  I do.

4   Q.  And at the top where it says version, it says 2.0?

5   A.  It does say 2.0.

6           MS. HAMPTON:  Your Honor, we'd move for the admission

7   of Plaintiff's Exhibit No. 3.

8           COURT:  Any objection?

9           MS. HOWARD:  Your Honor, I guess I would object.  Well,

10   one, relevance and then, you know, if it is admitted, with the

11   understanding that this was not adopted by the department.  This

12   was only a draft.

13           COURT:  You're free to examine about that if you want

14   to.

15           MS. HOWARD:  All right.

16           COURT:  Your objection is on relevance?

17           MS. HOWARD:  Yes.

18           COURT:  Ms. Hampton.

19           MS. HAMPTON:  Your Honor, I believe that it is relevant

20   in the development of the current version and that Mr. Zmuda has

21   been intimately involved in it and can speak to any questions on

22   its correspondence with or carryover --

23           COURT:  Are you challenging this version that's no. 3?

24           MS. HAMPTON:  Your Honor, I'm not challenging that it

25   is -- was ever adopted but I do think it's relevant to the

1  process that the director -- that the --

2       WITNESS:  Chief.

3       MS. HAMPTON:  -- chief used in coming up with the final

4  version.  I'm certainly not indicating --

5       COURT:  I'll let you make your argument about why it's

6  important.  I'm not sure I'm following right now but I'll allow

7  it.  It's admitted.

8       MS. HAMPTON:  Thank you, Your Honor.

9            (Plaintiff's Exhibit No. 3 admitted.)

10 BY MS. HAMPTON:

11 Q.  Deputy Chief, this document was still being reviewed by the

12 department as late as March 25, 2011.  Is that correct?

13 A.  Yes, that's the date on there being reviewed.

14 Q.  Now, I'd like to turn back to the actually adopted SOP,

15 Exhibit No. 1 which is SOP 135.  One of the duties assigned to

16 your position is planning for the execution.  Would you agree

17 with me there?

18 A.  That's correct.

19 Q.  And part of that is developing the detailed execution

20 guidelines.  You approved those detailed execution guidelines.

21 A.  Actually, I don't approve those.  The chief of operations is

22 the person that approves the standard operating procedure and

23 that's right under the header there about maybe a third of the

24 way down the page.

25       COURT:  You're talking about Exhibit 3?

1          WITNESS:  I'm talking about Exhibit 1.  Sorry, Your

2     Honor.

3          COURT:  Exhibit 1, okay.

4          WITNESS:  Exhibit 1, if we're talking about the

5     standard operating procedure.

6          COURT:  Very good.

7     BY MS. HAMPTON:

8     Q.  No.  I misspoke.  I misspoke.  In developing the detailed

9     execution guidelines.  Not the SOP but the next level of detail,

10    the more intricate level of detail, are you involved in that,

11    developing the field memorandums or the -- pardon me, or the

12    guidelines that will be applied in the execution process itself.

13    A.  I would typically approve field memorandums associated -- I

14    think the SOP calls for me to approve field memorandums

15    associated with the process if that's what you're getting at.

16    Q.  That is and my name for that is not clear.  You're calling

17    that a field memorandum, the detailed guides?

18    A.  I don't believe -- I don't believe the field memorandum is

19    detailed.  Are you talking about a portion of the SOP document

20    or a separate document?

21    Q.  I'm talking about a separate document.

22    A.  Institutions have field memorandums and those are typically

23    approved outside -- if it's related to the SOP, I believe I'm

24    responsible for approving field memorandums related to the

25    execution procedure.  Is that what you're asking?

1    Q.  Yes.  Thank you very much.

2    A.  Okay.

3    Q.  And then there's a distinction between the field memorandum

4    and what's been called a post order.  Are you familiar --

5    A.  There is a difference, yes.

6    Q.  And those post orders you do approve as well?

7    A.  I believe related to the execution procedure, I would, yes.

8    Q.  Correct.  And really all my questions are directed towards

9    the execution procedure.  I'm not interested in any of the other

10   duties that I know that you perform but aren't relevant.

11   A.  Okay.

12   Q.  So the post orders, are those the detailed instructions

13   given to a particular member on a specialty team?

14   A.  They would -- they would read, review and understand them,

15   yes.

16   Q.  And so they're a step by step instruction of what the team

17   member should do as whatever designated position they have?

18   A.  That's correct, as a member of the team.

19   Q.  And are there post orders for the medical team?

20   A.  There are not.

21   Q.  Are there post orders for the injection team?

22   A.  There are not.

23   Q.  One of your -- one of the other duties assigned to your

24   position and that you've fulfilled in this particular case was

25   selecting personnel.  Would you agree with that?

```
 1    A.   That's correct.

 2    Q.   And one of those is selecting the medical team leader.

 3    A.   That's correct.

 4    Q.   And also selecting an alternative medical team leader.

 5    A.   Yes.

 6    Q.   And as well as the injection team leader.

 7    A.   Yes.

 8    Q.   And the alternative injection team leader?

 9    A.   Yes.

10    Q.   Under the SOP 135 which is Plaintiff's Exhibit 1, you're

11    also responsible for identifying qualified personnel.  If you'll

12    look at page 8 of that document.

13    A.   What page, ma'am?

14    Q.   Page 8.  Down at the bottom, the medical team members,

15    selection and training.

16    A.   Okay.  Yes.

17    Q.   So you select the other medical team leader -- the other

18    medical team members as well.

19    A.   I approve them -- approve them, yes.

20    Q.   So if you don't approve them, they don't get on the team.

21    A.   That's correct.

22    Q.   And is that also true of the other specialty team members,

23    the injection team members?

24    A.   That's correct.  All of those specialty team members.

25         COURT:  What are we calling a specialty team?
```

1          MS. HAMPTON:  Your Honor, the specialty team members

2     are made up of three -- as I understand three teams.

3          COURT:  Are we talking about escort, medical and

4     injection?

5          MS. HAMPTON:  That's correct, Your Honor.

6          COURT:  I just wanted to make sure.

7     BY MS. HAMPTON:

8     Q.  Is that how you understand it too, Deputy Chief?

9     A.  The escort, the medical and the injection teams, specialty

10    teams.

11    Q.  When you are looking at your pool of qualified personnel,

12    you are requiring particular types of skills for each of the

13    different teams, the medical, the injection and the escort.  Is

14    that correct?

15    A.  That's correct.

16    Q.  And part of those specific to -- as I understand it,

17    specific to the medical team includes skills in inserting an IV.

18    A.  Correct.

19    Q.  Ensuring line -- the line functions properly or correctly.

20    A.  Correct.

21    Q.  Mixing chemicals.

22    A.  Correct.

23    Q.  Preparing syringes.

24    A.  Yes.

25    Q.  Supervising the administration of chemicals.

1    A.   Yes.

2    Q.   Monitoring in this case Mr. Rhoades or an offender?

3    A.   Correct.

4    Q.   And then checking the consciousness of the offender.

5    A.   Correct.

6    Q.   And you're also using some particular I'll call them

7    disciplines but they're the job types that an individual might

8    hold and just so you're clear, I'm looking at page 9 of the

9    protocol of SOP -- excuse me, SOP 135.

10   A.   Yes.

11   Q.   So you're looking at the types of individuals listed here,

12   the emergency medical technician.

13   A.   Yes.

14   Q.   And does that require a license from any state agency?

15   A.   I believe it says certification.

16   Q.   Is this certification by a state agency?

17   A.   I believe so.

18   Q.   There's also the licensed practical nurse or a registered

19   nurse.

20   A.   Yes.

21   Q.   That requires a state agency license.

22   A.   Yes.

23   Q.   The paramedic.

24   A.   Uh-huh.

25   Q.   Does that also require a license?

1   A.  I believe that's certification, is it not?

2   Q.  Certification.  All right.  By a state agency though.

3   A.  Yes.

4   Q.  A physician's assistant.  Would that require a license or

5   certification?

6   A.  I believe a license.

7   Q.  And then a physician, would that require a license by a

8   state agency?

9   A.  Yes.

10  Q.  And then the other three are kind of -- the medical --

11  excuse me.  Other medically trained personnel.  A phlebotomist

12  and a military corpsman.  Do you know if those require any

13  licenses from a state agency?

14  A.  I don't know.

15  Q.  Now, in earlier -- I don't believe you were in the courtroom

16  for earlier arguments on a different motion.  Is that correct?

17  A.  I was not in the courtroom.

18  Q.  So earlier, counsel argued that there was a potential of

19  discipline from licensing boards if individuals with these

20  licenses participated and were known to the licensing board.

21  Did you inquire of any particular licensing body whether the

22  individuals that you approved for the execution team held a

23  current license?

24  A.  I did not.

25  Q.  Now, the protocol also provides for the particular number of

1    team members for both the medical team or -- and the injection

2    team.  I assume the escort team as well but I'm really not

3    interested in the escort team right now.  Do you determine the

4    number of members on each of those specialty teams?

5    A.  Yes.

6    Q.  And when you do that, you considered the members'

7    qualifications as an integral part of meeting the United States

8    Constitution, the requirements to execute under the Eighth

9    Amendment?

10   A.  Yes.

11   Q.  All right.  And you recognize that importance because in

12   your affidavit, you recognize those as part of the safeguards

13   established under Baze.

14   A.  Correct.

15   Q.  Okay.  Now, the selection process that you did complete in

16   this case, you reviewed a pool of candidates I assume?

17   A.  That's correct.

18   Q.  And did you have more candidates for the open positions than

19   you had open positions?

20   A.  Well, I interviewed all of the candidates.  All of the

21   candidates were interviewed and then we selected -- candidates

22   were selected to serve on the team.

23   Q.  So you had -- for example, one of the positions -- I don't

24   care which one we pick.  2a, if there's a 2a, you may have had

25   three candidates for one position?  Could that have happened?

1  A.  In terms of their background, we could have considered them

2  for that position?  Is that -- is that what you're asking me?

3  Q.  You know, I'm not doing it very well but what I'm trying to

4  get to is how many people were in your pool of candidates versus

5  the number of positions actually filled.

6  A.  Versus the number of positions that we currently have

7  filled?  Is that what you're asking?

8  Q.  Currently filled, yes.  Thank you.

9  A.  Currently filled.  I had seven candidates and selected five.

10  Q.  And of the pool of the selected individuals, does that

11  include any backup individuals?

12  A.  Those are all active members on the team.

13  Q.  Are there any individuals who are alternates and by that I

14  mean are not presently members of the team but would become a

15  member should one of the five drop out?

16  A.  Not of the people that we initially interviewed.

17  Q.  Are there any current interviews going on?

18  A.  No.

19  Q.  And when you got the information of the candidates, I'd like

20  to talk about what you did to verify their qualifications if we

21  could.

22  A.  Okay.

23  Q.  In the first instance, did you make any employment contacts?

24  A.  No, I did not.

25  Q.  Did you look at -- you've already said you didn't contact

1   any licensing boards.  Did you look at any experience or

2   training records?

3   A.  Yes.

4   Q.  And what kinds of training records did you look at?

5          COURT:  Hold on.  Counsel, approach, please.

6              (Side bar discussion had.)

7          COURT:  Sometimes I'll have a side bar just because I

8   want to stand up.  Go ahead.

9          MS. HAMPTON:  Thank you, Your Honor.

10  BY MS. HAMPTON:

11  Q.  Going back to how you evaluated the members of the team, you

12  did have an interview process.

13  A.  Yes.

14  Q.  And you did that personally?

15  A.  Yes.

16  Q.  Any other individuals participate in that?

17  A.  Yes.

18  Q.  And who was that?

19  A.  The warden in charge of the execution and his backup,

20  another one of our wardens.

21  Q.  So Defendant Blades.

22  A.  Mr. Blades.

23  Q.  And then a backup warden?

24  A.  A backup warden for Warden Blades, Warden Cluney, and our

25  medical team leader.

1   Q.   And the medical team leader.

2   A.   And the medical team leader.

3   Q.   Okay.  Was the medical team leader involved in all of the

4   interviews so both the injection team and the medical team?

5   A.   Yes.

6   Q.   Okay.  And when you were looking at the qualifications of

7   the seven candidates that you whittled down to five, but of the

8   seven candidates, did you verify the -- did you verify the

9   proficiency of each candidate with regard to the listed

10   qualifications from the SOP 135 on page 9?

11   A.   Are you saying did we ask for a demonstration in the

12   interview?

13   Q.   I don't care how you verified but did you do it?

14   A.   In the interview, we asked the questions candidates -- the

15   candidates questions regarding their experience, education.

16   Asked them some questions related to the use of IV's, drawing

17   drugs into syringes, the administration of chemicals, that type

18   thing in the interview.

19   Q.   And then how did you verify the answers that you obtained?

20   A.   We're doing that through our mutual training and through

21   observation and verification in that initial training.

22   Q.   So the verification that they in fact hold the

23   qualifications that you were seeking are being verified through

24   the training process?  Do I understand it correctly?

25   A.   Not at this point in the training process.

1   Q.  Not at this point?

2   A.  In the initial training -- in the initial trainings, we had

3   them demonstrate some of those skills and we were able to

4   observe that and that gave us a sense of whether they were able

5   to perform the tasks or not.

6   Q.  And when did the -- when did the initial trainings begin?

7   A.  Shortly after the interview.  Late -- after the interviews.

8   Late October.

9   Q.  Would that be of this year?

10  A.  That would be of this year, yes.

11  Q.  So in late October of 2011, you did the interviews and began

12  the initial training review?

13  A.  Yes.

14  Q.  And at what point did you determine between late October and

15  today that the individuals were qualified to perform the tasks

16  outlined in the SOP on page 5 -- excuse me, 9?

17  A.  Would you repeat the question?

18  Q.  At what point between late October of 2011 and today's date

19  did you determine that the team members are qualified to perform

20  the tasks assigned?

21  A.  Well, you mean through demonstration or do you mean through

22  their education, training, experience and work history?

23  Q.  Well, I believe I understood it that you verified their

24  ability to perform the tasks under the SOP by reviewing their

25  training work.  Is that correct?

1   A.  Well, yeah.  I think -- through observations, we verified

2   that they are able to perform the tasks but I would add, if I

3   could --

4   Q.  Absolutely.

5   A.  -- that given their education, training, experience and work

6   history, there was -- it was highly probable that they had those

7   skills already or we would not have placed them on the team.

8   Q.  So let's go back to the observation.  When between late

9   October of 2011 and today did you make enough of an observation

10  to determine for your purposes that the individuals were

11  qualified?

12  A.  By that third training.

13  Q.  Third training.  So three times was the charm so to speak?

14  You won't go there.  After three times, you made the

15  observation.

16  A.  Not -- not all -- the first training was an orientation --

17  Q.  Okay.

18  A.  -- on the policy and the positions and the requirements of

19  the positions to familiarize them with that and expectations for

20  them.

21  Q.  All right.

22  A.  The second -- the second training, we were out getting

23  familiar with the equipment, the facility and some practical and

24  by the third, we were into all practical application.

25  Q.  All right.  Let's go to the no. 2 training when you say some

1    practical, what do you mean by that?

2    A.  I believe they did some IV work on an IV mannequin.

3    Q.  On an IV mannequin.  Not a live volunteer at this point?

4    A.  No.

5    Q.  All right.  How about the third session where you say it was

6    practical?  What did they do there?

7    A.  That was more of a complete -- starting to go through a

8    complete walk-through of the process from setting up the

9    equipment, establishing -- drawing the fluids, the syringes,

10   going through establishing the IV lines, administering the

11   chemical.

12   Q.  And what particular events occurred in establishing the IV

13   line in training session no. 3?

14   A.  I'm not sure I understand your question.

15   Q.  What did they do in session no. 3 to establish an IV line?

16   A.  Well, again, they were still practicing on a mannequin arm

17   which has -- requires that you have the proficiency to find the

18   vein.

19   Q.  Were they using fluids in this IV practice session?

20   A.  Were they --

21   Q.  Using any fluid when they were doing the practice session on

22   the mannequin arm.

23   A.  I don't believe they administered fluid through the IV that

24   went into the mannequin arm.  I can't recall for certain.

25   Q.  All right.  And when did they first practice on a live

1    volunteer?

2    A.   That's the next training.

3    Q.   That hasn't occurred yet?

4    A.   That has not occurred.

5    Q.   The other information that you indicated you look at in the

6    interview process was education.  What did you do to verify the

7    education?

8    A.   Reviewed the documentation that was provided.

9    Q.   And who provided those documentations?

10   A.   The candidates.

11   Q.   And what type -- in very general terms.  I'm not asking for

12   any identifying names but what kind of education records were

13   you looking at?

14   A.   Certificates, diploma, licenses.

15   Q.   And for the certificate, do you mean like a high school

16   equivalency or you mean a professional certificate?

17   A.   I mean like a professional certificate.

18   Q.   Okay.  So on the diploma, did you contact any educational

19   institute at any level to verify the diploma?

20   A.   I did not.

21   Q.   Okay.  On the training that was presented in the personal

22   interviews, what steps did you take to verify that each

23   candidate had the training they professed to have?

24   A.   I looked at the documentation that was provided to me by the

25   candidates.

1   Q.  And did you take any steps independent of reviewing the

2   candidates' information to determine if the training was

3   correct?

4   A.  No, I did not.  I did not contact those entities.

5   Q.  The experience, is that different than what you're

6   considering training?

7   A.  Work experience.

8   Q.  Work experience.  And my understanding is you did not

9   contact employers to verify any work experience.  Is that

10   correct?

11   A.  I did not contact employers.

12   Q.  Okay.  Now, we've talked about the IV experience.  I'm also

13   curious what types of checks you did to determine that each of

14   the members -- in this case I believe it's the medical team

15   leader who has the responsibility for consciousness checking.

16   What did you do to verify that the medical team leader was in

17   fact qualified to do a consciousness check?

18   A.  Well, the medical team leader -- I need to look at my

19   affidavit and see what's been --

20   Q.  Please.

21   A.  If I could just a moment?

22   Q.  Yes, absolutely.

23   A.  The medical team leader is a registered nurse with many

24   years of experience and in that capacity, nurses conduct

25   consciousness checks.

1   Q.  Okay.  So when -- when you interviewed I think it's

2   personnel 1a --

3   A.  Yes.

4   Q.  -- did you do the same kind of interview that you did for

5   the -- the other medical team members?

6   A.  Yes.  Asked about background and experience and education

7   and training.

