UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS E. CREECH, JAMES H. HAIRSTON, RICHARD LEAVITT, and GENE STUART, | Case No. 1:12-cv-00173-EJL |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| BRENT REINKE, in his official capacity as Direct, Idaho Department of Correction;  KEVIN KEMPF, in his official capacity as Chief, Operations Division, Idaho Department of Correction;  JEFF ZMUDA, in his official capacity as Deputy Chief, Bureau of Prisons, Idaho Department of Correction;  JOSH TEWALT, in his official capacity as Deputy Chief, Bureau of Prisons, Idaho Department of Correction; and RANDY BLADES, in his official capacity as Warden, Idaho Maximum Security Institution; | |
| Defendants. | |

**INTRODUCTION**

On April 4, 2012, four Idaho prisoners under death sentences filed a Complaint

challenging the Idaho Department of Correction's execution protocol and procedures.

(Dkt. 1.) On May 15, Defendants responded with a Motion to Dismiss under Rule

**MEMORANDUM DECISION AND ORDER - 1**

12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. 9.)

In Plaintiff Richard Leavitt's state court criminal case, the State of Idaho sought and received a death warrant from the state court for Leavitt, and an execution date of June 12, 2012, has been set. As a result of the execution date, the Court accelerated briefing on Leavitt's claims only.

No execution dates have yet been scheduled for the other three Plaintiffs. Their briefing schedule has been un-altered to allow them additional time to address the pending Motion to Dismiss.

With his execution date set, Leavitt has now filed an Emergency Motion for Preliminary Injunction or Stay of Execution, seeking an order from this Court staying the execution so that he may proceed in the current federal lawsuit to alter the manner in which his execution will occur, before his claims become moot as a result of his execution. (Dkt. 16.) The Court has considered the parties' arguments, and for the reasons set forth herein, it issues the following Order.

## BACKGROUND

Richard Leavitt was convicted of first degree murder, for the stabbing death of Danette Elg in Blackfoot, Idaho. He was first sentenced to death in 1985 and, following a remand from the Idaho Supreme Court, he was resentenced to death in 1990. *State v. Leavitt*, 822 P.2d 523 (Idaho 1991). For the next twenty-two years, Leavitt sought relief from his convictions and death sentence in state court and federal court, and although he has been granted federal habeas relief twice, those rulings have been reversed by the

**MEMORANDUM DECISION AND ORDER - 2**

Ninth Circuit Court of Appeals. *Leavitt v. Arave*, 383 F.3d 809, 840 (9th Cir. 2004); *Leavitt v. Arave*, 646 F.3d 605, 616 (9th Cir. 2011). The United States Supreme Court recently denied Leavitt's petition for writ of certiorari, effectively ending his collateral appeals, and an execution date is now set for June 12, 2012.

Leavitt's scheduled execution would be the second to occur in Idaho within a year. In October of 2011, the Idaho Department of Correction (IDOC) adopted a revised three-drug lethal injection protocol in preparation for the execution of Paul Rhoades (the "2011 Protocol"). Rhoades challenged the 2011 Protocol in a civil action in this Court on Eighth Amendment and other grounds, and the litigation was expedited once a death warrant was issued by the state court. *Rhoades v. Reinke*, 2011 WL 5520446 (D. Idaho 2011) ("*Rhoades I*"). After holding an evidentiary hearing, Magistrate Judge Ronald E. Bush denied Rhoades's motion for a stay of execution pending the completion of the litigation. *Id*. at *22. Judge Bush concluded, in relevant part, that Rhoades had failed to show a substantial likelihood of success on the merits of his Eighth Amendment claim; that is, he had not established that he faced a substantial risk of serious pain from the implementation of the 2011 Protocol. *Id*.

The Ninth Circuit affirmed that decision on appeal, *see Rhoades v. Reinke*, 671 F.3d 856, 863 (9th Cir. 2011) (*Rhoades II*), and Rhoades was executed on November 18, 2011. The case in the District Court was then dismissed as moot. (Dkt. 86 in Case No. 1:11-cv-00445-REB.)

The IDOC amended the execution protocol in January of 2012 (the "2012

**MEMORANDUM DECISION AND ORDER - 3**

Protocol"). Leavitt has now joined death-row prisoners Thomas Creech, James Hairston, and Gene Stuart in challenging the 2012 Protocol. In their Complaint, brought primarily under 42 U.S.C. § 1983, the Plaintiffs raise the following seven claims:

1.    The 2012 Protocol contains discretionary elements and uncertainties, which deprives the Plaintiffs of reasonable notice and an opportunity to object to the lethal injection procedures that will apply to them, in violation of their rights to due process of law under the Fourteenth Amendment;

2.    The 2012 Protocol exposes Plaintiffs to a substantial risk of serious pain, violating their rights against cruel and unusual punishment under the Eighth Amendment;

3.    The use of adulterated or illegally obtained drugs creates a substantial risk of harm under the Eighth Amendment;

4.    The use of pentobarbital in the three-drug protocol exposes Plaintiffs to a substantial risk of harm under the Eighth Amendment, though the use of a single-drug would not;

5.    Idaho is required to adopted a one-drug execution protocol under the Eighth Amendment;

6.    Executing any Plaintiff under a protocol that is more likely, compared to alternatives, to result in severe pain infringes his rights under the Eighth and Fourteenth Amendments; and

7.    State officials have or will violate the Controlled Substances Act, 21 U.S.C. § 801, et seq., and the Food Drug and Cosmetics Act, 21 U.S.C. § 301 et seq., because no appropriately licensed medical practitioner will obtain or administer the controlled substances used to execute Plaintiffs.

(Dkt. 1, pp. 11-37.)

        Events that have unfolded rapidly since the filing of Plaintiffs' Complaint in April have narrowed the claims and issues before the Court, at least as they pertain to Plaintiff

**MEMORANDUM DECISION AND ORDER - 4**

Leavitt.

On May 15, Defendants filed a Motion to Dismiss, arguing, in part, that all of Leavitt's claims are subject to dismissal without prejudice for failure to exhaust his administrative remedies, and that Claims 3, 4, 5, 6, and 7 for all Plaintiffs should be dismissed with prejudice for failure to state a claim upon which relief can be granted. (Dkt. 10.) Two days later, an Idaho state judge signed a death warrant for Leavitt, setting the June 12 execution date. In response, this Court issued an expediting briefing schedule for Leavitt to file a motion to stay the execution, if he intended to do so, and for briefing on Defendants' Motion to Dismiss his claims. (Dkt. 11.)

On May 23, Leavitt filed his Emergency Motion for Preliminary Injunction or Stay of Execution. (Dkt. 16.) Many of the arguments in his Motion challenge the "unfettered discretion" of the Idaho Department of Correction ("IDOC") to change the protocol at any time, which he contends violates his constitutional right to due process of law, and challenge the use of a three-drug execution protocol as exposing him to a serious risk of pain. (Dkt. 16-1, pp. 4-27.)

However, on May 25, the IDOC notified Leavitt and this Court that it would elect to use one drug – an injection of pentobarbital – for Leavitt's execution. (Dkt. 18.) In that same Notice, IDOC indicated that it would not invoke its authority "to deviate from the one-drug pentobarbital protocol outlined in [the 2012 Protocol] for the execution of Richard Leavitt on June 12, 2012." (*Id*. at 2.)

This Notice has significantly changed the posture of the case in short order. In

**MEMORANDUM DECISION AND ORDER - 5**

their Complaint, Plaintiffs had alleged that the Eighth Amendment *required* the IDOC to use pentobarbital as part of a one-drug method of execution procedure. (Dkt. 1, pp. 29-31; claims 4, 5, 6.) Now, because IDOC will use that drug in Leavitt's execution, he will receive much of the relief that he previously sought in the Complaint. Leavitt seems to acknowledge this, conceding in his Opposition to Defendants' Motion to Dismiss that IDOC's Notice renders Claims 1, 4, 5, and 6 moot, as long as IDOC adheres to its representation that it will not invoke its authority to deviate from the 2012 Protocol. (Dkt. 19, pp. 2-3.)

The Court agrees with Leavitt's assessment that IDOC's Notice that it will use pentobarbital as part of the one-drug method of execution, complying in all material respects with the 2012 Protocol, and that it will not exercise its discretion to deviate materially from that protocol during Leavitt's execution, is binding on the Defendants. *See Towrey v. Brewer*, 672 F.3d 650 (9th Cir. 2012) (accepting "representations and undertakings as binding on the State"). IDOC's Notice has therefore mooted Leavitt's due process arguments in support of Claim 1, and his allegations that the Eighth Amendment requires the use of a one-drug pentobarbital execution, as set out in Claims 4, 5, and 6, leaving only Claim 2, 3, and 7 still at issue as to Leavitt.

With the issues narrowed, the Court will first address Defendants' argument that Leavitt failed to exhaust his prison administrative remedies as to all of his claims in this lawsuit.

**MEMORANDUM DECISION AND ORDER - 6**

**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES UNDER THE PLRA**

**1.    Standard of Law**

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). This requirement is intended to give "prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Id*. at 204.

Proper exhaustion is required, meaning that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

By its plain terms, however, the PLRA requires prisoners to exhaust only those avenues of relief that are "available" to them. 42 U.S.C. § 1997e(a). When prison officials prevent a prisoner from using the correct channels to route a complaint, an administrative remedy that may be theoretically in place will not be available to the prisoner as a practical matter, and the failure to adhere to technical requirements will be excused. *Nuñez v. Duncan*, 591 F.3d 1217, 1226 (9th Cir. 2010); *see also Dole v. Chandler*, 438

F.3d 804, 809 (7th Cir. 2006). Confusing or contradictory information given to a prisoner is also pertinent "because it informs [the] determination of whether relief was, as a practical matter, 'available.'" *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005).

A claim that a prisoner failed to exhaust administrative remedies is an affirmative defense that should be brought as an unenumerated motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure. *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2002). The district court may consider matters outside of the pleadings and can resolve disputed issues of fact, if necessary. *Id*. Defendants bear the burden of raising and proving the absence of exhaustion. *Brown*, 422 F.3d at 936-37.