8   Q.  And did you do the same level of verification?

9   A.  I did.

10  Q.  So -- so by that I mean did you contact any independent

11  references or any independent work employer or work history?

12  A.  I did not.

13  Q.  Any licensing board for the medical team leader?

14  A.  No.

15  Q.  In establishing the consciousness check that's required

16  under SOP 135, what information did you rely upon to set the

17  consciousness check and by that I mean the information that's

18  provided in your affidavit?  If you'll bear with me, I'll take

19  you to the paragraph.  Paragraph 21.

20  A.  Well, I did -- I discussed it with our medical team leader

21  as to what's the appropriate protocol for that.

22  Q.  All right.

23  A.  And if I'm not mistaken and I'm not going to get -- I'm not

24  going to get the document correct but I thought -- I thought

25  maybe in one of your filings, there was some reference to that.

1    I saw it in some research material somewhere also.

2    Q.  So from our documents, you developed your --

3    A.  No, no.  But I saw it as well I believe is all I'm saying.

4    Q.  I see.  I see.  Okay.  All right.  But in the development

5    that you did for the consciousness check --

6    A.  Right.

7    Q.  -- was this developed in late October of this year as well?

8    A.  Yes.

9    Q.  And just to clarify, in your affidavit on that same

10   sentence, it says the execution team leader.  I take that you

11   really mean the medical team leader.

12   A.  That's a typo.  I apologize for that.  Yeah, I saw that when

13   I was reviewing the document today.

14   Q.  Just -- there's just the one person.

15   A.  It's medical team leader.

16   Q.  And so when you came up with the verbal stimulus, solicit an

17   auditory response, touch the eyelashes, that was based upon your

18   conversations with the medical team leader?

19   A.  Yes.

20   Q.  And the stimulus to pinch the offender and conduct a sternal

21   rub, that was also based upon the medical team leaders's

22   experience?

23   A.  Yes.

24   Q.  And when you -- so is there a post order for the medical

25   team leader?

1  A.  There is not.  There's the Attachment A for that group in

2  SOP.

3  Q.  And anywhere in Attachment A, that's in Exhibit No. 1,

4  towards the back of it, correct?

5  A.  Yes.  Attachment A is towards the back of --

6  Q.  That's page 35 of 53 on the top?

7  A.  Yes.  That's where it begins.

8  Q.  Anywhere in here, is there a specific direction on the type

9  of pinch that must be given?

10  A.  I do not believe so.

11  Q.  And is there a specific direction on the type of sternal rub

12  that must be conducted?

13  A.  No, I don't believe so.

14  Q.  And the other three, the verbal stimulus and the auditory

15  response and touching the eyelashes, is there any specific

16  direction on how those types of stimulus will be given?

17  A.  I don't believe so.

18  Q.  Okay.  Now, Deputy Chief, when you conducted the interviews

19  in this case, did you document the qualifications yourself?  I

20  mean did you take in documents and did you make a report on the

21  qualifications of these individuals?

22  A.  Gathered the documents and reviewed them with the medical

23  team leader.

24  Q.  And are those documents still in your possession?

25  A.  They are not.

1    Q.  Were those destroyed?

2    A.  They were.

3    Q.  And how does one know that the qualifications are acceptable

4    if for some chance you're not available to discuss those with

5    say the director or the warden?

6    A.  They're not.

7    Q.  So there's no report on that?

8    A.  There is no report.

9    Q.  Deputy Chief, did you attend POST?

10   A.  I did not attend POST.  I attended -- are you talking for my

11   pre-service?

12   Q.  Correct.

13   A.  I attended Idaho Department of Correction Pre-Service

14   Academy.

15   Q.  And in that academy, did they go over various duties that

16   were -- were you a CO?

17   A.  I was not.

18   Q.  So what level did you enter the IDOC?

19   A.  I entered in an entry level in our construction group,

20   maintenance group.

21   Q.  And then you worked your way kind of through the --

22   A.  That's true, yes.

23   Q.  And you're familiar with writing reports.  This is not a new

24   think.

25   A.  I am.  I am.

1   Q.  But in this case, there's -- just to be clear, there's not a

2   file memo on the qualifications?

3   A.  No, there's not.

4   Q.  And there's no collected certificates or documents?

5   A.  There are not.  Not to my knowledge.  I don't have them.

6   Q.  And there's no written report?

7   A.  There is not.

8   Q.  And there's no electronic file?

9   A.  There's not.

10  Q.  Okay.  Now, one of the other requirements under the SOP as I

11  understand it is that you're also to run a background check of

12  each candidate; is that correct?

13  A.  That's correct.

14  Q.  And the background check, as I understand, would be a

15  criminal history check?

16  A.  That's correct.

17  Q.  And did you run that?

18  A.  That was run.

19  Q.  Did you run that?

20  A.  I did not.

21  Q.  How was that criminal history check done?

22  A.  I asked someone who had -- who had the ability to run a

23  criminal history check to do that.

24  Q.  And were the names put into the data base?  Did you use

25  NCIC?

```
1           MS. HOWARD:  Your Honor, I'm going to -- can we have a

2    side bar?

3           COURT:  All right.

4               (Side bar discussion had.)

5    BY MS. HAMPTON:

6    Q.  So Deputy Chief, you did not -- first, was NCIC used as the

7    criminal background check database?

8    A.  We ran it through our department system.  ILETS/NCIC.

9    Q.  Okay.  ILETS, that's fine.  Now, you did not do it

10   personally.  Did someone in your department do it?  I'm not

11   asking for a name, Deputy Chief.  Did someone in your

12   department?

13   A.  Can I express my concern?

14   Q.  No.

15   A.  Okay.

16          MS. HAMPTON:  Well, then, Your Honor, I'd like a side

17   bar then.

18          COURT:  Let's clear the courtroom.  Let's get to the

19   bottom of this, please.  Where's our marshal?

20          CLERK:  In the hall.

21          COURT:  I need you to clear the courtroom, please.

22              (Courtroom cleared.  Proceedings sealed.)

23          COURT:  Bring the people back in the courtroom, please.

24              (Courtroom opened.)

25          COURT:  All right.  You may inquire.
```

1          MS. HAMPTON:  Thank you, Your Honor.

2     BY MS. HAMPTON:

3     Q.  So Deputy Chief, was there a background check run on each of

4     the individuals applying for -- or considered as a candidate for

5     the specialty teams?

6     A.  Yes.

7     Q.  And did you receive those prior to putting any of the

8     members on the final team?

9     A.  I received it shortly after we had interviewed them and

10    identified them as team members.  It took me a while to find the

11    person I wanted to run the background.

12    Q.  All right.  And when you -- when you had the requirement of

13    doing a background check, did you set any requirements or was

14    there any information from the background check that would

15    disqualify a member from participating?

16    A.  I think -- I think someone obviously with a violent

17    history -- there were no qualifications established.  Someone

18    with an inappropriate criminal background would not be on the

19    team.

20    Q.  But those -- what would be defined as inappropriate was not

21    established prior to running any of the background checks?

22    A.  It's not in the SOP.

23    Q.  All right.  Now, with regard to the individual personnel --

24    and if you will look at your affidavit at the Exhibit A to that

25    affidavit.  And going down the left-hand column as you look at

1    it, the personnel 1a, was there any information that you derived

2    that indicated 1a required any follow-up investigation in their

3    qualifications or training?

4    A.   I'm sorry.   Would you repeat it?

5    Q.   Was there anything about the information you received on

6    person 1a that would indicate you would need to do additional

7    investigation before the person was qualified?

8    A.   No.

9    Q.   And the same with 2c?

10   A.   No.

11   Q.   And 1b?

12   A.   No.

13   Q.   1c?

14   A.   No.

15   Q.   2c?

16   A.   I've already responded to 2c but no.

17   Q.   They're on twice.

18   A.   That's correct.

19   Q.   And 1d.

20   A.   No.

21   Q.   So you were satisfied from that initial interview and the

22   information you gathered that each of the individuals was

23   qualified to participate?

24   A.   With regard to placement on the team?

25   Q.   Correct.

1   A.   Yes.

2   Q.   And did you do any follow-up at all on any of them whether

3   you thought it was required or not?

4   A.   Follow-ups in what manner?

5   Q.   Any follow-up interviews with the individuals or any follow-

6   up discussions with the warden on the qualifications of the

7   individuals.

8   A.   After the interview, the -- after the interviews, the

9   interview panel discussed the candidates.

10   Q.   And that interview panel was you, the warden and the medical

11   team leader?

12   A.   Two wardens and the medical team leader.

13   Q.   Two wardens --

14   A.   And myself.

15   Q.   All right.  Now, Deputy Chief, I'd like to talk about the

16   facility itself, the F Block is its generic term but it's also

17   known as I believe the execution unit.  Is that correct?

18   A.   Go ahead.

19   Q.   The execution unit?

20   A.   A portion of F Block has been designated as the execution

21   unit.

22   Q.   All right.  And within that execution unit, there are

23   different rooms.  Would you agree?

24   A.   Within the unit, yes.  Within the execution unit, yes.

25   Q.   And there's the execution chamber as it's discussed in the

1   SOP.

2   A.  Yes.

3   Q.  And there are State's witness room.

4   A.  Yes.

5   Q.  And offender's witness room.

6   A.  Yes.

7   Q.  And then a chemical room I believe it's called.

8   A.  Yes.

9   Q.  All right.  Now, in your affidavit, if you look at that at

10  page -- excuse me, at paragraph 19, you indicate that the

11  execution chamber is complete.  Now, that's just the room that

12  the offender will be brought into and administered the

13  chemicals, correct?

14  A.  The execution chamber, yes.

15  Q.  All right.  And so when you indicate that the escort,

16  medical and injection teams have been engaged in training since

17  October 20 using the unit, was the entire unit completed on

18  October 20?

19  A.  No.  And the first training session was not conducted in the

20  unit.

21  Q.  All right.  So -- going back to your description of the

22  training sessions, that would be the protocol or --

23  A.  Correct.

24  Q.  Or orientation?

25  A.  The familiarization orientation protocol responsibilities.

1   Q.  So no. 2, the second one, becoming familiar with the

2   equipment and a little bit of a practical knowledge, was that

3   conducted in a completed execution unit?

4   A.  Substantially complete, yes.

5   Q.  All right.  And so what I mean by completed is that the

6   chemical room has all the equipment necessary.  It has the

7   lines.  Would you agree that completed means that?

8   A.  It has the what?

9   Q.  The lines that would be run through to the offender.

10  A.  Are you talking about the IV's?

11  Q.  Yes.

12  A.  Well, those wouldn't typically be part of the unit.  Those

13  would typically be part of the equipment that is brought out

14  when you're performing the execution.

15  Q.  All right.  So then let's understand each other when we say

16  completed.

17  A.  Yes.

18  Q.  You say it was substantially completed for the second

19  execution.  Could you tell me whether the monitoring system was

20  completed and working at the time of the second execution --

21  training session?

22  A.  The monitoring system for the execution chamber?

23  Q.  Correct.

24  A.  I think there was still some lines being hooked up, yes.

25  Q.  And what about the cameras that are supposed to be in the

1   execution --

2   A.  I don't know.  They may have been installed.  I don't know.

3   I think they were installed.

4   Q.  Were they working?

5   A.  You know, I don't recall.

6   Q.  Okay.

7   A.  I don't recall.

8   Q.  How about the microphone that was supposed to be over the

9   offender's --

10  A.  I don't recall if that was in or not at that time.

11  Q.  Was the -- if you turn to Appendix A, there's a discussion

12  about a three-gang, three-way manifold.  Is that something that

13  was present in the execution chamber?

14  A.  It was not in the execution chamber.  Again, that would be

15  part of the equipment.

16  Q.  All right.  So when you say "substantially completed," what

17  exactly do you mean by that?

18  A.  We were -- we were able to go in there and do training,

19  get -- effectively start training our staff on the protocols and

20  the practices.

21  Q.  And if you did not have the equipment to train on, what did

22  you use as a substitute?

23  A.  I'm not sure I understand what you're asking.

24  Q.  Well, you said you didn't have the three-way, three-gang

25  manifold.  Did you use a substitute piece of equipment to train?

1    A.  Yes.  We would have had a tray that was laid out with the

2    markings on it to lay the syringes out.

3    Q.  And in this second training, did you --

4          COURT:  Just a second.  The question you asked just a

5    moment ago, I may be unclear and obviously you must think it's

6    important.  Did you say, Mr. Zmuda, that you did not have the

7    three-way manifold at the time of the three -- or the second

8    training or just that it was part of the equipment --

9          WITNESS:  It's part of the equipment.  It's not -- it's

10   not a fixed portion of the executing unit.

11         COURT:  Can you clear that up for me, Counsel, because

12   then your follow-up question was you said you didn't have the

13   three-way manifold and I'm confused.

14         MS. HAMPTON:  All right.

15   BY MS. HAMPTON:

16   Q.  So in the second training session, you did not use -- as I

17   understand it, you did not use the three-way three-gang

18   manifold?

19   A.  I don't believe so.  I don't believe so.

20   Q.  All right.  And instead, you believe that they used syringes

21   laid out on a tray?

22   A.  Yes, I believe so, on the table or the counter, yes, labeled

23   and color coded.

24   Q.  All right.  So for that training session, the purpose would

25   be to -- the injection team would be able to identify what color

1    went with what drug?

2    A.  Correct, and the amount.

3    Q.  And the amount, right.  Okay.  And those -- so there was no

4    injection actually being done at that point?

5    A.  Injection into a mannequin or a person?

6    Q.  Yes.

7    A.  Not -- certainly not into a person.

8    Q.  Was it done into a mannequin?

9    A.  You know, I don't recall.  I don't believe so.  I don't

10   believe so.

11   Q.  All right.  Okay.  Now, if we go back to Exhibit No. 1, the

12   SOP, on page 10, if you wouldn't mind looking at that.  One of

13   the -- one of the requirements up at the very top with the

14   specialty team training is to establish minimum training

15   sessions for each of what we've been calling the specialty

16   teams.  Do you see that part at the top?

17   A.  I do see that, yes.

18   Q.  Okay.  So how many of the training sessions occurred after

19   SOP 135 has been finalized?

20   A.  All.

21   Q.  And how many were those?  Just the three?

22   A.  No.

23   Q.  There's more than three?

24   A.  Pardon me.  Yeah, there's been more than three training

25   sessions, yes.

1  Q.  Okay.  So what's -- how many training sessions have there

2  been?

3  A.  Five.

4  Q.  Five.  Okay.  So we know the first three.  What's the fourth

5  one?

6  A.  Back in the execution unit going through the protocol,

7  hooking up the IV's.

8  Q.  So in this particular instance, now training session no. 4,

9  was that hooking up an IV to a volunteer or was that to the

10  mannequin again?

11  A.  Up to this point, all the IV's -- any IV's that have been

12  hooked up have been to the mannequin.

13  Q.  Okay.  And no. 5, what training did that encompass?

14  A.  That -- again, that was going through the protocol,

15  establishing how -- how to load the syringes, place them in the

16  manifold, establish how you're going to hook up the IV on the

17  offender and we did not push -- did not push -- we did push

18  chemicals.  That's right, we did in the fifth one, yes.

19  Q.  In the fifth one, you pushed into the mannequin?

20  A.  I don't -- I think we did push it into the -- I'm not

21  certain.  I was back in the chemical room for that portion of

22  it.

23  Q.  Okay.  Now, the training sessions are supposed to be

24  recorded, correct?  Not recorded in the sense of filmed but

25  there is supposed to be a record of the training sessions that

1    occur.

2    A.  There's -- I don't -- there's an agenda, there's an outline

3    but not -- I don't know what you mean other than that.

4    Q.  Well, there's a warden's execution long.  Isn't that

5    correct?

6    A.  The warden maintains an execution log.

7    Q.  And the training sessions would be documented in that?

8    A.  That's correct.

9    Q.  And would it include all of the steps that are taken during

10   the particular training session?

11   A.  Not -- I don't believe in that execution log.  Really,

12   you're just establishing events.

13   Q.  All right.  So the most we would find from that execution

14   log would be that in fact on day X, a training occurred, X

15   people were involved?

16   A.  Yeah.  It would say on such and such a day, training session

17   for medical and injection team.

18   Q.  Okay.  Fair enough.  In the training from the protocol that

19   requires that after receiving a death warrant, the teams will

20   train weekly before the scheduled execution date.  Do you see

21   that?

22   A.  That's correct.

23   Q.  So the death warrant came down on the 19th of October.

24   A.  That's correct.

25   Q.  And it's now the 10th so is that about three weeks?

1    A.   That's correct.

2    Q.   And have they had three training sessions?

3    A.   Well, they've had more than three.  I think I indicated

4    we've had five.

5    Q.   Right.  But I'm more interested in whether they're having

6    them since -- have they had three training sessions since the

7    death warrant has been issued?

8    A.   Yes.

9    Q.   Okay.  Now, there's a distinction in the protocol that I'm

10   not quite sure I understand between a training session and a

11   rehearsal session.  Can you tell me what is included in a

12   training session?

13   A.   Training session would principally be limited to the team --

14   the team, the wardens, myself if I'm able to be there and just

15   working on their portion of the execution.

16   Q.   All right.  And during the training sessions, we've already

17   kind of talked about how the IV's worked but what about the

18   consciousness check?  Is there training on the consciousness

19   check?

20   A.   We would simulate the consciousness check on a person and

21   have --

22   Q.   So for the consciousness check, you would use a live

23   volunteer?

24   A.   We have.

25   Q.   And in those particular instances, have you used a volunteer

1    that has had any amount of anesthetic?

2    A.   No.

3    Q.   So these are volunteers who are fully conscious?

4    A.   Yes.

5    Q.   Okay.  Now, the rehearsal session, what is the distinction

6    between a rehearsal session and a training session?

7    A.   Rehearsal session would be a more expanded version.  It

8    would include other teams.  Maybe all of the teams, our

9    director.  A more expanded version including all of the entities

10   that play a role or most of the entities that play a role.

11   Q.   So a rehearsal session seems to me to be exactly as you

12   would anticipate in like a theatrical setting?

13   A.   Correct.

14   Q.   It's a dress rehearsal?

15   A.   More like that, yes.

16   Q.   All right.  And so you're going to step through each and

17   every part of the protocol, the appendix and any post orders?

18   A.   We're going to go through it by the numbers, what we're

19   going to do at the event.

20   Q.   All right.  And those have not happened yet because they're

21   only due 48 hours in advance.