**2.    Prison Administrative Grievance Procedures**

A prisoner held in custody of the Idaho Department of Correction (IDOC) must attempt to resolve any "problem or action" related to his incarceration using the prison's internal grievance system. (Byrne Aff., Exhibit C, Standard Operating Procedure 316.02.01.001 (Version 2.1), Dk. 10-5.) IDOC has a relatively straightforward three-step system, which requires the prisoner to submit an informal concern form describing the problem, file a formal grievance, and submit an appeal of any adverse decision. (Byrne Aff.,¶¶ 5-11.)

The prisoner begins this process by routing the concern form to the staff member most capable of addressing the problem. (*Id*. at ¶ 6.) If the issue is not resolved, the prisoner must complete a grievance form, attach a copy of the concern form, and file the grievance within 30 days of the incident. (*Id*. at ¶ 7) The "grievance coordinator" at the

**MEMORANDUM DECISION AND ORDER - 8**

prison will route a properly-completed grievance to the appropriate staff member, who must respond within 14 days. (*Id*. at ¶ 8.)

After the staff member responds, the coordinator forwards the grievance to the "reviewing authority," who, after reviewing the prisoner's complaint and the staff member's response, issues a decision. (*Id*.) If the prisoner is dissatisfied with the reviewing authority's decision, he may then appeal within 5 days to the "appellate authority." (*Id*. at ¶ 9.) When the appellate authority issues a final decision, the grievance is routed back to the inmate, thus concluding the administrative review process. (*Id*. at ¶¶10-11.)

**3.    Discussion of Whether the Statute Requires Exhaustion for Lethal Injection Claims**

Leavitt does not dispute Defendants' assertion that he did not exhaust the administrative remedies for his method-of-execution claim through the prison grievance procedure. There is no evidence in the record that Leavitt made any effort to do so. Defendants have submitted evidence showing that Leavitt was aware of the prison grievance system, knew how to use it, and, in fact, used it for conditions-of-confinement issues such as not being able to live in the general population, not having access to hobby craft supplies, and disagreements with the handling of his mail. (Byrne Aff., ¶ 17, Exhibit H.)

Rather than contest the fact of nonexhaustion, Leavitt argues that, as a matter of law, Defendants are not entitled to summary dismissal on the issue of exhaustion.

Defendants argue that the Supreme Court of the United States has determined that a §
1983 action challenging an execution procedure fits within the category of cases to which
exhaustion applies; in other words, under the statute, it is an action "with respect to prison
conditions." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004); 42 U.S.C. § 1997e(a). Leavitt
counters that the language in *Nelson* addressing exhaustion as to challenges to the method
of execution is dicta, and that, under the statute, a challenge to the method of execution is
not a challenge to the conditions of prison life.

The district courts that have addressed this issue in the death penalty context have
determined that the statute requiring exhaustion of administrative remedies *does* apply to
method-of-execution challenges. In *Reid v. Johnson*, 333 F.Supp. 2d 543 (E.D. Va. 2004),
the court determined that the plaintiff's action was subject to dismissal for failure to
exhaust administrative remedies pursuant to 42 U.S.C. § 1997e(a), based on *Nelson v.
Campbell*, but it did not engage in an analysis of the issue. *Id.* at 552.

In *Walton v. Johnson*, 2006 WL 2076717 (E.D. Va. 2006), the court dismissed the
plaintiff's § 1983 case based on failure to exhaust administrative remedies. There, the
district court cited *Nelson v. Campbell*, concluding as follows:

> Walton cannot avoid the PLRA exhaustion requirement, and the court is
> without discretion to dispense with it; therefore, the entire action must be
> dismissed without prejudice pursuant to § 1997e(a) of the PLRA.

*Id.* at *6.

In *Blankenship v. Owens*, 2011 WL 610967 (N.D. Ga. 2011), the district court
relied on *Nelson* and *Hill* to determine that exhaustion was required and the plaintiff's

**MEMORANDUM DECISION AND ORDER - 10**

claims subject to dismissal for failure to exhaust. In *Bowling v. Hass*, 2007 WL 403875 (E.D. Ky. 2007), the district court relied on *Porter v. Nussle*, 534 U.S. 516 (2002), to determine that lethal injection challenges must be submitted to the prison through the administrative grievance procedure in the first instance, notwithstanding the possibility that, upon receipt of the grievance, the prison could determine, based upon its particular grievance policy, that the particular claim was not grievable.

This Court agrees with Leavitt that the *Nelson* language is dicta; thus, a statutory analysis is in order to answer the question at hand. In *Porter v. Nussle*, the United States Supreme Court engaged in a detailed analysis of § 1997e(a) to determine whether that statute required an inmate to exhaust excessive force claims against individual prison officials. The Supreme Court reviewed (1) the statute's text, (2) the statute's context, and (3) prior United States Supreme Court decisions relating to "[s]uits by prisoners," as § 1997e(a) is titled. 534 U.S. at 525. This Court follows that model of analysis.

**A.     The Statute's Text**

The United States Supreme Court has instructed that, "[i]n ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue. . . ." *McCarthy v. Bronson*, 500 U.S. 135, 139 (1991) (citing *K Mart Corp. v. Cartier, Inc*., 486 U.S. 281, 291 (1988)).

The text of subsection (a) is unequivocal in scope as to prisoners bringing conditions-of-confinement suits: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

**MEMORANDUM DECISION AND ORDER - 11**

confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." 42 U.S.C. § 1997e(a). However, Congress did

not define the term "prison conditions" in the statute.

### B.     The Statute's Context

The statutory context of § 1997e is also important. The Supreme Court has

observed: "'In determining the meaning of the statute, we look not only to the particular

statutory language, but to the design of the statute as a whole and to its object and

policy.'" *McCarthy*, 500 U.S. at 139 (quoting *Crandon v. United States*, 494 U.S. 152,

158).

In *Nussle*, the Supreme Court noted that the term "prison conditions" should not be

read "in isolation," but "in its proper context," which includes the unqualified title "Suits

by prisoners." 534 U.S. at 527. In response to an argument that Congress intended to

exempt a certain category of prisoner suits from reach of the exhaustion requirement, the

Supreme Court aptly observed: "[T]his unqualified heading scarcely aids the argument

that Congress meant to bi-sect the universe of prisoner suits." *Nussle*, 534 U.S. at 527

(internal citations omitted); *id*. at 526-27 (finding support in *McCarthy*, 500 U.S. at 139

("We found no suggestion in § 636(b)(1)(B) [including the phrase 'challenging conditions

of confinement'] that Congress meant to divide prisoner petitions 'into subcategories.'")).

Here, the statutory history shows that exhaustion of administrative remedies in

prisoner civil suits has developed from no requirement, to a discretionary rule, and,

finally, to a mandatory rule. Before 1980, prisoners could file a civil rights action in

**MEMORANDUM DECISION AND ORDER - 12**

federal court without first pursuing administrative remedies. *See Wilwording v. Swenson*, 404 U.S. 249, 251 (1971) (per curiam). In 1980, Congress introduced a discretionary exhaustion provision for civil rights suit brought by state prisoners. *See* Civil Rights of Institutionalized Persons Act, 94 Stat. 352, as amended, 42 U.S.C. § 1997e (1994 ed.) In 1996, Congress "invigorated the exhaustion prescription," *Nussle*, 534 U.S. at 424, by enacting a mandatory exhaustion provision, as part of the Prison Litigation Reform Act (PLRA). *See* 42 U.S.C. § 1997e(a) (1994 ed., Supp. V); *Booth v. Churner*, 532 U.S. 731, 739 (2001). "And unlike the previous provision, which encompassed only § 1983 suits, exhaustion is now required for all "action [s] . . . brought with respect to prison conditions," whether under § 1983 or "any other Federal law." *Nussle*, 534 U.S. at 524.

The purpose of the PLRA was to curtail "a sharp rise in prisoner litigation in the federal courts." *Woodford v. Ngo*, 548 U.S. at 84. The United States Supreme Court called the "strengthened" exhaustion provision of the PLRA a "centerpiece of the PLRA's effort 'to reduce the quantity . . . of prisoner suits." *Id*. at 84-85 (citing *Nussle*, 534 at 524). Exhaustion serves a two-fold purpose: (1) to give an agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court"; and (2) to resolve claims "much more quickly and economically in proceedings before an agency than in litigation in federal court." *Woodford v. Ngo*, 548 U.S. at 89.

### C.     Prior Supreme Court Decisions Relating to "Suits by Prisoners"

Because Congress did not define the term "prison conditions" in the statute, it is

essential to review United States Supreme Court precedent governing suits by prisoners. The Supreme Court generally "presume[s] that Congress expects its statutes to be read in conformity with th[e] Court's precedents." *Nussle*, 534 at 528 (citing *United States v. Wells*, 519 U.S. 482, 495 (1997)).

The *Nussle* Court looked to two prior cases that had discussed "conditions of confinement," to draw support for its conclusion that "conditions of confinement" did, in fact, include both isolated incidents of excessive force, as well as larger, institution-wide problems of excessive force: *Preiser v. Rodriquez*, 411 U.S. 475 (1973), and *McCarthy v. Bronson*, 500 U.S. 135, 139 (1991).

In *Preiser v. Rodriguez*, the Supreme Court considered whether state prisoners could seek injunctive relief through a civil rights action to compel restoration of lost good-time credits. The federal district court granted relief, ordering that the inmate be released from prison on parole, because his conditional release date had already passed. *Id*. at 479. A panel of the United States Court of Appeals reversed, but the en banc Court of Appeals affirmed, whereupon the United State Supreme Court reversed.

The great debate in *Preiser* was whether such claims must be asserted in habeas corpus (which required state court exhaustion) or in civil rights (which at that time did not require any exhaustion of state remedies). The *Preiser* Court noted that prisoner cases in federal court fit within one of these two categories, using the term *a challenge "to the fact or duration of confinement"* to define habeas corpus cases, and using the term *a*

**MEMORANDUM DECISION AND ORDER - 14**

challenge *"to the conditions of their confinement"* to define civil rights-type actions.[1] *Id.* at 498-99.