22   A.   Yes.

23   Q.   Is there anything in addition to the protocol Appendix A and

24   post orders that will be done in the rehearsal session?

25   A.   I'm sorry?

1  Q.  Is there anything in addition to the protocol or the
2  Appendix A or the post orders that will be done in a rehearsal
3  session?
4  A.  I can't think of anything that we would do, no.
5  Q.  And in the rehearsal session, will you be using a live
6  volunteer for the IV setting?
7  A.  Yes.
8  Q.  And will you be pushing any fluid into the live volunteer
9  assuming -- I assume it's going to be like a saline flush.
10  A.  Yes.
11  Q.  And will you be doing any consciousness checking on the live
12  volunteer?
13  A.  Yes.
14  Q.  And will that volunteer be under any anesthetic?
15  A.  No.
16  Q.  Now, kind of going back to the team members and how they
17  interact with the protocol, what did -- what did you rely upon
18  to know that an individual had the ability to determine
19  sufficient unconsciousness for the purposes of the execution?
20  A.  Well, the person's a nurse.  Has -- had multiple years of
21  experience, worked in various capacities to include emergency
22  room and has lots of experience with the administration of
23  chemicals and checking consciousness.
24  Q.  All right.  And we kind of went over the medical team
25  leader's qualifications but one of the things that we haven't

1   discussed is the distinction between the medical team leader's

2   clinical practice and their administrative practice and that's

3   over in your affidavit, no. 14.

4   A.  Yes, yes.

5   Q.  So let me understand if I might what you mean by

6   administrative experience.  Could you describe that for me?

7   A.  Experience supervising others in the medical field,

8   monitoring processes, practices in the medical field.

9   Q.  And some of that would include what we would typically

10  understand to be administrative duties like filling out

11  insurance forms or paperwork or those kinds of requirements?

12  A.  Some paperwork -- yeah, paperwork.  Some, yes.

13  Q.  In the clinical experience, is that limited to the

14  information that's included in the -- in the paragraph?

15  A.  In the paragraph in my affidavit?

16  Q.  Correct.

17  A.  At least that experience, yes.

18  Q.  Was there other information that you obtained that would

19  indicate that the person's ability to determine sufficient

20  unconsciousness -- proficiency in determining a sufficient state

21  of unconsciousness?

22  A.  Just that information, yes.

23  Q.  All right.  Okay.  Now, when we also look at the development

24  of Exhibit 1, SOP 135, I believe in your affidavit, you talked

25  about it, paragraph 6, and also at paragraph 5 the process that

1   you took to develop this SOP.  Do you see that in your

2   affidavit?

3   A.  In the affidavit 5 and 6?  That's what you're referring to?

4   Q.  Yes, yes.

5   A.  Yes.

6   Q.  So I'd like to discuss with you what steps you actually took

7   in coming up with the development of the SOP.  So you indicate

8   that you were tasked with the duties to develop the SOP; is that

9   correct?

10  A.  That's correct.

11  Q.  All right.  And you say you looked at -- you say the IDOC

12  looked at other states' policies as a guide.  Did you personally

13  look at any other states' policies?

14  A.  I did.

15  Q.  All right.  Which states did you look at?

16  A.  I looked at Arizona's and I looked at Ohio's and I believe I

17  looked at Washington's.

18  Q.  And what were the effective dates of the protocols that you

19  looked at?

20  A.  I don't recall the effective dates.  The dates that they had

21  approved theirs?

22  Q.  Correct.

23  A.  It was the most recent -- the most recent versions at the

24  time and twice -- twice on Arizona.

25  Q.  Twice on the Arizona?

1   A.   Twice on Arizona.

2   Q.   All right.  And so on Arizona --

3   A.   They updated theirs.

4   Q.   I'm sorry.  I cut you off.

5   A.   I'm sorry.  They updated theirs.  They had updated theirs.

6   Q.   So you looked at the updated Arizona one?

7   A.   I did.

8   Q.   And that was a three-drug protocol?

9   A.   Yes.

10   Q.   The Ohio protocol that you looked at, was that their three-

11   drug or their one-drug?

12   A.   I believe when I looked at Ohio's, it was one drug I

13   believe.

14   Q.   And the Washington protocol, when you looked at it, was it

15   the three-drug or the one-drug?

16   A.   I can't remember Washington's that much.

17   Q.   So Washington really wasn't influential in your decision

18   making?

19   A.   And neither was Ohio's really.

20   Q.   All right.  Now, when you say that countless hours were

21   spent on this task, you're kind of lumping the entire department

22   into that project.

23   A.   That's correct.

24   Q.   Okay.  But you personally spent hours on it.

25   A.   Yes, ma'am.

1    Q.  All right.  When you did your investigation, did you look at

2    anything other than the actual SOP's from the other states --

3    from Arizona and from Ohio and Washington?

4    A.  I had staff pull some additional research information off of

5    the internet, what was going on with the different chemicals

6    being used in executions.

7    Q.  Did you happen to look at any of the states' policies or

8    statement of purpose in why they adopted the particular

9    protocol?

10   A.  I don't recall that.

11   Q.  And when you look at the states' protocol and the additional

12   information, did that include contacting any of the officials,

13   what I will call the Department of Correction counterparts in

14   either Ohio or Arizona or Washington?

15   A.  I have talked to people -- I've talked to people in Arizona

16   and Ohio and some others in our organization have talked to

17   people in Washington.

18   Q.  When you talked with the Department of Corrections

19   counterpart in Arizona, did you ask about their experience and

20   how effective their protocol was?

21   A.  I spent a great deal of time doing that with Arizona to

22   include a site visit.

23   Q.  And with Ohio, did you speak with any of the Department of

24   Correction officials there to ascertain their experience with

25   one-drug protocol?

1    A.  I don't recall that conversation.

2    Q.  Did you have any conversations with the Ohio department?

3    A.  Yeah, I did talk -- I did talk to Ohio.

4    Q.  And did you discuss any of the concerns that Ohio had with

5    their protocol?

6    A.  No.

7    Q.  Did they express any concerns?

8    A.  I don't recall that.

9    Q.  Now, when you were talking with Arizona and discussing their

10   three-drug protocol, you understand what the purpose of each of

11   the three drugs are in the protocol, correct?

12   A.  I do.

13   Q.  And the first -- for example, the pancuronium bromide,

14   that's the paralytic.

15   A.  That's not the first administered though.

16   Q.  I agree.

17   A.  Okay, okay.  I'm just making sure.

18   Q.  But the pancuronium bromide is the paralytic?

19   A.  Yes.

20   Q.  It produces the suffocation?  It can produce the

21   suffocation?

22   A.  Okay.

23   Q.  Did you learn that or not?

24   A.  It's a paralytic and it can affect the muscles around the

25   lungs, involuntary muscles, and the breathing.

1   Q.  Okay.

2   A.  As I understand it.

3   Q.  All right.  And the potassium chloride, you understand that

4   to be the cardiac arrest drug?

5   A.  I do.

6   Q.  And that drug will have a painful effect if the individual

7   is not sufficiently unconscious.  You understand that too?

8   A.  I would imagine so, yes.

9   Q.  Well, you understand from the requirement under Baze to

10  provide for a humane method.

11  A.  Yes, I do.

12  Q.  Okay.  All right.  Now, the risk that comes from the

13  three-drug protocol comes back to insufficient state of

14  unconsciousness.  Would you agree with me?

15  A.  Repeat that, please.

16  Q.  The pain that arises from a three-drug protocol comes

17  because of an insufficient state of unconsciousness.

18  A.  If the condemned was not sufficiently sedated, they could

19  experience pain?

20  Q.  Yes.

21  A.  Yes, yes.

22  Q.  So you agree with that.  All right.  Now, were those facts,

23  the suffocation, the cardiac arrest, the intense burning and the

24  purpose of the anesthetic, were those facts taken into account

25  when you did your development of the Idaho protocol?

1  A.  Talking about the sedative?

2  Q.  No.  Not the sedative.  The fact that there's a risk of pain

3  from the pancuronium bromide and the -- excuse me, the potassium

4  chloride.

5  A.  Yes.  We're aware of that.

6  Q.  And you were also aware of the pentobarbital's use in a

7  three-drug protocol?

8  A.  It's an option in ours, yes.

9  Q.  Right.  And the other option was just sodium thiopental?

10  A.  Yeah.

11  Q.  And the purpose of those two is to reduce the consciousness

12  level.

13  A.  Yes, to render the person unconscious.

14  Q.  Correct.  And the dose that you have outlined I believe is 5

15  grams for both.  Correct?

16  A.  Yes.

17  Q.  And are you aware of pentobarbital's use in a three-drug

18  protocol in which it was not effective in sufficiently rendering

19  the individual unconscious?

20  A.  I'm aware that there is an instance or instances.

21  Q.  Okay.  Are you also aware of the use of pentobarbital in a

22  one-drug execution process?

23  A.  I'm aware that there's a one-drug process.

24  Q.  And when you talk to Ohio, did you ask them about their use

25  of one-drug protocol?

1   A.  I don't believe I had that conversation.

2   Q.  Did you look at the length of time for death in one-drug

3   protocol out of Ohio?

4   A.  Did not.

5   Q.  Did you look at the length of death of time -- the length of

6   time for death in the Washington execution in 2010?

7   A.  I did not.

8   Q.  Were you -- the other anesthetic that was used -- that can

9   be used in Idaho is the thiopental, sodium thiopental?

10  A.  Yes.

11  Q.  And were you aware at the time that you developed this

12  protocol of a case out of Florida using thiopental in a

13  three-drug protocol that was botched and that's the Diaz

14  (phonetic) case?

15  A.  I'm aware that there's cases where that's occurred.

16  Q.  Okay.  Now going back to the actual protocol and how the

17  chemicals will be injected, the first drug, the anesthetic is

18  injected and then there's a wait until the consciousness check,

19  correct?

20  A.  That's correct.

21  Q.  And that's a three-minute wait time?

22  A.  That's correct.

23  Q.  And is that from the beginning of the injection or at the

24  completion of the injection that the three-minute wait time

25  occurs?

1   A.  Completion.

2   Q.  And when you do that, is there a difference in the wait time

3   if you use the thiopental versus the pentobarbital?

4   A.  The pentobarbital versus the pentothal -- what we refer to

5   as pentothal?  Sodium Pentothal versus the pentobarbital?

6   Q.  Yes.

7   A.  A wait time -- we would have the same wait time.

8   Q.  Same wait time.  All right.

9   A.  Let the sedative have an opportunity to work.

10  Q.  And how long from the time that you do the consciousness

11  check and you run the flush through the line until you inject

12  the first -- excuse me, until you inject the second drug, the

13  paralytic?  How long is that time?

14  A.  Well, that would depend on if the offender was determined to

15  be unconscious.

16  Q.  And if --

17  A.  And how long the consciousness check would take.

18  Q.  And if at the end of the consciousness check the offender is

19  still deemed unconscious by the medical team leader, how long

20  until the injection of the -- of the pancuronium bromide?

21  A.  Well, the protocol is that the medical team leader -- if the

22  medical team leader deems that the offender is not unconscious,

23  that person reports that to the warden.

24  Q.  Right.

25  A.  And then the warden makes a determination on how to proceed

1   from there.

2   Q.  Right.  But what I'm asking is once the medical team leader

3   determines that the offender is sufficiently unconscious.

4   A.  Okay.  I'm sorry.  I misunderstood.

5   Q.  Right.  From that time, how long until the pancuronium

6   bromide is injected?

7   A.  Well, the medical team leader has to make it back into the

8   chemical room so you're probably about two minutes.

9   Q.  Okay.  Now, the dose under SOP 135 for the anesthetic,

10  either one, is 5 grams.

11  A.  That's correct.

12  Q.  At the end of your development of the protocol, Exhibit

13  No. 1, did you present a report to the director for selection or

14  approval of the protocol?

15  A.  The SOP -- the SOP went to the chief of prisons for

16  approval.  The chief of operations.  I'm sorry.  Chief of

17  operations.

18  Q.  And then from there to the director?

19  A.  Well, the director has an opportunity to review it.  The

20  official approval is the chief of operations.

21  Q.  And could the director change any part of SOP 135?

22  A.  Yes.

23  Q.  And when you presented the information to the chief of

24  operations --

25  A.  Yes.

1   Q.  -- did you include information on the one-drug protocol in

2   your information?

3   A.  I did not but I believe -- I believe he's aware of one-drug

4   protocols.

5           MS. HAMPTON:  Your Honor, if we could just give me a

6   moment to consult with co-counsel.

7           COURT:  That would be just fine, Ms. Hampton.

8           MS. HAMPTON:  Your Honor, they want to make me earn my

9   keep here.  Your Honor, those are all my questions.  Thank you

10  very much.

11          COURT:  Thank you, Ms. Hampton.  Will there be any

12  examination from the State or from the defendants I should say?

13          MS. HOWARD:  Yes, Your Honor.

14          COURT:  Go ahead.  Sir, do you have some water up

15  there?

16          WITNESS:  I'm in good shape.  Thank you, Your Honor.

17          COURT:  Very good.  You may inquire.

18          MS. HOWARD:  Thank you, Your Honor.

19                          CROSS-EXAMINATION

20  QUESTIONS BY MS. HOWARD:

21  Q.  Deputy Chief, I want to talk briefly about when the medical

22  team leader does his consciousness check.  Have you actually

23  timed how long it takes for him to walk from the execution

24  chamber back to the staging area of the injection room?

25  A.  I've not timed that but it takes him less than a minute.

1    Less than a minute.

2    Q.  Okay.  So I believe you testified it was maybe two minutes

3    that it takes him to go from --

4    A.  I said before -- I think the question was -- was when would

5    we start administering the next chemical.  Wasn't that the

6    question?  I'm not sure.

7    Q.  You do the three-minute -- the three-minute consciousness

8    check or you have a three-minute window there and then he -- is

9    that from the beginning or -- from the beginning of the

10   injection or after the injection?

11   A.  No.  At the end of the -- at the end of the injection of the

12   sedative, there's a three-minute wait and then the team leader

13   comes from the chemical room around to the execution chamber and

14   performs the consciousness check.

15        COURT:  Ms. Howard, let me see you and Ms. Hampton up

16   here just one second.

17             (Side bar discussion had.)

18   BY MS. HOWARD:

19   Q.  Deputy Chief, I just want to clarify that I used the gender

20   him when asking about the medical team leader and I am using

21   that generically.  It could be a he or a she as is -- I

22   understand the SOP is the same way.

23   A.  That's correct.

24   Q.  Okay.  So you're talking about the two minutes that you said

25   occurred would be from the two minute -- two minutes would be

1   when he went in to do -- when the medical team leader went in to

2   do the consciousness check and then returned back to the

3   injection room.

4   A.  From the time the consciousness check was completed till the

5   time the medical team leader is back in the chemical room and

6   ready to proceed with the next chemical -- injecting the next

7   chemical is probably two minutes.

8   Q.  But you have not actually timed that?

9   A.  I have not timed that.

10  Q.  And the distance from the execution chamber to the injection

11  room, approximately how many feet is that?

12  A.  Yeah.  Probably 60 to 70 feet.  I'm guessing.  My best guess

13  from the execution chamber to the chemical room.

14  Q.  And do those rooms connect --

15  A.  They are not connected.  There's -- there's two other rooms

16  that you must pass through between the two.

17  Q.  When did you visit Arizona?

18  A.  October 2010.

19  Q.  Were you the only one who went to Arizona?

20  A.  I was not.

21  Q.  Who went to Arizona?

22  A.  My boss at the time, the chief of prisons, Pam Sonnen;

23  Warden Randy Blades.  Then deputy warden over virtual prisons

24  Shannon Cluney who's now a warden in our facilities and myself.

25  Q.  What did that visit entail?

1  A.  We visited the site, met with the warden and some of his

2  staff that play a role in the execution process, discussed

3  issues related to processes, practices, procedures, how they do

4  things.  We went down and visited their execution chamber and

5  looked at it to see how it was set up, talked about, you know,

6  how that worked for them and what issues they might have and got

7  a good sense of how they do business.

8          MS. HOWARD:  Something's beeping over here.

9          CLERK:  Yes, it is.  Just a second, please.

10         MS. HOWARD:  Okay.

11         CLERK:  It will take just a moment.  Sorry about that.

12         COURT:  There we go.  Go ahead.  Nope, I lied.

13         CLERK:  Okay.  You're on.

14         COURT:  Go ahead.

15         MS. HOWARD:  Thank you, Your Honor.

16 BY MS. HOWARD:

17 Q.  I want to briefly talk about the training sessions.  You

18 indicated that there are two rehearsals which would be more of a

19 dress rehearsal and you talked about training 1 wasn't an actual

20 training in the execution unit?

21 A.  It was not.

22 Q.  And then training 2, you began -- was training 2 in the

23 execution unit?

24 A.  It was.

25 Q.  Okay.  So since you've been training in the execution unit,

1   are you doing walk-throughs of the execution protocol?

2   A.  Yes.  If -- yes.  Doing functional duties and/or

3   walk-throughs is part of it.

4   Q.  Okay.  So you're taking Appendix A and the SOP and going

5   through that in your rehearsal -- or your training sessions what

6   each person's role is and actually --

7   A.  Each person has a role and each person is performing that

8   role in the trainings.

9   Q.  And you did testify that you've completed five trainings,

10  correct?

11  A.  Yes.  We've completed five trainings.

12  Q.  And you represented in your affidavit that there would be

13  ten training sessions.

14  A.  Ten to include at least two rehearsals, yes.

15  Q.  When you interviewed your candidates for the specialty

16  teams, was there a specific discussion about their experience

17  related to what was needed -- what was needed to be performed in

18  regards to the execution protocol?  Specifically did you ask

19  them how to do an IV or how to inject drugs or push drugs?  Were

20  those kind of questions asked when you interviewed the

21  candidates?

22  A.  Yes.  The medical team leader led asking those questions and

23  presented circumstances to them.  What if you encountered this,

24  what would you do?  That was part of the interview.

25  Q.  And all of the candidates that were interviewed had at least

1  one year of experience in their relevant professional field?

2  A.  Much more than one, yes.

3  Q.  I know that you were asked you don't have any written

4  documents regarding your candidates -- any information related

5  to the candidates when you interviewed them or their credentials

6  or anything like that?

7  A.  No.  They were reviewed and they were disposed of.

8  Q.  And you destroyed those, disposed of them?

9  A.  I did.  I did.

10  Q.  And I'm assuming that you destroyed those to maintain

11  confidentiality?