In *McCarty*, the Supreme Court noted: "We found it telling that Congress, in composing the Magistrates Act, chose language "that so clearly parallel[ed] our *Preiser* opinion." *Id.* at 142 (speaking to the "conditions of confinement" language in both *Preiser* and 28 U.S. C. § 636(b)(1)(B)). The *Nussle* Court relied on this history to support its conclusion that the "conditions of confinement" language selected by Congress for § 1997e(a) was purposely crafted to mirror the notion that, if a case is not one sounding in habeas corpus, it was intended to fit within the large category of civil rights-type cases.

Based upon its statutory analysis, the *Nussle* Court held, "in line with the text and purpose of the PLRA, our precedent in point [including *Presier* and *McCarty*], and the weight of lower court authority, that § 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences." 534 U.S. at 520. The *Nussle* Court restated its holding at the end of its opinion as: "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

---

[1] In *Preiser*, the Court was careful to note:

This is not to say that habeas corpus may not also be available to challenge such prison conditions. *See Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Wilwording v. Swenson*, *supra*, at 251 of 404 U.S., 92 S.Ct. at 409. When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal. *See Note, Developments in the Law-Habeas Corpus*, 83 Harv.L.Rev. 1038, 1084 (1970).

411 U.S. at 499.

**MEMORANDUM DECISION AND ORDER - 15**

circumstances or particular episodes, and whether they allege excessive force or some other wrong." 534 U.S. at 532.

D.     **Newer Supreme Court Precedent and Analysis of Particular Issue at Hand**

Turning to Leavitt's arguments, this Court disagrees that the *Porter v. Nussle* holding either limits the exhaustion requirement to conditions of confinement only about "prison life," or that it exempts method-of-execution claims. The *Nussle* Court had no occasion to consider whether the statute did or did not did not encompass lethal injection challenges.

However, the statutory analysis of *Nussle* is applicable here, to the point where the facts of this case diverge from *Nussle*'s facts; chiefly, that Congress created a broad statute encompassing all "suits by prisoner," and that "conditions of confinement" suits, as borrowed from *Preiser*, include all types of civil rights-type claims exclusive of suits seeking relief that can be obtained only in habeas corpus. This interpretation includes isolated incidents of excessive force by prison employees and lethal injection challenges.

Leavitt has not persuasively argued that the *Nussle* analysis and the reach of the exhaustion provision do not encompass lethal injection challenges. Both types of incidents challenge the method in which the prison carries out the punishment pronounced by the State. In fact, in a general sense, the method in which the prison carries out the inmate's punishment is the central, if not the only, focus of "conditions of confinement" cases brought under the Eighth Amendment's Cruel and Unusual

**MEMORANDUM DECISION AND ORDER - 16**

Punishment Clause, be it capital or non-capital punishment.

That, in the context of a particular challenge, the United States Supreme Court in *Nussle* characterized "prison conditions" cases as "conditions affecting prison life," does not limit the statute's reach, especially given the fact that the Supreme Court has emphasized that a method-of-execution case sounds *either* in habeas or in civil rights (but not in any third category exempt from the exhaustion requirement), and that Congress particularly drew up the heightened exhaustion requirement statute in an expansive method to include *all* types of civil actions filed by prisoners.

This Court concludes that the prisoner cases with precedential value interpreting "conditions of confinement" claims, both before and after § 1997e(a) was adopted, agree that, where claims over conditions of confinement are brought, rather than claims over the fact or duration of confinement, the appropriate vehicle is a § 1983 claim (or claim under another appropriate civil statute), and, accordingly, *all* such claims require administrative exhaustion.

The following cases support the Court's conclusion. As noted above, *McCarthy* and *Presier* determined that there are "two broad categories of prisoner petitions that can be filed in federal court: (1) those challenging the fact or duration of confinement itself; and (2) those challenging the conditions of confinement." *Nussle*, 534 U.S. at 527.

In *Nelson v. Campbell*, a 2004 United States Supreme Court lethal injection challenge, the "conditions of confinement" and habeas corpus dichotomy continued. The *Nelson* Court decided it "need not reach here the difficult question of how to categorize

**MEMORANDUM DECISION AND ORDER - 17**

method-of-execution claims *generally*." 541 U.S. at 644 (emphasis added). The Court explained, that, to implicate a matter sounding in habeas corpus, the claim at issue would "call into question the death penalty itself," *id*. at 645, rather than "simply altering its method of execution" and permitting "the State [to] go forward with the sentence." *Id*. at 644. However, the *Nelson* court characterized the *particular* prisoner's claim before it as "his *conditions of confinement claim*," rather than a "challenge to the validity of his death sentence." *Id*. at 647. Nevertheless, the *Nelson* Court clarified, "because we do not here resolve the question of how to treat method-of-execution claims generally, our holding is extremely limited." *Id*. at 648.

The *Nelson* Court concluded its opinion with the observation that "the ability to bring a § 1983 claim, rather than a habeas application, does not entirely free inmates from substantive or procedural limitations." *Id*. at 649. The *Nelson* Court then cited as examples the exhaustion of administrative remedies requirement and the authority of the court to sua sponte dismiss actions that are frivolous on their face as two procedural limitations. (*Id*. at 650.) While dicta, this language reinforces the foundational principle that lethal injection challenges are classifiable only as one of two types: prisoner civil conditions of confinement suits or habeas corpus petitions.

In *Hill v. McDonough*, 547 U.S. 573 (2006), a lethal injection challenge, the Supreme Court restated these two options available to a prisoner as "[c]hallenges to the validity of confinement or to particulars affecting its duration," which must be brought in habeas corpus, and a "challenge to the *circumstance of his confinement*," which may be

brought under § 1983." *Id.* at 579 (emphasis added; compare first statement of holding in *Nussle*, 534 U.S. at 520). Again in *Hill*, the Supreme Court again suggested that it was only when success in a lethal injection challenge "would prevent the State from implementing the sentence," or, in other words, when the challenge was "seeking to permanently enjoin the use of lethal injection" that the case "may amount to a challenge to the fact of the sentence itself" that must be brought in habeas corpus. *Id.* at 579-80.[2] There is no suggestion in *Hill* that lethal injection challenges brought under the Eighth Amendment are not classifiable as "suits by prisoners," but should be classified as some other type of civil action that is not a "suit by [a] prisoner." In other words, *Hill* reinforces the conclusion that the only federal court causes of actions for challenging how one's sentence is being carried out by prison officials are (1) that a prisoner file a suit subject to § 1997e(a) administrative exhaustion principles, or (2) that he file a habeas corpus action subject to state court exhaustion principles.

**4.     Discussion of Whether Lethal Injection Claims Come within the Prison's Policy and Whether Leavitt Used the Policy**

Now that the Court has determined that the exhaustion requirement applies to lethal injection challenges not seeking habeas corpus-type relief, the Court must turn to the IDOC's particular policy to determine whether Leavitt should have proceeded through the prison grievance system with his claims. As the Supreme Court explained in *Woodford v. Ngo*, "it is the prison's requirements, and not the PLRA, that define the

---

[2] Exhaustion of administrative remedies was not an issue before the *Hill* Court.

**MEMORANDUM DECISION AND ORDER - 19**

boundaries of proper exhaustion." *Jones*, 549 U.S. at 218.

Leavitt has chosen to use the vehicle of a § 1983 action to challenge the execution

procedures created and employed by the IDOC, specifically Standard Operating

Procedure (SOP) 135.02.01.001 (version 3.6) (SOP 135). (Affidavit of Krista Howard,

Exhibit C, Dkt. 10-3.) It is clear that SOP 135 was created in response to the delegation of

authority for carrying out death sentences from the State Legislature to the Idaho

Department of Correction, found in Idaho Code § 19-2716:

> The punishment of death shall be inflicted by continuous,
> intravenous administration of a lethal quantity of a substance or substances
> approved by the director of the Idaho department of correction until death is
> pronounced by a coroner or a deputy coroner. The director of the Idaho
> department of correction shall determine the procedures to be used in any
> execution. This act shall apply to all executions carried out on and after the
> effective date of this enactment, irrespective of the date sentence was
> imposed.

The IDOC grievance policy, Policy 316, set forth in the IDOC policy manual

provides as follows:

> Unless otherwise specified, the offender grievance procedure may be
> used to address complaints by offenders regarding all policies, conditions of
> confinement, actions by employees and other offenders and incidents
> occurring within the jurisdiction of the Idaho Department of Correction that
> affect the offender personally.

(Affidavit of Sheryll Byrne, Exhibit A, Dkt 10-4, p. 16.) The SOP implementing the

IDOC grievance policy is found at 316.02.01.001 (version 2.1). (Byrne Aff., Exhibit C,

Dkt. 10-5.) The stated "purpose" is as follows:

> The purpose of this standard operating procedure (SOP) is to
> increase the safety and security of Idaho Department of Correction (IDOC)

**MEMORANDUM DECISION AND ORDER - 20**

correctional facilities by providing offenders a process to voice complaints about policies, division directives, SOPs, field memorandums, conditions of confinement, employee actions, actions of other offenders, medical, and other incidents occurring within the jurisdiction of the Department.

An effective grievance process gives offenders the ability to voice concerns, helps IDOC staff increase adherence to policy and procedure, and aids in the discovery of unworkable, impractical, or inconsistent practices.

(*Id.*, Dkt. 10-5, p.2.)

SOP 315.02.01.001 also sets forth the problems that cannot be grieved, which include only the following: disciplinary offense reports, alternative sanctions, length of sentence, Commission of Pardons and Parole and court decisions, previously-grieved issues, and "problems beyond the control" of the IDOC. (*Id.*, p. 4-5.)

Based upon Leavitt's stated causes of action and the foregoing statutory and IDOC SOP provisions, the Court finds and concludes that the state legislature has delegated determination of execution procedures to the IDOC, that the execution procedures are set forth in the IDOC SOP manual available to inmates, that the IDOC grievance policy is broad enough to cover method-of-execution challenges, and that Leavitt's claims are of the nature that fit within the published SOP grievance procedure. No contrary argument has been made in the record.