12  A.  I did.

13  Q.  And you didn't write a report to maintain confidentiality as

14  well?

15  A.  I did.  I reported verbally to my superiors.

16  Q.  Through this whole process of developing the SOP, have you

17  reported to your superiors?

18  A.  Yes.

19  Q.  And who would that be?

20  A.  The chief of operations, Kevin Kempf, and the director of

21  the department Brent Reinke.

22  Q.  And regarding your training sessions, have you reported to

23  your superiors how those training sessions are going?

24  A.  Yes.

25  Q.  Is it fair to say that the director has been apprised of

1  this whole process since you've started the training?

2  A.  Yes.

3  Q.  Have you had direct communication with the director?

4  A.  I've talked to the director about the trainings.

5  Q.  Have you talked to the director about the candidates?

6  A.  In very general and broad terms.

7  Q.  Is it safe to assume that you didn't contact candidates'

8  employers to maintain confidentiality?

9  A.  That's correct.

10         MS. HOWARD:  If I could just have a minute, Your Honor.

11 I have no further questions, Your Honor.

12         COURT:  All right.  Ms. Hampton.

13         MS. HAMPTON:  Thank you, Your Honor.

14                      REDIRECT EXAMINATION

15 QUESTIONS BY MS. HAMPTON:

16 Q.  Deputy Chief, when you talked about the -- when you talk

17 about the walk-through sessions, is that the tasks that are

18 assigned under Appendix A alone?

19 A.  No, not alone.  Are you talking about the rehearsals or

20 trainings?  The trainings?

21 Q.  No, sir.  You were asked about walk-through sessions and you

22 indicated those were functional duties.

23 A.  Yes, yes, functional duties for the team and the warden, his

24 role which I don't -- some of that's outlined in Appendix A,

25 yes.

1    Q.  And the other duties are described in the post orders or in

2    some other document?

3    A.  Any other duties that the warden might have would be in the

4    SOP.

5    Q.  All right.  And any other duties that the specialty team

6    members would have, are those in addition to the duties we've

7    already previously discussed?

8    A.  I don't believe so, no.

9    Q.  All right.  Now, when asked questions about the interviews

10   that you conducted for the candidates, you were discussing

11   specifically the types of questions that you asked and you

12   indicated that the medical team leader would pose hypotheticals,

13   if I could use that word, to the candidates.  Is that correct?

14   A.  Yes.

15   Q.  And sometimes they would say if you encountered X event,

16   what would you do?

17   A.  Yes.

18   Q.  And so did they discuss particularly any -- if they

19   encountered a problem with setting the IV, what would you do?

20   A.  Yes.

21   Q.  And if you encountered that the offender was conscious, what

22   would you do?

23   A.  I don't believe we discussed that.

24   Q.  And what would you do to determine -- did you discuss or

25   pose a hypothetical about how the team member would determine if

1   the offender was unconscious?

2   A.  We didn't ask those team members that.

3   Q.  You talked about the experience of the team members and

4   indicated that they had much more experience than one year

5   experience.  Did they have -- did they have the experience

6   between October of 2010 and October 2011?

7   A.  October 2010 --

8   Q.  2010 and October 2011.

9   A.  Yes.  In their field, yes.

10  Q.  All right.  So in their field, their daily -- their

11  qualifications -- excuse me.  The experience that led them to be

12  qualified for the position occurred between October '10 and

13  October '11?

14  A.  They had experience beyond that but they all have one year

15  or more of that experience.

16  Q.  And that one year or more of experience that they have, did

17  that include daily experience in their professions?

18  A.  Yes.

19  Q.  So for each of the team members, they had daily experience

20  in their profession from October 10 to October 11?

21  A.  Their work history has them in the medical field performing

22  duties similar to what they're performing today through that

23  period they've been in the medical field for that and previous

24  to that.

25  Q.  So for just that one year time period, they have -- for

1  example, the individual who is charged with consciousness

2  checking has daily experience in determining whether an

3  individual is sufficiently unconscious?

4  A.  In that time period?

5  Q.  Yes.

6  A.  No, no.

7  Q.  And for the individuals who are setting the IV's, they have

8  daily experience during the time period of October '10 to

9  October '11 of setting IV's?

10  A.  Yes.

11  Q.  Each of them?

12  A.  There's two of them, yes.

13  Q.  And the same for the injector teams.  Their medical

14  experience is daily and it's between this time period?

15  A.  They are in the medical field for that time frame.

16  Q.  I appreciate that they're in the medical field but are they

17  doing the assigned duties under the protocol daily?

18  A.  For the injectors?

19  Q.  Yes.

20  A.  They -- not necessarily daily.

21  Q.  All right.  Thank you.  Those are all my questions.

22          COURT:  Okay.  Ms. Howard, anything further?

23          MS. HOWARD:  No, Your Honor.

24          COURT:  Mr. Zmuda, you may step down.  Thank you, sir.

25          WITNESS:  Thank you.

1      COURT:  All right, Counsel.  I'm going to allow for

2  this because on this discrete issue, I'm struggling with it and

3  I'll give you an opportunity to cross-examine.  Mr. Zmuda, come

4  back to the stand.

5      MS. HAMPTON:  Your Honor, Mr. Zmuda -- I mean we would

6  object.  Mr. Zmuda has been present for the entire argument at

7  this point and I realize that he was released because we didn't

8  think he was going to be a witness anymore.

9      COURT:  I didn't think he was going to come back to the

10  witness stand either.  Your objection is noted.

11      MS. HAMPTON:  But counsel -- okay.  Thank you.

12      COURT:  Your objection's noted.  I'm going to hear from

13  him.

14      MS. HAMPTON:  Thank you, Your Honor.

15      COURT:  Mr. Zmuda, you're still under oath.

16          (JEFFREY ZMUDA was previously sworn.)

17      COURT:  Counsel.

18      MS. HOWARD:  Thank you, Your Honor.

19                      DIRECT EXAMINATION

20  QUESTIONS BY MS. HOWARD:

21  Q.  Mr. Zmuda, you've obviously heard the Court's concerns and

22  the SOP directs that you'll have two rehearsals in the 48 hours

23  prior to the execution.  I'm assuming that in this -- that at

24  least those two rehearsals, you're going to use live volunteers

25  for the IV's.  Are there other trainings in which you have

1    volunteers planned to be -- or you have planned for volunteers

2    to be present so that the team members can initiate IV's?

3    A.  Yes.

4    Q.  And how many trainings will that consist of?

5    A.  From this point forward, from the next training, the sixth

6    training on.

7    Q.  So that would be four trainings or five trainings?  I

8    apologize.  I think you testified that you had already completed

9    five trainings?

10   A.  That's correct.  And so six, seven, eight and the two -- at

11   least two rehearsals so ten.  Number six, seven, eight and then

12   the two rehearsals will all have live sticks if you will, IV's.

13   Q.  So that will be five -- at least five training sessions with

14   volunteers that will be used to insert IV's; is that correct?

15   A.  That's correct, and volunteers include myself, the two

16   wardens and the medical team leader.

17          MS. HOWARD:  I have nothing further, Your Honor.

18          COURT:  All right.  Ms. Hampton, I'll allow you to

19   cross-examine if you'd like on this subject.

20          MS. HAMPTON:  Thank you, Your Honor.

21                          CROSS-EXAMINATION

22   QUESTIONS BY MS. HAMPTON:

23   Q.  So Deputy Chief --

24   A.  Yes, ma'am.

25   Q.  -- there's going to be at least one session in which the

1    person who's supposed to oversee whether the members are doing

2    it correctly is the volunteer, correct?  There's one session in

3    which the person who's overseeing the qualifications of the IV

4    people is the volunteer?

5    A.  You're referring to the session where I'll be -- an IV will

6    be inserted in me?  I'm not the only person that oversees that

7    but, yes, I'll --

8    Q.  Well, the only person that has training in this is the

9    medical team leader.

10   A.  Correct, yes.

11   Q.  And they're a volunteer.

12   A.  Yes.

13   Q.  And then there's a session in which you're going to be the

14   volunteer.

15   A.  Correct.

16   Q.  And you have no medical experience to determine whether or

17   not it's being done correctly.

18   A.  No, I do not.

19   Q.  And the other person involved in this is did I understand

20   the warden?

21   A.  Yeah, both of our wardens that are involved in the process.

22   Q.  Both wardens so that's Warden Blades.

23   A.  And Warden Cluney.

24   Q.  And Warden Cluney.  And Warden Blades, does he have any

25   medical training to know whether or not the IV is being set

1   properly?

2   A.  No medical training, no.

3   Q.  And how about Warden Cluney?

4   A.  Not that I'm aware of, no.

5   Q.  And for -- is that all the volunteers then?  Someone's going

6   to get to do this twice?

7   A.  No, no.  There's -- there's other volunteers from within our

8   staff.

9   Q.  The other staff member that's going to be the volunteer, do

10  they have any medical training in determining whether or not the

11  IV line is set appropriately?

12  A.  You know, I don't know who those volunteers are.  Warden

13  Blades has that information.

14  Q.  So to the best of your knowledge right now today, the answer

15  would be no?

16  A.  To the best of my knowledge.

17  Q.  All right.  And in this training session that you plan to

18  have between today, the 10th, and the 18th and when the

19  execution -- now, correct me if I'm wrong.  There will be no

20  training session on the 18th; is that correct?

21  A.  There's no training session on the 18th, no.

22  Q.  So that's one less day.  We're down to seven days, correct?

23  Because there will be no more training today.

24  A.  Yes.  The trainings will be conducted between now and the

25  last of the trainings will be on the 17th, the last -- the

1   rehearsals.

2   Q.  So you have seven days to conduct these five trainings.

3   Will there be multiple volunteers during these training

4   sessions?

5   A.  Yes.

6   Q.  And in these -- do any of -- in any of these training

7   sessions, will the team set an IV in which fluids will be

8   introduced?

9   A.  Yes.

10  Q.  Are any of these fluids anesthetic?

11  A.  No.

12  Q.  It's all saline?

13  A.  Yes.

14  Q.  And your experience in determining whether the IV is

15  appropriately set, you're relying upon the medical team leader?

16  A.  In the outcome, yes.

17  Q.  And how long will the IV be set?

18  A.  You know, I don't know that.

19  Q.  Wouldn't that inform your decision on whether it was

20  appropriately set?

21  A.  The length of time that it remained in?

22  Q.  Yes.

23  A.  Yes.

24  Q.  And what experience do you have in determining whether or

25  not there's an infiltration that has occurred in the IV?

1   A.  I don't have any experience.  I've not witnessed it.

2   Q.  How about Warden Blades?  Does he have any experience in

3   determining whether or not an IV is infiltrating?

4   A.  Not that I'm aware of.

5   Q.  Warden Cluney?

6   A.  Not that I'm aware of.

7   Q.  Any of these other staff members?

8   A.  The staff that are volunteering to have --

9   Q.  Correct.

10  A.  Not that I'm aware of.

11       MS. HAMPTON:  If I might have just a moment, Your

12  Honor.

13       COURT:  That's fine.

14       MS. HAMPTON:  Thank you, Your Honor.

15       COURT:  Okay.  Sir, you may step down.  Ms. Howard,

16  I'll have the rest of your argument.

17       MS. HOWARD:  Your Honor, I'll move on to -- unless you

18  have anymore questions from the ones that I've covered, the next

19  safeguard that Baze talks about and that's the redundancy that

20  the IV team established both primary and backup lines and

21  prepared two sets of injection drugs.  The SOP clearly has this

22  redundancy set in it.  The SOP allows or it does not -- it

23  dictates that there will be three sets of chemicals prepared for

24  the execution.  It also dictates that there will be a primary

25  and backup line for the offender which Baze only talked about

I, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


/s/ Tamara A. Weber                    11/13/11

Signature of Approved Transcriber          Date


Tamara A. Weber

Typed or Printed Name

# EXHIBIT 3

# EXHIBIT 3

LAWRENCE G. WASDEN
ATTORNEY GENERAL OF IDAHO

MARK A. KUBINSKI, ISB #5275
Lead Deputy Attorney General
Idaho Department of Correction

KRISTA L. HOWARD, ISB #5987
Deputy Attorney General
Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone (208) 658-2097
Facsimile (208) 327-7485
E-mail: khoward@idoc.idaho.gov

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| PAUL EZRA RHOADES, | ) | CASE NO. 11-445-REB |
| | ) | |
| Plaintiff, | ) | Redacted |
| | ) | AFFIDAVIT OF JEFF ZMUDA |
| vs. | ) | IN SUPPORT OF |
| | ) | DEFENDANTS' RESPONSE |
| BRENT REINKE, in his official capacity | ) | AND OBJECTION TO |
| as Director, Idaho Department of Correction; | ) | PLAINTIFF'S EMERGENCY |
| | ) | MOTION FOR PRELIMINARY |
| RANDY BLADES, in his official capacity | ) | INJUNCTION OR STAY OF |
| as Warden, Idaho Maximum Security | ) | EXECUTION [DKT. NO. 17] |
| Institution; | ) | |
| | ) | |
| DOES 1-50, UNKNOWN | ) | |
| EXECUTIONERS, in their official | ) | |
| Capacities as Employees and/or Agents of | ) | |
| Idaho Department of Correction. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE
AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR
PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--1

STATE OF IDAHO )
              ) ss.
COUNTY OF ADA )

    COMES NOW Jeff Zmuda, being duly sworn upon his oath, deposes and says:

    1.    I am over the age of eighteen (18) years and competent to testify on the matters herein. I make this affidavit based upon my own personal knowledge.

    2.    I am an employee of the Idaho Department of Correction ("IDOC"). I am the Deputy Chief of the Bureau of Prisons. I have been employed with the IDOC for approximately 24 years.

    3.    In my position as the Deputy Chief of the Bureau of Prisons, I work in conjunction with the Idaho Maximum Security Institution (IMSI) to plan, prepare and implement the IDOC execution procedures.

    4.    I have reviewed the Complaint and Amended Complaint (Dkt. Nos. 1 & 19) filed by offender Paul Rhoades in Case No. 11-445-REB.

    5.    In my position as the Deputy Chief of the Bureau of Prisons I was tasked with overseeing the execution process and developing and implementing the IDOC Standard Operating Procedures (SOP) regarding execution procedures. I am also tasked with all the duties related to my position as outlined in the Execution Procedures Standard Operating Procedure.

    6.    As the Deputy Chief of the Bureau of Prisons for the IDOC I was intricately involved in the development of IDOC SOP Execution Procedures 135.02.01.001 (hereinafter "SOP 135") that was approved on October 14, 2011. In developing SOP 135, the IDOC looked to other states' policies as a guide in the development of SOP 135. Countless hours were spent in the development of SOP 135 to

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--2**

ensure that it complies with the Eighth Amendment and the procedural safeguards established in *Baze v. Rees* and *Dickens v. Brewer*.

7.      That after reviewing Arizona's Execution Protocol it was determined that the IDOC would model its Execution Procedures SOP after Arizona's Execution Protocol. In developing Appendix A of SOP 135, the IDOC modeled it after the Arizona Execution Protocol in this section of the IDOC SOP 135.

8.      That it is absolutely paramount that the identity of the Specialty Team members remains confidential for their own safety and security, as well as the IDOC's ability to carry out its statutory obligations.

9.      It is my responsibility in conjunction with the IMSI warden to identify qualified team members for the specialty teams for an execution. I am responsible for designating the Medical Team leader and an alternate Medical Team leader. The Medical Team leader reports to and takes direction from the IMSI warden.

10.     In selecting persons for the Medical Team, even though SOP 135 does not specifically identify professional qualifications, I used the same criteria set forth in SOP 135 for selecting Injection Team members to identify Medical Team members. Specifically, candidates were required to have at least one year of medical experience as an emergency medical technician, licensed practical nurse or registered nurse, military corpsman, paramedic, phlebotomist, physician assistant, physician or other medically trained personnel including those trained in the United States Military. This is consistent with the safeguards set forth in *Baze*.

11.     For selection of the Medical Team candidates I reviewed professional qualifications, training, experience, professional licenses and certifications, criminal

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--3**

history and conducted a personal interview with each of the candidates in selecting the Medical Team.

12.     In selecting persons for the Injection Team, the criteria set forth in SOP 135 is that the team member must have at least one year of medical experience as a certified medical assistant, phlebotomist, emergency medical technician, paramedic, or military medical corpsman. I also reviewed the Injection Team members' professional qualifications, training, experience, professional license(s) and certification(s), criminal history and conducted a personal interview. In addition, I verified that the Injection Team members had professional licensure or certification. *See SOP 135, Dkt. No. 7-4*, p.9. These qualifications are consistent with the safeguards set forth in *Baze*.

13.     That all the members of the Medical Team and Injection Teams have professional qualifications and experience exceeding one year of professional training and experience. The team member with the least amount of experience has 15 years experience in his/her professional field. Attached as Exhibit A is a true and correct copy of a spreadsheet I constructed to illustrate each position of the Medical and Injection team and the training, professional licenses and certifications, and profession of each team member. In addition, each team member's years of experience is set forth below.

14.     The Medical Team leader, Personnel 1a of Exhibit A, is a registered nurse with approximately ⬤ years experience as a registered nurse. The Medical Team leader Personnel 1a, has experience working in an emergency room and an intensive care unit. This individual has certification in CPR and has been an Advanced Cardiac Life Support (ACLS)⬤⬤⬤⬤⬤⬤ provider. The Medical Team leader, Personnel 1a has more administrative and clinical experience than any other team member.

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--4**

15.     The Injection Team leader, Personnel 1b has approximately ███ plus years *medical provider* as a ███████ and is currently an ████████████████. This individual is an ACLS certified provider.

16.     The Injection Team members, Personnel 1c and 2c, with IV access are *medical providers* ██████████████████████. Personnel 1c has approximately ███ plus *medical provider* years experience as an ████████ and is ███████████████ ACLS certified.  Personnel 2c has ███ plus years experience as an ███████████ *medical provider* ████████████████ and is ACLS certified.  Personnel 2c is the backup Medical Team leader and also has a position on the Medical Team as IV Access. Personnel 1c will be responsible for inserting a central line in the femoral vein if this alternate site is necessary.

17.     The Injector, Personnel 1d, is a ██████████████ *medical provider* with experience as a ███████████ and is currently working in a clinic. This individual has over ███ years of medical and clinical experience. The Injector is tasked with pushing the IV drugs through the IV tubing.