The Court notes that the record reflects that when a different plaintiff, James Hairston, submitted a grievance regarding the lethal injection method ("Please bring the rules governing executions into compliance with constitutional requirements.") In 2008, Grievance Coordinator Kim Reischman originally returned the grievance to him because

**MEMORANDUM DECISION AND ORDER - 21**

(1) he did not attach a signed Offender Grievance Form, (2) his description of the problem was not written in the proper section of the form, and (3) the problem is beyond the IDOC's control. (Byrne Aff., Exhibit I, Dkt. 10-7, p. 6.) When Hairston resubmitted the grievance, it was processed, not rejected, and the response was:

> As we stated in the response to your grievance & concern form, the IDOC is currently reviewing its execution protocol to ensure Idaho & Federal Constitutionality. An S.O.P. will be put in place prior to any executions. You & your attorney will have access to the S.O.P. when completed & approved.

(*Id.*, Exhibit J, Dkt 10-7, p. 15.)

Return of the grievance to Hairston for the reason that the problem was beyond the IDOC's control appears to have been a mistake of the Grievance Coordinator, because the prison official properly responded to the Offender Grievance Form with a substantive response, "The IDOC is reviewing the execution protocol to ensure Idaho and Federal Constitutionality" (*Id.*, Dkt. 10-7, p. 13), and, after the Grievance was resubmitted by Hairston, it was answered. (*Id.*, pp. 11-12.) Regardless, nothing in the record shows that Leavitt himself (the plaintiff at issue) attempted to file an Offender Concern Form or a Grievance Form to challenge the method of his execution. Neither would it have been helpful for Leavitt to argue that he relied on the mistake of the Grievance Coordinator in Hairston's case to draw conclusions about the grieve-ability of the method of execution, because Hairston's Offender Concern Form *and* his resubmitted Grievance Form, were accepted and an answer provided on the merits of Hairston's issue.

**MEMORANDUM DECISION AND ORDER - 22**

**5.      Conclusion**

The Court concludes that claims challenging the method of execution are "suits filed by prisoners" about "prison conditions," that require exhaustion of prison administrative remedies prior to filing a complaint in the federal district court. Idaho statute places the authority for carrying out executions with the IDOC, that the execution policy is published in the IDOC SOP manual, and the prison grievance policy covers such claims. Thus, an administrative remedy was available to Leavitt, but Leavitt did nothing to try to exhaust his administrative remedies. Nothing in the Court's own review of the record suggests an adequate excuse or defense under the statute exists for failing to exhaust administrative remedies. For all of these reasons, Leavitt's claims are subject to dismissal without prejudice.

Leavitt cites no precedent, and the Court finds none in its own research, to support Leavitt's argument that his "Fourteenth Amendment right to due process and Eighth Amendment right against cruel and unusual punishment trump any preclusion of a stay of execution which the PLRA may purport to create." (Dkt. 26, pp. 13-14.) Even assuming that the § 1997e(a) exhaustion requirement does not apply to lethal injection challenges, as Leavitt argues, the Court concludes that he has not carried his burden to show that a preliminary injunction should issue to permit him additional time to litigate the merits of his case, the ultimate conclusion of which would not be to vacate his execution, but

simply to command that it occur in a different manner, as the Court will now explain.[3]

## LEAVITT'S EMERGENCY MOTION FOR
## PRELIMINARY INJUNCTION OR STAY OF EXECUTION

### 1.      Standard of Law

To be entitled to preliminary injunctive relief, the movant must show each of the

following: (1) a likelihood of success on the merits; (2) that irreparable harm is likely, not

just possible, if the injunction is not granted; (3) that the balance of equities tips in its

favor; and (4) that an injunction is in the public interest. *Winter v. Natural Resources*

*Defense Council,* 555 U.S. 7 (2008). In applying the *Winter* test, the United States Court

of Appeals for the Ninth Circuit has instructed that, if a party cannot show a likelihood of

success on the merits, but raises "serious questions going to the merits," a preliminary

injunction may issue if the balance of equities tips "sharply" in the party's favor, and the

other two elements (irreparable harm and public interest) are also satisfied. *Alliance For*

*The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (holding that this

aspect of the Ninth Circuit's sliding scale test survived *Winter*).

This combination of  tests applies when a condemned state prisoner asks a federal

court for an order staying an impending execution, an equitable remedy. *See Lopez v.*

*Brewer*, 2012 WL 1693926, at *2-3 (9th Cir. May 15, 2012); *Towery v. Brewer*, 672 F.3d

650, 657 (9th Cir. 2012). The United States Supreme Court has cautioned that "the mere

---

[3] The Court need not address the 12(b)(6) portion of Defendants' claims as to Plaintiff Leavitt, because such claims will be rendered moot upon his execution; however, the Court will address that portion of the Motion in the regular course of the other Plaintiffs' case.

**MEMORANDUM DECISION AND ORDER - 24**

fact that an inmate states a cognizable §1983 claim does not warrant the entry of a stay as

a matter of right. *Nelson v. Campbell*, 541 U.S. at 649.

> Rather, the Supreme Court explained:

> > A stay is an equitable remedy, and "[e]quity must take into consideration the State's strong interest in proceeding with its judgment and . . . attempt[s] at manipulation." *Ibid*. Thus, before granting a stay, a district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim. Given the State's significant interest in enforcing its criminal judgments, *see Blodgett*, 502 U.S., at 239, 112 S.Ct. 674; *McCleskey*, 499 U.S., at 491, 111 S.Ct. 1454, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay.

*Nelson*, 541 U.S. at 649-50. In *Hill v. McDonough*, the Court reiterated that "inmates

seeking time to challenge the manner of their execution must satisfy all of the

requirements for a stay, including showing a significant possibility of success on the

merits." 547 U.S. at 584.

**2.      Leavitt has Failed to Show a Substantial Likelihood of Success on Claim 2**

In his second claim for relief,[4] Leavitt contends that the 2012 Protocol is

"materially different from those approved in *Baze v. Kentucky* [sic]" and fails to include

"alternative safeguards" against severe pain. (Dkt. 1, p. 14.) The Court finds that Leavitt

has not shown that he is likely to succeed on the merits of this claim or that there is a

serious question going to the merits for the following reasons: (1) the 2012 Protocol is not

---

[4] In light of IDOC's May 25, 2012 Notice (Dkt. 18), Leavitt admits the Claim 1 is moot as to him.

**MEMORANDUM DECISION AND ORDER - 25**

significantly different from *Baze* as to training, experience, and procedural safeguards, notwithstanding the fact that the State will use a one-drug rather than a three-drug method of execution (which was used in *Baze* and Rhodes); (2) the 2012 Protocol, supplemented by the 2012 Zmuda Affidavit, contains greater safeguards than required by the Constitution, as noted in *Baze*; and (3) Leavitt admits in his Complaint that "the one-drug protocol completely eliminates the substantial risk of severe pain that arises in three-drug executions."[5] (Dkt. 1, p. 30.)

### A.    Eighth Amendment Standards

The Eighth Amendment prohibits "punishments that involve the unnecessary and wanton infliction of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society." *Cooper v. Rimmer*, 379 F.3d 1029, 1032 (9th Cir. 2004).

For a prisoner to establish an Eighth Amendment violation based on his future exposure to pain during an execution, he must demonstrate that "the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to 'sufficiently *imminent* dangers.'" *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion) (emphasis in original and quoting *Helling v. McKinney*, 509 U.S. 25, 33, 34–35 (1993)). Put another way, "there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm,' that prevents prison officials from

---

[5] While, in his Complaint, Leavitt asserts that a one-drug protocol using pentobarbital would be constitutional, in his briefing supporting his Motion for a Preliminary Injunction, he contests the manner in which the pentobarbital would be administered, which is addressed herein below.

pleading that they were 'subjectively blameless for purposes of the Eighth Amendment."

*Baze*, 553 U.S. at 50 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 & n.9 (1994).[6]

## B.    *Baze* – the Kentucky Protocol

*Baze* set out the controlling standard for this claim, and because Leavitt alleges

that the 2012 Idaho Protocol is substantially different from *Baze,* it is necessary to

examine the procedures at issue there and to compare them with Idaho's current protocol.

The protocol in *Baze* called for the sequential administration of three drugs:

sodium thiopental, a fast-acting barbiturate intended to anesthetize the prisoner;

pancuronium bromide, a paralytic agent that stops breathing and muscle movement; and

potassium chloride, which interferes with cardiac rhythm and causes cardiac arrest. *Baze*,

553 U.S. at 44-45. If sodium thiopental is administered properly, the prisoner will be

unconscious and will not feel significant pain during the execution. *Id*. at 45, 49. If a

prisoner is not sufficiently anesthetized, however, the pancuronium bromide would render

him unable to move or speak, and he would likely experience an extreme suffocating and

burning sensation during the administration of the final two drugs. *Id*. at 49. The prisoners

in *Baze* argued that the protocol did not contain safeguards to ensure that they would be

fully anesthetized when the final two drugs were administered, violating the Eighth

Amendment. *Id*.

---

[6] In *Baze*, seven justices agreed that the prisoners had not shown an Eighth Amendment violation on the facts of the case, though a majority could not agree on a controlling rationale. The Ninth Circuit has since followed the lead of every other circuit to consider the issue and has held that Chief Justice Roberts' opinion for a three-justice plurality sets out the controlling standard. *Dickens v. Brewer*, 631 F.3d 1139, 1444-46 (9th Cir. 2010).

**MEMORANDUM DECISION AND ORDER - 27**

The Supreme Court disagreed and held that the prisoners had not shown an Eighth Amendment violation. 553 U.S. at 61. The plurality opinion authored by Chief Justice Roberts concluded that the prisoners had not shown a substantial, objectively intolerable risk that they would suffer serious harm. *Id*. at 56. In reaching that conclusion, the Court found that the safeguards that Kentucky had put in place significantly minimized the risk. Those safeguards included, among other things, that the members of the injection team have at least one year of professional medical experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsman; that the execution team participate in at least 10 practice sessions per year; that the IV team establish both a primary and backup line and to prepare two sets of lethal injection drugs before the execution; a limit of one hour to establish intravenous access; and the presence of the warden and deputy warden in the execution chamber for a visual inspection to determine that the prisoner is unconscious after injection of the sodium thiopental. *Id*. at 51-56. Although some risk of error might remain,"an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty, or that the procedure at issue give rise to a 'substantial risk of serious harm.'" 553 U.S. at 50 (quoting *Farmer*, 511 U.S. at 842).