18.     That all members of the Medical Team and Injection Team are certified in CPR, have venous access currency, which means they have current professional practice in insertion of IVs on a regular basis.  Additionally, all team members have experience in Pharmco Dynamic Currency, which means the team members understand medical orders, can read and understand medical labels, draw medications and deliver medications through either an injection or IV.

19.     The execution chamber at IMSI is complete.  The Escort, Medical and Injection Teams have been engaged in training sessions since October 20, 2011, using the

AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--5

execution unit. Between October 20, 2011 and the scheduled execution, there will be a total of 10 training sessions, which includes two full rehearsals as provided for in SOP 135 for the Escort Team, Injection Team and Medical Team. *See Dkt. No.* 7-4, p.10. All members of the Specialty teams are familiar with SOP 135, the execution process and skill sets needed to complete the execution. All team members were placed into their respective roles for the execution procedure based on their professional experience, training and practice. All team members will have participated in a minimum of four training sessions prior to the actual execution. Medical Team members will have practiced IV insertion on volunteers. The training schedule outlined in SOP 135 is consistent with the *Baze* safeguards. Additionally, all team members exceed the one year of training and experience in their respective professions.

20.     At all times during the execution, the offender's level of consciousness will be continually monitored by the Medical Team through a closed-circuit video feed. *Dkt. No.* 7-4, pp. 9, 39-41. Additionally, another team member will continually monitor the EKG machine during the execution. *Dkt. No.* 7-4, pp. 9, 39.

21.     The execution procedure contains provisions for the consciousness checks of the offender once the drugs have been administered. Once the sodium pentothal or pentobarbital has been administered the Medical Team leader will enter the execution chamber and confirm the offender is unconscious by direct examination. *Dkt. No.* 7-4, p.40. The Execution Team leader will physically assess the offender for signs of consciousness through verbal stimulus, solicit an auditory response, touch the offender's eyelashes, pinch the offender and conduct a sternal rub. The Medical Team leader will confirm the IV line remains affixed and is functioning properly. *Id.* The Medical Team

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--6**

leader is competent in conducting levels of consciousness checks. These consciousness checks are consistent with the safeguards set forth in *Baze*.

22.     No further chemical shall be administered until the Medical Team leader has assessed and confirmed the offender is unconscious and has advised the warden and three minutes have elapsed since commencing the administration of sodium pentothal or pentobarbital. *Dkt. No. 7-4*, p.40.

23.     If the offender is conscious after the administration of sodium pentothal or pentobarbital, the Medical Team shall assess the situation to determine why the offender is conscious. *Id.* This information will be relayed to the warden and the warden will determine how to proceed or, if necessary, to start the procedure over at a later time or stand down. *Id.* If deemed appropriate the warden may instruct the Injection Team to administer an additional 5 grams of sodium pentothal or pentobarbital followed by a heparin/saline flush from the Backup Sets. *Id.* at. 41. Only after three minutes have elapsed since commencing the chemicals from the Backup set, and only after the Medical Team leader has again physically confirmed the offender is unconscious, will the warden instruct the Injection Team leader to proceed. *Id.*

24.     SOP 135 contains the redundancy safeguard set forth in *Baze*. SOP 135 requires that three (3) complete sets of chemicals be prepared prior to the execution. *Dkt. No. 7-4*, p.35. The preparation of chemicals will be done by the Medical Team. SOP 135 does not state that the Medical Team members have at least one year of professional training and practical experience, however, all Medical Team members selected for the preparation of chemicals have at least one year of professional training and practical experience necessary to prepare the chemicals.

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--7**

25. The Medical Team will take measures to ensure that there is no leakage in the tubing of the IV.

26. SOP 135 does not provide for a "cut down" procedure requiring an incision. A central line may be inserted in the femoral vein through the use of an ultrasound and sticking a needle into the vein. *See Dkt. No.* 7-4, p.40. The Medical Team member must have one year of regular and current professional experience conducting this procedure. *Id.* Personnel 1c will be the team member responsible for inserting the central line, if necessary. ████████████████████████████████████████
████████████████████████████████

27. SOP 135 contains a contingency procedure in the event that the offender is conscious or any part of the execution procedure is not going according to SOP 135. *See Dkt. No.* 7-4, p.42. If any Medical or Injection Team members determine that any part of the execution process is not going according to procedure, they shall notify the Medical Team leader who shall immediately notify the warden. *Id.* The warden and director may consult with persons deemed appropriate and determine to go forward, start the procedure over at a later time or stand down. *Id.*

28. There is no substantial risk of pain to offender Rhoades during the execution procedure. The Medical Team and the Injection Team are made up of members with professional qualifications, training and practice of inserting and maintaining IVs with more than one year of professional experience.

29. Further your affiant sayeth naught.

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--8**

DATED this 3ʳᵈ day of November, 2011.

_____
JEFF ZMUDA

SUBSCRIBED AND SWORN To before me this 3ʳᵈ day of November, 2011.

Notary Public for Idaho
Residing at Boise
Commission Expires: 10/30/2015

**AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--9**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 4 day of November, 2011, I caused to be served a true and correct copy of the foregoing AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17] with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Oliver W. Loewy, oliver_loewy@fd.org

Teresa Hampton, Teresa_Hampton@fd.org

KRISTA L. HOWARD

AFFIDAVIT OF JEFF ZMUDA IN SUPPORT OF DEFENDANTS' RESPONSE AND OBJECTION TO PLAINTIFF'S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION OR STAY OF EXECUTION [DKT. NO. 17]--10

| Personnel | Medical Team Position | License/ Certification | IV Therapy/ Venipuncture Trained | Venous Access Currency | CPR | Pharmco Dynamic Currency | Comments |
|---|---|---|---|---|---|---|---|
| 1a | Team Leader | RN | Yes | Dated | Yes | Yes | Med Adm experienced |
| 2c | IV Access | medical provider | Yes | Yes | Yes, ACLS | Yes | ▓ |
| | | | | | | | |
| 1b | Injection Team Leader: injector | medical provider | Yes | Yes | Yes, ACLS | Yes | Works in Medical Clinic |
| 1c | IV Access | medical provider | Yes, Central Line | Yes | Yes, ACLS | Yes | ▓ |
| 2c | IV Access | medical provider | Yes | Yes | Yes, ACLS | Yes | ▓ |
| | | | | | | | |
| 1d | Injector | medical provider | Yes | Yes | Yes | Yes | |

EXHIBIT A

# EXHIBIT 4

# EXHIBIT 4



College of Western Idaho

August 25, 2011

To Whom It May Concern,

I am the Phlebotomy instructor with College of Western Idaho. I am also nationally certified as a Phlebotomist by the American Society for Clinical Pathology with over 12 years' experience in the field.

The state of Idaho does not regulate what training or experience a phlebotomist must have to work in Idaho. Anyone can start working in Idaho as a phlebotomist with no previous training or experience needed. In fact many Phlebotomists get on the job training only.

We do however have voluntary guidelines which the course at CWI is modeled after. These national guidelines are set out by the Clinical Laboratory Standards Institute (CLSI). According to CLSI, phlebotomists are not allowed to start IV's or use implanted devices. This rule has proved true in my 12 years' experience, as I have never been allowed to access devices (including but not limited to starting IV's and administering medications). This is something I teach my students as out of their "scope of practice".

Phlebotomists are also not trained in assessing patient's consciousness or in basic patient care, such as vital sign assessments.

Sincerely,

Nicole Walton Pbt
nicolewalton@cwidaho.cc

# EXHIBIT 5

# EXHIBIT 5



# STATE OF IDAHO

# EMS PHYSICIAN COMMISSION

# STANDARDS MANUAL

Authority:
  Idaho Code § 56-1013A, § 56-1016, and § 56-1017(1)


  Rules for EMS Physician Commission Idaho Administrative Procedures Act 16.02.02


# Edition 2011-1



# TABLE OF CONTENTS

I.      DEFINITIONS ..................................................................................................................1

II.     EMS PHYSICIAN COMMISSION STANDARDS MANUAL AUTHORITY ......................................4

III.    EMS PERSONNEL AUTHORITY TO ACT ..................................................................................4

IV.     OUT-OF-HOSPITAL SUPERVISION ...........................................................................................5

        EMS Medical Director Qualifications, Authority and Responsibility .............................................5

        Direct Medical Supervision by Physician Assistants and Nurse Practitioners...............................7

        Medical Supervision Plan for the Out-Of-Hospital Setting.............................................................8

        A.      Credentialing of licensed EMS personnel.....................................................................8

        B.      Indirect (off-line) medical supervision ..........................................................................9

        C.      Direct (on-line) medical supervision ...........................................................................10

        D.      Standards of supervision and training for students of state approved training
                programs ...................................................................................................................10

V.      HOSPITAL AND MEDICAL CLINIC SUPERVISION ...................................................................10

        Licensed EMS Personnel Responsibilities ...............................................................................10

        Hospital Supervising Physician and Medical Clinic Supervising Physician Qualifications,
                Authority and Responsibility ...................................................................................11

        Direct Medical Supervision by Physician Assistants and Nurse Practitioners.............................12

        Medical Supervision Plan for the Hospital and Medical Clinic Settings ......................................13

VI.     EMS BUREAU RESPONSIBILITIES ........................................................................................13

VII.    EMS PHYSICIAN COMMISSION RESPONSIBILITIES................................................................13

VIII.   IDAHO AUTHORIZED SCOPE OF PRACTICE ...........................................................................14

        Emergency Medical Responder (EMR) ...................................................................................15

        Description of Profession ......................................................................................................15

        Emergency Medical Technician (EMT) ...................................................................................16

        Description of Profession ......................................................................................................16

        Advanced Emergency Medical Technician (AEMT)...................................................................17

        Description of the Profession ................................................................................................17

        Paramedic ...........................................................................................................................18

        Description of the Profession ................................................................................................19

IX.     EMS PERSONNEL PROFICIENCY AND PERFORMANCE ASSESSMENT REQUIREMENT ......20

X.      IDAHO PHYSICIAN COMMISSION CONTACT INFORMATION ...................................................20

XI.     IDAHO EMS BUREAU OFFICE LOCATIONS ...........................................................................20

APPENDIX A – EMSPC SCOPE OF PRACTICE GRID ...............................................................21

APPENDIX B – ADVANCED EMT STATEWIDE INTUBATION STANDARDS ....................................25

APPENDIX C – PARAMEDIC NON-RSI STATEWIDE INTUBATION STANDARDS ...........................27

APPENDIX D – EMSPC RSI STATEWIDE STANDARDS.............................................................29

# I.   DEFINITIONS.

As promulgated by and in addition to the applicable definitions in Section 56-1012, Idaho Code, and IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services," the following terms are used in this manual as defined below:

Advanced Emergency Medical Technician (AEMT). A person who holds a current active license issued by the EMS Bureau at the Advanced Emergency Medical Technician or Advanced Emergency Medical Technician-Ambulance level and is in good standing with no restriction upon, or actions taken against, his license.

Affiliation. The recognition of an individual as a member or employee.

Contemporaneous. Originating, existing, or occurring during the same period of time.

Credentialed EMS Personnel. Individuals who are authorized to provide medical care by the EMS medical director, hospital supervising physician, or medical clinic supervising physician.

Credentialing. The local process by which licensed EMS personnel are authorized to provide medical care in the out-of-hospital, hospital, and medical clinic setting, including the determination of a local scope of practice.

Critical Care Paramedic. A person who holds a current active license issued by the EMS Bureau at the Paramedic or Emergency Medical Technician-Paramedic level and has successfully completed training objectives as set forth in the Critical Care Transport Curriculum Guide of the EMS Bureau and who possesses a current active credential to provide Critical Care.

Critical Care Transport. The transportation of a patient with continuous care, monitoring, medication, or procedures requiring knowledge or skills not contained within the Paramedic curriculum approved by the State Health Officer.

Designated Clinician. A licensed Physician Assistant (PA) or Nurse Practitioner designated by the EMS medical director, hospital supervising physician, or medical clinic supervising physician who is responsible for direct (on-line) medical supervision of licensed EMS personnel in the temporary absence of the EMS medical director.

Direct (On-Line) Supervision. Contemporaneous instructions and directives about a specific patient encounter provided by a physician or designated clinician to licensed EMS personnel who are providing medical care.

Emergency Medical Services (EMS). The services utilized in responding to a perceived individual need for immediate care in order to prevent loss of life or aggravation of physiological or psychological illness or injury.

Emergency Medical Services Bureau. The Emergency Medical Services Bureau of the Idaho Department of Health and Welfare.

Emergency Medical Services Physician Commission. The Idaho Emergency Medical Services Physician Commission as created under Section 56-1013A, Idaho Code, hereafter referred to as "the Commission."

Emergency Medical Responder (EMR). A person who holds a current active license issued by the EMS Bureau at the First Responder or Emergency Medical Responder level and is in good standing with no restriction upon, or actions taken against, his license.

Emergency Medical Technician (EMT). A person who holds a current active license issued by the EMS Bureau at the Emergency Medical Technician or Emergency Medical Technician-Basic level and is in good standing with no restriction upon, or actions taken against, his license.

EMS Agency. An organization licensed by the EMS Bureau to provide emergency medical services in Idaho.

EMS Medical Director. A physician who supervises the medical activities of licensed personnel affiliated with an EMS agency.

Hospital. A facility in Idaho licensed under Sections 39-1301 through 39-1314, Idaho Code, and defined in Section 39-1301(a)(1), Idaho Code.

Hospital Supervising Physician. A physician who supervises the medical activities of licensed EMS personnel while employed or utilized for delivery of services in a hospital.

Indirect (Off-Line) Supervision. The medical oversight provided by a physician to licensed EMS personnel who are providing medical care. The components of medical supervision include EMS system design, education, quality management, patient care guidelines, medical policies, and compliance.

License. A license issued by the EMS Bureau to an individual for a specified period of time indicating that minimum standards corresponding to one (1) of several levels of EMS proficiency have been met.

Licensed EMS Personnel. Individuals who possess a valid license issued by the EMS Bureau.

Medical Clinic. A place devoted primarily to the maintenance and operation of facilities for outpatient medical, surgical, and emergency care of acute and chronic conditions or injury.

Medical Clinic Supervising Physician. A physician who supervises the medical activities of licensed EMS personnel while employed or utilized for delivery of services in a medical clinic.

Medical Supervision. The advice and direction provided by a physician, or under the direction of a physician, to licensed EMS personnel who are providing medical care, including direct and indirect supervision.

Medical Supervision Plan (MSP). The written document describing the provisions for medical supervision of licensed EMS personnel.

<u>Nurse Practitioner.</u> An Advanced Practice Professional Nurse, licensed in the category of Nurse Practitioner, as defined in IDAPA 23.01.01, "Rules of the Idaho Board of Nursing."

<u>Out-of-hospital.</u> Any setting outside of a hospital, including inter-facility transfers, in which the provision of emergency medical services may take place.

<u>Paramedic.</u> A person who holds a current active license issued by the EMS Bureau at the Paramedic or Emergency Medical Technician-Paramedic level and is in good standing with no restriction upon, or actions taken against, his license.

<u>Physician.</u> A person who holds a current active license issued by the Board of Medicine to practice medicine and surgery, osteopathic medicine and surgery, or osteopathic medicine in Idaho and is in good standing with no restriction upon, or actions taken against, his license.

<u>Physician Assistant.</u> A person who meets all the applicable requirements to practice as a licensed physician assistant under Title 54, Chapter 18, Idaho Code, and IDAPA 22.01.03, "Rules for the Licensure of Physician Assistants."

## II.  EMS Physician Commission Standards Manual Authority

Idaho Code 56-1013A(1) empowers the EMS Physician Commission with statutory authority to establish standards for scope of practice and medical supervision for licensed personnel, air medical, ambulance, and non-transport agencies licensed by the EMS Bureau. Idaho Code 56-1017(1) specifically authorizes and directs the Commission to adopt appropriate rules defining the allowable scope of practice and acts and duties which can be performed by persons licensed by the department and the required level of supervision by a licensed physician.

IDAPA 16.02.02, "Rules of the EMS Physician Commission," Section 004 incorporate this EMS Physician Commission Standards Manual by reference. The purposes of this EMS Physician Commission Standards Manual are to establish the scope of practice of licensed EMS personnel and to specify the type and degree of medical supervision for specific skills, treatments, and procedures by level of EMS licensure.

## III. EMS Personnel Authority to Act

To provide emergency medical services, EMS licensed personnel must comply with Idaho Code and IDAPA 16.02.02, "Rules of the EMS Physician Commission." The policies of the EMS Physician Commission are documented in this Standards Manual.

Licensed EMS personnel who are representing an Idaho EMS agency and who possess a valid credential issued by that agency's EMS medical director may act and provide services in the out-of-hospital setting under the following conditions:

1. When participating in a planned deployment of personnel resources approved by the EMS medical director; or

2. When administering first aid or emergency medical attention as a "Good Samaritan" and without expectation of remuneration in accordance with Idaho Code 5-330 or 5-331 in a manner approved by the EMS medical director; or

3. When participating in a training program approved by the EMS Bureau or the EMS medical director.

4. When on duty, visibly display at all times identification specifying name and level of EMS licensure.

In addition, licensed EMS personnel may only provide out-of-hospital care when:

1. The patient care does not exceed the scope of practice as defined by this Standards Manual; and

2. Licensed EMS personnel have been trained, based on curricula or specialized training approved according to IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services;" and

3. The patient care does not exceed the scope of practice approved by their EMS medical director and does not include assessments or interventions that have been specifically prohibited by their EMS medical director.

Licensed EMS personnel who are representing a hospital or medical clinic and who possess a valid credential issued by the hospital or medical clinic supervising physician may act and provide services in the hospital and medical clinic setting under the following conditions:

1. When participating in a planned deployment of personnel resources approved by the hospital or medical clinic supervising physician; or

2. When administering first aid or emergency medical attention as a "Good Samaritan" and without expectation of remuneration in accordance with Idaho Code 5-330 or 5-331 in a manner approved by the hospital or medical clinic supervising physician; or

3. When participating in a training program approved by the EMS Bureau or the hospital or medical clinic supervising physician.

In addition, licensed EMS personnel may only provide hospital and medical clinic care when:

1. Licensed EMS personnel have been trained, based on curricula or specialized training approved according to IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services," or additional training approved by the hospital or medical clinic supervising physician and

2. The patient care does not exceed the scope of practice approved by their hospital or medical clinic supervising physician and does not include assessments or interventions that have been specifically prohibited by their hospital or medical clinic supervising physician.