Chief Justice Roberts concluded the plurality opinion by noting that a stay of execution would not be warranted in "[a] State with a lethal injection protocol substantially similar to the protocol we uphold today . . ." *Id*. at 61. Thus, *Baze* creates a "safe harbor" for those lethal injection protocols that are substantially similar to

**MEMORANDUM DECISION AND ORDER - 28**

Kentucky's lethal injection protocol. *See also Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2011) (finding that Arizona's protocol was in the safe harbor and that minor deviations from the written protocol did not change that result).

### C.     Idaho's Execution Protocol from October 2011 to the Present

In October 2011, Idaho adopted a protocol that required the sequential administration of the same three drugs at issue in *Baze*, and Inmate Paul Rhoades filed a lawsuit challenging the 2011 Protocol. *Rhoades v. Reinke*, 2011 WL 5520446 (D. Idaho 2011) ("*Rhoades I*"). After holding an evidentiary hearing, Magistrate Judge Ronald E. Bush determined that Rhoades had not shown a substantial risk that he would suffer serious pain during his impending execution. Judge Bush denied Rhoades's request for a preliminary injunction to delay the execution, *id.* at *22, and the Ninth Circuit affirmed that decision, *Rhoades v. Reinke*, 671 F.3d 856 (9th Cir. 2011) ("*Rhoades II*").

Judge Bush and the Ninth Circuit made several findings and conclusions in the course of the *Rhoades* proceedings that are relevant to resolving Leavitt's current claim.

Judge Bush first noted that "Rhoades overstates the holding of *Baze* to the extent he equates the identified 'safeguards' as mandatory requirements that must each be in place in order for a State's three-drug lethal injection protocol to pass constitutional muster." *Rhoades I*, at *7. He emphasized that the *Baze* Court did not impose minimum procedures that states must incorporate into their execution protocols to comport with the Eighth Amendment; instead, the Supreme Court found that the procedures in Kentucky's protocol were *sufficient*, but not required, to satisfy the Eighth Amendment. *Id.* As

**MEMORANDUM DECISION AND ORDER - 29**

Rhoades did, Leavitt makes the same error by assuming that *Baze* "constitutionalized" some minimum set of execution procedures that every state must either follow or risk having their execution protocols found to be unconstitutional.

Judge Bush further concluded that Idaho's 2011 Protocol, as written and supplemented by witness testimony, was substantially similar to the protocol in *Baze* and was sheltered in *Baze*'s "safe harbor." *Rhoades I*, at *16. Of particular importance, team members who were assigned to carry out the execution were all "medical providers" with at least 15 years of experience and had "venous access currency," meaning that they were proficient in insertion of IVs, which they did professionally "on a regular basis." *Id*. at *8-9.

In addition, the 2011 Protocol required a minimum of 10 training sessions a year, weekly sessions in the month before a scheduled execution, and two full rehearsals on live volunteers in the 48 hours preceding the execution. *Id*. at *9-10. The protocol contained "meaningful redundancy safeguards" that included a primary and backup IV and three sets of chemicals. *Id*. at 11-12. It also required "meaningful consciousness checks," including a microphone in the execution chamber, an electrocardiograph (EKG), continual monitoring of the offender's level of consciousness and EKG readings, and a consciousness check by the leader of the Medical Team before administration of the final two drugs. *Id*. at *12-13.

Judge Bush also found that the 2011 Protocol even went beyond *Baze* to provide an added layer of protection against the improper administration of the pain-causing

**MEMORANDUM DECISION AND ORDER - 30**

substances. The added safeguards included: on-site medical services, continual

monitoring of potential IV problems, a time delay between the administration of the

chemicals, inspection of the condition of the equipment, and a drug chain of custody. *Id*.

at *14-16.

Even with these checks, safeguards, and redundancies in place, Rhoades argued

that Idaho must choose a one-drug protocol – the injection of a single barbiturate – which

he argued would significantly reduce the risk of serious pain. *Rhoades I*, at *20.

Following *Baze*, Judge Bush rejected that claim, concluding that Idaho was free to choose

its method of execution as long as the method did not create a substantial risk of serious

harm. *Id*. at 20-21.

After carefully reviewing all of the evidence, Judge Bush found no substantial

likelihood of success on the merits of the Eighth Amendment claim. *Rhoades I*, at *4. On

appeal, the Ninth Circuit affirmed and concluded that the 2011 Protocol "is not only

substantially similar to the Kentucky protocol as described in *Baze*, but includes more

safeguards than the Kentucky protocol." 671 F.3d at 861-62. The Ninth Circuit turned

aside Rhoades's claim that IDOC officials would make errors in implementation that

created a substantial risk that he would suffer pain. *Id*. at 863. It also agreed with the

Judge Bush's opinion that Idaho was not required to choose a single drug protocol. *Id*. at

862-63.

In January of 2012, IDOC modified its execution procedures in certain respects.

(SOP 135; Complaint Exhibit 1, Dkt 1-7, pp. 4-53.) These amendments (1) eliminate the

**MEMORANDUM DECISION AND ORDER - 31**

distinction between the Medical Team and the Injection Team, which is now consolidated into one Medical Team, and each member of the Medical Team must have at least three years of "medical experience," (2) delegate administrative oversight to an Administrative Team, (3) do not limit use of a central line catheter to a femoral vein, (4) authorize the Medical Team leader to use a local anesthetic to numb the IV site, and (5) expand the method of execution options to include a one-drug protocol, using either sodium thiopental or pentobarbital, at the discretion of the Director. (*Id.*; May 30, 2012, Redacted Affidavit of Jeff Zmuda ("2012 Zmuda Aff."), Dkt. 22-1, ¶¶ 12-17.) *All other material components from 2011 Protocol remain in place.*

As previously noted, the IDOC has notified Leavitt that it would elect to use on an injection of pentobarbital for his execution and that it will not exercise its discretion to depart from the 2012 Protocol. (Dkt. 18.) Accordingly, the method of execution that will apply to Leavitt is a one-drug, pentobarbital lethal injection, to be administered in accordance with all other requirements in IDOC's 2012 Standard Operating Procedure 135.

### D. Leavitt has not Shown a Substantial Risk of Serious Harm From the One-Drug Protocol

Leavitt's arguments in his Complaint and Motion for Preliminary Injunction about the risk of harm from implementation of the 2012 Protocol have either already been answered in *Rhoades*, are resolved by the supplemental evidentiary record setting out the events that have occurred since the Rhoades execution, or are now inapposite because of

**MEMORANDUM DECISION AND ORDER - 32**

the IDOC's decision to use a single drug during his execution.

Leavitt first alleges that the 2012 Protocol does not require members of the Medical Team to have experience in their daily professional practice – or any training, practice, or knowledge – in starting and maintaining IVs. (Dkt. 1, p. 15.) He contends that this lack of relevant  experience increases the risk to him that the critical initial step of setting an IV will go awry. (*Id.*) Even under the use of a single injection of pentobarbital through an IV catheter, according to Leavitt, there is a risk that an improperly set IV could cause "infiltration" of the chemical into surrounding tissue, resulting in a severe burning sensation. (Dkt. 28, p. 5; Exhibit 1, p. 5; Dkt. 30, June 3, 2012, Affidavit of David B. Waisel, M.D.)

The 2012 Protocol requires Medical Team members to have "three (3) years of medical experience as an EMT, LPN, military corpsman, paramedic, phlebotomist, physician assistant, physician, RN or other medically trained personnel including those trained in the United States Military." (SOP 135, p. 9; Dkt 1-7, p. 12.) This requirement for three years of experience is superior to 2011 Protocol, which had no requirement that Medical Team members have any set number of years of experience (only the Injection Team members were required to have one year of experience). *Rhoades I*, at *8. Even in that situation, however, Rhoades's similar lack-of-training-and-experience claim failed because Jeff Zmuda, the IDOC official in charge of implementing execution procedures, testified that the least experienced member of the Medical Team for Rhoades's execution actually had fifteen years of relevant medical experience, and all members had current

**MEMORANDUM DECISION AND ORDER - 33**

professional practice and experience in the insertion of IVs on a regular basis. *See Rhoades II*, 671 F.3d at 860, n.1, n.2.

Zmuda has now submitted an updated affidavit, in which he asserts that "the Medical Team members selected for the June 12, 2012, execution are the exact same Medical Team and Injection Team members that the IDOC used in the execution in November 2011," and that they "will serve in the same exact roles as they performed in the November 2011 execution." (2012 Zmuda Aff., ¶ 21.) The Medical Team Leader is a registered nurse, with the most clinical and administrative experience of any Medical Team member, and has worked, or currently works, in an emergency room and an intensive care unit. (*Id*. at ¶ 26.). All members of the "Medical Team are certified in CPR, have venous access currency, which means they [have] current professional practice in the insertion of IVs on a regular basis." (*Id*. at ¶ 30.) Contrary to Leavitt's contention that there is no showing that the Medical Team members are experienced in setting and delivering drugs through an IV, Zmuda testifies that "all team members have experience in Pharmco Dynamic Currency, which means the team members understand medical orders, can read and understand medical labels, draw medications and deliver medications through either an injection or IV." (*Id*.) Leavitt has come forward with no evidence, only speculation, that would call any of these claims into question.

Consequently, the 2012 Protocol, supplemented with Zmuda's Affidavit, contains the necessary assurances that the Medical Team members for Leavitt's execution will have regular experience establishing IV catheters. Because Leavitt's challenge to the

**MEMORANDUM DECISION AND ORDER - 34**

experience of the Medical Team falls short, his claim that "redundant measures do not constitute safeguards against several pain because they are performed by the same inadequately credentialed and trained personnel" necessarily fails as well.[7] (Dkt. 1, p. 22.)