# IV. OUT-OF-HOSPITAL SUPERVISION

All Idaho-licensed EMS agencies, including hospital-based EMS agencies, must comply with the requirements described in this section. Hospital-based EMS agencies must comply with both the requirements described in this section and with the hospital and clinic supervision requirements described later in this Standards Manual when their licensed EMS personnel also have patient care duties in the hospital or clinic setting.

## EMS Medical Director Qualifications, Authority and Responsibility.

In accordance with Section 56-1011, Idaho Code, licensed EMS personnel must provide emergency medical services under the supervision of a designated EMS medical director.

1. The EMS agency must designate a physician for the medical supervision of licensed EMS personnel affiliated with the EMS agency.

2. The EMS medical director can designate other physicians to supervise the licensed EMS personnel in the temporary absence of the EMS medical director.

The EMS medical director will have a written agreement with the EMS agency(s) that includes the following elements:

1. Identification of the EMS agency(s) for which he provides medical supervision.

2. Acknowledgement of the authority of the EMS medical director as established in Idaho statute and IDAPA 16.02.02, "Rules of the EMS Physician Commission."

3. An effective date.

4. An expiration date or a provision for automatic renewal upon mutual agreement.

5. Assurance of EMS medical director access to relevant agency, hospital, or medical clinic records as permitted or required by statute to ensure responsible medical supervision of licensed EMS personnel.

The EMS medical director will provide the EMS Bureau with documentation of the written agreement annually or upon request.

The EMS medical director must:

1. Accept responsibility for the medical direction and medical supervision of the activities provided by licensed EMS personnel.

2. Obtain and maintain knowledge of the contemporary design and operation of EMS systems.

3. Obtain and maintain knowledge of Idaho EMS laws, regulations and standards manuals.

4. The EMS medical director shall demonstrate appropriate training and/or expertise in adult and pediatric emergency medical services.

The EMS medical director is authorized to:

1. Provide explicit approval for licensed EMS personnel under his supervision to provide medical care. Licensed EMS personnel may not provide medical care without the explicit approval of an EMS medical director.

2. Credential licensed EMS personnel under his supervision with a scope of practice. This scope of practice may be limited relative to the scope of practice authorized by the Commission and may not exceed the scope of practice established by the Commission.

3. Restrict the scope of practice of licensed EMS personnel under his supervision and withdraw approval of licensed EMS personnel to provide services when such personnel fail to meet or maintain proficiencies established by the EMS medical director or the Idaho EMS Bureau.

   o Such restriction or withdrawal of approval must be reported in writing within fifteen (15) days of the action to the EMS Bureau in accordance with Section 39-1393, Idaho Code.

The EMS medical director is responsible for:

1. Approving the planned deployment of personnel resources.

2. Approving the manner in which licensed EMS personnel administer first aid or emergency medical attention as a "Good Samaritan" in accordance with Section 5-330 or 5-331, Idaho Code, without expectation of remuneration.

3. Documenting the review of the qualification, proficiencies, and all other EMS agency, hospital, and medical clinic affiliations of EMS personnel prior to credentialing the individual.

4. Documenting that the capabilities of licensed EMS personnel are maintained on an ongoing basis through education, skill proficiencies, and competency assessment.

5. Developing and implementing a program for continuous assessment and improvement of services by licensed EMS personnel under their supervision.

6. Reviewing and updating protocols, policies, and procedures at least every two (2) years.

7. Developing, implementing and overseeing a Medical Supervision Plan, as defined in this Standards Manual.

8. Collaborating with other EMS medical directors, hospital supervising physicians, and medical clinic supervising physicians to ensure EMS agencies and licensed EMS personnel have protocols, standards of care, and procedures that are consistent and compatible with one another.

9. Designating other physicians to supervise licensed EMS personnel in the temporary absence of the EMS medical director.

10. Designating Physician Assistants and Nurse Practitioners to serve as designated clinicians, as defined in this Standards Manual.


## Direct Medical Supervision by Physician Assistants and Nurse Practitioners.

The EMS medical director can designate Physician Assistants (PA) and Nurse Practitioners for purposes of direct (on-line) medical supervision of licensed EMS personnel. Such designated clinicians may only provide direct medical supervision when a designated physician is not present in the anticipated receiving health care facility. The following conditions must also be satisfied:

1. A written agreement between the designated Nurse Practitioner and the EMS medical director which describes the role and responsibilities of the designated Nurse Practitioner is required.

2. A written agreement between the designated PA and the EMS medical director which describes the role and responsibilities of the designated PA related to supervision of EMS personnel is required.

3. Designated clinicians must possess and be familiar with the Medical Supervision Plan, as defined in this Standards Manual, protocols, standing orders, and standard operating procedures authorized by the EMS medical director.

4. The physician supervising the PA, as defined in IDAPA 22.01.03, Idaho Department of Health and Welfare, "Rules for the Licensure of Physician Assistants," must authorize the designated PA to provide direct (on-line) supervision.


Provisions for direct medical supervision by designated clinicians must be documented in the Medical Supervision Plan.

## Medical Supervision Plan for the Out-Of-Hospital Setting.

The medical supervision of licensed EMS personnel must be provided in accordance with a documented Medical Supervision Plan (MSP) that includes direct, indirect, on-scene, educational, and proficiency standards components. The EMS medical director is responsible for developing, implementing, and overseeing the MSP.  However, non-physicians can assist the EMS medical director with the indirect medical supervision of licensed EMS personnel. The EMS medical director will submit the Medical Supervision Plan to the EMS Bureau by November 1, 2008 and thereafter annually or upon request.  The EMS Bureau must be notified upon any changes in the Medical Supervision Plan, including changes in designated clinicians, within thirty (30) days of the change(s).

At a minimum, the MSP must consist of the following elements:

   **A.  Credentialing of licensed EMS personnel.**

   Credentialing is an EMS agency process by which licensed EMS personnel are authorized by the EMS medical director to provide medical care in accordance with a scope of practice that is established by the EMS medical director. The process for credentialing licensed EMS personnel is an extension of the "affiliating" of personnel and is consistent with contemporary EMS system design.

   The process for credentialing will include the following:

   1. Verification of EMS Bureau licensure;

   2. Affiliation to the EMS agency;

   3. Review of the qualifications and proficiencies of the EMS provider, and all other EMS agency, hospital, and medical clinic affiliations.

   4. Completion of an EMS agency orientation, as prescribed by the EMS agency, that includes:

      a.  EMS agency policies;

      b.  EMS agency procedures;

      c.  Medical treatment protocols;

      d.  Radio communications procedures;

      e.  Hospital/facility destination policies;

      f.  Other unique system features.

Upon successful completion of the credentialing process, the EMS medical director may issue the EMS provider with a card, certificate, or other document which indicates explicit approval to provide patient care and specifically authorizes a scope of practice for the EMS provider.

   o  This credential should include a specific expiration date which may be the same date of expiration as the EMS Bureau license.

   o  This credential will be sufficient evidence of "affiliation" for his or her license or renewal by the EMS Bureau, if the dates are inclusive of the

licensure period and the credential has not been withdrawn by the EMS medical director.

**B. Indirect (off-line) medical supervision.**

Indirect (off-line) supervision will include all of the following:

1. Written standing orders and treatment protocols for both adult and pediatric patients including direct (on-line) supervision criteria;

2. Description of authorized optional psychomotor skills and patient care interventions, as defined by the Commission;

3. Initial and continuing education in addition to those required by the EMS Bureau;

4. Methods of assessment and improvement;

5. Periodic assessment of psychomotor skill proficiency;

6. Provisions for medical supervision of and defining the patient care provided by licensed EMS personnel who are present for a multiple or mass casualty incident, disaster response, or other significant event involving response of licensed EMS personnel;

7. Defining the response when licensed EMS personnel discover a need for EMS while not on duty;

8. The credentialing of licensed EMS personnel for emergency response;

9. The appropriate level of emergency response based upon dispatch information provided by the designated Public Safety Answering Point(s);

10. Triage, treatment, and transport guidelines;

11. Scene management for multiple EMS agencies anticipated to be on scene concurrently;

12. Criteria for determination of patient destination;

13. Criteria for utilization of air medical services in accordance with IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services," Section 415;

14. Policies and protocols for patient refusal, "treat and release", advanced directives by patients and physicians, determination of death, termination of resuscitation and other predictable patient non-transport scenarios;

15. Criteria for cancellation or modification of EMS response;

16. Equipment authorized for patient care;

17. Medical communications guidelines; and

18. Methods and elements of documentation of services provided by licensed EMS personnel.

19. Policies and protocols for the identification, treatment and transport of patients with ST-elevation myocardial infarction to ensure timely re-perfusion therapy.

20. Policy for recognition and utilization of bystander providers that are not credentialed by the local EMS system.

### C. Direct (on-line) medical supervision.

Direct supervision may be accomplished by concurrent communication with the EMS medical director, other physicians designated by the EMS medical director, or designated clinicians, who must be available twenty-four (24) hours a day seven (7) days a week. Provisions for direct supervision, including on-scene supervision, will be documented in the MSP which shall identify designated clinicians.

The EMS medical director will develop and implement procedures in the event of on-scene supervision by:

1. The EMS medical director or other physician(s) designated by the EMS medical director;

2. A physician with a pre-existing relationship with the patient; and

3. A physician with no pre-existing relationship with the patient who is present for the duration of treatment on scene or transportation.

Direct supervision of licensed EMS personnel by other persons is prohibited except in the manner described in the MSP.

Designated on-line physicians and clinicians shall have appropriate training and/or expertise in adult and pediatric emergency care.

### D. Standards of supervision and training for students of state-approved training programs.

The EMS medical director, in collaboration with the course medical director or course coordinator, will define standards of supervision and training for students of state-approved training programs, who have been placed for clinical practice and training. These standards will be defined, identified, and documented in the MSP.

# V.  HOSPITAL AND MEDICAL CLINIC SUPERVISION

## Licensed EMS Personnel Responsibilities.

The licensed EMS personnel employed or utilized for delivery of services within a hospital or medical clinic must:

1. When on duty, visibly display at all times identification specifying their level of EMS licensure.

2. Report such employment or utilization to the EMS Bureau within thirty (30) days of engaging in such activity.

Licensed EMS personnel will only provide patient care with on-site contemporaneous supervision by the hospital supervising physician, medical clinic supervising physician or designated clinicians, as defined in this Standards Manual.

## Hospital Supervising Physician and Medical Clinic Supervising Physician Qualifications, Authority and Responsibility.

In accordance with Section 56-1011, Idaho Code, licensed EMS personnel must provide emergency medical services under the supervision of a designated hospital supervising physician or medical clinic supervising physician.

1. The hospital or medical clinic administration must designate a physician for the medical supervision of licensed EMS personnel employed or utilized in the hospital or medical clinic.

2. The hospital supervising physician or medical clinic supervising physician can designate other physicians to supervise the licensed EMS personnel during the periodic absence of the hospital supervising physician or medical clinic supervising physician.

3. Licensed EMS personnel will only provide patient care with on-site contemporaneous supervision by the hospital supervising physician, medical clinic supervising physician or designated clinicians, who are defined in this Standards Manual.

The hospital supervising physician and medical clinic supervising physician must:

1. Accept responsibility for the medical direction and medical supervision of the activities provided by licensed EMS personnel.

2. Obtain and maintain knowledge of the contemporary design and operation of EMS systems.

3. Obtain and maintain knowledge of Idaho EMS laws, regulations and standards manuals.

The hospital supervising physician and medical clinic supervising physician are authorized to:

1. Provide explicit approval for licensed EMS personnel under his supervision to provide medical care. Licensed EMS personnel may not provide medical care without the explicit approval of a hospital supervising physician or medical clinic supervising physician.

2. Credential licensed EMS personnel under his supervision with a scope of practice. This scope of practice may be limited relative to the scope of practice authorized by the Commission. If the authorized scope of practice exceeds the out-of-hospital scope of practice established by the Commission, the hospital supervising physician and/or medical clinic supervising physician must approve additional training to ensure competency in the expanded scope of practice. The Commission recognizes that hospital and medical clinic policies, state rules and the local community standard of care will influence the specific elements of any expanded scope of practice and the development of additional local oversight requirements.

3. Restrict the scope of practice of licensed EMS personnel under his supervision and to withdraw approval of licensed EMS personnel to provide services when such personnel fail to meet or maintain proficiencies established by the hospital supervising physician or

medical clinic supervising physician or the Idaho EMS Bureau.

o Such restriction or withdrawal of approval must be reported in writing within fifteen (15) days of the action to the EMS Bureau in accordance with Section 39-1393, Idaho Code.

The hospital supervising physician and medical clinic supervising physician are responsible for:

1. Approving the planned deployment of personnel resources.

2. Approving the manner in which licensed EMS personnel administer first aid or emergency medical attention as a "Good Samaritan" in accordance with Section 5-330 or 5-331, Idaho Code, without expectation of remuneration.

3. Approving additional training when the local scope of practice exceeds the out-of-hospital scope of practice established by the Commission.

4. Documenting the review of the qualification, proficiencies, and all other EMS agency, hospital, and medical clinic affiliations of EMS personnel prior to credentialing the individual.

5. Documenting that the capabilities of licensed EMS personnel are maintained on an ongoing basis through education, skill proficiencies, and competency assessment.

6. Developing, implementing and overseeing a Medical Supervision Plan, as defined in this Standards Manual.

7. Collaborating with other EMS medical directors, hospital supervising physicians, and medical clinic supervising physicians to ensure EMS agencies and licensed EMS personnel have protocols, standards of care and procedures that are consistent and compatible with one another.

8. Designating other physicians to supervise the licensed EMS personnel during the periodic absence of the hospital supervising physician or medical clinic supervising physician.

9. Designating Physician Assistants and Nurse Practitioners to serve as designated clinicians, as defined in this Standards Manual.

## Direct Medical Supervision by Physician Assistants and Nurse Practitioners.

The hospital supervising physician or medical clinic supervising physician can designate Physician Assistants (PA) and Nurse Practitioners for purposes of direct (on-line) medical supervision of licensed EMS personnel under the following conditions:

1. A written agreement between the designated Nurse Practitioner and the hospital supervising physician or medical clinic supervising physician which describes the role and responsibilities of the designated Nurse Practitioner is required,

2. A written agreement between the designated PA and the hospital supervising physician or medical clinic supervising physician which describes the role and responsibilities of the designated PA related to supervision of EMS personnel is required,

3. Designated clinicians must possess and be familiar with the Medical Supervision Plan, as defined in this Standards Manual, protocols, standing orders, and standard operating procedures authorized by the hospital supervising physician or medical clinic supervising physician.

4. The physician supervising the PA, as defined in IDAPA 22.01.03, "Rules for the Licensure of Physician Assistants," must authorize the designated PA to provide direct (on-line) supervision.

Provisions for direct medical supervision by designated clinicians must be documented in the Medical Supervision Plan.

## Medical Supervision Plan for the Hospital and Medical Clinic Settings.

The medical supervision of licensed EMS personnel must be provided in accordance with a documented medical supervision plan (MSP). The hospital supervising physician or medical clinic supervising physician is responsible for developing, implementing, and overseeing the MSP.

The MSP will include:

1. A credentialing process for licensed EMS personnel as defined by the hospital or medical clinic.

2. A current written description of acts and duties authorized by the hospital supervising physician or medical clinic supervising physician for credentialed EMS personnel.

3. The hospital or medical clinic will submit such descriptions upon request of the Commission or the EMS Bureau.

4. Provisions for direct medical supervision by designated clinicians and the identification of designated clinicians.

# VI. EMS BUREAU RESPONSIBILITIES.

The EMS Bureau will provide:

1. Technical assistance to medical directors, hospital supervising physicians, medical clinic supervising physicians, and their administrators to develop appropriate Medical Supervision Plans.

2. The Commission with EMS agency Medical Supervision Plans annually and upon request.

3. The Commission with the identification of EMS medical directors and their designated clinicians annually and upon request.

# VII.   EMS PHYSICIAN COMMISSION RESPONSIBILTIES.

The Commission will provide interpretation of the Rules of the Commission.

# VIII.  IDAHO AUTHORIZED SCOPE OF PRACTICE.

The Commission has approved the Scope of Practice for licensed EMS personnel, which is articulated in Appendix A. Appendix A lists specific psychomotor skills and patient care interventions and indicates the level of EMS licensure that may perform each skill or intervention. The EMS Medical Director, Hospital Supervising Physician, or Medical Clinic Supervising Physician must oversee a process to verify competency in all credentialed skills and interventions. The effective date of this Scope of Practice will be sine die of the 2011 legislative session.

It must be noted that not everyone is currently operating at the levels indicated by Xs in Appendix A and that it is only upon completion of required education, competency assessment, and endorsement or permission by their medical director that a provider can perform the procedures.

EMS personnel will transition to the 2011-1 scope of practice no later than September 30, 2014.

Appendix A implicitly defines both a "floor" and "ceiling" for each level of EMS licensure. Licensed EMS personnel must receive training and demonstrate competency in each skill and intervention that lies within their "floor." Training for skills and interventions within the "floor" is based on curricula or specialized training approved according to IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services." Training and competency in skills and interventions within the "floor" are verified by examination and state EMS license according to IDAPA  16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services." Skills and interventions designated by an "X" in Appendix A are included in the "floor" for the specified level of EMS licensure.

Skills and interventions designated by "OM" in Appendix A may be authorized by the EMS Medical Director, Hospital Supervising Physician and/or Medical Clinic Supervising Physician and are considered optional.  These skills and interventions lie between the "floor" and "ceiling" of the specified level of EMS licensure. The EMS Medical Director, Hospital Supervising Physician and/or Medical Clinic Supervising Physician must ensure that licensed EMS personnel receive appropriate initial and continuing training for optional skills and interventions. In addition, the EMS Medical Director, Hospital Supervising Physician or Medical Clinic Supervising Physician must take an active role in verifying competency in optional skills and interventions since state EMS licensing will not address optional skills or interventions.

When an EMS Medical Director, Hospital Supervising Physician or Medical Clinic Supervising Physician desires to incorporate an OM, they must:

1.  Report patient care response data to the Idaho Prehospital Electronic Record Collection System (PERCS) directly or by way of an Idaho validated export from a National EMS Information System (NEMSIS) compliant software application.

2.  Submit an addendum to their medical supervision plan to the EMS Bureau that indicates which OM(s) they want to adopt.