As Rhoades did, Leavitt next contends that on-site training is inadequate. (Dkt. 1, p. 20.) The 2012 Protocol – like the 2011 Protocol – requires ten practice sessions a year, weekly practice sessions once a death warrant is issued, and two rehearsals in the 48 hours before the execution. (SOP 135, p. 10; Dkt. 1-7, p. 13.) Training and rehearsals must include the placing of IV catheters and establishing an IV drip in a minimum of two live volunteers before each execution. (*Id*.) In addition, all members of the Medical Team must participate in a minimum of four training sessions before participating in an execution. (*Id*.) Between 30 and 21 days before the execution, the Administrative Team must "ensure that the Escort Team, Medical Team, and command staff are conducting training in preparation for the execution. (SOP 135, p. 23; Dkt. 1-7, p. 26.)

In his updated Affidavit, Zmuda indicates that same Medical Team that is assigned to the Leavitt execution was "involved in approximately 10 training and rehearsal sessions prior to the execution in November 2011 and the actual execution in November

---

[7] Leavitt also argues that the 2012 Protocol allows for a central line catheter in a femoral vein if peripheral access cannot be achieved, which could be accomplished through an invasive "cut-down" surgical procedure that none of the Medical Team members are qualified to conduct. Although a physician will be on-site to render emergency aid, if needed, he will not participate in the execution. In any event, Zmuda asserts that the 2012 Protocol "does not provide for a 'cut-down' procedure requiring an incision" and that the Medical Team member who would insert the central line has training to complete that procedure. (2012 Zmuda Aff., ¶ 36.) The Court will hold IDOC, as binding, to its interpretation of its own Protocol that a cut-down procedure is not authorized by the Protocol and that it will not occur on Leavitt.

**MEMORANDUM DECISION AND ORDER - 35**

2011." (2012 Zmuda Aff., ¶ 32.) He also states that the "Medical Team and command staff have engaged in annual trainings since February 2012 " and, after the death warrant was served on Leavitt, "training has been conducted weekly" using the one-drug protocol. (*Id.* at ¶ 31.) By the date of his Affidavit, Zmuda notes that "there have been eight training sessions involving live sticks." (*Id.* at 33.) The training and practice requirements in the 2012 Protocol, together with the evidence from Zmuda as to the extent of the training that has and will continue to occur before Leavitt's execution, are sufficient to guard against a substantial risk of error.

Leavitt challenges the consciousness checks as not sufficiently meaningful. (Dkt. 1, p. 22.) This argument is now moot in light of the fact that IDOC has chosen to use an overdose of a single barbiturate. The 2012 Protocol does not call for a consciousness check under this method because the final two pain-causing chemicals will not be administered. (SOP 135, p. 10; Dkt. 1-7, p. 48.)

In *Rhoades*, the plaintiff claimed that even if the written protocol contained sufficient safeguards to comply with *Baze* and the Eighth Amendment on its face, there still existed a substantial risk that IDOC would make errors in the implementation of the protocol that would expose him to serious pain. *Rhoades I*, at *16. This type of "as-applied" claim is available, but a prisoner making it "faces an uphill battle" when a written protocol is facially constitutional. *Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir. 2011). To make such a claim, the possibility of error must be substantial. The Ninth Circuit has previously noted that an assessment of the likelihood of harm should not

**MEMORANDUM DECISION AND ORDER - 36**

include any pain and suffering that is attributable to the remote possibility of human error, accident, or negligence. *See Campbell v. Wood*, 18 F.3d 662, 687 (9th Cir. 1994) ("The risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review.").

In finding no merit to Rhoades's argument, Judge Bush determined that anecdotal information about mistakes or mishaps in other jurisdictions using a three-drug protocol under unknown conditions was not particularly probative of how Idaho officials would implement their own protocol. *Rhoades I*, at *17. Leavitt reasserts these same arguments, but Judge Bush's observation, backed up by the Ninth Circuit, see *Rhoades II*, F.3d at 862, is still true today.

While Judge Bush expressed his concern that IDOC had delayed enacting execution procedures and "was playing catch-up" in the Fall of 2011, he was persuaded that it had "since made up for much of the lost time" by assembling a proficient team and engaging in numerous practice sessions. *Id.* at *19. In reaching his conclusion, Judge Bush was convinced that Zmuda was "a credible witness who has been acting in good faith to minimize the potential risk of error," and that Zmuda "appears to the Court to be carrying out his responsibilities with a full understanding of the gravity of his duties." *Id.* at *17.

Leavitt has come forward with no evidence that gives this Court pause or a reason to second-guess Judge Bush's assessment. Zmuda asserts that IDOC did not deviate materially from the protocol in Rhoades's execution, and there is nothing before the Court

**MEMORANDUM DECISION AND ORDER - 37**

to suggest otherwise. (2012 Zmuda Aff., ¶ 10.) The Medical Team now has the experience of one execution that proceeded without a reported serious incident, and it has been training since at least February 2012 for Leavitt's execution. Even though the Medical Team now will be using the one-drug method rather than the three-drug method, Leavitt provides no facts showing that implementation of the protocol will be substantially different from, or carry substantially more risk than, the manner in which the Rhoades execution was carried out.[8] Leavitt has the burden to show that he is entitled to preliminary injunctive relief, and he has not come forward with any credible or persuasive evidence that IDOC has engaged in practices that inject serious uncertainty and risk into the process.

While Leavitt complains of the IDOC's habit of providing an affidavit close to the execution date that sets forth additional details about the particular upcoming execution to show how the published protocol will be implemented (as in the Rhoades execution), rather than including all of that information in the protocol itself, the Court concludes that Leavitt's criticism does not aid his endeavor to show that there is a substantial risk of severe pain inherent in the manner in which his execution is planned. In affirming Judge

---

[8] Among Leavitt's allegations supporting his assertion that his execution should be carried out by a one-drug protocol – which the State has now agreed to use – include the following: (1) "There is scientific consensus that rapid IV delivery of a large dose of thiopental or pentobarbital will cause death in a short amount of time"; (2) "A one-drug protocol using pentobarbital (or thiopental) is a known alternative that has been used in 14 executions since 2008 in Ohio and Washington"; (3) "Of those 14 one-drug executions, 11 used thiopental and 3 used pentobarbital"; (4) "A one-drug protocol completely eliminates the substantial risk of severe pain that arises in three-drug executions"; (5) "There are no reports of one-drug protocol executions apparently creating severe pain for the offender." (*Id.*, Dkt. 1, p. 30.)

**MEMORANDUM DECISION AND ORDER - 38**

Bush's denial of a preliminary injunction in Rhoades, the Ninth Circuit observed that Zmuda's "testimony is relevant to show the actual protocol that will be implemented, which in turn bears on the likelihood that Rhodes will suffer severe pain." *Rhoades II,* 671 F.3d at 860.

Leavitt tries to apply the criticisms levied by the Ninth Circuit about the manner in which the Arizona Department of Corrections (ADC) frequently deviates from its published execution protocol at the last minute, *see Lopez v. Brewer*, 2012 WL 1693926 (9th Cir. May 15, 2012) to the IDOC's provision of implementation details by affidavit. However, the analogy is not a good fit, because, here, the IDOC is giving some advance notice of how it will be *implementing* its protocol, so that inmates under a death warrant can challenge the planned implementation in court, rather than the ADC *deviating* from its protocol on the basis of its discretion to do so. Here, in contrast, IDOC has assured Leavitt and this Court that it will not exercise that discretion as to his execution, and the IDOC is bound by that representation. *See Towery v. Brewer*, 672 F.3d 650, 658 (9th Cir. 2012). It is important to note, that, even though the ADC's last-minute changes were frowned upon, a majority of a panel of the Ninth Circuit nevertheless affirmed the denial of preliminary injunctive relief in *Lopez*, because Lopez did not demonstrate that the ADC Director "exercised his discretion in a manner that increases a prisoner's risk of being subject to an objectively intolerable risk of pain . . . or in a constitutionally prohibited manner." *Lopez*, 2012 WL 1693926 at *6.

The Court therefore concludes that Leavitt has failed to carry his burden to show a

**MEMORANDUM DECISION AND ORDER - 39**

serious question going to the merits, or a likelihood of success on the merits, as to his claim that the 2012 Protocol lacks constitutionally adequate safeguards. The Protocol is sufficient on its face to ensure meaningful protection from a serious risk of harm, the Medical Team that has been assigned is capable and experienced, and the uncontroverted evidence before the Court shows that the IDOC has followed the protocol and does not intend to depart from it in a material way. IDOC's switch to a single barbiturate also addresses many of the concerns that Rhoades expressed in the previous litigation and should allay the same concerns that Leavitt expresses here. Even if something were to go wrong during the execution process, the risk of pain to him is minimized because the most severe pain-causing agents will not be used.

Accordingly, Leavitt has not demonstrated that, if he were given more time to litigate Claim 2, he would be able to establish that the implementation of the 2012 Protocol, which the State is bound to implement according to its May 25, 2012 Notice (Dkt. 18), exposes him to a substantial risk of serious harm.

### 3.    Leavitt has Failed to Show a Substantial Likelihood of Success on Claim 3

Leavitt's third claim is that there is a substantial risk of serious harm if the IDOC uses adulterated or illegally-obtained drugs in the execution. (Dkt.1, p. 26). He argues that there is a "reasonable inference," drawn from email correspondence between Defendant Blades and a manufacturer of pentobarbital in India, that there was no source for the manufactured drug in the United States. (Dkt. 19, p. 5). Leavitt also asserts there is a reasonable inference that pentobarbital manufactured in India falls below the quality

**MEMORANDUM DECISION AND ORDER - 40**

control and purity standards of a drug that is manufactured in the United States. (*Id*.)

Leavitt's counsel requested that IDOC counsel provide Leavitt with information relating

to whether the pentobarbital to be used in any June execution was manufactured by the

sole U.S. manufacturer, whether it was obtained directly from a U.S. distributor before

July 1, 2011, and whether the drug will expire before the date of the execution. (*Id*., at 6).