3.  Submit verification of credentialing to the EMS Bureau prior to utilization of OM skills or interventions.

Psychomotor skills and patient care interventions that are not designated by either an "X" or "OM" in Appendix A fall outside the Commission's established Scope of Practice for the specified level of EMS licensure and may not be performed by licensed EMS personnel at that level in the out-of-hospital setting. As such, Appendix A defines the "ceiling" for the specified level of EMS licensure.

Appendix A includes a CC Skills (Critical Care Skills) column that designates optional psychomotor skills and patient care interventions that may be performed by a Paramedic who receives additional training in critical care transport and who is appropriately credentialed by the EMS Medical Director, Hospital Supervising Physician or Medical Clinic Supervising Physician. This formal training program must meet or exceed the applicable objectives of the curriculum approved according to IDAPA 16.02.03, Idaho Department of Health and Welfare, "Rules Governing Emergency Medical Services." Completion of the entire curriculum is not required. Curriculum objectives are currently listed in the "Idaho EMS Critical Care Transport Curriculum Guide." The EMS Medical Director, Hospital Supervising Physician and/or Medical Clinic Supervising Physician must ensure that licensed EMS personnel receive appropriate initial and continuing training for optional skills and interventions. In addition, the EMS Medical Director, Hospital Supervising Physician or Medical Clinic Supervising Physician must take an active role in verifying competency in optional skills and interventions since state EMS licensing will not address optional skills and interventions.

The Commission has created additional requirements for certain psychomotor skills and patient care interventions that, if done improperly, represent a significant hazard to the patient. Additional standards may include but are not limited to on-line medical direction prior to performance of the skill or intervention, completion of specified training prior to credentialing, required elements for Patient Care Report documentation, required elements for performance assessment and improvement and/or compliance with a state-wide protocol or guideline. See Appendices B through D. Skills and interventions with additional requirements are designated in Appendix A by a 1, 2, 3, 4, 5, etc. alongside the "X" or "OM".

## Emergency Medical Responder (EMR)

The primary focus of the Emergency Medical Responder, which prior to July 1, 2009 was known as a certified First Responder, is to initiate immediate lifesaving care to critical patients who access the emergency medical system. This individual possesses the basic knowledge and skills necessary to provide lifesaving interventions while awaiting additional EMS response and to assist higher level personnel at the scene and during transport. Emergency Medical Responders function as part of a comprehensive EMS response, under medical oversight. Emergency Medical Responders perform basic interventions with minimal equipment.

### Description of the Profession

The Emergency Medical Responder's scope of practice includes simple skills focused on lifesaving interventions for critical patients. Typically, the Emergency Medical Responder renders on-scene emergency care while awaiting additional EMS response and may serve as part

of the transporting crew, but not as the primary care giver.

In many communities, Emergency Medical Responders provide a mechanism to increase the likelihood that trained personnel and lifesaving equipment can be rapidly deployed to serious emergencies. In all cases, Emergency Medical Responders are part of a tiered response system. Emergency Medical Responders work alongside other EMS and health care professionals as an integral part of the emergency care team.

The Emergency Medical Responder's scope of practice includes simple, non-invasive interventions to reduce the morbidity and mortality associated with acute out-of-hospital medical and traumatic emergencies. Emergency care is based on assessment findings. Additionally, the Emergency Medical Responder provides care designed to minimize secondary injury and comfort the patient and family while awaiting additional EMS resources.

A major difference between the lay person and the Emergency Medical Responder is the "duty to act" as part of an organized EMS response.

In some systems, Emergency Medical Responders serve as a part of the crew on transporting EMS units; however, the Emergency Medical Responder is not intended to be the highest level caregiver in such situations. They must function with an EMT or higher level personnel during the transportation of emergency patients. The scope of practice model of an Emergency Medical Responder is limited to simple skills that are effective and can be performed safely in an out-of-hospital setting with medical oversight.

After initiating care, the Emergency Medical Responder transfers care to higher level personnel. The Emergency Medical Responder serves as part of an EMS response system that ensures a progressive increase in the level of assessment and care.

## Emergency Medical Technician (EMT)

The primary focus of the Emergency Medical Technician is to provide basic emergency medical care and transportation for critical and emergent patients who access the emergency medical system. This individual possesses the basic knowledge and skills necessary to provide patient care and transportation. Emergency Medical Technicians function as part of a comprehensive EMS response, under medical oversight. Emergency Medical Technicians perform interventions with the basic equipment typically found on an ambulance. The Emergency Medical Technician is a link from the scene to the emergency health care system.

### Description of the Profession

The Emergency Medical Technician's scope of practice includes basic skills focused on the acute management and transportation of critical and emergent patients. This may occur at an emergency scene until transportation resources arrive, from an emergency scene to a health care facility, between health care facilities, or in other health care settings.

In many communities Emergency Medical Technicians provide a large portion of the prehospital care.  In some jurisdictions, especially rural areas, Emergency Medical Technicians provide the highest level of prehospital care. Emergency Medical Technicians work alongside other EMS

and health care professionals as an integral part of the emergency care team.

Emergency Medical Technicians' scope of practice includes basic, non-invasive interventions to reduce the morbidity and mortality associated with acute out-of-hospital medical and traumatic emergencies. Emergency care is based on assessment findings. Additionally, Emergency Medical Technicians provide care to minimize secondary injury and provide comfort to the patient and family while transporting the patient to an emergency care facility.

An Emergency Medical Technician's knowledge, skills, and abilities are acquired through formal education and training. The Emergency Medical Technician has the knowledge of, and is expected to be competent in, all of the skills of the Emergency Medical Responder. A major difference between the Emergency Medical Responder and the Emergency Medical Technician is the knowledge and skills necessary to provide medical transportation of emergency patients.

The Emergency Medical Technician level is the minimum licensure level for personnel transporting patients in ambulances. The scope of practice is limited to basic skills that are effective and can be performed safely in an out-of-hospital setting with medical oversight and limited training.

The Emergency Medical Technician transports all emergency patients to an appropriate medical facility. The Emergency Medical Technician is not prepared to make decisions independently regarding the appropriate disposition of patients. The Emergency Medical Technician serves as part of an EMS response system, assuring a progressive increase in the level of assessment and care. The Emergency Medical Technician may make destination decisions in collaboration with medical oversight. The principal disposition of the patient encounter will result in the direct delivery of the patient to an acute care facility.

In addition to emergency response, Emergency Medical Technicians often perform medical transport services of patients requiring care within their scope of practice.

## Advanced Emergency Medical Technician (AEMT)

The primary focus of the Advanced Emergency Medical Technician is to provide basic and limited advanced emergency medical care and transportation for critical and emergent patients who access the emergency medical system. This individual possesses the basic knowledge and skills necessary to provide patient care and transportation. Advanced Emergency Medical Technicians function as part of a comprehensive EMS response, under medical oversight. Advanced Emergency Medical Technicians perform interventions with the basic and advanced equipment typically found on an ambulance. The Advanced Emergency Medical Technician is a link from the scene to the emergency health care system.

### Description of the Profession

The Advanced Emergency Medical Technician's scope of practice includes basic and limited advanced skills focused on the acute management and transportation of critical and emergent patients. This may occur at an emergency scene until transportation resources arrive, from an emergency scene to a health care facility, between health care facilities, or in other health care settings.

For many communities, Advanced Emergency Medical Technicians provide an option to provide high benefit, lower risk advanced skills for systems that cannot support or justify Paramedic level care. This is frequently the case in rural and volunteer systems. In some jurisdictions, Advanced Emergency Medical Technicians are the highest level of prehospital care. In communities which utilize emergency medical dispatch systems, Advanced Emergency Medical Technicians may function as part of a tiered response system. In all cases, Advanced Emergency Medical Technicians work alongside other EMS and health care professionals as an integral part of the emergency care team.

The Advanced Emergency Medical Technician's scope of practice includes basic and limited advanced interventions to reduce the morbidity and mortality associated with acute out-of-hospital medical and traumatic emergencies. Emergency care is based on assessment findings. Additionally, Advanced Emergency Medical Technicians provide care to minimize secondary injury and provide comfort to the patient and family while transporting the patient to an emergency care facility.

The Advanced Emergency Medical Technician's knowledge, skills, and abilities are acquired through formal education and training. The Advanced Emergency Medical Technician has the knowledge associated with, and is expected to be competent in, all of the skills of the Emergency Medical Responder and Emergency Medical Technician. The major difference between the Advanced Emergency Medical Technician and the Emergency Medical Technician is the ability to perform limited advanced skills for emergency patients.

The Advanced Emergency Medical Technician is the minimum licensure level for patients requiring limited advanced care at the scene or during transportation. The scope of practice is limited to lower risk, high benefit advanced skills that are effective and can be performed safely in an out-of-hospital setting with medical oversight and limited training.

The Advanced Emergency Medical Technician transports all emergency patients to an appropriate medical facility. The Advanced Emergency Medical Technician is not prepared to independently make decisions regarding the disposition of patients. The Advanced Emergency Medical Technician serves as part of an EMS response system assuring a progressive increase in the level of assessment and care. The Advanced Emergency Medical Technician may make destination decisions in collaboration with medical oversight. The principal disposition of the patient encounter will result in the direct delivery of the patient to an acute care facility.

In addition to emergency response, Advanced Emergency Medical Technicians often perform medical transport services of patients requiring care within their scope of practice.

## Paramedic

The Paramedic is an allied health professional whose primary focus is to provide advanced emergency medical care for critical and emergent patients who access the emergency medical system. This individual possesses the complex knowledge and skills necessary to provide patient care and transportation. Paramedics function as part of a comprehensive EMS response, under medical oversight. Paramedics perform interventions with the basic and advanced equipment typically found on an ambulance. The Paramedic is a link from the scene into the health care

system.

## Description of the Profession

The Paramedic's scope of practice includes basic and advanced skills focused on the acute management and transportation of the broad range of patients who access the emergency medical system. This may occur at an emergency scene until transportation resources arrive, from an emergency scene to a health care facility, between health care facilities, or in other health care settings.

In some communities, Paramedics provide a large portion of the prehospital care and represent the highest level of prehospital care. In communities that utilize emergency medical dispatch systems, Paramedics may be part of a tiered response system. In all cases, Paramedics work alongside other EMS and health care professionals as an integral part of the emergency care team.

The Paramedic's scope of practice includes invasive and pharmacological interventions to reduce the morbidity and mortality associated with acute out-of-hospital medical and traumatic emergencies. Emergency care is based on an advanced assessment and the formulation of a field impression. The Paramedic provides care designed to minimize secondary injury and provide comfort to the patient and family while transporting the patient to an appropriate health care facility.

The Paramedic has knowledge, skills, and abilities developed by appropriate formal education and training. The Paramedic has the knowledge associated with, and is expected to be competent in, all of the skills of the Emergency Medical Responder, Emergency Medical Technician, and Advanced Emergency Medical Technician. The major difference between the Paramedic and the Advanced Emergency Medical Technician is the ability to perform a broader range of advanced skills. These skills carry a greater risk for the patient if improperly or inappropriately performed, are more difficult to attain and maintain competency in, and require significant background knowledge in basic and applied sciences.

The Paramedic is the minimum licensure level for patients requiring the full range of advanced out-of-hospital care. The scope of practice is limited to advanced skills that are effective and can be performed safely in an out-of-hospital setting with medical oversight.

The Paramedic transports all emergency patients to an appropriate medical facility. The Paramedic serves as part of an EMS response system, ensuring a progressive increase in the level of assessment and care. The Paramedic may make treat and release decisions in collaboration with medical oversight. The principal disposition of the patient encounter will result in the direct delivery of the patient to an acute care facility.

In addition to emergency response, Paramedics often perform medical transport services of patients requiring care within their scope of practice.

## IX.   EMS Proficiency and Performance Assessment Requirement.

Additional performance assessment requirements exist for advanced airway management including all intubation attempts and placements by any personnel affiliated with the EMS agency. The responsibility of the EMS medical director includes implementation of these requirements and EMS personnel compliance pursuant to IDAPA 16.02.02.300.05 and .06. The required data elements to be supplied by every EMS provider who attempts advanced airway management will be defined by the EMS Physician Commission. EMS providers will electronically submit the required data elements directly to the EMS Physician Commission starting January 1, 2010 in a manner established by the EMS Physician Commission. EMS providers will submit the required data elements contemporaneously with the completion of their patient care documentation. In the interest of evaluating aggregate performance, the EMS Physician Commission will compile and supply the EMS medical director with submitted data elements.

## X.   Idaho EMS Physician Commission Contact Information

EMSPhysiciancomm@dhw.idaho.gov

www.emspc.dhw.idaho.gov

Call Toll Free:  1-877-554-3367

Idaho EMS Physician Commission
650 W. State Street, B-17
PO Box 83720
Boise, Idaho 83720-0036
(208) 334-4000
Fax (208) 334-4015

## XI. Idaho EMS Bureau Contact Information

IdahoEMS@dhw.idaho.gov

www.idahoems.org

Call Toll Free:  1-877-554-3367

650 W. State Street, B-17
PO Box 83720
Boise, ID 83720-0036
(208) 334-4000
Fax (208) 334-4015

## EMSPC Scope of Practice - All Levels 2011-1 - Standards Manual

**EMSPC 2011-1**

### AIRWAY / VENTILATION / OXYGENATION

| # | Skill | EMR | EMT | AEMT | Paramedic | CC Skills |
|---|-------|-----|-----|------|-----------|-----------|
| 1 | Airway devices not intended to be inserted into trachea | | | X | X | |
| 2 | Airway – Nasal | X | X | X | X | |
| 3 | Airway – Oral | X | X | X | X | |
| 4 | Airway – Obstruction - removal of foreign body by direct laryngoscopy | | | | X | |
| 5 | Bag-Valve-Mask (BVM) | X | X | X | X | |
| 6 | BiPAP | | | | | 2,OM |
| 7 | Chest Decompression – Needle | | | | X | |
| 8 | Chest Tube Placement | | | | | 2,OM |
| 9 | Chest Tube – Monitoring & Management | | | | X | |
| 10 | CPAP | | | 2,OM | OM | |
| 11 | Cricoid Pressure (Sellick) | X | X | X | X | |
| 12 | Cricothyrotomy – Needle/Percutaneous | | | | X | |
| 13 | Cricothyrotomy - Surgical | | | | X**** | |
| 14 | Demand Valve – Manually triggered ventilation | | X | X | X | |
| 15 | End Tidal $CO_2$ Monitoring/Capnometry | | | 2,OM | X | |
| 16 | Gastric Decompression – NG Tube | | | | X | |
| 17 | Gastric Decompression – OG Tube | | | | X | |
| 18 | Head-tilt/chin-lift | X | X | X | X | |
| 19 | Intubation – Digital | | | | X | |
| 20 | Intubation – Medication Assisted (non-paralytic) | | | | X | |
| 21 | Intubation – Medication Assisted (paralytics) (RSI) | | | | 2,3,OM | |
| 22 | Intubation - Nasotracheal | | | | X | |
| 23 | Intubation - Orotracheal | | | 2,3,OM | X | |
| 24 | Intubation – Retrograde | | | | | |
| 25 | Jaw-thrust | X | X | X | X | |
| 26 | Jaw-thrust - Modified (trauma) | X | X | X | X | |
| 27 | Mouth-to-Barrier | X | X | X | X | |
| 28 | Mouth-to-Mask | X | X | X | X | |
| 29 | Mouth-to-Mouth | X | X | X | X | |
| 30 | Mouth-to-Nose | X | X | X | X | |
| 31 | Mouth-to-Stoma | X | X | X | X | |
| 32 | Obstruction – Direct Laryngoscopy | | | | X | |
| 33 | Obstruction – Manual | X | X | X | X | |
| 34 | Oxygen Therapy – Humidifiers | X | X | X | X | |
| 35 | Oxygen Therapy – Nasal Cannula | X | X | X | X | |
| 36 | Oxygen Therapy – Non-rebreather Mask | X | X | X | X | |
| 37 | Oxygen Therapy – Partial Rebreather Mask | X | X | X | X | |
| 38 | Oxygen Therapy – Simple Face Mask | X | X | X | X | |
| 39 | Oxygen Therapy – Venturi Mask | X | X | X | X | |
| 40 | PEEP – Therapeutic (>6cm $H_2O$ pressure) | | | | | 2,OM |
| 41 | Pulse Oximetry | | | 2,OM | X | |
| 42 | CO Oximetry | | 2,4,OM | 2,4,OM | OM | |
| 43 | Suctioning – Tracheobronchial via advanced airway | | | X | X | |
| 44 | Suctioning – Upper Airway | X | X | X | X | |
| 45 | Ventilators – Automated Transport (ATV) for non-intubated patients | | | | X | |
| 46 | Ventilators – Automated Transport (ATV) | | | | X | |
| 47 | Ventilators, Automated – Enhanced Assessment & Management | | | | | 2,OM |

| | | EMSPC 2011-1 | | | |
|---|---|:---:|:---:|:---:|:---:|
| | **CARDIOVASCULAR / CIRCULATION** | | | | |
| | **Skill** | EMR | EMT | AEMT | Paramedic | CCS |
| 48 | EKG - 12-lead data acquisition | | **2,OM** | **2,OM** | **X** | |
| 49 | EKG - 12-lead interpretation | | | | **X** | |
| 50 | EKG - 3-lead rhythm interpretation | | | | **X** | |
| 51 | Cardiopulmonary Resuscitation (CPR) | **X** | **X** | **X** | **X** | |
| 52 | Cardioversion – Electrical | | | | **X** | |
| 53 | Carotid Massage | | | | **X** | |
| 54 | Defibrillation – Automated / Semi-Automated | **X** | **X** | **X** | **X** | |
| 55 | Defibrillation – Manual | | | | **X** | |
| 56 | Hemorrhage Control – Direct Pressure | **X** | **X** | **X** | **X** | |
| 57 | Hemorrhage Control - Pressure Point | **X** | **X** | **X** | **X** | |
| 58 | Hemorrhage Control – Tourniquet | | **X** | **X** | **X** | |
| 59 | Impedance Threshold Device (ITD) | | **OM** | **OM** | **OM** | |
| 60 | IABP monitoring & management | | | | | **2,OM** |
| 61 | Pacing - Transvenous & Epicardial – monitoring & management | | | | | **2,OM** |
| 62 | Invasive Hemodynamic Monitoring | | | | | **2,OM** |
| 63 | Mechanical CPR Device | | **X** | **X** | **X** | |
| 64 | Pericardiocentesis | | | | | **2,OM** |
| 65 | Pacing - Transcutaneous | | | | **X** | |
| 66 | Pacing - Permanent/ICD | | | | **X*\*\*\*** | |

| | | EMSPC 2011-1 | | | |
|---|---|:---:|:---:|:---:|:---:|
| | **IMMOBILIZATION** | | | | |
| | **Skill** | EMR | EMT | AEMT | Paramedic | CCS |
| 67 | Cervical stabilization – Cervical Collar | **2,OM** | **X** | **X** | **X** | |
| 68 | Spinal Immobilization – Long Board | **2,OM** | **X** | **X** | **X** | |
| 69 | Cervical stabilization – Manual | **X** | **X** | **X** | **X** | |
| 70 | Spinal Immobilization – Seated Patient (KED, etc.) | **2,OM** | **X** | **X** | **X** | |
| 71 | Extremity stabilization - Manual | **X** | **X** | **X** | **X** | |
| 72 | Extremity splinting | **2,OM** | **X** | **X** | **X** | |
| 73 | Extremity splinting – Traction | | **X** | **X** | **X** | |
| 74 | MAST/PASG for pelvic immobilization only | | **X** | **X** | **X** | |
| 75 | Pelvic immobilization devices | | **OM** | **OM** | **OM** | |

| | | EMSPC 2011-1 | | | |
|---|---|:---:|:---:|:---:|:---:|
| | **VASCULAR ACCESS / FLUIDS** | | | | |
| | **Skill** | EMR | EMT | AEMT | Paramedic | CCS |
| 76 | Arterial Line – Monitoring & Access Only | | | | | **2,OM** |
| 77 | Central Line – Placement | | | | **X*\*\*\*** | |
| 78 | Central Line – Monitor & Maintain Only | | | | **X** | |
| 79 | Intraosseous – Pediatric | | | **X** | **X** | |
| 80 | Intraosseous – Adult | | | **OM** | **X** | |
| 81 | Peripheral – Initiation | | | **X** | **X** | |
| 82 | Umbilical - Initiation | | | | **X*\*\*\*** | |
| 83 | IV Fluid infusion - Non-medicated | | | **X** | **X** | |