IDOC counsel refused to provide Leavitt with the information, and, here, questions

whether Leavitt's counsel should have revealed to the court  discussions between counsel

in pursuit of settlement of these issues, calling into question a violation of Rule of

Evidence 408. (Dkt. 20, p. 6, n.1.)

Nevertheless, Leavitt relies on the email correspondence, the possible lower

quality and purity standards of drugs manufactured outside the country, the potential that

an expired drug may be used, and IDOC counsel's failure to adequately address Leavitt's

inquiries as support for Claim 3. Leavitt argues that these bases are to enough to show

that it is plausible that IDOC may use an expired, poor-quality drug from a foreign source

in the execution, creating a substantial risk that Leavitt may suffer severe pain while

being executed. (Dkt.19, p. 6).

However, in this preliminary injunction context in which he bears the burden of

proof, Leavitt has not brought forward sufficient facts to show that, even if an expired,

foreign-manufactured dosage of pentobarbital is used, he is at substantial risk of suffering

severe pain during execution. Likewise, he has produced no facts showing that a foreign-

manufactured dosage of pentobarbital would be of such poor quality that it would amount

**MEMORANDUM DECISION AND ORDER - 41**

to a substantial risk of suffering severe pain during execution.

Other similar claims have failed when presented in lethal injection challenges. In *Cook v. Brewer*, the Ninth Circuit determined that a complaint cannot merely speculate and make general claims about every drug produced outside of the country. 637 F.3d 1002, 1006 (9th Cir. 2011). In his appeal from the court's granting of Defendant's motion to dismiss, Cook argued that using a foreign manufactured drug that was not approved by the FDA created a "substantial and unnecessary risk of unconstitutional pain." *Id*. at 1003. His support for this claim included allegations that the drug was obtained in violation of federal law, that a foreign-manufactured drug may not be effective and could be contaminated or compromised, and that drugs from foreign countries do not have the same quality and safety assurance as those regulated by the FDA. *Id*.

In its holding, the Ninth Circuit stated that "plaintiffs must make specific allegations about the manufacturing process, formulation, potency, quality, or labeling of the drug at issue" in the particular case. *Id*. Because Cook's claims were merely speculations about the possibilities of unsafe foreign-manufactured drugs, and not factual claims about the specific drug being used for his own execution, the court found that he did not have enough to survive the motion to dismiss. *Id*. at 1008. Because these general claims fell short of the motion to dismiss standard, speculation certainly must fall short of a higher preliminary injunction standard.

Likewise, in *Brewer v. Landrigan*, the Supreme Court held that a court cannot be left to speculate whether the drug will cause severe pain and suffering. 131 S.Ct. 445

**MEMORANDUM DECISION AND ORDER - 42**

(2010). Before reaching the Supreme Court, Brewer's Motion for a Temporary Restraining Order was granted by the United States District Court for the District of Arizona. *Landrigan v. Brewer*, 2010 WL 4269559, No. CV-10-02246-PHX-ROS (D. Ariz. 2010), *vacated*, 131 S.Ct. 445. The district court found that the plaintiff was likely to succeed on the merits, partly because the defendants failed to provide important information about the origins and efficacy of the drug. *Id*. at *9-10. Without the information, the court was "unable to determine whether the drug was produced by a foreign company that follows standard operating procedures for the drug's manufacture or that has no history of contamination in manufacturing the product." *Id*. Consequently, the court accepted the plaintiff's showing that "such drugs are likely to contain harmful contaminants," and therefore found the plaintiff was likely to succeed in showing there was a substantial risk in administering the drug. *Id*. The Ninth Circuit affirmed in *Landrigan v. Brewer*, 625 F.3d 1144 (9th Cir. 2010).

However, the United States Supreme Court reversed, vacating the district court's decision, because it found that "speculation cannot substitute for evidence that the drug is sure or very likely to cause serious illness and needless suffering." *Brewer*, 131 S.Ct. at 445 (internal quotations marks omitted). Absent a showing that a drug is illegally obtained or proof to support such a claim, the claim will not be likely to succeed on the merits. *Id*. The Court emphasized that district courts cannot be left to make determinations based on speculation and conclusory allegations that are unsupported by facts specific to the drug being used in the execution at issue in each case.

**MEMORANDUM DECISION AND ORDER - 43**

Here, the Court has before it mere speculation, preventing a stay of the execution. In his complaint, Leavitt contends that a reasonable inference can be drawn that there is no source for the manufactured sodium thiopental in the United States, and, in his Opposition to Motion to Dismiss, he makes the same claim about pentobarbital. Leavitt makes no specific claims as to each drug; he merely states the same general claims as to both. Like the plaintiff in *Cook*, Leavitt asserts that these foreign-manufactured drugs fall below the quality control and purity standards of those manufactured in the United States. Cook's allegations that the foreign-manufactured drug for his execution may not be effective because foreign countries do not have the same quality and safety assurances as those manufactured in the U.S. failed to meet the plausibility standard to survive the defendant's motion to dismiss. Leavitt makes the same general claims with no additional support to show the pentobarbital to be used for his execution is ineffective, contaminated, or compromised, thus posing a risk of substantial harm. Because no further allegations were made as to the specific drug, Leavitt's allegations parallel those of Cook, and therefore fall short of a plausibility.

Leavitt makes further claims that he did not have the needed information to make specific claims because IDOC counsel failed to provide such. Like the defendants in *Landrigan* who failed to provide information about the origins and efficacy of the drug, defense counsel in this case declined to give information relating to the origin of the drug, which manufacturer it was obtained from, and the expiration date of the drug to be used for the execution. While the district court in *Landrigan* considered this a reason to find

**MEMORANDUM DECISION AND ORDER - 44**

the plaintiff was likely to succeed on the merits, the Supreme Court held that, regardless of the withheld information, the court could not speculate about whether the drug would cause pain and suffering. Just as the Supreme Court in *Landrigan* required specific evidence to support the plaintiff's claims, this Court must also do so.

While Leavitt does not have the specific information he desires at this early stage of the litigation, he did not provide scientific research, medical studies, expert opinions, or other factual information to support his claims. Thus, the Court is left to speculate, based on general claims and conclusory allegations. Another element of his claim that is missing is any fact showing a causal link between a foreign-manufactured or expired drug and any serious harm that might result in the course of the execution. Thus, Leavitt cannot show that the drug is sure or very likely to cause serious illness and needless suffering or that he is likely to succeed on the merits of this claim.

**4.     Leavitt has Failed to Show a Substantial Likelihood of Success on Claim 7**

Leavitt's seventh claim is that pentobarbital is classified as a Schedule II controlled substance under 21 Code of Federal Regulations § 1308.12(e)(3), and that Defendants have or will violate the Controlled Substances Act (CSA), 21 U.S.C. § 801, et seq., and the Food Drug and Cosmetics Act (FDCA), 21 U.S.C. § 301, et seq., because no appropriately-licensed medical practitioner will obtain or administer the pentobarbital used to execute Leavitt. (Dkt. 1, pp. 32-37.) Leavitt seeks "equitable relief in the form of a declaratory judgment clarifying that the safeguards contained in the CSA and FDCA apply to his execution by lethal injection," as well as a "declaratory judgment that if

**MEMORANDUM DECISION AND ORDER - 45**

Defendants act in compliance with the 2012 Protocol and Idaho Code § 19-2716, they will violate the CSA and FDCA because the means the protocol prescribes for Defendants to obtain and administer the lethal injection chemicals violate those statutes." (Dkt. 1, p. 34.)

While Claim 7 raises interesting issues addressable in the regular course of a litigation, the focus today is whether Leavitt is entitled to a stay of his execution under the planned one-drug method, involving pentobarbital (Dkt. 18, 24), so that he can more fully litigate these claims at a later date. The gateway to addressing these interesting issues at a later date is a showing a likelihood of success on the merits. The Court has identified three distinct issues preventing a finding that Leavitt has a likelihood of success on the merits of his claim: (1) lack of standing to bring such a claim; (2) failure to show that declaratory relief is available; and (3) failure to show that a declaratory relief action would result in actual relief rather than result in an advisory opinion.

### A.   Standing

Leavitt has not shown that he has standing to bring a claim under the CSA and FDCA. The CSA is a comprehensive regulatory framework governing the manufacture, importation, distribution and use of controlled substances. 21 U.S.C. § 812. It includes penalties for violations of its provisions and authorizes the United States Attorney General to initiate a civil action "for appropriate declaratory or injunctive relief." 21 U.S.C. § 842(f)(1). Similarly, the FDCA provides the Food and Drug Administration with the authority to ensure the safety of products within the scope of the act, including drug

**MEMORANDUM DECISION AND ORDER - 46**

products. 21 U.S.C. § 355(a). The FDCA provides that all "proceedings for the
enforcement or to restrain violations of this chapter shall be by and in the name of the
United States"; in addition, a State may bring a proceeding in its own name. 21 U.S.C.
§ 337(a),(b).

Courts that have addressed similar claims brought by death-sentenced prisoners
seeking declaratory relief under the CSA and FDCA appear to have uniformly concluded
that these Acts do not provide for a private right of enforcement by the prisoner. *See, e.g.,
Jones v. Hobbs*, 2010 WL 2985502, at *4-5 (E.D. Ark. 2010); *Bowling v. Haas*, 2010 WL
3825467, at *4-5 (E.D. Ky. 2010); *see also Durr v. Strickland*, 2010 WL 1610592, at *3
(S.D. Ohio 2010) (finding no private right of action and no cognizable injury to the
plaintiffs by alleged violations of the CSA and FDCA); *Ringo v. Lombardi*, 2011 WL
3584476 (W.D. Mo. 2011) (finding an absence of an injury in fact to confer standing to
go forward with challenges under the CSA and FDCA).

Illustrative of these holdings is *Jones v. Hobbs*, 745 F.Supp.2d 886 (E.D. Ark.
2010), in which the District Court for the Eastern District of Arkansas rejected a
prisoner's claims identical to those brought here. After analyzing several cases, it
concluded:

> [t]o entertain, under the auspices of the Declaratory Judgment Act,
> a cause of action brought by private parties seeking a declaration
> that the FDCA or the CSA has been violated would, in effect, evade
> the intent of Congress not to create private rights of action under
> those statutes and would circumvent the discretion entrusted to the
> executive branch in deciding how and when to enforce those
> statutes.