### TECHNIQUE OF MEDICATION ADMINISTRATION — EMSPC 2011-1

Only includes techniques required to administer meds listed in the medication formulary. Does not include techniques for assisting a patient in administering his/her own medications.

| # | Skill | EMR | EMT | AEMT | Paramedic | CCS |
|---|-------|-----|-----|------|-----------|-----|
| 84 | Aerosolized (MDI) | | | | X | |
| 85 | Auto-Injector | X | X | X | X | |
| 86 | Buccal | | X | X | X | |
| 87 | Endotracheal Tube (ET) | | | | X | |
| 88 | Intramuscular (IM) | | 2,OM | 2,OM | X | |
| 89 | Intranasal | | | | X | |
| 90 | Intraosseous, pediatric | | | X | X | |
| 91 | Intraosseous, adult | | | | X | |
| 92 | IV infusion | | | | X | |
| 93 | IV Programmable volume infusion device | | | | | 2,OM |
| 94 | IV push | | | | X | |
| 95 | IV Push-D50/concentrated dextrose solutions only | | | | X | |
| 96 | Accessing implanted central IV port | | | | X | |
| 97 | Nasogastric | | | | X | |
| 98 | Nebulized (SVN) | | | | X | |
| 99 | Oral | | X | X | X | |
| 100 | Rectal | | | | X | |
| 101 | Subcutaneous | | 2,OM | 2,OM | X | |
| 102 | Sub-lingual | | | | X | |
| 103 | Topical | | | | X | |

### MISCELLANEOUS — EMSPC 2011-1

| # | Skill | EMR | EMT | AEMT | Paramedic | CCS |
|---|-------|-----|-----|------|-----------|-----|
| 104 | Arterial Blood Sampling, Radial Site - Obtaining | | | | | |
| 105 | Assist with prescribed meds | | X | X | X | |
| 106 | Over-the-Counter Medications (OTC) | | | | X | |
| 107 | Assisted childbirth delivery - normal | X | X | X | X | |
| 108 | Assisted childbirth delivery- complicated | | X | X | X | |
| 109 | Blood Chemistry Analysis | | | | | 2,OM |
| 110 | Blood Glucose Monitoring - automated | | 2,4,OM | X | X | |
| 111 | Blood Pressure – Manual | X | X | X | X | |
| 112 | Blood Pressure – Automated | | X | X | X | |
| 113 | Eye Irrigation | | X | X | X | |
| 114 | Eye Irrigation – Morgan Lens | | | | X | |
| 115 | Extrication awareness/patient access | X | X | X | X | |
| 116 | Emergency Moves for Endangered Patients | X | X | X | X | |
| 117 | Mechanical patient restraints | | X | X | X | |
| 118 | Rapid extrication | | X | X | X | |
| 119 | ICP Monitoring | | | | | 2,OM |
| 120 | Taser Barb Removal | OM | OM | OM | OM | |
| 121 | Urinary Catheterization | | | | X**** | |
| 122 | Venous Blood Sampling – Obtaining | | | X | X | |

| | Formulary | EMR | EMT | AEMT | Paramedic | CCS |
|---|---|---|---|---|---|---|
| | **EMSPC 2011-1** | | | | | |
| | **MEDICATION FORMULARY** | | | | | |
| 123 | Acetylsalicylic acid (Aspirin) | | | | X | |
| 124 | Acetylsalicylic acid (Aspirin) for suspected cardiac chest pain | | OM | OM | | |
| 125 | Activated Charcoal | | | X | X | |
| 126 | Antihistamines | | | | X | |
| 127 | Blood products administration | | | | | 2,OM |
| 128 | Dextrose 50% | | | | X | |
| 129 | Dextrose, concentrated solutions | | | | X | |
| 130 | Epinephrine (Adrenalin) | | | | X | |
| 131 | Epinephrine Auto Injector | 2,4,OM | 2,4,OM | 2,4,OM | X | |
| 132 | Glucagon | | 2,4,OM | 2,4,OM | X | |
| 133 | Glucose (Oral) | | X | X | X | |
| 134 | Inhaled beta agonist | | X** | X** | X | |
| 135 | Maintenance of blood administration | | | | | 2,OM |
| 136 | Atropine sulfate & 2-Pralidoxime chloride auto-injector (e.g. MARK-I, DuoDote) self & peer | | | | X | |
| 137 | Atropine sulfate & 2-Pralidoxime chloride auto-injector (e.g. MARK-I, DuoDote) | | | | X | |
| 138 | Atropine sulfate & 2-Pralidoxime chloride auto-injector (Chempack patient use - emergency stockpile release only) | 5X | 5X | 5X | X | |
| 139 | Medical director approved medications | | | | X | |
| 140 | Naloxone (Narcan) | | | | X | |
| 141 | Nitroglycerin - sublingual | | X** | X** | X | |
| 142 | Nitrous Oxide (Nitronox) | | | | X | |
| 143 | Oxygen | X | X | X | X | |
| 144 | Plasma volume expander administration | | | | | 2,OM |
| 145 | Thrombolytic therapy administration | | | | X | |

**OM=Optional Module**

**X in a white square = Existing Idaho SOP, will be removed from future standard manual editions.**

**Change from previous version 2010-1**

| **Levels of Medical Supervision** | |
|---|---|
| Requires online medical direction before performing | 1 |
| Requires completion of training that meets or exceeds specified state-wide training content established by the EMS Bureau | 2 |
| Requires additional standards as defined by the EMSPC | 3 |
| Requires EMSPC protocol | 4 |
| Just In Time Training | 5 |

*for chest pain of suspected ischemic origin
**may carry and administer only if already prescribed
*** may assist with patients own medication only
****will be included in Critical Care Curriculum in future Standards Manual

## Advanced EMT Statewide Intubation Standards

| Topic | Requirements | Available Options |
|---|---|---|
| **Patient Selection** | | |
| Adult / Peds over 12 only | Unconscious w/ineffective respiration | |
| | Cardiac arrest | |
| | Apnea or agonal respirations | |
| | | |
| | | |
| | | |
| **Equipment** | | |
| Laryngoscope blades | adult | Macintosh |
| | at least 3 sizes of 2 different blade types | Miller |
| | | other blade types permissable |
| | | |
| Continuous Pulse Oximetry | before, during & after intubation | |
| Rescue device | must have at least one available | LMA |
| | | Combitube |
| | | King LT |
| | | bougie/flexguide |
| Tube placement | must have at least one available | ETCO2, qualitative |
| | | esophageal detector device (EDD) |
| Selection of tube size | based on patient age or size of 5th finger | |
| Suction device | per minimum EMS Bureau equipment list | |
| Bag Valve Mask | per minimum EMS Bureau equipment list | |
| Oxygen | per minimum EMS Bureau equipment list | |
| | | |
| **Intubation Attempts** | | |
| Preoxygenation | 100% by BVM prior to any attempts | |
| Provider limited to 3 attempts | duration: each attempt should be no more than 30 seconds. If unsuccessful should oxygenate before subsequent attempts. | |
| Patient limited to 5 attempts | multiple attempts should not delay transport | |
| NAEMSP definition of attempt: insertion of laryngoscope blade into mouth | | |
| | | |
| **Confirmation of Tube Placement** | | |
| Confirmation of Tube Placement | Utilize multiple methods | Breath sounds |
| | | Epigastric sounds |
| | | ETCO2 |
| | | EDD |
| | | chest rise |
| | | tube misting |
| | | Patient response |
| | | |
| **PCR Documentation** | | |
| See 'EMSPC Intubation PCR Documentation List' for required data elements. | | |

| Required Elements for Performance Assessment and Improvement | | |
|---|---|---|
| **Monitoring** | | |
| 100% chart review | | |
| | | |
| Intubation success rate | | |
| | agency | |
| | provider | |
| | | |
| 1st attempt success rate | | |
| | agency | |
| | provider | |
| | | |
| Rescue airway device utilization | | |
| | | |
| Complications (agency vs provider) | | |
| | R mainstem (unrecognized) | |
| | esophageal intubation (unrecognized) | |
| | airway/dental trauma | |
| | hypoxia during intubation | |
| | bradycardia during intubation | |
| | inappropriate tube size | |
| | inappropriate tube depth | |
| | | |
| | | |
| **Training** | | |
| 1.  Minimum annual demonstration of intubation proficiency | | |
| 2.  Minimum annual review of intubation to include cognitive and psychomotor components with an emphasis on team coordination. | | |
| | | |
| **Remediation** | | |
| Remediation at the discretion of the local EMS medical director | | |

## Paramedic Non-RSI Statewide Intubation Standards

| Topic | Requirements | Available Options |
|---|---|---|
| **Patient Selection** | | |
| Adult / Peds | Unconscious w/ineffective respiration | |
| | Cardiac arrest | |
| | Apnea or agonal respirations | |
| | Conscious with ineffective respirations (Nasal intubations only) | |
| | | |
| **Equipment** | | |
| Laryngoscope blades | adult & ped blade sizes | Macintosh |
| | 2 different blade types | Miller |
| | | other blade types permissable |
| | | |
| Continuous Pulse Oximetry | before, during & after intubation | |
| Rescue device | must have at least one available | LMA |
| | | Combitube |
| | | King LT |
| | | bougie/flexguide |
| Tube placement | must have at least one available | ETCO2, qualitative |
| | | esophageal detector device (EDD) |
| Selection of tube size | based on patient age or size of 5th finger | |
| Suction device | per minimum EMS Bureau equipment list | |
| Bag Valve Mask | per minimum EMS Bureau equipment list | |
| Oxygen | per minimum EMS Bureau equipment list | |
| | | |
| **Intubation Attempts** | | |
| Preoxygenation | 100% oxygen prior to any attempts | Bag Valve Mask |
| | | Non-Rebreatther Mask |
| Provider limited to 3 attempts | duration: each attempt should be no more than 30 seconds. If unsuccessful should oxygenate before subsequent attempts. | |
| Patient limited to 5 attempts | multiple attempts should not delay transport | |
| NAEMSP definition of attempt: insertion of laryngoscope blade into mouth or insertion of tube through nares | | |
| | | |
| **Confirmation of Tube Placement** | | |
| Confirmation of Tube Placement | Utilize multiple methods | Breath sounds |
| | | Epigastric sounds |
| | | ETCO2 |
| | | EDD |
| | | chest rise |
| | | tube misting |
| | | Patient response |
| | | |
| **PCR Documentation** | | |
| See 'EMSPC Intubation PCR Documentation List' for required data elements. | | |

| Required Elements for Performance Assessment and Improvement | | |
|---|---|---|
| **Monitoring** | | |
| 100% chart review | | |
| | | |
| Intubation success rate | | |
| | agency | |
| | provider | |
| | | |
| 1st attempt success rate | | |
| | agency | |
| | provider | |
| | | |
| Rescue airway device utilization | | |
| | | |
| Complications (agency vs provider) | | |
| | R mainstem (unrecognized) | |
| | esophageal intubation (unrecognized) | |
| | airway/dental trauma | |
| | hypoxia during intubation | |
| | bradycardia during intubation | |
| | inappropriate tube size | |
| | inappropriate tube depth | |
| | | |
| | | |
| **Training** | | |
| 1.  Minimum annual demonstration of intubation proficiency | | |
| 2.  Minimum annual review of intubation to include cognitive and psychomotor components with an emphasis on team coordination. | | |
| | | |
| **Remediation** | | |
| Remediation at the discretion of the local EMS medical director | | |

| EMSPC RSI Statewide Standards | | |
|---|---|---|
| **Topic** | **Requirements** | **Available Options** |
| **Patient Selection** | | |
| Adult /Peds | Patient requires intubation; AND | |
| | is not flaccid, or | |
| | has intact protective airway reflexes. | |
| | Not a difficult airway | |
| | | |
| **Equipment** | | |
| Laryngoscope blades | adult & ped blade sizes | Macintosh |
| | 2 different blade types | Miller |
| | | other blade types permissable |
| | | |
| Medications | As per local EMS Medical Director | |
| Continuous Pulse Oximetry | before during and after intubation | |
| Rescue device | must have at least one available | LMA |
| | | Combitube |
| | | King LT |
| | | other |
| Tube placement | must have at least one available | ETCO2, qualitative |
| | | esophageal detector device (EDD) |
| Selection of tube size | based on patient age or size of 5th finger | |
| Suction device | per minimum EMS Bureau equipment list | |
| Bag Valve Mask | per minimum EMS Bureau equipment list | |
| Oxygen | per minimum EMS Bureau equipment list | |
| | | |
| **Intubation Attempts** | | |
| Preoxygenation | 100% oxygen prior to any attempts | Bag Valve Mask |
| | | Non-Rebreatther Mask |
| | duration: each attempt should be no more | |
| | than 30 seconds. If unsuccessful should | |
| Provider limited to 3 attempts | oxygenate before subsequent attempts. | |
| | | |
| Patient limited to 5 attempts | multiple attempts should not delay transport | |
| NAEMSP definition of attempt: | | |
| insertion of laryngoscope blade | | |
| into mouth | | |
| | | |
| **Confirmation of Tube Placement** | | |
| Confirmation of Tube Placement | Utilize multiple methods | Breath sounds |
| | | Epigastric sounds |
| | | ETCO2 |
| | | EDD |
| | | chest rise |
| | | tube misting |
| | | Patient response |
| | | |
| **PCR Documentation** | | |
| See 'EMSPC Intubation PCR Documentation List' for required data elements. | | |

| Required Elements for Performance Assessment and Improvement | | |
|---|---|---|
| **Monitoring** | | |
| 100% chart review | | |
| | | |
| Intubation success rate | | |
| | agency | |
| | provider | |
| | | |
| 1st attempt success rate | | |
| | agency | |
| | provider | |
| | | |
| Rescue airway device utilization | | |
| | | |
| Complications (agency vs provider) | | |
| | R mainstem (unrecognized) | |
| | esophageal intubation (unrecognized) | |
| | airway/dental trauma | |
| | hypoxia during intubation | |
| | bradycardia during intubation | |
| | inappropriate tube size | |
| | inappropriate tube depth | |
| | | |
| | | |
| **Training** | | |
| 1.  Minimum annual demonstration of intubation proficiency | | |
| 2.  Minimum annual review of intubation to include cognitive and psychomotor components with an emphasis on team coordination. | | |
| | | |
| **Remediation** | | |
| Remediation at the discretion of the local EMS medical director | | |

# EXHIBIT 6

# EXHIBIT 6



*3277 E. Louise Dr., Suite 200 • Meridian, Idaho 83642 • (208) 884-2920*

22 August 2011

Greg Worthen

Investigator, Federal Defense Services, Capital Habeas Section

Fax: 208-331-5559

Dear Mr Worthen:

As per our conversation earlier today by telephone, I am writing to confirm that to the best of my knowledge, Medical Assistant programs at present do not include IV medication administration, Intravenous catheter insertion nor IV fluid hydration training. At present, this is out of the scope of their practice and certification.

I checked with our course instructor, and she was aware of an independent course which had existed in the Nampa area which did offer IV certification, but this is no longer available. She also stated that at one time the College of Southern Idaho, which offers a 2 year Associate Degree Medical Assistant program, did offer IV certification inclusive in their course. She was not aware if they still offer this.

In the local hospitals (St Lukes or St Alphonsus systems) Medical Assistants are not allowed to administer, initiate, or manage intravenous medications or fluids. To the best of my knowledge only Registered Nurses or Licensed Practical Nurses with additional training are allowed to manage IV medications.

The problem with MA training is that in independent physician offices, an MA may assist the physician with many procedures which the physician feels comfortable assigning his Medical Assistant. In Idaho, there is no separate Board under which a Medical Assistant is licensed, even though they may be certified nationally by taking the RMA or CMA board exams. The Medical Assistant operates under the supervision and licensure of their physician.

In my opinion I cannot think of an incident in which it would be appropriate for a Medical Assistant to start or manage IV fluids, or administer intravenous medications. I hope that this letter clarifies the situation. If you have further questions or concerns, please feel free to contact me.

Timothy P. Hodges, DO, FAAFP, Medical Director – MA Program/CWI

*215 E. Hawaii Ave.*
*Nampa, Idaho 83686*
*(208) 463-3000*

*7272 W. Potomac Dr.*
*Boise, Idaho 83704*
*(208) 884-2922*

*4400 E. Flamingo Ave.*
*Nampa, Idaho 83687*
*(208) 288-4970*

*1818 S. 10ᵗʰ Ave., Ste. 220*
*Caldwell, Idaho 83605*
*(208) 455-2355*