**MEMORANDUM DECISION AND ORDER - 47**

*Jones*, 745 F.Supp.2d at 893 (citations omitted). This Court agrees with the *Jones* Court that the executive branch has the exclusive authority to enforce violations of the CSA or the FDCA and that death-sentenced prisoners such as Leavitt have no private cause of action to enforce these Acts.

### B.    Availability of Declaratory Relief

Leavitt has not persuaded the Court that, in the absence of a private cause of action in the CSA and FDCA, he can bring a cause of action for declaratory relief based on these statutes. The majority of courts have rejected the argument that, notwithstanding the failure of Congress to create a private remedy via these statutes, a plaintiff can still bring a claim for declaratory relief regarding the statutes. In *Jones v. Hobbs*, the district court reasoned:

> [The plaintiffs] seek to bypass the congressionally mandated enforcement schemes for the FDCA and the CSA; in effect, they seek private enforcement of those statutes by means of a declaratory judgment. Congress committed complete discretion to the executive branch to decide when and how to enforce those statutes and authorized no private right of action for the enforcement of those statutes. The Declaratory Judgment Act does not authorize a bypass of that enforcement scheme.

745 F.Supp. 2d at 893-94.

Likewise, in *Durr v. Strickland*, the district court found unpersuasive the argument that a complaint for a declaratory relief is not the same as a private action "to enforce" the CSA or FDCA to be a "semantic slight of hand." 2010 WL 1610592, at *3. The United States Court of Appeals for the Sixth Circuit agreed that there was no private cause of

**MEMORANDUM DECISION AND ORDER - 48**

action under either statute and that declaratory relief was not a proper mechanism for seeking injunctive relief from execution. *Durr v. Strickland*, 602 F.3d 788, 789 (6th Cir. 2010).

The courts are not free to fashion judicial remedies arising from statutes where Congress has declined to include such remedies in the statutes. Congress is well-aware of how to draft statutes that include a private cause of action; it chose not to do so in the CSA and FDCA. Thus, the Court rejects the reasoning of *Ringo v. Lombardi*, 706 F.Supp. 2d 952 (W.D. Mo. 2010), where the court found that plaintiffs facing death by lethal injection may bring an action pursuant to the Declaratory Judgment Act seeking a declaration that the state's lethal injection protocol violates the FDCA and the CSA even though those statutes create no private cause of action.

### C.    Nature of Declaratory Relief

Plaintiff has failed to show that declaratory relief would be appropriate under the circumstances of his case. "A declaratory judgment, like other forms of equitable relief, should be granted only as a matter of judicial discretion, exercised in the public interest." *Eccles v. Peoples Bank of Lakewood Village*, 333 U.S. 426, 431 (1948). "Declaratory relief should be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties." *United States v. Washington*, 759 F.2d 1353, 1357 (9th Cir. 1985).

In *Brown v. Vail*, 237 P.3d 263 (Wash. 2010), the Washington Supreme Court

declined to issue a declaratory judgment based on the alleged violations of federal statutes regulating controlled substances, finding that, because a declaratory judgment has no direct, coercive effect," the plaintiffs did not establish that any declaratory judgment "would produce a final and conclusive determination," calling into question whether a justiciable controversy existed. *Id*. at 333-34. Rather, because "the decision to enforce provisions of a controlled substances act is left to the discretion of the agencies overseeing the statute, the court observed: "Such a judgment would look very much like an advisory opinion," which should issue only in rare circumstances. *Id*. at 334.[9]

Accordingly, because Leavitt has not shown that he has a likelihood of prevailing on the merits of Claim 7, it is not appropriate to stay the execution under the current protocol in favor of a prolonged litigation to determine whether a declaratory judgment should issue that would not be binding on the state prison officials who carry out the executions.

## 5.     Leavitt Has Not Shown Irreparable Harm

Because Plaintiff's sentence of death is not at issue, to show that irreparable harm

---

[9] *See also Heckler v. Chaney*, 470 U.S. 821 (1985), where the FDA Commissioner stated that the FDA would decline to pursue a statutory cause of action against the states for use of drugs in lethal injection executions:

> Generally, enforcement proceedings in this area are initiated only when there is a serious danger to the public health or a blatant scheme to defraud. We cannot conclude that those dangers are present under State lethal injection law[s], which are duly authorized statutory enactments in furtherance of proper State functions. . . ."

*Id*. at 824-25.

**MEMORANDUM DECISION AND ORDER - 50**

would occur if a preliminary injunction is not granted, Plaintiff must demonstrate that there is a substantial risk that he will suffer serious pain during his execution (Claims 2 and 3), or that he has meritorious claims under the CSA and the FDCA that would result in requiring the IDOC to use a different method of execution than the one-drug protocol, using the particular pentobarbital supply the IDOC has on hand and plans to use in the June 12, 2012 execution (Claim 7). Therefore, a stay of execution is not warranted.

**6.     Leavitt Has Not Shown the Balance of the Equities Tips in His Favor or There is a Public Interest in Granting the Preliminary Injunction**

Finally, while Plaintiff undoubtedly has a strong interest in being executed in a constitutional manner, *see Beaty v. Brewer*, 649 F.3d 1071, 1072 (9th Cir. 2011), the Court does not find a significant risk that his upcoming execution will violate the Constitution or other federal law. On the other side of the balance, Idaho has a compelling interest in enforcing its lawful judgment for the murder of Danielle Elg, which has now been pending for over two decades. The United States Supreme Court has sent a clear, concise message that, absent actual evidence showing something more than speculative harm, the law does not permit a federal district court to enjoin a scheduled state execution. *See Brewer v. Landrigan*, 131 S.Ct. 445 (2010).

The Court concludes that the equities favor Defendants in this matter and that a stay would not be in the public interest.

**7.     An Evidentiary Hearing is Unnecessary**

The purpose of a preliminary injunction is to preserve the status quo if the balance

of equities so heavily favors the moving party that justice requires the court to intervene

to secure the positions until the merits of the action are ultimately determined. *University

of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A court "is not obligated to hold a

hearing [on a motion for a preliminary injunction] when the movant has not presented a

colorable factual basis to support the claim on the merits or the contention of irreparable

harm." *Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172, 1176 (3rd Cir. 1990).

A colorable factual basis is found where the movant's "allegations, if proved, would

establish the right to relief." *Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002).

In *Lopez v. Brewer*, the district court considered all the evidence that was

presented in the record and denied a request for preliminary injunction without holding an

evidentiary hearing. No. 12-16084, 2012WL 1693926, at *1 (9th Cir. May 15, 2012). The

Ninth Circuit affirmed the district court's decision to not hold an evidentiary hearing

because "an evidentiary hearing was not required or warranted," and any new evidence

obtained by the plaintiff would not alter its decision in affirming the denial of Lopez's

motion for a preliminary injunction. *Id*. at *8. Lopez did not present a substantial

likelihood of success on the merits of his claim, and therefore was not entitled to

injunctive relief, or an evidentiary hearing. *Id*. at *2.

Without a showing of a substantial likelihood of success on the merits, the motion

cannot proceed and a hearing is not required. The district court in *Cook v. Brewer*

proceeded without a hearing because the plaintiff asserted "only in a conclusory fashion

that there is a significant risk [foreign-manufactured] drugs were not produced in an

**MEMORANDUM DECISION AND ORDER - 52**

environment requiring them to be effective," and this was "insufficient to unlock the doors of discovery." 2011 WL 251470, at *3 (D. Ariz. Jan. 26, 2011) *aff'd*, 637 F.3d 1002 (9th Cir. 2011). The Ninth Circuit agreed with the district court's decision, stating that Cook's allegations offer no factual support for his assertions contained therein. *Cook v. Brewer*, 637 F.3d 1002, 1007 n.3 (9th Cir. 2011). Because there was no factual basis to support the claim, there was no obligation to hold a hearing.

Here, Leavitt offers no more than Lopez or Cook offered. Like Cook, Leavitt offers only assertions in a conclusory fashion, which is insufficient to lead to discovery. As in *Lopez*, a hearing would be required here only if the plaintiff had alleged specific factual support that would show there was a substantial risk of serious pain in his execution. Because Leavitt offers no facts that, if proven, would show an entitlement to relief, an evidentiary hearing is not required.

**8.    Conclusion**

Plaintiff has not demonstrated that he is entitled to preliminary injunctive relief, and his Motion will be denied.

## ORDER

**IT IS ORDERED:**

1.      Defendants' Motion to Dismiss (Dkt. 10), based on failure to exhaust administrative remedies as to Plaintiff Richard Leavitt's claims, is GRANTED as to Leavitt. Plaintiff Richard Leavitt's claims are dismissed without prejudice.

2.      Plaintiff Richard Leavitt's Motion for a Preliminary Injunction (Dkt. 16), seeking a stay of execution, is DENIED.

3.      Plaintiff's Amended Motion to Exceed the Page Limits (Dkt. 17) is GRANTED.

4.      Defendants' Motion to Seal Affidavit of Jeff Zmuda in Support of Defendants' Response and Objection to Plaintiff Leavitt's Emergency Motion for Preliminary Injunction or Stay of Execution (Dkt. 23) is GRANTED. Docket No. 24 shall remain sealed. Plaintiff and his counsel shall be allowed to receive the Affidavit of Jeff Zmuda (Dkt. 24), but shall keep the Affidavit confidential and not disclose it or its contents to any third parties.

5.      Defendants' Motion to Exceed the Page Limits (Dkt. 23) is GRANTED.

6.      Plaintiffs' Motion to Temporarily Seal Plaintiff's Reply (Dkt. 27) is GRANTED. Docket No. 28 shall remain sealed.

7.      Defendants' Motion to Strike Plaintiff Leavitt's Expert Affidavit (Dkt. 32)

is DENIED.

DATED:  **June 4, 2012**

Honorable Edward J. Lodge
U. S. District Judge